# EXHIBIT 13

1  Olu K. Orange, Esq. (SBN 213653)
2  ORANGE LAW OFFICES, P.C.
   3435 Wilshire Blvd., Suite 2910
3  Los Angeles, California 90010
   T: (213) 736-9900 / F: (213) 417-8800
4  orangelawoffices@att.net

5  Shawna L. Parks, Esq. (SBN 208301)
6  LAW OFFICE OF SHAWNA L. PARKS
   4470 W. Sunset Blvd., Ste. 107-347
7  Los Angeles, CA 90027
   Phone/Fax: (323) 389-9239
8  sparks@parks-law-office.com

9  *(Additional Counsel Listed on Following Page)*

FILED
Superior Court of California
County of Los Angeles

AUG 02 2018

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Shamya Bolden

10            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                    **COUNTY OF LOS ANGELES**

12

13  S.G., a minor, by and through her          Case No.: BS174498
    guardian *ad litem*, Brittany Dorn;
14  A.D.G., and R.L., minors, by and
    through their guardian *ad litem*, Derek   **FIRST AMENDED VERIFIED**
15  Spencer; N.B., a minor, by and             **PETITION FOR WRIT OF**
    through his guardian *ad litem*, Araceli   **MANDAMUS AND COMPLAINT**
16  Boyce; A.G., a minor, by and through       **FOR DECLARATORY AND**
17  his guardian *ad litem*, Karla Garcia;     **INJUNCTIVE RELIEF**
    CHRISTAL LORD; and DYANNA
18  SANABRIA,                                  [Code Civ. Pro. §§ 526, 527, 1060, 1085,
19       *Petitioners and Plaintiffs,*         1094.5 Pub. Res. Code §§ 21168, 21168.5;
20                                             14 CCR §15001, *et seq*]
         vs.
21                                             *Hon. Yvette M. Palazuelos*
    CITY OF LOS ANGELES; LOS
22  ANGELES CITY COUNCIL; and
23  DOES 1 THROUGH 10, inclusive,              Dept: 28
         *Respondents and Defendants.*         Next Date: Aug. 14, 2018 *(Trial Setting
24                                             Conf.)*
25  HIRO KOBAYASHI, 3568 MOTOR
26  LLC, AND ROES 1 THROUGH 10,
    inclusive,
27       *Real Parties In Interest.*

28

                                    - 1 -

Verified Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief

1   *Additional Counsel for Petitioners/Plaintiffs:*

2   Janeen Steel (211401)
3   Patricia A. Van Dyke (160033)
    LEARNING RIGHTS LAW CENTER
4   205 S. Broadway, Suite 808
5   Los Angeles, CA 90012
    213-489-4030
6   patsy@learningrights.org

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 1-

## I. INTRODUCTION

1. This petition addresses the fraudulent and deceptive attempt by Respondents to manipulate the regulatory and judicial system to avoid trial in an on-going CEQA[1] appeal pending before the Honorable Yvette Palazuelos—*S.G. et al. v. City of Los Angeles et al., Case No.* BS171903 *(filed December 13, 2017) ("Original Writ")*—based upon the same project at issue in this petition. In their attempt to avoid that trial, and to avoid conducting a full environmental review and health assessment of the project, Respondents acted in concert with each other, and with the Los Angeles Unified School District ("LAUSD" or "District") to withhold and conceal material information regarding the known environmental impacts of the project from the public in general, and more specifically, from the students, teachers and families of Palms Elementary School ("Petitioners") in order to derail the scheduled trial in the Original Writ.

2. The project is for the demolition of an existing one-story, three-unit, 6,768 square-foot commercial building located at 3568 Motor Avenue, and the construction, operation, and maintenance of a new six-story, 42-unit, mixed-use development containing 38 market rate units, 4 low income units, and 1,770 square feet of ground-floor retail ("3568 Motor Project" or "Project"). The Project proposes five residential levels over one level of at-grade parking and commercial uses, and one level of subterranean parking, with a total of 54 parking spaces. *See Exhibit 1.*

---

[1] California Environmental Quality Act, California Public Resources Code §21000 et seq. ("CEQA").

Verified Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief

3. The Project site is directly adjacent to Palms Elementary School, and the construction zone is on the fence-line of the kindergarten playground. *See Exhibit 2.*

4. Per the City and Developer's own documentation, the project will send toxic dust, vapors, PM2.5 and PM10 particles, volatile organic compounds, reactive organic gases, NOx gas, and other poisonous contaminants into the air covering the children's playground and the school. Additionally, many of the children at Palms Elementary School are in the Deaf and Hard of Hearing ("DHH") program and wear sound amplifying listening devices to accommodate their disabilities. The construction noise from the project will cause them pain and prevent them from learning. *See Exhibit 3.*

5. Nevertheless, through meetings with politicians from which parents were specifically excluded, the City and developer have pushed the Project through the approval process—no Environmental Impact Report ("EIR"), no Health Risk Analysis, and no protective measures have been undertaken to ensure the safety of the 350+ children and their teachers. This writ is brought in response to the City's and Developer's deceptive, non-noticed, last-minute approval of a new exemption for the Project in an attempt to avoid the Original Writ's challenge to their previously granted categorical exemptions—all of which were granted to avoid necessary testing and analysis to protect the safety of 350+ Los Angeles schoolchildren and their teachers.

*After Losing Before this Court and the Court of Appeal on Discovery Regarding the Exhaustion Issue, City Changed the Basis for Its Exemption*

- 3 -

*Determination and Proceeded on Deceptive Bases*

*Before City Council*

6.  On September 1, 2017, the City Planning Department determined that the Project was exempt from CEQA based upon two categorical CEQA exemptions – Class 4 and Class 32, and issued a letter setting forth its findings ("the Bertoni Letter" or the "Director's Determination Letter. " *See Exhibit 3.*

7.  On December 13, 2017, Petitioners appealed the Director's Determination Letter. *See Exhibit 4.* Petitioners soon after filed the Original Writ on December 18, 2017.

8.  On April 17, 2018, Respondents filed a demurrer seeking to dismiss the Original Writ on the basis that Petitioners failed to exhaust their administrative remedies before seeking judicial review.

9.  Petitioners amended their complaint on April 25, 2018 to include allegations that the City Council failed to act on their appeal, thus making the Director's Determination Letter the final decision subject to review, and excusing Petitioners from having to further exhaust administrative remedies.

10. On May 9, 2018 Judge Palazuelos denied Respondent's motion to dismiss and granted Petitioners' leave to take discovery on the exhaustion issue. Petitioners basis for pursuit of discovery on the exhaustion issue was that if Respondent's delay in responding to the initial appeal was unreasonable, then Petitioners could be excused from having to exhaust further administrative remedies. *See Exhibit 5.*

11. On May 10, 2018, Petitioner's served a deposition notice pursuant to California Code of Civil Procedure Section 2025, seeking to depose the

-4-

1   person(s) most knowledgeable about the City's conduct of the appeal,
2   and its failure to act on a timely basis.

12. On May 11, 2018, the Los Angeles Unified School District ("LAUSD")
    sent a letter to City Councilmember Paul Koretz indicating that the
    Developer was willing to make an unrestricted $500,000 donation to
    LAUSD if the City would issue the permits for the Palms Project. *See Exhibit 6.*

13. On May 11, 2018, The City posted notice that the Planning, Land Use
    and Management Committee ("PLUM") would hear Petitioners' appeal
    of the Director's Determination Letter on May 22, 2018.

14. On May 14, 2018, the Director of City Planning ("DCP") recommended
    that the City approve the Project on entirely new grounds—the statutory
    exemption for sustainable communities pursuant to Public Resources
    Code Section 21155.1—in addition to the reasons set forth in the Bertoni
    Letter. This is the first time that the City ever raised the statutory
    "sustainable communities" exemption for this Project, which was not part
    of the Original Writ. *See Exhibit 7.*

15. On May 15, 2018, Respondents' filed a writ of mandamus with the
    California Court of Appeal, challenging this Court's order granting
    discovery on the exhaustion issue.

16. On May 17, 2018, the California Court of Appeal denied Respondents'
    writ of mandamus on the merits, finding that discovery was appropriate
    under the circumstances of this case. *See Exhibit 8.*

17. On May 18, 2018, the Developer submitted a letter to the PLUM
    committee detailing, for the first time, why the Project should be exempt
    from CEQA review under the "sustainable communities" exemption. *See Exhibit 9.*

-5-

18. On May 22, 2018, Petitioners hand-delivered a supplemental submission to City Council in the CEQA appeal, objecting to the City's last-minute request to exempt the Project pursuant to the Sustainable Communities Exemption. *See Exhibit 10.*

19. On May 22, 2018, the City posted an Amended Notice of Hearing for the Project, including, for the first time, information that the DCP found that Project was exempt pursuant to the statutory exemption for Sustainable Communities, and not just the categorical exemptions, as previously posted. *See Exhibit 11.*

20. On May 22, 2018, the PLUM committee held a hearing at which it considered Petitioner's appeal of the Director's Determination Letter as well as the new DCP report recommending that the project be exempted under the "sustainable communities" exemption. The PLUM committee adopted the new recommendation of the DCP and denied Petitioners' appeal, sending the matter to City Council for final determination by consent.

21. On June 5, 2018, the City Council adopted the PLUM committee's recommendation, denying the appeal, and finding the Project exempt pursuant to the Sustainable Communities exemption. City Council did not take testimony or public comment at the June 5th hearing. *See Exhibit 11.*

22. On June 14, 2018, Developer filed a new notice of exemption ("NOE") for the Project based, in part, on the upon the Sustainable Communities exemption. *See Exhibit 12.*

*Fraud and Deception from the Beginning of*
*the Application Process*

- 6 -

23. Based upon Wells Fargo Bank reports disclosed to the developer, the Project site was occupied by a dry-cleaning business from 1958 to at least 1985. The report noted, "... there is still an unresolved concern about possible dry-cleaning operation conducted by Palms Laundry and Cleaners. This is identified as a potential environmental concern ..." *See Exhibit 13.* Nevertheless, in the two applications the developer filed with the City for approval of the Project, Mr. Kobayashi intentionally declined to disclose this fact. Those applications required him to certify under penalty of perjury that the site of the project had not ever been developed with a use that "could" release hazardous materials. Despite knowing that the site had been used by a dry cleaners, Mr. Kobayashi intentionally stated under penalty of perjury that that the site of the project had not been "developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning ..."). *See Exhibit 14.*

24. Based on these misleading, incomplete and untruthful applications, the City Planning Department ("CPD") granted all exemptions and approvals for the Project.

## *Ongoing Deception Harming the Students and Teachers at Palms Elementary School*

25. During the several days prior to and including December 15, 2017, while children were in school and without notice to parents or teachers (and thus in violation of state law), the developer began dispersing toxic pesticides at the project site. *See Exhibit 15.*

26. Upon information and belief, on December 19, 2017, while children were in school, without notice and in contravention of the conditions imposed

- 7 -

by the Bertoni Letter, Developer commenced demolition without following safe practices and procedures for containing asbestos, lead dust and other toxic materials developer, the City and LAUSD knew to be on-site, thus exposing Petitioners to further harm. *See Exhibits 16 and 17.*

## *Developer and the City Concealed LAUSD's Warning*
## *That the Children Could Be Harmed*

27. On January 23, 2018, LAUSD wrote to the developer and expressed its opinion that the Project would have "significant environmental impacts on LAUSD's Palms ES (aesthetics, air quality, noise, traffic and pedestrian safety)." LAUSD's letter went on to recommend mitigative measures: "Since the project will have a significant impact on a LAUSD school, recommended measures designed to help reduce or eliminate those impact are included in this response." *See Exhibit 18.*

28. LAUSD specifically objected to the use of categorical exemptions under CEQA for the project because the exemption failed to consider that Palms ES is a "noise sensitive receptor." Indeed, LAUSD's objections to the Project closely mirror those raised by Petitioners here and in the Original Writ. Nevertheless, neither City, Developer nor LAUSD disclosed this material information to Petitioners or the public, despite the pending Original Writ.

29. In reliance on the Director's Determination Letter, Petitioners pursued their appeal of the Original Writ based upon the publicly available documents, which were incomplete and misleading in that they never disclosed the District's objections or known environmental impacts— including but not limited to the potential for exposure to asbestos and lead. *See Exhibit 19.*

- 8 -

*The City's and Developer's Agreement, Joint Actions, and*
*$500,000 Payment to Avoid an EIR*

30. Following the post-vote publication of notice of the new exemption, new documents have been made available to Petitioners that show City and Developer Defendants conspired to avoid doing an Environmental Impact Report ("EIR") despite being aware of the danger to students and employees of Palms Elementary School.

31. Although Respondents still contend that the Project is exempt from any environmental review, this recent discovery in the pending actions confirms that Developer, the City and LAUSD all knew that the Project would negatively impact the environment; that mitigation was required to protect the children attending Palms Elementary and the staff who work there; and that further testing was necessary.

32. Indeed, on December 5, 2017, LAUSD communicated with City's Palms Neighborhood Council regarding LAUSD's response to the Project, referencing "hammering out an Agreement" between District and the Developer to address items of concern raised by the community. *See Exhibit 20.*

33. LAUSD specifically stated that it was "premature" to reach any "'agreement'" in light of community concerns:

> *"In terms of 'hammering out an agreement' we don't know what you mean. The purpose of the community meeting was to present the project to the community and get their feedback. We here in Beaudry have some ideas of improvements we may want the developer to provide as part of the minimum requirements for the project (such as a block*

- 9 -

*wall along the alley to replace our chain link fence) and some ideas of priorities for other improvements at the school should the developer be so inclined to work with us. Also, operationally, during construction there are things we will need to discuss given the sensitive receptors on the school site (children in general and our DHH program in particular, not to men on the staff) that will need further study to determine the needs. But coming to any type of an 'agreement' and the use of that phrase, particularly in light of the heightened concerns of the community, is probably premature." See Exhibit 20.*

34. LAUSD continued to negotiate with Developer, who provided estimates for certain mitigation measures, but no mitigation for the DHH classrooms. *See Exhibit 21.*

35. However, upon LAUSD expressing its objections, Developer agreed to pay LAUSD $500,000 for LAUSD to exercise influence in support of the Project during City's hearing process—payment of which is conditioned upon the Developer obtaining all necessary permits for the Project from City.

*See Exhibit 6.*

36. As between Developer and LAUSD, no guarantees or requirements exist that the money be spent to mitigate the known and confirmed environmental harms to Palms Elementary School children and teachers.

37. Despite this fact, Developer's May 18 submission to City Council falsely asserts that that the $500,000 will be used "to relocate the kindergarten playground away from the School's property line, to move the DHH students to the northern portion of the School property, and to insulate

- 10 -

the DHH classrooms" even though there is no such agreement in place. *See Exhibit 9*.

38. Further, consistent with the money-for-influence agreement involving LAUSD, City and Developer, LAUSD officials attended City's PLUM committee hearing, spoke favorably of the Project, and made no mention of LAUSD's previous objections to the Project. Thereafter, as planned, City's PLUM Committee voted to approve the Project.

## *Nature of Remedy Sought by Petitioners*

39. Upon information and belief, rather than provide key information regarding the environmental impacts of the Project to the public (including Petitioners), Respondents: (1) conspired to shield any negotiations with LAUSD from public scrutiny; (2) willfully and intentionally failed to disclose this information to this Court, Petitioners, and the public; and (3) pursued a sham appeal before the PLUM Committee and the City Council by raising the sustainable communities exemption for the first time on May 11, 2018 after losing their attempts to block trial in the first appeal, so that the Project could proceed without the admittedly necessary environmental studies, review, public comment and mitigation.

40. Upon information and belief, rather than honestly and appropriately disclosing the 20 plus years the dry-cleaner existed at the Project site, Developer willfully and intentionally failed to disclose this information so that the Project could proceed without the admittedly necessary environmental studies, review, public comment and mitigation.

41. The children and teachers now seek through this action an order from the Court: (1) revoking all approvals and permits granted by City to

- 11 -

Developer; (2) mandating an environmental impact report and health risk analysis; and (3) requiring Petitioners to have reasonable notice thereof and a meaningful opportunity to be heard.

42. The children and teachers also seek a declaration that Respondents withheld material information from the public regarding the negative environmental impacts of the Project and the mitigation measures necessary to address those impacts, for the express purpose of depriving them of the ability to comment on the environmental impacts of the Project or to participate fully in any and all public hearings regarding the Project, including the PLUM committee hearing on May 22, 2018 and the City Council appeal on June 5, 2018.

## II. JURISDICTION AND VENUE

43. The children and their teachers ("Petitioners") at all times mentioned herein, resided in the County of Los Angeles. Respondents conducted business, at all times mentioned herein, in and about the County of Los Angeles, out of which the causes of action described herein arose. Thus, the County of Los Angeles is the proper county for the determination of this action and this Court may exercise jurisdiction over Respondents.

44. Venue is proper because most or all of the acts and omissions complained of in this litigation took place within this judicial district.

45. This Court has jurisdiction pursuant to, and this petition is brought pursuant to, the following, *inter alia*: C.C.P.§1085; C.C.P. §1094.5; C.C.P. §1060; C.C.P. §§526-527; and P.R.C. §§21168 and 21168.5.

## III. PARTIES

- 12-

## A. PETITIONERS

46. S.G., A.D.G., R.L., N.B., and A.G., are all minors who currently attend, and at all times material herein, attended as pupils Palms Elementary School, located at 3520 Motor Avenue, in the City of Los Angeles, California. Each of them are private residents in the County of Los Angeles, State of California. Plaintiffs S.G., A.D.G., R.L., and N.B. are individuals with disabilities as described in detail below.

47. Petitioner CHRISTAL LORD ("Lord") is a private resident in the County of Los Angeles, State of California. She is currently employed as a teacher at Palms Elementary School, and at all times material herein, she was so employed.

48. DYANNA SANABRIA ("Sanabria") is a private resident in the County of Los Angeles, State of California. She is currently employed as a teacher's assistant at Palms Elementary School, and at all times material herein, she was so employed. Petitioner Sanabria is a person with a disability as described in detail below.

49. Petitioners have a substantial interest in ensuring that the City's decisions are in conformity with the requirements of law, and in having those requirements properly executed and the public duties of the City enforced. Petitioners will be adversely affected by impacts resulting from the City's actions and approvals, and are aggrieved by the acts, decisions and omissions of the City as alleged in this petition and complaint Petitioners are suing on their own behalf, and on behalf of similarly situated others who will be affected near schools in the City of Los Angeles.

## B. RESPONDENTS

- 13 -

50. Respondent City of Los Angeles ("City") is a public entity organized and existing under the laws of the State of California. This respondent is sued in its own right for City policies, practices and/or customs which cause respondents' injuries. The Project is within the jurisdictional limits of the City.

51. Respondent Los Angeles City Council is the elected governing body of the City, and is the body responsible for the decision at issue herein.

52. Petitioners are informed and believe that Hiro Kobayashi, named as a real party in interest, is and at all time material herein was, an owner and developer ("Developer") of the "3568 Motor Avenue" project ("the Project"), located in the City of Los Angeles, currently scheduled to be built on the fence-line of Palms Elementary School. By contract, defendant Kobayashi is personally obligated to defend, indemnify and hold harmless the City of Los Angeles as to all legal actions related to the Project.

53. Petitioners are informed and believe that 3568 Motor LLC ("the LLC"), named as a real party in interest, is the business entity formed to constitute and own the Project. At all times material herein, the LLC was registered with the California Secretary of State, having its business address in the County of Los Angeles.

54. Petitioners are ignorant of the true names and capacities of respondents sued herein as DOES 1 through 10, inclusive, and therefore sue these respondents by such fictitious names. Petitioners will amend this petition and give notice of this petition, and of one or more DOES' true names and capacities, when ascertained. Petitioners allege, based on information and belief, that respondent DOES 1 through 10 are responsible in some manner for the damages and injuries hereinafter complained of.

- 14-

55. Petitioners are ignorant of the true names and capacities of real parties sued herein as ROES 1 through 10, inclusive, and therefore sue these real parties by such fictitious names. Petitioners will amend this petition and give notice of this petition, and of one or more ROES' true names and capacities, when ascertained. Petitioners allege, based on information and belief, that real party ROES 1 through 10 are responsible in some manner for the damages and injuries hereinafter complained of.

56. Petitioners are informed and believe that at all times relevant herein, the individual respondents and real parties, and each of them, were the agents, servants and employees of each other and/or their respective employers and were acting at all times within the scope of their agency and employment, and with the knowledge and consent of their principals and employers. At all times herein, respondents and real parties, and each of them, acted in coordination with, approval of, and in conspiracy with one another. All said respondents and real parties, and each of them, ratified the aforesaid conduct committed under color of law. All entity defendants are liable for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of *Respondeat Superior*, codified at California Government Code § 815.2.

## IV. FIRST CAUSE OF ACTION
## [WRIT OF MANDATE – VIOLATION OF CEQA]

57. Each and every allegation throughout this entire Petition is incorporated as though repeated and fully set forth herein.

58. As more fully set forth herein below, Petitioners allege that Respondents violated CEQA in light of the following:

- 15-

- the City failed to properly consider that Petitioners' unique needs constitute an 'unusual circumstance' upon whose environment the Project will have a significant impact;

- the City failed to properly consider that the Project presents an increased risk of cancer well above the acceptable SCAQMD limits to the children and teachers at Palms Elementary School;

- the City failed to properly consider that the Project site was occupied by a dry-cleaner from 1958 to at least 1985;

- the City failed to properly consider that Developer mademisrepresentations as to whether the Project site was previously used as a dry-cleaner;

- the City failed to properly consider that the Project violates the City's CEQA shade thresholds;

- the City failed to properly consider that the Project violates the City's CEQA construction noise thresholds;

- the City failed to consider Petitioners' Original Writ;

- Respondents withheld material information from Petitioners and the public regarding known environmental impacts;

- The City improperly permitted the Developer to submit additional environmental studies to justify the Director's Determ4ination; and

- The City approved this Project based upon the Sustainable Communities exemption raised by Developer long after the issuance of the Determination Letter for which there was no meaningful notice or opportunity for public comment.

### *No Exemptions Should Have Been Given to This Project*

- 16 -

59. "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.'" *Laurel Heights Improvement Assn. v. Regents of University of California*, 47 Cal. 3d 376, 390 (1988).

60. Petitioners are informed and believe the City "exempted" the Project from CEQA upon certain predetermined screening criteria – to wit: City CEQA Guidelines Article III, Section 1, Class 4 Category 1 (published with City's "thresholds of significance"); 14 CCR § 15304, titled "Minor Alterations to Land";[2] and 14 CCR § 15332, titled, "In-Fill Development Projects" – which require that "Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality."

61. Thus, an exemption cannot apply if it is established that the project falls within an exception to the exemptions set forth in 14 CCR §15300.2. Section (c) mandates: "Significant Effect. A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a *significant effect on the environment due to unusual circumstances.*" Moreover, section (e) requires that a categorical exemption shall not be used for any project located on a site where hazardous substances may have been used. Accordingly, City's project approval application requires disclosure, under penalty of perjury, as to whether a site was *"developed with use that could release hazardous*

---

[2] For perspective, the statute gives as an example: "Minor temporary use of land having negligible or no permanent effects on the environment, including carnivals, sales of Christmas trees, etc." *Id at Section (e)*. The proposed Project at issue clearly fails this definition.

- 17-

*materials on soil and/or groundwater (e.g. dry cleaning ...". See Exhibit 14.*

62. On May 11, 2018 Developer asked City for the first time to exempt the Project based upon the Sustainable Communities exemption, even though it possessed reports from experts as well as information from LAUSD confirming the negative environmental impacts the Project has and will continue to have, on the environment—and in particular, the sensitive receptors at Palms Elementary.

### An EIR Is Required Whenever There Is a Reasonable Possibility of Significant Negative Effects on the Environment

63. Per Cal Pub Resources Code § 21100, "All lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report on any project which they propose to carry out or approve that may have a significant effect on the environment. Whenever feasible, a standard format shall be used for environmental impact reports."

64. "An EIR is required whenever "'substantial evidence in the record supports a 'fair argument' significant impacts or effects may occur .... '" *Keep Our Mountains Quiet v. Cty. of Santa Clara*, 236 Cal. App. 4th 714, 730, (2015). "In the CEQA context, substantial evidence 'means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' (Guidelines, § 15384, subd. (a).) Substantial evidence includes 'facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts' (id., subd. (b)), but not '[a]rgument, speculation, unsubstantiated opinion or narrative, evidence

- 18-

which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment' (id., subd. (a))." *Id.* Moreover, "Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence ... ." *Id.*

65. Here, during the Original Writ proceeding, the PLUM committee hearing, and the City Council hearing, Respondents intentionally withheld from the public substantial evidence provided to it by LAUSD regarding the significant effects on the environment and community at the Palms Elementary that would occur as a result of the Project. Respondents instead sought a last-minute exemption for the Project on the basis of the Sustainable Communities Exemption, with full knowledge that the Project would cause environmental harm at the Palms Elementary school. Moreover, Respondents attempted to "buy-off" District with an unrestricted $500,000 "donation" which they falsely represented would be used for mitigation measures.

*The City Failed to Properly Consider That Petitioners' Unique Situation Constitutes an 'Unusual Circumstance' Upon Which the Project Will Have a Significant Impact*

66. Petitioners include children with disabilities and unique sensitivities and the teachers who work with them at an elementary school on the fence-line of the Project. Whatever the City's predefined thresholds of significance are – they do not take Petitioners needs into account. Moreover, Petitioners' environment is not a residential dwelling. It is a teaching and learning environment wherein certain conditions must be in a delicate balance to be healthy and effective. The proposed Project wipes

-19-

1     out the balance and substantially and negatively impacts the surrounding

2     environment.

3     67. Petitioner S.G. is a student with a disability at Palms Elementary School.

4         As an accommodation for her disability-related learning needs, she wears

5         a sound amplifying listening device and participates in the school's DHH

6         program as part of her Individualized Education Program ("IEP"). In her

7         classroom, as in all of the DHH classrooms, sound is controlled via use

8         of carpets on the classroom floor, fabric on the walls, and a drop ceiling

9         to minimize sound reverberation.

10

11    68. Sound control is necessary for the DHH classrooms because acoustic

12         interruptions are amplified and make it impossible for students who are

13         new to sounds to discern which sounds are voices and sources of

14         information which need to be interpreted, as opposed to sounds which

15         should be filtered out as noise. Background noise causes early attention

16         fatigue. Amplification of sharp unexpected sounds is painful because

17         there is no chance to adjust volume, and ongoing repetitive sounds are

18         annoying and cause headaches.

19    69. Petitioner A.D.G. is a student with a disability at Palms Elementary

20         School. He wears a sound amplifying listening device but does not

21         participate in the DHH program. For Petitioner A.D.G., background noise

22         is distracting and causes an inability to focus. Amplification of sharp

23         unexpected sounds can be painful and ongoing repetitive sounds can be

24         annoying and cause headaches.

25    70. Petitioner N.B. is a student with a disability at Palms Elementary School.

26         As an accommodation for his disability-related learning needs, his IEP

27         includes services related to Autism Spectrum Disorder. As a result of his

28         disability he is easily and severely distracted by loud noises.

-20-

Additionally, N.B. has been diagnosed with mastocytosis. Environmental changes caused by dust, fumes and chemicals have the high probability of triggering an anaphylactic allergic reaction which could result in N.B's death.

71. Petitioner R.L. is a student with a disability at Palms Elementary School. He has an IEP and accommodations for his disability-related learning needs associated with speech and language impairment. Loud noises distract his attention and interfere with his ability to receive, interpret and replicate word formation, as well as linguistic distinctions in intonation, inflection and cadence – which are necessary to mastering effective communication, and effectively accessing and participating in his curriculum.

72. Petitioner A.G. is a student at Palms Elementary School. Like many elementary school students, he is vibrant, curious, and intellectually agile. He also has reactions to noise, dust and fumes which are manageable when not in quantities above normal. However, when noise, dust and fumes are in increased quantities, A.G. is distracted and cannot focus on his educational activities.

73. Petitioner Lord is a teacher at Palms Elementary School. She spends no less than six hours per day, five days per week inside of, and on the grounds surrounding, the buildings comprising Palms Elementary School.

74. Petitioner Sanabria is a teacher's assistant at Palms Elementary School. She spends several hours per day, on multiple days per week inside of, and on the grounds surrounding, the buildings comprising Palms Elementary School. She is a cancer survivor, but remains under doctor's instructions to limit exposure to carcinogens, and is highly susceptible to

-21-

relapse. Palms Elementary is a pre-K through 5 primary school located in a fast-developing section of West L.A., with a population of approximately 350 young children. The vast majority of its student body is composed of minority students. 82.2% of the students are classified by the California Department of Education as socioeconomically disadvantaged. 36% of the students are English learners. The school is also the site of one of LAUSD's four Deaf and Hard of Hearing program dedicated sites, a unique and specialized program designed to address the needs of this population of young students.

75. Palms Elementary School is immediately adjacent the proposed construction project. Moreover, the kindergarten playground is on the fence-line of the Project. The Project will involve multiple years of demolition, excavation and construction. Upon information and belief, the developer has indicated that the demolition, excavation and construction of the Project will take place between December of 2017 and October of 2019.

76. The City has not conducted or required an Environmental Impact Report, Health Risk Analysis, or any other protective measures for the 350+ children, or their teachers, who will be at Palms Elementary during the Project.

77. During each school day at Palms Elementary School, the children eat lunch in the outdoor areas with teachers and teaching assistants. The children also run, play, breathe heavily and roll around on the ground in their outdoor play areas.

78. Per the City and developer's own documentation, the project will send, construction noise, toxic dust, vapors, PM2.5 and PM10 particles, volatile organic compounds, reactive organic gases, NOx gas, and other

-22-

poisonous contaminants into the air covering the children's playground and the school – for at least two years. Moreover, as a result of the demolition process which did not appear to be done in such a way as to contain asbestos or lead dust, the Property likely is contaminated with these substances, requiring further study.

79. The exhibits from Petitioners' appeal to City Council appeal contain declarations from teachers and parents explaining factual observations detailing the Petitioners' sensitivities, the features of their environment, and the impact the Project would have on it.

80. Upon information and belief, Petitioners allege that had City properly considered their unusual circumstances, i.e. the presence of a school and young school children, no exemption and/or approval would have been granted without conducting an EIR – which would have disclosed the adverse impacts on Petitioners and the environment around them.

81. The impact upon Petitioners cannot be taken lightly. In California, education is a fundamental right. "Among other things ... for California purposes, education remains a fundamental interest 'which [lies] at the core of our free and representative form of government [fn.] . . ..' (citation omitted)." *Butt v. State of Cal.*, 4 Cal. 4th 668, 683 (1992). Moreover, "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

82. In this case, the Project at 3568 Motor Avenue will severely infringe upon each of the children's educational rights and fundamental interests by compromising, and in some cases eliminating, the safety and

- 23-

effectiveness of their learning environments. The declarations of the teachers and parents submitted with their City Council appeal explain that their children are, *inter alia*, easily distracted by sharp, as well as ambient noises. Their children are also subject to allergies and physical ailments related to airborne irritants. Additionally, many of the teachers' declarations detail the additional harm their DHH students would suffer. LAUSD's letter to the developer from January 2018 further confirms the negative environmental impacts on the school that will be caused by the Project, and describes in detail necessary mitigation measures.

83. The DHH teachers relate that elementary school years are the point in the students' lives when they are gaining the bedrock understandings of how to socialize with and understand each other, as well as children without hearing challenges, and that preventing that process from happening would have far-reaching consequences for the rest of their lives.

84. As set forth in supporting declarations, construction noise would make it difficult, and in many cases impossible, for students to distinguish between voices and other sources of information – as opposed to noise and other sounds which should be disregarded. So-called "new listeners" – students who have newly activated cochlear implants – would experience pain and listening fatigue, but would not even know how to express what is happening to them or why.

85. Substantial evidence exists to support a fair argument that significant environmental impacts might result from the unusual circumstances surrounding the Project.

*The City Failed to Properly Consider That the Project Presents an Increased*

- 24 -

*Risk of Cancer Well Above the Acceptable SCAQMD Limits to the Children and Teachers at Palms Elementary School*

86. Per 14 CCR §15300.2(c), another demonstration of the unstudied Project's significant impact on the environment is its increased cancer risks to the hundreds of young children in close proximity on a daily basis.

87. Petitioners submitted the Bertoni Determination Letter to Dr. Paul Rosenfeld, an environmental scientist and chemist, for review. Dr. Rosenfeld's December 5, 2017 review and comments concluded that a proper health analysis was necessary because the Project could result in significant cancer risks to nearby adults and children far exceeding acceptable thresholds. Dr. Rosenfeld's review and comments were submitted as part of the record with Petitioners' City Council appeal. *See Exhibit 22.*

88. Dr. Paul Rosenfeld is a Co-Founder and Principal Environmental Chemist at Soil / Water / Air Protection Enterprise ("SWAPE"). He has over twenty years' experience conducting remedial investigations, risk assessments, and developing cleanup programs for sites containing petroleum hydrocarbons, chlorinated solvents, pesticides, radioactive waste, PCBs, PAHs, dioxins/furans, volatile and semi-volatile organics, perchlorate, heavy metals, asbestos, PFOA, unusual polymers, fuel oxygenates (MTBE), and odors. Dr. Rosenfeld conducts contaminant fate and transport modeling in all environmental media and is a specialist regarding the analysis and modeling of airborne contaminants. [*See* http://www.swape.com/staff/paul-rosenfeld-ph-d/].

89. In his comments, Dr. Rosenfeld noted that there are hundreds of sensitive receptors in the immediate vicinity of the site of the Project. "Sensitive

- 25 -

Verified Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief

1

2

receptors" include but are not limited to children and the elderly. They are most likely found at schools and nursing homes.[3]

3

4

5

6

7

8

9

10

11

90. Upon review, Dr. Rosenfeld concluded that "the Determination report and associated documents demonstrates that the Project's potential health risk impact posed to nearby sensitive receptors has not been adequately evaluated." Dr. Rosenfeld further concluded that "there is substantial evidence indicating that the proposed Project could result in a potentially significant impact to the surrounding environment, something that the Determination and associated documents failed to evaluate or even address."

12

13

14

15

16

17

18

19

20

21

22

91. As part of Dr. Rosenfeld's review, he compared his analysis of a project similarly located near sensitive receptors, children. The project was called "the View." The screening level Health Risk Analysis demonstrated that the excess cancer risk posed to adults, children, and infants near the View would be, out of one million, approximately 43, 290, and 25, respectively. Furthermore, the analysis demonstrated that the excess cancer risk over the course of a residential lifetime (30 years) was approximately 580 in one million. The Southern California Air Quality Management District's maximum allowable threshold is 10 in one million. Independent of Dr. Rosenfeld's analysis, a simple

23

24

25

26

27

28

[3] The California Air Pollution Control Officer's Association (CAPCOA) categorizes receptors as sensitive receptors or work receptors. According to CAPCOA, "Sensitive receptors refer to those segments of the population most susceptible to poor air quality (i.e., children, the elderly, and those with pre-existing serious health problems affected by air quality). Land uses where sensitive individuals are most likely to spend time include schools and schoolyards, parks and playgrounds, daycare centers, nursing homes, hospitals, and residential communities (these sensitive land uses may also be referred to as sensitive receptors). Worker receptors refer to employees and locations where people work."

-26-

extrapolation for the proposed Project (3568 Motor) based upon number of units suggests that the excess cancer risk over the course of a residential lifetime for receptors at Palms Elementary School would be 277 in one million – 27 times the SCAQMD threshold.[4]

92. Based upon the unusual circumstance of such a large number of sensitive receptors (300+ children) being located in the immediate vicinity of the Project site, coupled with the multi-year timeframe within which the Project would emit toxic pollutants into the air the children breathe and the ground upon which they run and play, a fair argument can be made that the Project has a reasonable possibility of having significant negative effects on the environment, per CEQA Guidelines §15300.2(c). Thus, an EIR was required.

### The City Failed To Properly Consider That the Project Site Was Occupied by a Dry Cleaner from 1958 to at Least 1985

93. CEQA requires full disclosure of a project's significant environmental effects so that decision-makers and the public are informed of these consequences before the project is approved, to ensure that government officials are held accountable for these consequences. *Laurel Heights Improvement Ass'n of San Francisco v. Regents of the University of California*, 47 Cal.3d 376, 392 (1988).

---

[4] Extrapolated cancer risk depends upon all other factors being equal and is determined as follows:

Step 1 ---> "View" Cancer Risk (divided by) "View" # of Units = Cancer Risk Ratio
Step 2 ---> Cancer Risk Ratio (multiplied by) "Motor Ave" # of Units = "Motor Ave" Cancer Risk

-27-

94. CEQA rule 14 CCR §15300.2(e) requires that a categorical exemption shall not be used for any project located on a site where hazardous substances may have been used. Accordingly, City's project approval application requires disclosure, under penalty of perjury, as to whether a site was *"developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning ...". See Exhibit 14.*

95. Upon information and belief, Petitioners allege that the City failed to become informed of, and properly consider, that 3568 Motor Avenue was occupied by a dry-cleaner for approximately 27 years. Moreover, Petitioners contend that if City had properly considered this fact, no exemption and/or approval would have been granted without conducting an EIR – which would have disclosed the adverse impacts on Petitioners and the environment around them.

## *The City Failed to Properly Consider The Developers' Intentional Misrepresentations as to Whether the Project Site Was Previously Used as a Dry Cleaners*

96. In the instant case, the Project was granted exemptions from CEQA based upon the information provided by the developer when submitting applications to the City for approval. In the City of Los Angeles, exemptions afford developers an expedited process and schedule. Exemptions are not available for any project which involves potential significant environmental impacts. One of the conditions which makes an exemption *unavailable*, is the use or former use of a site for a purpose which *could* emit hazardous or toxic substances, such as a dry cleaner.

97. Here, in the applications the developer filed with the City for approval of the Projects, Mr. Kobayashi intentionally declined to disclose the fact that

- 28-

the site was a dry cleaners for almost 30 years – and could have released hazardous substances. Those applications required him to indicate under penalty of perjury whether or not the site of the project had ever been occupied by a dry cleaners. Despite knowing that the site had been used by a dry cleaners, on two separate occasions Mr. Kobayashi intentionally stated under penalty of perjury that that the Project site had not been "developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning ...") *See Exhibit 14*

98. Mr. Kobayashi made these representations even though an environmental study for the Project was mandated by Wells Fargo Bank and revealed that the site was occupied by a dry-cleaner from 1958 to at least 1985, stating:

> *"It should be however noted that Palms Laundry and Cleaners occupied the Property since at least 1958. Since this is during a period of little or no regulatory oversight, permitting or compliance, there is still an unresolved concern about possible dry-cleaning operation conducted by Palms Laundry and Cleaners. This is identified as a potential environmental concern and significant data gap which affects our ability to determine RECs in connection with the Property." See Exhibit 13.*

99. Petitioners contend, upon information and belief, that Mr. Kobayashi and the Project directly benefited from his false representations by obtaining expedited processing and approval for the Project. Whether a dry cleaner would ultimately be discovered to have omitted hazardous materials at

-29-

the site is irrelevant under Cal. Pen. Code §§ 118 and 123. Petitioners allege that under the specified code sections, Mr. Kobayashi's intentional omissions constitute perjury.

100. "The test in a perjury charge is not that injury actually occurred as a result of the false statements, but that the falsehoods could have influenced or changed the status of the subject of the statement to the benefit of the falsifier or the detriment of others. It is sufficiently material if it might have affected the proceeding in or for which it was made ... In the present instance [applicant] was benefited at least to the extent of eliminating delay ..." *People v. Darcy*, 59 Cal. App. 2d 342, 349 (1943).

101. Petitioners further allege, upon information and belief, that in addition to perjury, Mr. Kobayashi's conduct constitutes fraud and deceit under Cal. Civ. Code § 1710(3). This is so because it is "the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." *Id.*

102. Petitioners contend that Mr. Kobayashi's fraud/perjury vitiates and nullifies the approval of the Project it was used to procure. "There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments." *United States v. Throckmorton*, 98 U.S. 61, 64 (1878); *Crow v. Madsen*, 111 P.2d 7, 11 (Cal. Dist. Ct. App. 1941). Thus, approval of the Project and all underlying exemptions should be reversed, revoked and/or cancelled.

## *The City Failed to Properly Consider That the Project Violates The City's CEQA Shade Thresholds*

-30-

103. The 'screening criteria' for shade/shadow impacts from the City's CEQA Thresholds Guide are as follows:

- *QUESTION: Would the project include light-blocking structures in excess of 60 feet in height above the ground elevation that would be located within a distance of three times the height of the proposed structure to a shadow-sensitive use on the north, northwest or northeast?*

- *ANSWER: Clearly <u>yes</u>. The proposed building is over 70 ft and the Palms Elementary School play yard (a shadow-sensitive use) is well within 210 ft to the north/northeast (i.e., it's adjacent).*

- *THEREFORE: Further study is indicated (as opposed to a categorical exemption).*

104. A project impact would normally be considered significant if shadow-sensitive uses would be shaded by project-related structures for more than three hours between the hours of 9:00 a.m. and 3:00 p.m. Pacific Standard Time (between late October and early April), or for more than four hours between the hours of 9:00 a.m. and 5:00 p.m. Pacific Daylight Time (between early April and late October). [see 2006 L.A. CEQA Thresholds Guide, pp. A.3-1 to A.3-10].

105. Here the developer's own shade studies demonstrate unacceptable shading during the proscribed time periods. Accordingly, this should have precluded the City from exempting this Project from CEQA. Exemptions cannot be claimed if there is a reasonable possibility that the project will result in a significant adverse impact. There is such a reasonable possibility here. The City's failure to consider and properly evaluate the impact of shade is an appropriate basis for revoking the Project's approval and all exemptions – and, requiring an EIR.

- 31-

1

2          ***The City Failed to Properly Consider That***

3          ***The Project Violates the City's CEQA Noise Thresholds***

4     106. The 'screening criteria' for noise impacts from the City's CEQA

5          Thresholds Guide (pp. I.1-1 to I.1-9) is as follows:

6          • QUESTION: Would construction activities occur within 500 feet of

7            a noise sensitive use?

8          • ANSWER: Clearly <u>yes</u>. Palms Elementary School and its play yard

9            (both noise-sensitive uses) are well within 500 ft of the Project (i.e.,

10           it's adjacent).

11

12         • THEREFORE: Further study is indicated (as opposed to a

13           categorical exemption).

14    107. "Noise sensitive uses include residences, transient lodgings, schools,

15         libraries, churches, hospitals, nursing homes, auditoriums, concert halls,

16         amphitheaters, playgrounds, and parks. Determine whether construction

17         activities would occur within 500 feet of a noise sensitive use or during

18         the hours specified in the Screening Criteria." *Id.* at (p. I.1-3).

19    108. In order to determine the impacts of the Project, it is necessary to

20         "[r]eview the description of the proposed project, including the duration

21         of construction activities. Identify the type, amount, and scheduling of

22         construction equipment to be used during each construction phase, and

23         the distance from construction activities to noise sensitive uses. Calculate

24         the noise emissions from individual equipment by using the noise levels

25         shown in Exhibits I.1-1 and I.1-2, or other applicable references, the

26         distance to the noise sensitive uses, and noise attenuation standards." *Id.*

27         at (p. I.1-4).

28

- 32 -

109. In the instant case, the City was required to make a determination of the impacts of the Project as specified by its own CEQA guidelines, but did not. The City failed to properly evaluate a sham noise study which:1) improperly measured the ambient noise levels at and near the Project site; 2) set forth construction equipment noise levels clearly and demonstrably outside of accepted norms, as well as outside of those accepted by LAUSD; 3) improperly calculated increases in noise exposure to the sensitive receptors at Palms Elementary School; and 4) improperly concluded that noise levels and noise level increases would fall within legally accepted limits. As a result of this failure, the CEQA exemption process was fatally flawed because the City failed to proceed in the manner required by law.

110. Because it is incumbent upon the developer to demonstrate CEQA compliance, this should have precluded the City from exempting this Project from CEQA. The City's failure to demand necessary information, precluded the demonstration that there is not a reasonable possibility that the project will result in a significant adverse impact upon the environment. Therefore, an EIR is required to evaluate the environmental impacts.

*Petitioners Were Given No Notice of the Project and Are Specifically Excluded From the Class of Persons Allowed to Appeal the Director's Determination by its Terms*

111. The Bertoni letter explicitly limited the group of persons who could appeal to only owners or tenants of adjacent or abutting property and indicated that no hearings would be held. *See Exhibit 3.* Petitioners are not owners or tenants of property abutting or adjacent the Project. They

- 33 -

were not mailed notice of the Project. Thus, per Cal. Pub. Resources Code §21177, Petitioners are not subject to an exhaustion of administrative remedies requirement. Moreover, the appropriate standard of review is set forth by Cal Pub Resources Code §21168.5 - prejudicial abuse of discretion.

112. Petitioners and parents became aware of the Bertoni letter only after they became aware of the Project, on or near the Thanksgiving holiday of 2017 – purely by way of rumor and happenstance.

113. Additionally, when parents of petitioning minors attempted to be heard, they were shut out. On and before November 30, 2017, LA. City Councilman Paul Koretz's ("Koretz") office held a number of so-called community meetings to discuss the project. Koretz's office invited the developer and purported neighborhood stakeholders, but refused to allow the meetings to be attended by any, or even one, Palms parent. During a phone call with one of the parents, Koretz's office took the express position that any persons who were not in favor of the project were not allowed to attend the meetings.

114. After becoming aware of the Bertoni letter, Palms parents and teachers made daily calls and sent daily emails to Bertoni's office, LA City Councilman Paul Koretz's office, and various other City offices to ask to have their objections heard as to the project. Petitioners have been denied opportunities to have their objections heard.

115. Councilman Koretz's office also expressly banned Petitioner Lord from attending and being heard at the meetings. Petitioner Lord was banned from the meetings because in an earlier community meeting she made statements in opposition to the Project.

-34-

Verified Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief

116. Nevertheless, on December 12, 2017, Petitioners served upon the City Council and developer an unsolicited CEQA appeal, and exhibits pursuant to Cal. PRC §21151. Later, on December 14, 2017, the same appeal was filed with the City Council through the City's Department of Planning (Receipt No. 0302113714), at the instruction of City Senior Planner, Debbie Lawrence. *See Exhibit 4.*

117. Petitioners are informed and believe that the City failed to act on the City Council Appeal, so that the Director's Determination Letter is now the final decision subject to review by the Superior Court. *Kaiser Foundation Hospitals v. Superior Court,* 128 Cal. App. 4th 85, 101; (2005); *In re: Hudson,* 143 Cal. App. 4th 1, 7, 10-11 (2006) (exhaustion of administrative remedies not required where agency fails to act on appeal and there are no procedures for how to proceed if the agency fails to act).

## *The Developer Conducted Additional Environmental Testing That Confirmed the Need For Mitigation in Contravention of Laurel Heights*

118. While the Original Writ was pending, Developer conducted additional environmental testing that confirmed the need for mitigation, particularly with respect to noise. The additional air quality testing report and the noise study were submitted to Developer on May 4, 2018. These studies confirm that the Project should not be exempt from CEQA. True and correct copies of these reports are attached. *See Exhibit 9.*

119. Upon information and belief, after the filing of this writ, City and the Developer began negotiating with Los Angeles Unified School District ("LAUSD") regarding making a donation to the school so that LAUSD would not oppose the Project. Petitioners were not included in these

-35-

1      discussions or given the chance to review the new environmental test

2      results.

3      120. To date, there are no agreements or findings that will require Developer

4          to implement the required mitigation measures.

5

6  **V.    REQUEST FOR STAY AND INJUNCTION AND DECLARATORY**

7                              **RELIEF**

8      121. Petitioners hereby request that the Court stay and/or enjoin Respondents

9          and real parties in interest as set forth below in the Prayer.

10

11     122. Petitioners have no adequate remedy at law to address the matter set forth

12          in this petition.

13     123. Petitioners as well as members of the general public will suffer

14          irreparable harm if the relief requested herein is not granted and the

15          Project continues based upon approvals and exemptions in the Bertoni

16          letter and the DCP Report, as evidenced, in part, by the environmental

17          studies produced for Developer on May 4, 2018 which require mitigation

18          measures, particularly with respect to sound. Respondents did not,

19          however, issue a Mitigated Negative Declaration as required by Public

20          Resources Code Section 21080 and California Code of Regulations

21          Section 15070 and the substantial evidence in the record, and they have

22          not conducted a complete EIR. Thus, Petitioners and the general public

23          have been denied the right of public comment under CEQA and the

24          protection of the necessary mitigation measures. Without the required

25          mitigation measures, it is undisputed that the Project will have a

26          significant environmental impact.

27     124. Respondents cannot rely on the Sustainable Communities exemption to

28          avoid CEQA's requirement to conduct further environmental review,

                                    -36-

1      and/or to issue a mitigated negative declaration, now that there is
2      substantial evidence of a harmful environmental impact. Respondents
3      raised this exemption for the first time on May 14, 2018, long after the
4      Original Writ was pending and set for trial.

5   125. Pursuant to Code of Civil Procedure section 1085 and section 1094.5, the
6      Court may stay or enjoin the operation of any administrative decision or
7      order involved in this proceeding.

8   126. A stay or injunction of Respondents' and real parties' in interest actions
9      relating to the Project would not be against the public interest because
10     Respondents are required by CEQA to conduct an adequate
11     environmental review of the Project before taking any actions to approve
12     it, Developer's own reports show that construction and operation of the
13     Project will have significant environmental impacts and because neither
14     Respondents nor real parties in interest will be harmed by the Court's
15     issuance of a stay or an injunction.

16  127. Because City has issued real parties in interest exemptions and approval
17     for the construction of the Project, and the developer already commenced
18     the Project by demolishing the existing structure on site, there is a real,
19     concrete threat that real parties will continue with such construction
20     despite the absence of an EIR, Health Risk Assessment or Mitigated
21     Negative Declaration to protect Petitioners.

22  128. On or about December 15, 2017, the Developer commenced construction
23     and demolished the existing structures on site, even though school was
24     still in session. As a result of the excessive noise and dust from the
25     demolition--including the use of a jackhammer--the kindergarten
26     playground (which is immediately adjacent to the property line of the
27     Project) was not safe for the children. The children and staff were

- 37 -

1    prohibited from using the kindergarten playground on their last day of
2    school before winter break.   According to the California Supreme Court,
3    "CEQA requires that an agency determine whether a project may have a
4    significant environmental impact, and thus whether an EIR is required,
5    before it approves that project. ... A fundamental purpose of an EIR is to
6    provide decision makers with information they can use in deciding
7    whether to approve a proposed project, not to inform them of the
8    environmental effects of projects that they have already approved. If
9    post-approval environmental review were allowed, EIR's would likely
10   become nothing more than post hoc rationalizations to support action
11   already taken. We have expressly condemned this use of EIR's." *Laurel*
12   *Heights Improvement Ass'n v. Regents of Univ. of Cal.*, 47 Cal. 3d 376,
13   394 (1988) (*"Laurel Heights"*).
14

15   129. Upon information and belief, the Developer commenced an air quality
16       study on or about April 18, 2018 in an apparent attempt to undertake post-
17       approval environmental review in contravention of *Laurel Heights*.

18   130. Upon information and belief, the Developer also commenced a noise
19       study in April 2018, in a further contravention of *Laurel Heights*.

20   131. Petitioners have performed all conditions imposed by law precedent to
21       filing this action, including complying with the requirement of Public
22       Resources Code Section 21167.5 by mailing notice to the City and
23       developer as real party in interest that this action would be filed. A copy
24       of the notices are attached. *See Exhibit 23*.

25   132. Petitioners also served a copy of this Petition on the California Attorney
26       General as required by law.
27

28   133. Petitioners have no plain, speedy or adequate remedy available to them
         in the ordinary course of law to redress the claims alleged in this petition

- 38-

unless this Court grants the requested writs of mandate and declaratory and injunctive relief.

134. Petitioners are informed and believe that all children at Palms Elementary School will have their learning environments disrupted and made ineffective by the noise and toxins emitted by the Project.

135. Petitioners are informed and believe that all children and teachers at Palms Elementary School will suffer increased risks of cancer from toxins emitted by the Project.

## VI. PRAYER

WHEREFORE, Petitioners, pray for judgment in their favor as follows:

136. For an order, or in the alternative, a Peremptory Writ of Mandamus, directing the City and City Council to vacate and set aside the actions exempting the Project from CEQA and approving the Project for demolition, excavation and construction;

137. For an order, or in the alternative, a Peremptory Writ of Mandamus directing the City and City Council to require a full Environmental Impact Report and Health Risk Analysis as to the Project, with notice to Petitioners and a reasonable opportunity to be heard and object thereto, prior to the issuance of any further approvals or permits for the Project;

138. For a declaration that the Bertoni Letter is the final decision subject to appeal based on the City's failure to act on the City Council appeal and the sham nature of the City Council appeal.

139. For a declaration that the City and the Developer violated CEQA by pursuing a sham appeal based on a false application;

140. For a declaration the City and Developer withheld material information from Petitioners and the public regarding the negative environmental

- 39-

1    impacts of the Project in order to avoid full and fair public hearings,

2    public comment and having to conduct a full EIR under CEQA;

3    141. That the Court enjoin the City, City Council and its agents from granting

4    any authority, approvals, exemptions or permits as to the Project in the

5    absence of a full Environmental Impact Report and Health Risk Analysis;

6    142. For an order staying the implementation of the Bertoni Letter, the DCP's

7    recommendation, and the City Council's decision on June 5, 2018

8    exempting this Project from CEQA;

9    143. For attorneys' fees, including pursuant to C.C.P. Section 1021.5.

10   144. For costs of suit; and

11   145. For such other relief as is just and proper.

13   Dated: August 1, 2018                          Respectfully Submitted,

16                                                   Olu K. Orange, Esq.
17                                                   Attorney for the Petitioners

- 40-

**VERIFICATION**

I, CHRISTAL LORD, am a plaintiff/petitioner in this proceeding. I have read the foregoing VERIFIED AMENDED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with which this verification is filed and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 26, 2018, at Los Angeles, California.

CHRISTAL LORD

S.G. et al. v. City of Los Angeles et al.

## **VERIFICATION**

I, ARACELI BOYCE, have petitioned for appointment as a guardian ad litem for plaintiff/petitioner N.B. in this proceeding. I have read the foregoing VERIFIED AMENDED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with which this verification is filed and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 26, 2018, at Los Angeles, California.

**ARACELI BOYCE**

## **VERIFICATION**

I, DEREK SPENCER, have petitioned for appointment as a guardian ad litem for plaintiffs/petitioners A.D.G. and R.L. in this proceeding. I have read the foregoing VERIFIED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with which this verification is filed and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 17, 2018, at Los Angeles, California.

DEREK SPENCER

## **VERIFICATION**

I, BRITTANY DORN, have petitioned for appointment as a guardian ad litem for plaintiff/petitioner S.G. in this proceeding. I have read the foregoing VERIFIED AMENDED PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF with which this verification is filed and know the contents thereof. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this July 26, 2018, at Los Angeles, California.

BRITTANY DORN

1

2

3

## VERIFICATION

4

5   I, KARLA GARCIA, have petitioned for appointment as a guardian ad litem for

6   plaintiff/petitioner A.G. in this proceeding. I have read the foregoing VERIFIED

7   PETITION FOR WRIT OF MANDAMUS AND COMPLAINT FOR DECLARATORY

8   AND INJUNCTIVE RELIEF with which this verification is filed and know the contents

9   thereof. The same is true of my own knowledge, except as to those matters that are

10   therein alleged on information and belief, and as to those matters, I believe them to be

11   true.

12   I declare under penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct.

14   Executed this July 26, 2018, at Los Angeles, California.

15

16

17                                           KARLA GARCIA

18

19

20

21

22

23

24

25

26

27

28

S.G. et al. v. City of Los Angeles et al.

**DEPARTMENT OF
CITY PLANNING**

CITY PLANNING COMMISSION

DAVID K. J. AMBROZ
PRESIDENT

RENEE DAKE WILSON
VICE-PRESIDENT

CAROLINE CHOE
RICHARD KATZ
JOHN W. MACK
SAMANTHA MILLMAN
MARC MITCHELL
VERONICA PADILLA-CAMPOS
DANA M. PERLMAN

ROCKY WILES
COMMISSION OFFICE MANAGER
(213) 978-1300

# CITY OF LOS ANGELES
CALIFORNIA



ERIC GARCETTI
MAYOR

**EXECUTIVE OFFICES**
200 N. SPRING STREET, ROOM 525
Los Angeles, CA 90012-4801

VINCENT P. BERTONI, AICP
DIRECTOR
(213) 978-1271

KEVIN J. KELLER, AICP
DEPUTY DIRECTOR
(213) 978-1272

LISA M. WEBBER, AICP
DEPUTY DIRECTOR
(213) 978-1274

JAN ZATORSKI
DEPUTY DIRECTOR
(213) 978-1273

http://planning.lacity.org

## JUSTIFICATION FOR PROJECT EXEMPTION
## CASE NO. ENV-2016-4881-CE

On September 1. 2017, the Planning Department determined that the City of Los Angeles Guidelines
for the implementation of the California Environmental Quality Act of 1970 and the State CEQA
Guidelines designate the subject project as Categorically Exempt under State CEQA Guidelines
Article 19, Sections 15304 and 15332, and City CEQA Guidelines Article III, Section 1, Class 4
Category 1, Case No. ENV-2016-4881-CE.

The project is for the demolition of an existing one-story, three-unit, 6,768 square-foot commercial
building, and the construction, operation, and maintenance of a new six-story, 42-unit, mixed-use
development containing 38 market rate units, 4 Very Low Income units, and 1,770 square feet of
ground-floor retail. The Project proposes five residential levels over one level of at-grade parking and
commercial uses, and one level of subterranean parking, with a total of 54 parking spaces. The
building measures 72 feet and 7 inches in height (as measured from average grade to the top of the
parapet). Two non-protected trees will be removed. The project also involves a haul route for the
export of 6,000 cubic yards of dirt. As a mixed-use development, and a project which is characterized
as in-fill development, the project qualifies for the Class 4, Category 1 and Class 32 Categorical
Exemption(s).

### CEQA Determination – Class 32 Categorical Exemption Applies

A project qualifies for a Class 32 Categorical Exemption if it is developed on an infill site and meets
the following criteria:

(a)  **The project is consistent with the applicable general plan designation and all applicable
general plan policies as well as with the applicable zoning designation and regulations.**

The project is consistent with the following Elements of the General Plan: Framework Element,
Land Use Element (Palms – Mar Vista – Del Rey Community Plan), Housing Element, and the
Mobility Element.

**Framework Element:** The Citywide General Plan Framework is a guide for communities to
implement growth and development policies by providing a comprehensive long-range view of
the City as a whole. The Framework establishes categories of land use that are broadly
described by ranges of intensity/density, heights, and lists of typical uses. The Framework
Element's land use designation of General Commercial has corresponding zones of C2 and
[Q]C2. The subject site is designated for General Commercial land uses and zoned C2-1;
therefore, the subject site is consistent with the Framework Element.

EX 1

ENV-2016-4881-CE                                                                      09/01/2017

**Land Use Element (Palms – Mar Vista – Del Rey Community Plan)**: The subject site is located within the Palms – Mar Vista – Del Rey Community Plan ("Community Plan"). The Community Plan designates the site for General Commercial land uses, which has corresponding zones of C1.5, C2, C4, RAS3, and RAS4. The subject site is zoned C2-1, and is therefore consistent with the Community Plan's land use designation. The C2-1 zoning of the subject site allows for residential uses at R4 density, unlimited building height and a maximum Floor Area Ratio (FAR) of 1.5:1. The subject site has a lot area of approximately 14,997 square feet, which allows a by-right density 38 residential units in conjunction with LAMC Sections 12.14 A.1(a), 12.13.5 A.1, and 12.11, and up to a maximum of 52 residential units through the Density Bonus pursuant to LAMC Section 12.22 A.25 and Assembly Bill (AB) 2501. The proposed Project is for the construction of new six-story 42-unit mixed-use development containing 1,770 square feet of ground-floor retail and measuring 72 feet and 7 inches in height. The proposed uses, density, and height are allowed by the Community Plan's land use designation in combination with the site's zoning in combination with state Density Bonus law.

**Housing Element**: The Housing Element indicates that not only are more housing units needed to accommodate the City's growth, but that these units need to be a broader array of typologies to meet evolving household types and sizes. In addition, the Housing Element includes an Inventory of Sites for Housing (Housing Element Exhibit H) that identifies parcels suitable for additional residential development without the need for any discretionary zoning action by the City. The site's Assessor Parcel Number (APN # 4314014002) has been identified in the Inventory, and is therefore meeting Housing Element provisions of providing housing on these applicable sites. As mentioned, the proposed Project will demolish an existing commercial building and construct 42 new residential units. The proposed Project will therefore provide a net increase of 42 residential units within close proximity to jobs, transit, and other amenities including an elementary school. Pursuant to Density Bonus requirements, 4 of the total units will be reserved for Very Low Income households, and is therefore achieving the Housing Element goal of providing affordable units and promoting mixed-income developments.

**Mobility Element**: The Mobility Element sets forth objectives and policies to establish a citywide strategy to achieve long-term mobility and accessibility within the City of Los Angeles. The subject site is located at the intersection of Motor Avenue and Tabor Street, and is served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, as well as by local and regional bus lines operated by Culver City Bus, Big Blue Bus, Los Angeles Metro, and LADOT. Specifically, the subject site is within 1,500 feet of Transit Stops served by Culver City Bus Line 3 and Big Blue Bus Lines 17 and Rapid 12; and the subject site is within 0.5 miles from Transit Stops served by Metro Bus Lines 33 and 733, Big Blue Bus Line 5, and LADOT Line Commuter Express Line 431. The proposed Project will allow for a reduction of vehicle trips by placing high-density residential within proximity to public transit, as well as existing retail and amenities along Motor Avenue and the greater Palms neighborhood. Furthermore, the location of ground floor commercial uses and residential lobby will facilitate a pedestrian-oriented environment by providing transparency at the street level, thereby activating the streets. The project also involves the dedication of 3 feet along Motor Avenue and 5 feet along Tabor Street; therefore the building wall will be set back further from the street and allow for wider sidewalks to facilitate pedestrian activity. The proposed Project will also provide bicycle parking spaces in accordance with the Bicycle Parking Ordinance and LAMC Section 12.21 A.16 for residents and visitors, thereby facilitating bicycle ridership.

The subject site is also located within the West Los Angeles Transportation Improvement and Mitigation Specific Plan. The West Los Angeles Transportation Improvement and Mitigation Specific Plan does not address development issues. It identifies trip fee requirements for non-residential projects.

2

Consistent with the Palms – Mar Vista – Del Rey Community Plan and General Plan, the proposed 42-unit mixed-use development adds new mixed-income multi-family housing to Los Angeles' housing supply in a neighborhood which is conveniently located to a variety of community services including transit stops. The project meets parking, yard, open space, and landscaping requirements, with modifications to allow additional FAR, and reduced parking through the Density Bonus Ordinance. Therefore, the project is consistent with the applicable general plan designation and all applicable general plan policies as well as with the applicable zoning designation and regulations.

**(b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.**

The subject site is located in close at the intersection of Motor Avenue and Tabor Street in the Palms neighborhood. The development consists of a mixed-use project on a lot that is approximately 14,997 square feet (0.344 acres) in size, and is wholly within the City of Los Angeles.

The subject site is substantially surrounded by urban uses in close proximity to major arterials including Motor Avenue to the west and Palms Boulevard to the north. Lots adjacent to the subject site are zoned R3-1, C2-1, and [Q]PF-1XL, and are developed with low- to mid-rise multi-family and commercial uses Neighboring lots to the east (across the alley) are zoned R3-1 and developed with multi-family uses. The lot to the north (across the alley) is zoned [Q]PF-1XL and developed with an elementary school. The subject site is also served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, as well as by local and regional bus lines operated by the Culver City Bus, Big Blue Bus, Los Angeles Metro, and LADOT. Therefore, it can be found that the proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.

**(c) The project site has no value as habitat for endangered, rare or threatened species.**

The subject site is located within an established area that is fully-developed with a commercial corridor with low- to medium-density multi-family and commercial uses. The site is previously disturbed and surrounded by development. There are no protected trees on the site. The project does not involve the removal of healthy, mature, scenic trees because the trees being removed (palm) are not protected trees. Therefore, the site is not, and has no value as, a habitat for endangered, rare or threatened species.

**(d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.**

The proposed project replaces an existing one-story commercial building, adding 42 new housing units and 1,770 square feet of ground-floor commercial to the subject site.

Based upon the existing mobility and circulation networks in direct proximity to the proposed project, the introduction of 42 additional units to the community will result in no traffic impacts. The traffic impact analysis, prepared by Overland Traffic Consultants, Inc. dated May 1, 2017, concluded the Project will result in net project trip generation of 179 daily trips with thirty (30) a.m. peak hour trips and two (2) p.m. peak hour trips. The traffic impact analysis also indicated there will be no significant traffic impacts at the intersection of Motor Avenue and Palms Boulevard, at the intersection of Motor Avenue and Tabor Avenue, and at the driveway off of Linwood Avenue. The traffic impact analysis was reviewed by the Los Angeles Department of Transportation (LADOT). In a memo dated May 30, 2017, LADOT determined that the analysis

3

ENV-2016-4881-CE                                                                        09/01/2017

adequately describes the project-related impact of the proposed development Therefore, the
project will not have any significant impacts to traffic.

The Department of Building and Safety will require a haul route for the export of 6,000 cubic
yards of soil in a Special Grading Area. Regulatory Compliance Measures (RCMs) include the
submittal of a Geology and Soils Report to the Department of Building and Safety (DBS), and
compliance with a Geology and Soils Report Approval Letter, issued by DBS on March 8, 2017
(LOG # 96213-01), which details conditions of approval that must be followed. In addition, the
RCMs require that design and construction of the building must conform to the California
Building Code, and grading on site shall comply with the City's Landform Grading Manual, as
approved by the Department of Building and Safety Grading Division. According to Navigate
LA, within 500 feet of the subject site, there is one other haul route application in conjunction
with the construction of a new 5-story, 49-unit apartment building over 1 level of subterranean
parking, located at 3628-3642 South Motor Avenue, which is currently pending. In light of the
increase in construction activity in Grading Hillside Areas and the increase in associated truck
traffic related to the import and export of soil, a haul route monitoring program is being
implemented by the Department of Building and Safety for Council Districts 4 and 5 for added
enforcement to ensure safety and to protect the quality of life of area residents. As part of this
program, a haul route monitor is assigned to a geographic area to monitor haul routes and keep
track of daily activities in order to minimize impacts to neighboring residents  Haul routes are
tracked via a Map for each district to identify the locations of construction sites for which a haul
route was required  The haul route approval will include RCMs and recommended conditions
prepared by LADOT to be considered by the Board of Building and Safety Commissioners to
reduce the impacts of construction related hauling activity, monitor the traffic effects of hauling,
and reduce haul trips in response to congestion. Therefore, no foreseeable cumulative impacts
are expected

The project will be subject to Regulatory Compliance Measures (RCMs), which require
compliance with the City of Los Angeles Noise Ordinance; pollutant discharge, dewatering,
stormwater mitigations; and Best Management Practices for stormwater runoff. The project
must comply with the adopted City of Los Angeles Noise Ordinances Nos. 144,331 and 161,574,
as well as any subsequent Ordinances, which prohibit the emission or creation of noise beyond
certain levels. These Ordinances cover both operational noise levels (i.e., post-construction),
and any construction noise impacts  These RCMs will ensure the project will not have significant
impacts on noise and water. As a result of this mandatory compliance, the proposed project will
not result in any significant impacts on noise or water.

The building construction phase includes the construction of the proposed building on the
subject property, which grading and a haul-route for the importing/exporting of approximately
6,000 cubic yards of dirt, connection of utilities, laying irrigation for landscaping, architectural
coatings, paving, and landscaping the subject property. These construction activities would
temporarily create emissions of dusts, fumes, equipment exhaust, and other air contaminants
Construction activities involving grading and foundation preparation would primarily generate
PM2.5 and PM10 emissions.  Mobile sources (such as diesel-fueled equipment onsite and
traveling to and from the Project Site) would primarily generate NOx emissions. The application
of architectural coatings would result primarily in the release of ROG emissions  The amount of
emissions generated on a daily basis would vary, depending on the amount and types of
construction activities occurring at the same time.

Nevertheless, appropriate dust control measures would be implemented as part of the Proposed
Project during each phase of development, as required by SCAQMD Rule 403 - Fugitive Dust.
Specifically, Rule 403 control requirements include, but are not limited to, applying water in
sufficient quantities to prevent the generation of visible dust plumes, applying soil binders to
uncovered areas, reestablishing ground cover as quickly as possible, utilizing a wheel washing

4

system to remove bulk material from tires and vehicle undercarriages before vehicles exit the Project Site, and maintaining effective cover over exposed areas.

Best Management Practices (BMP) will be implemented that would include (but not be limited to) the following:

- Unpaved demolition and construction areas shall be wetted at least three times daily during excavation and construction, and temporary dust covers shall be used to reduce emissions and meets SCAQMD Rule 403;
- All dirt/soil loads shall be secured by trimming, watering or other appropriate means to prevent spillage and dust;
- General contractors shall maintain and operate construction equipment to minimize exhaust emissions; and
- Trucks shall not idle but be turned off.

The project, a 29,782-square foot mixed-use building will replace an approximately 6,768-square foot existing commercial building. The project will not result in significant impacts related to air quality because it falls below interim air threshold established by DCP staff. Interim thresholds were developed by DCP staff based on CalEEMod model runs relying on reasonable assumptions, consulting with AQMD staff, and surveying published air quality studies for which criteria air pollutants did not exceed the established SCAQMD construction and operational thresholds. Possible project-related air quality concerns will derive from the mobile source emissions generated from the proposed residential uses for the project site. Operational emissions for project-related traffic will be less than significant. In addition to mobile sources from vehicles, general development causes smaller amounts of "area source" air pollution to be generated from on-site energy consumption (natural gas combustion) and from off-site electrical generation. These sources represent a small percentage of the total pollutants. The inclusion of such emissions adds negligibly to the total significant project-related emissions burden generated by the proposed project. The proposed project will not cause the SCAQMD's recommended threshold levels to be exceeded. Operational emission impacts will be at a less-than-significant level.

The development of the project would not result in any significant effects relating to water quality. The project is not adjacent to any water sources and construction of the project will not · create any impact to water quality. The project will be subject to Regulatory Compliance Measures (RCMs) for pollutant discharge, dewatering, stormwater mitigations, and Best Management Practices for stormwater runoff. Furthermore, the project will comply with the City's stormwater management provisions per LAMC 64.70.

The subject property has a slope of less than 10 percent and is not in a waterway, wetland, or officially designated scenic area. Therefore, there is no substantial evidence that the proposed project will have a specific adverse impact on the physical environment.

Furthermore, the subject site is located within a Transit Priority Area (TPA) as defined by Public Resources Code (PRC) Section 21099(a)(7) and Zoning Information (ZI) File 2452, due to its location within one-half mile of a major transit stop. Therefore, pursuant to SB 743 and PRC Section 21099 (d)(1), "aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a Transit Priority Area shall not be considered significant impacts on the environment". Therefore, the project's aesthetic impacts, such as visual resources, aesthetic character, shade and shadow, light and glare, shall not be considered a significant impact on the environment for CEQA purposes.

ENV-2016-4881-CE                                                                                              09/01/2017

**(e)   The site can be adequately served by all required utilities and public services.**

The project site will be adequately served by all public utilities and services given that the
construction of a mixed-use development will be on a site which has been previously developed
and is consistent with the general plan. The site is currently and adequately served by the City's
Department of Water and Power, the City's Bureau of Sanitation, the Southern California
(SoCal) Gas Company, the Los Angeles Police Department, the Los Angeles Fire Department,
Los Angeles Unified School District, Los Angeles Public Library, and other public services.
These utilities and public services have continuously served the neighborhood for more than 50
years. In addition, the California Green Code requires new construction to meet stringent
efficiency standards for both water and power, such as high-efficiency toilets, dual-flush water
closets, minimum irrigation standards, LED lighting, etc. As a result of these new building codes,
which are required of all projects, it can be anticipated that the proposed project will not create
any impact on existing utilities and public services through the net addition of 42 dwelling units.

The project and its related haul route application can be characterized as in-fill development within
urban areas for the purpose of qualifying for Class 32 Categorical Exemption as a result of meeting
the five conditions listed above. Therefore, based on the facts herein, it can be found that the project
meets the qualifications of the Class 32 Exemption.

## CEQA Section 15300.2: Exceptions to the Use of Categorical Exemptions

The City has further considered whether the proposed project is subject to any of the six (6)
exceptions that would prohibit the use of any of a categorical exemption as set forth in State CEQA
Guidelines Section 15300.2. None of the exceptions are triggered for the following reasons.

There are six (6) Exceptions which the City is required to consider before finding a project exempt
under Class 15303 and 15332:

1)   Location. *Classes 3, 4, 5, 6, and 11 are qualified by consideration of where the project is to be
located – a project that is ordinarily insignificant in its impact on the environment may in a
particularly sensitive environment be significant. Therefore, these classes are considered to
apply in all instances, except where the project may impact on an environmental resource of
hazardous or critical concern where designated, precisely mapped, and officially adopted
pursuant to law by federal, state, or local agencies.*

While the subject site is located within a Special Grading Area and is approximately 1.87 km
from the Newport – Inglewood Fault Zone (onshore), specific Regulatory Compliance Measures
in the City of Los Angeles regulate the grading and construction of projects in these particular
types of "sensitive" locations and will reduce any potential impacts to less than significant.
Regulatory Compliance Measures (RCMs) include but are not limited to:

*   **Regulatory Compliance Measure RC-AQ-1(Demolition, Grading and Construction
    Activities): Compliance with provisions of the SCAQMD District Rule 403.** The
    project shall comply with all applicable standards of the Southern California Air Quality
    Management District, including the following provisions of District Rule 403:
    o   All unpaved demolition and construction areas shall be wetted at least twice daily
        during excavation and construction, and temporary dust covers shall be used to
        reduce dust emissions and meet SCAQMD District Rule 403. Wetting could reduce
        fugitive dust by as much as 50 percent.
    o   The construction area shall be kept sufficiently dampened to control dust caused by
        grading and hauling, and at all times provide reasonable control of dust caused by
        wind.

6

- o All clearing, earth moving, or excavation activities shall be discontinued during periods of high winds (i.e., greater than 15 mph), so as to prevent excessive amounts of dust.
- o All dirt/soil loads shall be secured by trimming, watering or other appropriate means to prevent spillage and dust.
- o All dirt/soil materials transported off-site shall be either sufficiently watered or securely covered to prevent excessive amount of dust.
- o General contractors shall maintain and operate construction equipment so as to minimize exhaust emissions.
- o Trucks having no current hauling activity shall not idle but be turned off.
- **Regulatory Compliance Measure RC-GEO-1 (Seismic):** The design and construction of the project shall conform to the California Building Code seismic standards as approved by the Department of Building and Safety.
- **Regulatory Compliance Measure RC-NO-1 (Demolition, Grading, and Construction Activities):** The project shall comply with the City of Los Angeles Noise Ordinance and any subsequent ordinances, which prohibit the emission or creation of noise beyond certain levels at adjacent uses unless technically infeasible.

These RCMs have been historically proven to work to the satisfaction of the City Engineer to reduce any impacts from the specific environment the project is located. Thus, the location of the project will not result in a significant impact based on its location.

2) **Cumulative Impacts.** *All exemptions for these classes are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant.*

There is not a succession of known projects of the same type and in the same place as the subject project. There is one site within a 500-foot radius from the subject site that is under construction. The site is at 3628-3642 Motor Avenue, which is located approximately 400 feet south of the subject site, approved per Case No. DIR-2016-1262-DB, with building permits (16010-10001-03000) pending and verifications in progress as of 2/15/2017.

While there could be potentially projects of similar type in the same place, a traffic impact analysis, prepared by Overland Traffic Consultants, Inc. dated May 1, 2017, conducts a "Future With Project conditions" analysis that adds Project traffic volumes to the "Future Without Project volumes" which adds "ambient growth of 1% per year as required by LADOT in traffic studies for this area and traffic volumes from other planned development in the area to the existing counts". In a memo dated May 30, 2017, LADOT determined that the analysis adequately describes the project-related impact of the proposed development, and that neither of the two studied intersections would be significantly impacted by project-related traffic.

In addition, all projects will be subject to Regulatory Compliance Measures (RCMs), which require compliance with the City of Los Angeles Noise Ordinance; pollutant discharge, dewatering, stormwater mitigations; and Best Management Practices for stormwater runoff. The haul route approval will include RCMs and recommended conditions prepared by LADOT to be considered by the Board of Building and Safety Commissioners to reduce the impacts of construction related hauling activity, monitor the traffic effects of hauling, and reduce haul trips in response to congestion. Therefore, no foreseeable cumulative impacts are expected.

3) **Significant Effect Due to Unusual Circumstances.** *A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.*

ENV-2016-4881-CE                                                                  09/01/2017

The Project is for the construction of a mixed-use development containing 42 residential units and 1,770 square feet of ground-floor retail. The project involves the demolition of the existing 6,768 square-foot commercial building.

The subject site is substantially surrounded by urban uses in close proximity to major arterials including Motor Avenue to the west and Palms Boulevard to the north. Lots adjacent to the subject site are zoned R3-1, C2-1, and [Q]PF-1XL, and are developed with low- to mid-rise multi-family and commercial uses Neighboring lots to the east (across the alley) are zoned R3-1 and developed with multi-family uses The lot to the north (across the alley) is zoned [Q]PF-1XL and developed with an elementary school. The subject site is also served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, as well as by local and regional bus lines operated by the Culver City Bus, Big Blue Bus, Los Angeles Metro, and LADOT. The subject site is located within an established area that is fully-developed with a commercial corridor with low-to medium-density multi-family and commercial uses. The site is previously disturbed and surrounded by development. As such, there are no unusual circumstances which may lead to a significant effect on the environment.

4)  **Scenic Highways.** *A categorical exemption shall not be used for a project which may result in damage to scenic resources, including but not limited to, trees, historic buildings, rock outcroppings, or similar resources, within a highway officially designated as a state scenic highway.*

    The only State Scenic Highway within the City of Los Angeles is the Topanga Canyon State Scenic Highway, State Route 27, which travels through a portion of Topanga State Park. The Scenic Highway is located over 10 miles west of the subject site. Therefore, no damage to scenic resources within a state scenic highway would occur as a result of this Project.

5)  **Hazardous Waste Sites.** *A categorical exemption shall not be used for a project located on a site which is included on any list complied pursuant to Section 65962.5 of the Government Code.*

    The subject property is not in an officially mapped area of severe geologic hazard, or within an official Seismic Hazard Zone. According to Envirostor, the State of California's database of Hazardous Waste Sites, neither the subject site, nor any site in the vicinity, is identified as a hazardous waste site.

6)  **Historical Resources.** *A categorical exemption shall not be used for a project which may cause a substantial adverse change in the significance of a historical resource.*

    The existing one-story commercial building was built in 1923 and is known as the Palms Market. The project site has not been identified as a historic resource by local or state agencies, and the project site has not been determined to be eligible for listing in the National Register of Historic Places, California Register of Historical Resources, the Los Angeles Historic-Cultural Monuments Register, and/or any local register.

    The subject site was found to be a potential historic resource based on the City's HistoricPlacesLA website and SurveyLA, the citywide survey of Los Angeles, with the existing Palms Market on-site as a "rare example of an early neighborhood market still in operation at its original location". However, a Historical Evaluation report prepared by Sapphos Environmental, Inc., dated March 10, 2017, found the project will not result in any impacts to a historical resource. The report was accepted by the Office of Historic Resources ("OHR") in correspondence dated March 20, 2017. Based on this, the project will not result in a substantial adverse change to the significance of a historic resource and this exception does not apply.

8

2



**DEPARTMENT OF**
**CITY PLANNING**

CITY PLANNING COMMISSION

DAVID H. J. AMBROZ
PRESIDENT

RENEE DAKE WILSON
VICE-PRESIDENT

CAROLINE CHOE
RICHARD KATZ
JOHN W. MACK
SAMANTHA MILLMAN
MARC MITCHELL
VERONICA PADILLA-CAMPOS
DANA M. PERLMAN

ROCKY WILES
COMMISSION OFFICE MANAGER
(213) 978-1300

# CITY OF LOS ANGELES
CALIFORNIA

ERIC GARCETTI
MAYOR

**EXECUTIVE OFFICES**
200 N. SPRING STREET, ROOM 525
LOS ANGELES, CA 90012-4801

VINCENT P. BERTONI, AICP
DIRECTOR
(213) 978-1271

KEVIN J. KELLER, AICP
EXECUTIVE OFFICER
(213) 978-1272

LISA M. WEBBER, AICP
DEPUTY DIRECTOR
(213) 978-1274

JAN ZATORSKI
DEPUTY DIRECTOR
(213) 978-1273

http://planning.lacity.org

## DIRECTOR'S DETERMINATION
## DENSITY BONUS & AFFORDABLE HOUSING INCENTIVES

September 1, 2017

| | |
|---|---|
| **Applicant/Owner** | |
| Hiro Kobayashi | **Case No.** DIR-2016-4880-DB |
| 3568 Motor LLC | **CEQA:** ENV-2016-4881-CE |
| 800 South Figueroa Street, | **Location:** 3558-3570 South Motor Avenue, 10313 West Tabor Street |
| Suite 960 | **Council District:** 5 – Koretz |
| Los Angeles, CA 90017 | **Neighborhood Council:** Palms |
| | **Community Plan Area:** Palms – Mar Vista – Del Rey |
| **Representative** | **Land Use Designation:** General Commercial |
| Dana Sayles | **Zone:** C2-1 |
| Three6ixty | **Legal Description:** Block: S, Tract: THE PALMS, |
| 4309 Overland Avenue | Lot: 13 |
| Culver City, CA 90230 | |

**Last Day to File an Appeal:** September 18, 2017

### DETERMINATION – Density Bonus/Affordable Housing Incentives Program

Pursuant to the Los Angeles Municipal Code (LAMC) Section 12.22 A.25, I have reviewed the proposed project and as the designee of the Director of Planning, I hereby:

**Approve** the following incentive requested by the applicant for a project totaling 42 dwelling units. The project will reserve 10 percent, or 4 dwelling units, of the 38 total base dwelling units permitted on the site for Very Low Income household occupancy for a period of 55 years. The Density Bonus includes the following requested incentive:

1.   **Floor Area Ratio.** A 32.5 percent increase in the allowable Floor Area Ratio allowing a total floor area ratio of 1.98:1 in lieu of the normal maximum of 1.5:1.

Determined, based on the whole of the administrative record the project is exempt from the California Environmental Quality Act (CEQA) pursuant to State CEQA Guidelines Article 19, Sections 15304 and 15332, and City CEQA Guidelines Article III, Section 1, Class 4 Category 1, and there is no substantial evidence demonstrating that an exception to a categorical exemption pursuant to CEQA Guidelines, Section 15300.2 applies.

**Adopt** the attached Findings.

ƐX3

## CONDITIONS OF APPROVAL

1. **Site Development.** Except as modified herein, the project shall be in substantial conformance
with the plans and materials submitted by the Applicant, stamped "Exhibit A," and attached to
the subject case file. No change to the plans will be made without prior review by the
Department of City Planning, West/Coastal/South Project Planning Division, and written
approval by the Director of Planning. Each change shall be identified and justified in writing.
Minor deviations may be allowed in order to comply with the provisions of the Los Angeles
Municipal Code or the project conditions.

2. **Residential Density.** The project shall be limited to a maximum density of 42 residential units
including Density Bonus Units.

3. **Affordable Units.** A minimum of 4 units, that is 10 percent of the base 38 dwelling units, shall
be reserved as affordable units, as defined by the State Density Bonus Law 65915 (c)(1) or
(c)(2). No additional affordable units are required per Assembly Bill (AB) 2222 as replacement
units as HCIDLA has determined there are currently no affordable units on-site.

4. **Changes in Restricted Units.** Deviations that increase the number of restricted affordable
units or that change the composition of units or change parking numbers shall be consistent
with LAMC Section 12.22 A.25 (9a-d).

5. **Housing Requirements.** Prior to issuance of a building permit, the owner shall execute a
covenant to the satisfaction of the Los Angeles Housing and Community Investment
Department (HCIDLA) to make 4 units available to Very Low Income Households, for rental
as determined to be affordable to such households by HCIDLA for a period of 55 years.
Enforcement of the terms of said covenant shall be the responsibility of HCIDLA. The applicant
will present a copy of the recorded covenant to the Department of City Planning for inclusion
in this file. The project shall comply with any monitoring requirements established by the
HCIDLA. Refer to the Density Bonus Legislation Background section of this determination.

6. **Floor Area.** The project shall be limited to 29,807 square feet of floor area, as shown in Exhibit
"A".

7. **Automobile Parking.** Based upon the number and/or type of dwelling units proposed 42
parking spaces shall be provided for the project. Vehicle parking shall be provided consistent
with LAMC Section 12.22 A.25, Parking Option 1, which permits one on-site parking space for
each residential unit with one or fewer bedrooms; two on-site parking spaces for each
residential unit with two to three bedrooms; and two-and-one-half parking spaces for each
residential unit with four or more bedrooms. The Bicycle Parking Ordinance, LAMC Section
12.21.A.4, allows affordable residential projects to reduce required vehicle parking by 10
percent. Based upon the number and type of dwelling units proposed and the 10 percent
reduction per the Bicycle Ordinance, 38 residential parking spaces shall be provided. The
project shall provide 42 residential parking spaces as provided in Exhibit A. For the
commercial uses, the project shall provide 7 commercial parking spaces, at a ratio of one
space for every 250 square feet of commercial square footage.

8. **Automobile Parking for Commercial Uses.** As required by LAMC Section 12.21 A.4(c), the
project shall provide a minimum of 7 automobile parking spaces for the 1,770 square feet of
commercial uses, at a ratio of one space for every 250 square feet of commercial square
footage. The project shall provide 12 commercial parking spaces as provided in Exhibit A.

9. **Adjustment of Parking.** In the event that the number of Restricted Affordable Units should
increase, or the composition of such units should change (i.e. the number of bedrooms, or the

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001115

number of units made available to Senior Citizens and/or Disabled Persons), or the applicant selects another Parking Option (including Bicycle Parking Ordinance) and no other Condition of Approval or incentive is affected, then no modification of this determination shall be necessary, and the number of parking spaces shall be re-calculated by the Department of Building and Safety based upon the ratios set forth above.

10. **Bicycle Parking.** Bicycle parking shall be provided consistent with LAMC 12.21 A.16. Long-term bicycle parking shall be provided at a rate of one per dwelling unit or guest room. Additionally, short-term bicycle parking shall be provided at a rate of one per ten dwelling units or guest rooms, with a minimum of two short-term bicycle parking spaces. Short-term and long-term bicycle parking for general retail stores requires one bicycle parking space per 2,000 square feet, with a minimum of two bicycle parking spaces for both long- and short-term bicycle parking. Based upon the number of dwelling units, 42 long-term and 5 short-term bicycle parking spaces shall be provided on-site for residential uses. In addition, 2 long-term and 2 short-term bicycle parking spaces shall be provided for commercial uses. Both long-term and short-term bicycle parking must be located consistent with LAMC Section 12.21 A.16.

### Administrative Conditions

11. **Final Plans.** Prior to the issuance of any building permits for the project by the Department of Building and Safety, the applicant shall submit all final construction plans that are awaiting issuance of a building permit by the Department of Building and Safety for final review and approval by the Department of City Planning. All plans that are awaiting issuance of a building permit by the Department of Building and Safety shall be stamped by Department of City Planning staff "Plans Approved". A copy of the Plans Approved, supplied by the applicant, shall be retained in the subject case file.

12. **Notations on Plans.** Plans submitted to the Department of Building and Safety, for the purpose of processing a building permit application shall include all of the Conditions of Approval herein attached as a cover sheet, and shall include any modifications or notations required herein.

13. **Approval, Verification and Submittals.** Copies of any approvals, guarantees or verification of consultations, review of approval, plans, etc., as may be required by the subject conditions, shall be provided to the Department of City Planning prior to clearance of any building permits, for placement in the subject file.

14. **Code Compliance.** Use, area, height, and yard regulations of the zone classification of the subject property shall be complied with, except where granted conditions differ herein.

15. **Department of Building and Safety.** The granting of this determination by the Director of Planning does not in any way indicate full compliance with applicable provisions of the Los Angeles Municipal Code Chapter IX (Building Code). Any corrections and/or modifications to plans made subsequent to this determination by a Department of Building and Safety Plan Check Engineer that affect any part of the exterior design or appearance of the project as approved by the Director, and which are deemed necessary by the Department of Building and Safety for Building Code compliance, shall require a referral of the revised plans back to the Department of City Planning for additional review and sign-off prior to the issuance of any permit in connection with those plans.

16. **Covenant.** Prior to the issuance of any permits relative to this matter, an agreement concerning all the information contained in these conditions shall be recorded in the County

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001116

Recorder's Office. The agreement shall run with the land and shall be binding on any
subsequent property owners, heirs or assign. The agreement must be submitted to the
Department of City Planning for approval before being recorded. After recordation, a copy
bearing the Recorder's number and date shall be provided to the Department of City Planning
for attachment to the file.

## 17. Indemnification and Reimbursement of Litigation Costs.

Applicant shall do all of the following:

(i)   Defend, indemnify and hold harmless the City from any and all actions against the
      City relating to or arising out of, in whole or in part, the City's processing and
      approval of this entitlement, including but not limited to, an action to attack,
      challenge, set aside, void, or otherwise modify or annul the approval of the
      entitlement, the environmental review of the entitlement, or the approval of
      subsequent permit decisions, or to claim personal property damage, including from
      inverse condemnation or any other constitutional claim.

(ii)  Reimburse the City for any and all costs incurred in defense of an action related to
      or arising out of, in whole or in part, the City's processing and approval of the
      entitlement, including but not limited to payment of all court costs and attorney's
      fees, costs of any judgments or awards against the City (including an award of
      attorney's fees), damages, and/or settlement costs.

(iii) Submit an initial deposit for the City's litigation costs to the City within 10 days'
      notice of the City tendering defense to the Applicant and requesting a deposit. The
      initial deposit shall be in an amount set by the City Attorney's Office, in its sole
      discretion, based on the nature and scope of action, but in no event shall the initial
      deposit be less than $50,000. The City's failure to notice or collect the deposit does
      not relieve the Applicant from responsibility to reimburse the City pursuant to the
      requirement in paragraph (ii).

(iv)  Submit supplemental deposits upon notice by the City. Supplemental deposits may
      be required in an increased amount from the initial deposit if found necessary by
      the City to protect the City's interests. The City's failure to notice or collect the
      deposit does not relieve the Applicant from responsibility to reimburse the City
      pursuant to the requirement in paragraph (ii).

(v)   If the City determines it necessary to protect the City's interest, execute an
      indemnity and reimbursement agreement with the City under terms consistent with
      the requirements of this condition.

The City shall notify the applicant within a reasonable period of time of its receipt of any
action and the City shall cooperate in the defense. If the City fails to notify the applicant of
any claim, action, or proceeding in a reasonable time, or if the City fails to reasonably
cooperate in the defense, the applicant shall not thereafter be responsible to defend,
indemnify or hold harmless the City.

The City shall have the sole right to choose its counsel, including the City Attorney's office
or outside counsel. At its sole discretion, the City may participate at its own expense in
the defense of any action, but such participation shall not relieve the applicant of any
obligation imposed by this condition. In the event the Applicant fails to comply with this
condition, in whole or in part, the City may withdraw its defense of the action, void its
approval of the entitlement, or take any other action. The City retains the
right to make all decisions with respect to its representations in any legal proceeding,
including its inherent right to abandon or settle litigation.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001117



For purposes of this condition, the following definitions apply:

"City" shall be defined to include the City, its agents, officers, boards, commissions, committees, employees, and volunteers.

"Action" shall be defined to include suits, proceedings (including those held under alternative dispute resolution procedures), claims, or lawsuits. Actions includes actions, as defined herein, alleging failure to comply with <u>any</u> federal, state or local law.

Nothing in the definitions included in this paragraph are intended to limit the rights of the City or the obligations of the Applicant otherwise created by this condition.

*DIR-2016-4880-DB*                                                                                    *Page 5 of 18*





## PROJECT BACKGROUND

The site is located in the Palms – Mar Vista – Del Rey Community Plan area at the northeastern corner of Motor Avenue and Tabor Street, and consists of two lots that measure approximately 14,997 square feet in lot area. The subject site is zoned C2-1, with a General Plan land use designation of General Commercial. The C2-1 zone permits a 1.5:1 Floor Area Ratio ("FAR") and unlimited height. The subject property is within the West Los Angeles Transportation Improvement and Mitigation Specific Plan and in a Transit Priority Area.

The proposed project includes the demolition of an existing one-story three-unit commercial building, and the construction of a six-story mixed-use commercial and residential building providing 42 apartment units, including a minimum of 4 units for Very Low Income Households, and 1,770 square feet of ground-floor retail. The project proposes a total of 54 vehicular parking spaces and a total of 44 long-term and 7 short-term parking spaces. The project consists of 20 vehicular parking spaces at the ground floor and 34 residential parking spaces in one subterranean parking level. The total project size is limited to 29,807 square feet, and the building will measure approximately 72 feet and 7 inches in height. The proposed project requests a haul route to export 6,000 cubic yards of soil. Two non-protected trees are being removed.

The proposed project will provide pedestrian-oriented retail, enhanced paving, off-street parking, bicycle parking, and planters to enhance this portion of Motor Avenue and Tabor Street. Parking access is located off the alley, opening Motor Avenue and Tabor Street for pedestrian and bicycle access only. Open space is provided in the form of front-facing private balconies along Motor Avenue and Tabor Street, an inner courtyard and outdoor deck on Level 2, and an outdoor deck on Level 6. The amenities on Level 2 include stained color concrete paving, steel frame seating areas, COR-TEN steel and built-in benches, 30-inch high steel planters, a green wall, portable barbecues, and fiberglass rectangular planters, as provided in Exhibit "A". Eight (8) new street trees will be planted along the sidewalk on Motor Avenue and Tabor Avenue per the Urban Forestry Division. The proposed project will provide a total of 51 bicycle parking spaces, and five percent (4 spaces) of the required vehicular parking will be configured as electric vehicle charging stations.

Pursuant to LAMC Section 12.22.A.25, the applicant requests a Density Bonus Compliance Review. In consideration of 4 affordable units, the applicant seeks one on-menu incentive: a 32.5 percent increase in Floor Area Ratio (FAR) from 1.5:1 to 1.98:1.

In accordance with California State Law (including Senate Bill 1818, and Assembly Bills 2280 and 2222), the applicant is proposing to utilize Section 12.22 A.25 (Density Bonus) of the Los Angeles Municipal Code (LAMC), which permits a density bonus of 35 percent. The project is requesting a density bonus of 32.5 percent. This allows for a maximum of 52 total dwelling units in lieu of the otherwise maximum density limit of 38 dwelling units on the property. A density bonus is automatically granted in exchange for the applicant setting aside a portion of dwelling units, in this case 4 units, for habitation by Very Low Income Households for a period of 55 years. Consistent with the Density Bonus Ordinance, the Applicant is also automatically granted a reduction in required parking based on two Parking Options, and a reduction based on the Bicycle Parking Ordinance. The Applicant selected Parking Option 1, which requires a total of 42 residential parking spaces. The Applicant also selected an automobile parking reduction based on the Bicycle Parking Ordinance. Based on the 10 percent automobile parking reduction with the replacement of bicycle parking spaces in excess of the normally required bicycle parking spaces, the proposed project shall provide a minimum of 38 automobile spaces and a minimum of 51 bicycle parking spaces.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001119

**Housing Replacement**

With Assembly Bill 2222, applicants of Density Bonus projects filed as of January 1, 2015 must demonstrate compliance with the housing replacement provisions which require replacement of rental dwelling units that either exist at the time of application of a Density Bonus project, or have been vacated or demolished in the five-year period preceding the application of the project. This applies to all pre-existing units that have been subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to persons and families of lower or very low income; subject to any other form of rent or price control; or occupied by Low or Very Low Income Households. A Determination made by the Los Angeles Housing and Community Investment Department (HCIDLA) dated February 24, 2017 concluded that there are no residential units on the property within the last five years; AB 2222 does not apply to commercial structures, so no AB 2222 replacement affordable units are required. Per Density Bonus state law, the proposed project will be required to provide 4 units affordable to Very Low Income Households. This is reflected in the Conditions of Approval. Refer to the Density Bonus Legislation Background section of this determination for additional information.

**LAMC Criteria**

As permitted by LAMC Section 12.22.A.25 the applicant is requesting two incentives that will facilitate the provision of affordable housing at the site: a 32.5 percent increase in the allowable FAR from 1.5:1 to 1.98. Pursuant to LAMC Section 12.22 A.25 (e)(2), in order to be eligible for any on-menu incentives, a Housing Development Project (other than an Adaptive Reuse Project) shall comply with the following criteria, which it does:

a.  *The façade of any portion of a building that abuts a street shall be articulated with a change of material or a break in plane, so that the façade is not a flat surface.*

The proposed mixed-use development abuts two streets, Motor Avenue and Tabor Street, as well as a full 20-foot wide alley to the rear and side. As provided in Exhibit "A", the street-facing facades are articulated to modulate the building wall and create distinct breaks in the building plane. The building design incorporates a variety of recesses, stepbacks, and varied rooflines, and different materials to add architectural interest to the building and create distinct breaks in the building plane. The building façade is articulated horizontally to create distinct vertical components through the use of varied building planes and materials. The building materials include corrugated metal siding, longboard wood siding, cement plaster, clear anodized storefront system, steel canopies, glass guardrails, and perforated metal sun shades as provided in Exhibit "A". Together, these elements are applied to create sufficient breaks in plane and articulation.

b.  *All buildings must be oriented to the street by providing entrances, windows architectural features and/or balconies on the front and along any street facing elevation.*

The subject site has a frontage of approximately 100 feet along Motor Avenue and 150 feet along Tabor Street. The proposed project has one residential entrance and two commercial entrances along Tabor Street, with balconies along both Motor Avenue and Tabor Street. The vehicular entrance is provided along the rear alley that is accessed from Tabor Street. The proposed project includes many architectural features to help define the main entrances. For instance, the residential lobby is recessed to create a distinct break from the commercial storefront. The commercial entrances are accentuated through steel canopies and storefront system to create transparency at the ground floor along Tabor Street.

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001120**



c.   *The Housing Development Project shall not involve a contributing structure in a
     designated Historic Preservation Overlay Zone (HPOZ) and shall not involve a
     structure that is a City of Los Angeles designated Historic-Cultural Monument (HCM).*

     The proposed project is not located within a designated Historic Preservation Overlay
     Zone, nor does it involve a property that is designated as a City Historic-Cultural
     Monument.

d.   *The Housing Development Project shall not be located on a substandard street in a
     Hillside Area or in a Very High Fire Hazard Severity Zone as established in Section
     57.25.01 of the LAMC.*

     The project is not located in a Hillside Area, nor is it located in a Very High Fire Hazard
     Severity Zone.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001121



The project proposes an allowance for a 1.98:1 Floor Area Ratio (FAR) in lieu of the normal maximum 1.5:1 FAR. The proposed project qualifies for a Density Bonus FAR increase because it is located within 1,500 feet of several transit stops as defined by LAMC Section 12.22.A.25. The subject site is located at the intersection of Motor Avenue and Tabor Street, and is served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, and is within 1,500 feet of Transit Stops served by Culver City Bus Line 3 and Big Blue Bus Lines 17 and Rapid 12.

## DENSITY BONUS/AFFORDABLE HOUSING INCENTIVES COMPLIANCE FINDINGS

1. **Pursuant to Section 12.22 A.25(c) of the LAMC, the Director <u>shall approve</u> a density bonus and requested incentive(s) unless the director finds that:** .

   a. *The incentives are not required to provide for affordable housing costs as defined in California Health and Safety Code Section 50052.5 or Section 50053 for rents for the affordable units.*

   The record does not contain substantial evidence that would allow the Director to make a finding that the requested incentives are not necessary to provide for affordable housing costs per State Law. The California Health & Safety Code Sections 50052.5 and 50053 define formulas for calculating affordable housing costs for Very Low, Low, and Moderate Income Households. Section 50052.5 addresses owner-occupied housing and Section 50053 addresses rental households. Affordable housing costs are a calculation of residential rent or ownership pricing not to exceed 25 percent gross income based on area median income thresholds dependent on affordability levels.

   The list of on-menu incentives in 12.22 A.25 was pre-evaluated at the time the Density Bonus Ordinance was adopted to include types of relief that minimize restrictions on the size of the project. As such, the Director will always arrive at the conclusion that the density bonus on-menu incentives are required to provide for affordable housing costs because the incentives by their nature increase the scale of the project.

   The requested incentive, an increase in the Floor Area Ratio, is expressed in the Menu of Incentives per LAMC 12.22 A.25(f) and, as such, permit exceptions to zoning requirements that result in building design or construction efficiencies that provide for affordable housing costs. The requested incentive allows the developer to expand the building envelope so the additional units can be constructed and the overall space dedicated to residential uses is increased. The incentive supports the applicant's decision to set aside 4 Very Low Income dwelling units for 55 years.

   *Floor Area Ratio Increase:* The subject site is zoned C2-1 which allows 38 units on the 14,997 square foot site, with a maximum 1.5:1 Floor Area Ratio (FAR) and unlimited building height. The FAR Increase incentive permits a percentage increase in the allowable Floor Area Ratio equal to the percentage of Density Bonus for which the Housing Development Project is eligible, not to exceed 35 percent. While the proposed project qualifies for a maximum 2.025:1 FAR, the proposed project is actually providing a maximum 1.98 FAR and is proposing 29,782 square feet of floor area. The proposed 1.98:1 FAR creates 7,311 additional square feet.

   | FAR by-right | Buildable Lot Area (sf) | Total Floor Area (sf) |
   |---|---|---|
   | 1.5:1 | 14,997 | 14,997 X 1.5= 22,495.5 |

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001122



| FAR proposed | Buildable Lot Area (sf) | Total Floor Area (sf) | Additional Floor Area (sf) |
|---|---|---|---|
| 1.98:1 | 14,997 | 29,806.5 | 29,806.5- 22,495.5= **7,311** |

b. *The Incentive will have specific adverse impact upon public health and safety or the physical environment, or on any real property that is listed in the California Register of Historical Resources and for which there is no feasible method to satisfactorily mitigate or avoid the specific adverse Impact without rendering the development unaffordable to Very Low, Low and Moderate Income households. Inconsistency with the zoning ordinance or the general plan land use designation shall not constitute a specific, adverse impact upon the public health or safety.*

The proposed incentives <u>will not</u> have a specific adverse impact. A "specific adverse impact" is defined as "a significant, quantifiable, direct and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete" (LAMC Section 12.22.A.25(b)). The proposed Project and potential impacts were analyzed in accordance with the California Environmental Quality Act (CEQA) Guidelines and the City's L.A. CEQA Thresholds Guide. These two documents establish guidelines and thresholds of significant impact, and provide the data for determining whether or not the impacts of a proposed Project reach or exceed those thresholds. Analysis of the proposed Project determined that it is Categorically Exempt from environmental review pursuant to State CEQA Guidelines Article 19, Sections 15304 (Class 4) and 15332 (Class 32), and City CEQA Guidelines Article III, Section 1, Class 4 Category 1. The Class 32 Exemption is intended to promote infill development within urbanized areas.

The proposed project qualifies for a Categorical Exemption because it conforms to the definition of "In-fill Projects" as follows:

**(a)** *The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations:*

The project is consistent with the following Elements of the General Plan: Framework Element, Land Use Element (Palms – Mar Vista – Del Rey Community Plan), Housing Element, and the Mobility Element.

**Framework Element:** The Citywide General Plan Framework is a guide for communities to implement growth and development policies by providing a comprehensive long-range view of the City as a whole. The Framework establishes categories of land use that are broadly described by ranges of intensity/density, heights, and lists of typical uses. The Framework Element's land use designation of General Commercial has corresponding zones of C2 and [Q]C2. The subject site is designated for General Commercial land uses and zoned C2-1; therefore, the subject site is consistent with the Framework Element.

**Land Use Element (Palms – Mar Vista – Del Rey Community Plan):** The subject site is located within the Palms – Mar Vista – Del Rey Community Plan ("Community Plan"). The Community Plan designates the site for General Commercial land uses, which has corresponding zones of C1.5, C2, C4, RAS3, and RAS4. The subject site is zoned C2-1, and is therefore consistent with the Community Plan's land use designation. The C2-

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001123



1 zoning of the subject site allows for residential uses at R4 density, unlimited building height and a maximum Floor Area Ratio (FAR) of 1.5:1. The subject site has a lot area of approximately 14,997 square feet, which allows a by-right density 38 residential units in conjunction with LAMC Sections 12.14 A.1(a), 12.13.5 A.1, and 12.11, and up to a maximum of 52 residential units through the Density Bonus pursuant to LAMC Section 12.22 A.25 and Assembly Bill (AB) 2501. The proposed Project is for the construction of new six-story 42-unit mixed-use development containing 1,770 square feet of ground-floor retail and measuring 72 feet and 7 inches in height. The proposed uses, density, and height are allowed by the Community Plan's land use designation in combination with the site's zoning in combination with state Density Bonus law.

**Housing Element**: The Housing Element indicates that not only are more housing units needed to accommodate the City's growth, but that these units need to be a broader array of typologies to meet evolving household types and sizes. In addition, the Housing Element includes an Inventory of Sites for Housing (Housing Element Exhibit H) that identifies parcels suitable for additional residential development without the need for any discretionary zoning action by the City. The site's Assessor Parcel Number (APN # 4314014002) has been identified in the Inventory, and is therefore meeting Housing Element provisions of providing housing on these applicable sites. As mentioned, the proposed Project will demolish an existing commercial building and construct 42 new residential units. The proposed Project will therefore provide a net increase of 42 residential units within close proximity to jobs, transit, and other amenities including an elementary school. Pursuant to Density Bonus requirements, 4 of the total units will be reserved for Very Low Income households, and is therefore achieving the Housing Element goal of providing affordable units and promoting mixed-income developments.

**Mobility Element**: The Mobility Element sets forth objectives and policies to establish a citywide strategy to achieve long-term mobility and accessibility within the City of Los Angeles. The subject site is located at the intersection of Motor Avenue and Tabor Street, and is served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, as well as by local and regional bus lines operated by Culver City Bus, Big Blue Bus, Los Angeles Metro, and LADOT. Specifically, the subject site is within 1,500 feet of Transit Stops served by Culver City Bus Line 3 and Big Blue Bus Lines 17 and Rapid 12; and the subject site is within 0.5 miles from Transit Stops served by Metro Bus Lines 33 and 733, Big Blue Bus Line 5, and LADOT Line Commuter Express Line 431. The proposed Project will allow for a reduction of vehicle trips by placing high-density residential within proximity to public transit, as well as existing retail and amenities along Motor Avenue and the greater Palms neighborhood. Furthermore, the location of ground floor commercial uses and residential lobby will facilitate a pedestrian-oriented environment by providing transparency at the street level, thereby activating the streets. The project also involves the dedication of 3 feet along Motor Avenue and 5 feet along Tabor Street; therefore the building wall will be set back further from the street and allow for wider sidewalks to facilitate pedestrian activity. The proposed Project will also provide bicycle parking spaces in accordance with the Bicycle Parking Ordinance and LAMC Section 12.21 A.16 for residents and visitors, thereby facilitating bicycle ridership.

The subject site is also located within the West Los Angeles Transportation Improvement and Mitigation Specific Plan. The West Los Angeles Transportation Improvement and Mitigation Specific Plan does not address development issues. It identifies trip fee requirements for non-residential projects.

Consistent with the Palms – Mar Vista – Del Rey Community Plan and General Plan, the proposed 42-unit mixed-use development adds new mixed-income multi-family

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001124

housing to Los Angeles' housing supply in a neighborhood which is conveniently located
to a variety of community services including transit stops. The project meets parking,
yard, open space, and landscaping requirements, with modifications to allow additional
FAR, and reduced parking through the Density Bonus Ordinance. Therefore, the project
is consistent with the applicable general plan designation and all applicable general plan
policies as well as with the applicable zoning designation and regulations.

### (b)   The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses:

The subject site is located in close at the intersection of Motor Avenue and Tabor Street
in the Palms neighborhood. The development consists of a mixed-use project on a lot
that is approximately 14,997 square feet (0.344 acres) in size, and is wholly within the
City of Los Angeles.

The subject site is substantially surrounded by urban uses in close proximity to major
arterials including Motor Avenue to the west and Palms Boulevard to the north. Lots
adjacent to the subject site are zoned R3-1, C2-1, and [Q]PF-1XL, and are developed
with low- to mid-rise multi-family and commercial uses Neighboring lots to the east
(across the alley) are zoned R3-1 and developed with multi-family uses. The lot to the
north (across the alley) is zoned [Q]PF-1XL and developed with an elementary school.
The subject site is also served by a variety of transit options including the Metro Expo
Line (806) Palms Station, which is located approximately 0.3 miles from the subject site,
as well as by local and regional bus lines operated by the Culver City Bus, Big Blue Bus,
Los Angeles Metro, and LADOT. Therefore, it can be found that the proposed
development occurs within city limits on a project site of no more than five acres
substantially surrounded by urban uses.

### (c)   The project site has no value as habitat for endangered, rare or threatened species:

The subject site is located within an established area that is fully-developed with a
commercial corridor with low- to medium-density multi-family and commercial uses. The
site is previously disturbed and surrounded by development. There are no protected
trees on the site. The project does not involve the removal of healthy, mature, scenic
trees because the trees being removed (palm) are not protected trees. Therefore, the
site is not, and has no value as, a habitat for endangered, rare or threatened species.

### (d)   Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality:

The proposed project replaces an existing one-story commercial building, adding 42 new
housing units and 1,770 square feet of ground-floor commercial to the subject site.

Based upon the existing mobility and circulation networks in direct proximity to the
proposed project, the introduction of 42 additional units to the community will result in
no traffic impacts. The traffic impact analysis, prepared by Overland Traffic Consultants,
Inc. dated May 1, 2017, concluded the Project will result in net project trip generation of
179 daily trips with thirty (30) a.m. peak hour trips and two (2) p.m. peak hour trips. The
traffic impact analysis also indicated there will be no significant traffic impacts at the
intersection of Motor Avenue and Palms Boulevard, at the intersection of Motor Avenue
and Tabor Avenue, and at the driveway off of Linwood Avenue. The traffic impact
analysis was reviewed by the Los Angeles Department of Transportation (LADOT). In a
memo dated May 30, 2017, LADOT determined that the analysis adequately describes

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001125

the project-related impact of the proposed development. Therefore, the project will not have any significant impacts to traffic.

The Department of Building and Safety will require a haul route for the export of 6,000 cubic yards of soil in a Special Grading Area. Regulatory Compliance Measures (RCMs) include the submittal of a Geology and Soils Report to the Department of Building and Safety (DBS), and compliance with a Geology and Soils Report Approval Letter, issued by DBS on March 8, 2017 (LOG # 96213-01), which details conditions of approval that must be followed. In addition, the RCMs require that design and construction of the building must conform to the California Building Code, and grading on site shall comply with the City's Landform Grading Manual, as approved by the Department of Building and Safety Grading Division. According to Navigate LA, within 500 feet of the subject site, there is one other haul route application in conjunction with the construction of a new 5-story, 49-unit apartment building over 1 level of subterranean parking, located at 3626-3642 South Motor Avenue, which is currently pending. In light of the increase in construction activity in Grading Hillside Areas and the increase in associated truck traffic related to the import and export of soil, a haul route monitoring program is being implemented by the Department of Building and Safety for Council Districts 4 and 5 for added enforcement to ensure safety and to protect the quality of life of area residents. As part of this program, a haul route monitor is assigned to a geographic area to monitor haul routes and keep track of daily activities in order to minimize impacts to neighboring residents. Haul routes are tracked via a Map for each district to identify the locations of construction sites for which a haul route was required. The haul route approval will include RCMs and recommended conditions prepared by LADOT to be considered by the Board of Building and Safety Commissioners to reduce the impacts of construction related hauling activity, monitor the traffic effects of hauling, and reduce haul trips in response to congestion. Therefore, no foreseeable cumulative impacts are expected

The project will be subject to Regulatory Compliance Measures (RCMs), which require compliance with the City of Los Angeles Noise Ordinance; pollutant discharge, dewatering, stormwater mitigations; and Best Management Practices for stormwater runoff. The project must comply with the adopted City of Los Angeles Noise Ordinances Nos. 144,331 and 161,574, as well as any subsequent Ordinances, which prohibit the emission or creation of noise beyond certain levels. These Ordinances cover both operational noise levels (i.e., post-construction), and any construction noise impacts. These RCMs will ensure the project will not have significant impacts on noise and water. As a result of this mandatory compliance, the proposed project will not result in any significant impacts on noise or water.

The building construction phase includes the construction of the proposed building on the subject property, which grading and a haul-route for the importing/exporting of approximately 6,000 cubic yards of dirt, connection of utilities, laying irrigation for landscaping, architectural coatings, paving, and landscaping the subject property. These construction activities would temporarily create emissions of dusts, fumes, equipment exhaust, and other air contaminants. Construction activities involving grading and foundation preparation would primarily generate PM2.5 and PM10 emissions. Mobile sources (such as diesel-fueled equipment onsite and traveling to and from the Project Site) would primarily generate NOx emissions. The application of architectural coatings would result primarily in the release of ROG emissions. The amount of emissions generated on a daily basis would vary, depending on the amount and types of construction activities occurring at the same time.

Nevertheless, appropriate dust control measures would be implemented as part of the Proposed Project during each phase of development, as required by SCAQMD Rule 403

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001126

- Fugitive Dust. Specifically, Rule 403 control requirements include, but are not limited to, applying water in sufficient quantities to prevent the generation of visible dust plumes, applying soil binders to uncovered areas, reestablishing ground cover as quickly as possible, utilizing a wheel washing system to remove bulk material from tires and vehicle undercarriages before vehicles exit the Project Site, and maintaining effective cover over exposed areas.

Best Management Practices (BMP) will be implemented that would include (but not be limited to) the following:

- Unpaved demolition and construction areas shall be wetted at least three times daily during excavation and construction, and temporary dust covers shall be used to reduce emissions and meets SCAQMD Rule 403;
- All dirt/soil loads shall be secured by trimming, watering or other appropriate means to prevent spillage and dust;
- General contractors shall maintain and operate construction equipment to minimize exhaust emissions; and
- Trucks shall not idle but be turned off.

The project, a 29,782-square foot mixed-use building will replace an approximately 6,768-square foot existing commercial building. The project will not result in significant impacts related to air quality because it falls below interim air threshold established by DCP staff. Interim thresholds were developed by DCP staff based on CalEEMod model runs relying on reasonable assumptions, consulting with AQMD staff, and surveying published air quality studies for which criteria air pollutants did not exceed the established SCAQMD construction and operational thresholds. Possible project-related air quality concerns will derive from the mobile source emissions generated from the proposed residential uses for the project site. Operational emissions for project-related traffic will be less than significant. In addition to mobile sources from vehicles, general development causes smaller amounts of "area source" air pollution to be generated from on-site energy consumption (natural gas combustion) and from off-site electrical generation. These sources represent a small percentage of the total pollutants. The inclusion of such emissions adds negligibly to the total significant project-related emissions burden generated by the proposed project. The proposed project will not cause the SCAQMD's recommended threshold levels to be exceeded. Operational emission impacts will be at a less-than-significant level.

The development of the project would not result in any significant effects relating to water quality. The project is not adjacent to any water sources and construction of the project will not create any impact to water quality. The project will be subject to Regulatory Compliance Measures (RCMs) for pollutant discharge, dewatering, stormwater mitigations, and Best Management Practices for stormwater runoff. Furthermore, the project will comply with the City's stormwater management provisions per LAMC 64.70.

The subject property has a slope of less than 10 percent and is not in a waterway, wetland, or officially designated scenic area. Therefore, there is no substantial evidence that the proposed project will have a specific adverse impact on the physical environment.

Furthermore, the subject site is located within a Transit Priority Area (TPA) as defined by Public Resources Code (PRC) Section 21099(a)(7) and Zoning Information (ZI) File 2452, due to its location within one-half mile of a major transit stop. Therefore, pursuant to SB 743 and PRC Section 21099 (d)(1), "aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a Transit Priority Area shall not be considered significant impacts on the environment". Therefore,

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001127

the project's aesthetic impacts, such as visual resources, aesthetic character, shade and shadow, light and glare, shall not be considered a significant impact on the environment for CEQA purposes.

*(e) The site can be adequately served by all required utilities and public services:*

The project site will be adequately served by all public utilities and services given that the construction of a mixed-use development will be on a site which has been previously developed and is consistent with the general plan. The site is currently and adequately served by the City's Department of Water and Power, the City's Bureau of Sanitation, the Southern California (SoCal) Gas Company, the Los Angeles Police Department, the Los Angeles Fire Department, Los Angeles Unified School District, Los Angeles Public Library, and other public services. These utilities and public services have continuously served the neighborhood for more than 50 years. In addition, the California Green Code requires new construction to meet stringent efficiency standards for both water and power, such as high-efficiency toilets, dual-flush water closets, minimum irrigation standards, LED lighting, etc. As a result of these new building codes, which are required of all projects, it can be anticipated that the proposed project will not create any impact on existing utilities and public services through the net addition of 42 dwelling units.

The project and its related haul route application can be characterized as in-fill development within urban areas for the purpose of qualifying for Class 32 Categorical Exemption as a result of meeting the five conditions listed above.

## DENSITY BONUS LEGISLATION BACKGROUND

The California State Legislature has declared that "[t]he availability of housing is of vital statewide importance," and has determined that state and local governments have a responsibility to "make adequate provision for the housing needs of all economic segments of the community." Section §65580, subds. (a), (d). Section 65915 further provides that an applicant must agree to, and the municipality must ensure, the "continued affordability of all Low and Very Low Income units that qualified the applicant" for the density bonus.

With Senate Bill 1818 (2004), state law created a requirement that local jurisdictions approve a density bonus and up to three "concessions or incentives" for projects that include defined levels of affordable housing in their projects. In response to this requirement, the City created an ordinance that includes a menu of incentives (referred to as "on-menu" incentives) comprised of eight zoning adjustments that meet the definition of concessions or incentives in state law (California Government Code Section 65915). The eight on-menu incentives allow for: 1) reducing setbacks; 2) reducing lot coverage; 3) reducing lot width, 4) increasing floor area ratio (FAR); 5) increasing height; 6) reducing required open space; 7) allowing for an alternative density calculation that includes streets/alley dedications; and 8) allowing for "averaging" of FAR, density, parking or open space. In order to grant approval of an on-menu incentive, the City utilizes the same findings contained in state law for the approval of incentives or concessions.

California State Assembly Bill 2222 went into effect January 1, 2015, and with that Density Bonus projects filed as of that date must demonstrate compliance with the housing replacement provisions which require replacement of rental dwelling units that either exist at the time of application of a Density Bonus project, or have been vacated or demolished in the five-year period preceding the application of the project. This applies to all pre-existing units that have been subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to persons and families of lower or very low income; subject to any other form of rent or price control

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001128

(including Rent Stabilization Ordinance); or is occupied by Low or Very Low Income Households (i.e., income levels less than 80 percent of the area median income [AMI]). The replacement units must be equivalent in size, type, or both and be made available at affordable rent/cost to, and occupied by, households of the same or lower income category as those meeting the occupancy criteria. Prior to the issuance of any Director's Determination for Density Bonus and Affordable Housing Incentives, the Housing and Community Investment Department (HCIDLA) is responsible for providing the Department of City Planning, along with the applicant, a determination letter addressing replacement unit requirements for individual projects. The City also requires a Land Use Covenant recognizing the conditions be filed with the County of Los Angeles prior to granting a building permit on the project.

Assembly Bill 2222 also increases covenant restrictions from 30 to 55 years for projects approved after January 1, 2015. This determination letter reflects these 55 year covenant restrictions.

Under Government Code Section § 65915(a), § 65915(d)(2)(C) and § 65915(d)(3) the City of Los Angeles complies with the State Density Bonus law by adopting density bonus regulations and procedures as codified in Section 12.22 A.25 of the Los Angeles Municipal Code. Section 12.22 A.25 creates a procedure to waive or modify Zoning Code standards which may prevent, preclude or interfere with the effect of the density bonus by which the incentive or concession is granted, including legislative body review. The Ordinance must apply equally to all new residential development.

In exchange for setting aside a defined number of affordable dwelling units within a development, applicants may request up to three incentives in addition to the density bonus and parking relief which are permitted by right. The incentives are deviations from the City's development standards, thus providing greater relief from regulatory constraints. Utilization of the Density Bonus/Affordable Housing Incentives Program supersedes requirements of the Los Angeles Municipal Code and underlying ordinances relative to density, number of units, parking, and other requirements relative to incentives, if requested.

For the purpose of clarifying the Covenant Subordination Agreement between the City of Los Angeles and the United States Department of Housing and Urban Development (HUD) note that the covenant required in the Conditions of Approval herein shall prevail unless pre-empted by State or Federal law.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001129

## TIME LIMIT – OBSERVANCE OF CONDITIONS

All terms and conditions of the Director's Determination shall be fulfilled before the use may be established. Pursuant to LAMC Section 12.25 A.2, the instant authorization is further conditional upon the privileges being utilized within **three years** after the effective date of this determination and, if such privileges are not utilized, building permits are not issued, or substantial physical construction work is not begun within said time and carried on diligently so that building permits do not lapse, the authorization shall terminate and become void.

## TRANSFERABILITY

This determination runs with the land. In the event the property is to be sold, leased, rented or occupied by any person or corporation other than yourself, it is incumbent that you advise them regarding the conditions of this grant. If any portion of this approval is utilized, then all other conditions and requirements set forth herein become immediately operative and must be strictly observed.

## VIOLATIONS OF THESE CONDITIONS, A MISDEMEANOR

The applicant's attention is called to the fact that this grant is not a permit or license and that any permits and licenses required by law must be obtained from the proper public agency. Furthermore, if any condition of this grant is violated or not complied with, then the applicant or his successor in interest may be prosecuted for violating these conditions the same as for any violation of the requirements contained in the Municipal Code, or the approval may be revoked.

Section 11.00 of the LAMC states in part (m): "It shall be unlawful for any person to violate any provision or fail to comply with any of the requirements of this Code. Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code shall be guilty of a misdemeanor unless that violation or failure is declared in that section to be an infraction. An infraction shall be tried and be punishable as provided in Section 19.6 of the Penal Code and the provisions of this section. Any violation of this Code that is designated as a misdemeanor may be charged by the City Attorney as either a misdemeanor or an infraction.

Every violation of this determination is punishable as a misdemeanor unless provision is otherwise made, and shall be punishable by a fine of not more than $1,000 or by imprisonment in the County Jail for a period of not more than six months, or by both a fine and imprisonment."

## APPEAL PERIOD - EFFECTIVE DATE

**The Determination in this matter will become effective and final fifteen (15) days after the date of mailing of the Notice of Director's Determination** unless an appeal there from is filed with the City Planning Department. It is strongly advised that appeals be filed early during the appeal period and in person so that imperfections/incompleteness may be corrected before the appeal period expires. Any appeal must be filed on the prescribed forms, accompanied by the required fee, a copy of this Determination, and received and receipted at a public office of the Department of City Planning on or before the above date or the appeal will not be accepted. Forms are available on-line at http://planning.lacity.org.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001130

Planning Department public offices are located at:

| Downtown Office | Valley Office | West Office |
|---|---|---|
| Figueroa Plaza | Marvin Braude Constituent | West Los Angeles Development |
| 201 North Figueroa Street, | Service Center | Services Center |
| 4th Floor | 6262 Van Nuys Boulevard, | 1828 Sawtelle Boulevard, |
| Los Angeles, CA 90012 | Suite 251 | 2nd Floor |
| (213) 482-7077 | Van Nuys, CA 91401 | Los Angeles, CA 90025 |
| | (818) 374-5050 | (310) 231-2912 |

**Only an applicant or any owner or tenant of a property abutting, across the street or alley from, or having a common corner with the subject property can appeal this Density Bonus Compliance Review Determination.** Per the Density Bonus Provision of State Law (Government Code Section §65915) the Density Bonus increase in units above the base density zone limits and the appurtenant parking reductions are not a discretionary action and therefore cannot be appealed. Only the requested incentives are appealable. Per Section 12.22 A.25 of the LAMC, appeals of Density Bonus Compliance Review cases are heard by the City Planning Commission.

Verification of condition compliance with building plans and/or building permit applications are done at the Development Services Center of the Department of City Planning at either Figueroa Plaza in Downtown Los Angeles or the Marvin Braude Constituent Service Center in the Valley. In order to assure that you receive service with a minimum amount of waiting, applicants are encouraged to schedule an appointment with the Development Services Center either through the Department of City Planning website at http://planning.lacity.org or by calling (213) 482-7077 or (818) 374-5050. The applicant is further advised to notify any consultant representing you of this requirement as well.

The time in which a party may seek judicial review of this determination is governed by California Code of Civil Procedures Section 1094.6. Under that provision, a petitioner may seek judicial review of any decision of the City pursuant to California Code of Civil Procedure Section 1094.5, only if the petition for writ of mandate pursuant to that section is filed no later than the 90th day following the date on which the City's decision becomes final.

VINCENT P. BERTONI, AICP
Director of Planning

Approved by:
Faisal Roble, Principal City Planner

Reviewed by:
Michelle Singh, City Planner

Reviewed by:
Debbie Lawrence, AICP, Senior City Planner

Prepared by:
Connie Chauv, City Planning Associate
connie.chauv@lacity.org

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001131

**APPLICATIONS:**

**APPEAL APPLICATION**

This application is to be used for any appeals authorized by the Los Angeles Municipal Code (LAMC) for discretionary actions administered by the Department of City Planning.

**1. APPELLANT BODY/CASE INFORMATION**

Appellant Body:

☑ Area Planning Commission   ☑ City Planning Commission   ☑ City Council   ☑ Director of Planning

Regarding Case Number: _DIR-2016-4880-DB; ENV-2016-4881-CE_

Project Address: _3568 Motor Avenue, Los Angeles, California 90034_

Final Date to Appeal: _N/A_

Type of Appeal:   ☐ Appeal by Applicant/Owner
                  ☑ Appeal by a person, other than the Applicant/Owner, claiming to be aggrieved
                  ☐ Appeal from a determination made by the Department of Building and Safety

**2. APPELLANT INFORMATION**

Appellant's name (print): _Palms Elementary Family Association, et al_

Company: _c/o Orange Law Offices, P.C._

Mailing Address: _3435 Wilshire Blvd., Suite 2910_

City: _Los Angeles_                State: _CA_                Zip: _90010_

Telephone: _(213) 736-9900_        E-mail: _orangelawoffices@att.net_

- Is the appeal being filed on your behalf or on behalf of another party, organization or company?

  ☐ Self   ☑ Other: _Palms Elementary Family Association, et al_

- Is the appeal being filed to support the original applicant's position?   ☐ Yes   ☑ No

**3. REPRESENTATIVE/AGENT INFORMATION**

Representative/Agent name (if applicable): _Olu K. Orange, Esq._

Company: _Orange Law Offices, P.C._

Mailing Address: _3435 Wilshire Blvd., Suite 2910_

City: _Los Angeles_                State: _CA_                Zip: _90010_

Telephone: _(213) 736-9900_        E-mail: _orangelawoffices@att.net_

CP-7769 appeal (revised 5/25/2016)                Page 1 of 2

EX 4

4. **JUSTIFICATION/REASON FOR APPEAL**

Is the entire decision, or only parts of it being appealed?  ☑ Entire    ☐ Part

Are specific conditions of approval being appealed?    ☑ Yes    ☐ No

If Yes, list the condition number(s) here:  all

Attach a separate sheet providing your reasons for the appeal. Your reason must state:

- The reason for the appeal
- How you are aggrieved by the decision
- Specifically the points at issue
- Why you believe the decision-maker erred or abused their discretion

5. **APPLICANT'S AFFIDAVIT**

I certify that the statements contained in this application are complete and true:

Appellant Signature: _____    Date: Dec. 13, 2017

6. **FILING REQUIREMENTS/ADDITIONAL INFORMATION**

- Eight (8) sets of the following documents are required for each appeal filed (1 original and 7 duplicates):
  - Appeal Application (form CP-7769)
  - Justification/Reason for Appeal
  - Copies of Original Determination Letter

- A Filing Fee must be paid at the time of filing the appeal per LAMC Section 19.01 B.
  - Original applicants must provide a copy of the original application receipt(s) (required to calculate their 85% appeal filing fee).

- All appeals require noticing per the applicable LAMC section(s)  Original Applicants must provide noticing per the LAMC, pay mailing fees to City Planning's mailing contractor (BTC) and submit a copy of the receipt.

- Appellants filing an appeal from a determination made by the Department of Building and Safety per LAMC 12.26 K are considered Original Applicants and must provide noticing per LAMC 12.26 K.7, pay mailing fees to City Planning's mailing contractor (BTC) and submit a copy of receipt.

- A Certified Neighborhood Council (CNC) or a person identified as a member of a CNC or as representing the CNC may not file an appeal on behalf of the Neighborhood Council; persons affiliated with a CNC may only file as an individual on behalf of self.

- Appeals of Density Bonus cases can only be filed by adjacent owners or tenants (must have documentation).

- Appeals to the City Council from a determination on a Tentative Tract (TT or VTT) by the Area or City Planning Commission must be filed within 10 days of the date of the written determination of said Commission.

- A CEQA document can only be appealed if a non-elected decision-making body (ZA, APC, CPC, etc.) makes a determination for a project that is not further appealable. [CA Public Resources Code ‹ 21151 (c)].

| This Section for City Planning Staff Use Only | | |
|---|---|---|
| Base Fee: $ 89.00 | Reviewed & Accepted by (DSC Planner): Lucas Martin | Date: 12/14/17 |
| Receipt No: 0302113714 | Deemed Complete by (Project Planner): | Date: |
| ☐ Determination authority notified | ☐ Original receipt and BTC receipt (if original applicant) | |

## [ ORANGE ]

| | |
|---|---|
| **From:** | "Debbie Lawrence" <debbie.lawrence@lacity.org> |
| **Date:** | Wednesday, December 13, 2017 2:25 PM |
| **To:** | <oluorange@att.net> |
| **Attach:** | 12_11_17_OBJ_APPEAL_3568_Motor_Ave.pdf |
| **Subject:** | Fwd: TIME SENSITIVE ... NOTICE OF APPEAL per Cal. PRC §21151 |

Hello,

Your notice of appeal was forwarded to me yesterday. In order for us to accept this as an official appeal, you will need to file it at one of our Development Services Centers. There are three: Downtown Los Angeles, Van Nuys, and West Los Angeles. You may access the appeal form on our website at http://planning.lacity.org/, under the Forms tab. You can fill out the form and pay the required fee at one of these centers, and it will be transmitted for processing to the Project Planning Division of the City Planning Department.

thank you,

Debbie Lawrence

Debbie Lawrence, AICP
Senior City Planner
Los Angeles Department of City Planning
West/Coastal/South Project Planning
200 N. Spring Street, Room 721
Los Angeles, CA 90012
(213) 978-1163

* Your first stop for most City Planning questions regarding your property will usually begin at the Development Service Center (DSC). Click the following link for DSC contact information:
http://www.planning.lacity.org/PublicCounter.html

In addition, two City Planning Department on-line systems can provide a variety of information – Zoning Information and Map Access Systems (ZIMAS) and Planning Case Tracking System (PCTS). ZIMAS provides a property's zoning designation, potential hazard zones, County Assessor's data, and economic development incentives among other information. It can be accessed at zimas.lacity.org. PCTS provides a summary of information regarding cases that were submitted to the Planning Department and can be accessed at plncts.lacity.org/cts_internet/

---------- Forwarded message ----------
From: [ ORANGE ] <oluorange@att.net>
Date: Tue, Dec 12, 2017 at 2:58 PM
Subject: TIME SENSITIVE ... NOTICE OF APPEAL per Cal. PRC §21151
To: vince.bertoni@lacity.org

Dear Madam / Sir,

12/13/2017

# ORANGE LAW OFFICES, P.C.

Equitable Plaza Tower
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Tel: (213) 736-9900
Fax. (213) 417-8800
Email: orangelawoffices@att.net

12 December 2017

CITY OF LOS ANGELES
CITY COUNCIL
*via* CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
TEL: (213) 978-1133
FAX: (213) 978-1027
Clerk.CPS@lacity.org

VIA FAX, U.S. MAIL (certified) &
EMAIL (Clerk.CPS@lacity.org)

**CEQA APPEAL**

*(made pursuant to Cal. PRC §21151
and filed with Exhibits, pp. 001001-
001137)*

**RE: Appeal of Determination by Director of Planning**
3568 Motor Avenue, Los Angeles, California 90034
Case No. DIR-2016-4880-DB; ENV-2016-4881-CE

Dear Honorable Council Members:

We hereby appeal the Director of Planning's September 1, 2017, "Director's Determination Density Bonus & Affordable Housing Incentives," and all approvals, findings, exemptions and orders upon which it is based and/or subsumes in the above-mentioned case. The proposed 72.5-foot-high 3568 Motor Avenue project ("project") would have significant and adverse environmental impacts that preclude the City's reliance upon any categorical exemption for approval of the project.

1.    The Persons Appealing and Objecting

This appeal is brought on behalf of the Palms Elementary Family Association,

as well as the following persons:

a.  ("Children" *identified by initials only*) A.G., K.Q., N.B., H.B., M.O.,
    R.O., M.G., E.G., M.G., R.L., X.G., E.T., A.G., J.S., M.G., M.G., Z.J.,
    M.V., M.V., S.T., M.B., B.G., A.G., D.A., S.G., by their *Next Friend*
    Derek Spencer;

b.  ("Parents") Amy Franco, Ana Laura Antonio, Araceli Boyce, Araceli
    Boyce, Araceli Ibanez, Efren Gonzalez, Erika Antonio, Estela Martinez,
    Felicia Guzman, Janet Gutierrez, Juanita Franco, Karla Garcia, Maria
    Del Carmen Santos, Martha Garcia, Muna Abdulkader, Salvador
    Vasquez, Sarah Strohecker, Violeta Garcia, Virginia Garcia, Zenaida
    Garcia; and

c.  ("Teachers") Brittany Dorn, Christal Lord, Sonia Salazar-Zavala,
    Kristen A. Ward, Shinkai Karzai, Molly Temple, Debra Breeding,
    Monica Davis, Mary Higashi and Derek Spencer.

## II.   Summary of the Bases for Appealing and Objecting

Palms Elementary is a K through 5 primary school located in a fast-developing
section of West L.A., with a population of approximately 350 young children. The
vast majority of its student body is composed of minority students. 82.2% of the
students are classified by the California Department of Education as
socioeconomically disadvantaged. 36% of the students are English learners. The
school is also the site of one of LAUSD's five Deaf and Hard of Hearing program
dedicated sites, a unique and specialized program designed to address the needs of
this population of young students.

Palms Elementary School is immediately adjacent to the project. Moreover, the
kindergarten playground is on the fence-line of this multi-year demolition, excavation
and construction project. The noise and toxins from this project, as presently
proposed, will do irreparable harm to the health of these young children and teachers,
as well as destroy the educational environment for the 300+ children. There is an
urgent need for action from this Honorable Council requiring a full Environmental
Impact Review, inclusive of an exhaustive Health Risk Analysis to protect the
children and teachers at Palms Elementary School.

Section 21151 of the Public Resources Code provides, "If a nonelected
decision-making body of a local lead agency certifies an environmental impact
report... that certification ... may be appealed to the agency's elected decision-making
body, if any." As the City Planning Commission and its executive officers are not an

elected decision-making body, its determinations under the California Environmental
Quality Act ("CEQA") are appealable to the City's elected decision-making body, the
City Council.

The Palms Elementary Family Association and forgoing children, parents and
teachers of Palms Elementary School ("school"), located at 3520 Motor Avenue,
object to and appeal the determination in this case because the approved project:

a)   was procured based upon an application to the City which fraudulently
     and perjuriously claimed that the site of the project had not been
     *"developed with use that could release hazardous materials on soil
     and/or groundwater (e.g. dry cleaning ..."* – knowing that the site was
     occupied by a dry cleaner from 1958 to at least 1985;

b)   presents an increased risk of cancer well above the acceptable
     SCAQMD limits to the children and teachers at Palms Elementary
     School;

c)   violates the City's CEQA shade thresholds;

d)   violates the City's CEQA construction noise thresholds;

e)   creates noise and toxins which will irreparably harm the children's
     educational and environmental interests;

f)   was the result of an approval and exemption process which violated the
     rights of persons with disabilities; and

g)   was the result of an approval and exemption process which violated the
     children's, parents' and teachers' procedural due process rights.

Based upon some or all of items (a) through (g) above, and as more fully
explained herein below, it can be fairly argued that there are unusual circumstances
whereby the project would create the reasonable possibility of significant negative
effects on the environment, per CEQA Guidelines §15300.2(c). Thus, requiring
preparation of an environmental impact report. Cal. PRC §21151.

III.   Perjury / Fraud as to the Dry Cleaners Vitiates the Approval in its Entirety

CEQA requires full disclosure of a project's significant environmental effects
so that decision-makers and the public are informed of these consequences before the
project is approved, to ensure that government officials are held accountable for these

consequences. *Laurel Heights Improvement Ass'n of San Francisco v. Regents of the University of California,* 47 Cal.3d 376, 392 (1988).

In the instant case, the Project was granted a Class 32 "Infill" Categorical Exemption from CEQA based upon the application the developer, Hiro Kobayashi, submitted to the City – under penalty of perjury. In the City of Los Angeles, the Class 32 exemption affords developers an expedited process and schedule. The Class 32 exemption is not available for any project which involves potential significant environmental impacts. Additionally, a developer seeking a Class 32 exemption must be able to demonstrate that the project does not fall under the exceptions to the exemptions set forth in CEQA Guidelines §15300.2. [see Bates No. 001132, LA City Findings RE Class 32 Exemptions]. One of the conditions therein, which makes an exemption unavailable, is the use or former use of a site for a purpose which involved hazardous or toxic substances, such as a dry cleaner.

Here, the developer, Mr. Kobayashi, filed two applications to the City for approval of the Project wherein he indicated on two different occasions, under penalty of perjury, that the site of the project had not been *"developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning ... ".* [see Bates No. 001086 through 001090, City Planning Application]. These representations were made even though an environmental study for the Project was mandated by Wells Fargo Bank and revealed that the site was occupied by a <u>dry cleaner</u> from 1958 to at least 1985.

The study further stated, *"It should be however noted that Palms Laundry and Cleaners occupied the Property since at least 1958. Since this is during a period of little or no regulatory oversight, permitting or compliance, there is still an unresolved concern about possible dry-cleaning operation conducted by Palms Laundry and Cleaners. This is identified as a potential environmental concern and significant data gap which affects our ability to determine RECs in connection with the Property."* [see Bates No. 001091 through 001094, Environmental Study]

The result of Mr. Kobayashi's false representations was the direct benefit to him and his Project of expedited processing and approval. It is irrelevant whether a dry cleaner would ultimately be discovered to have omitted hazardous materials at the site. Under Cal Pen Code §§ 118 and 123, Mr. Kobayashi's intentional omission constitutes perjury.

"The test in a perjury charge is not that injury actually occurred as a result of the false statements, but that the falsehoods could have influenced or changed the status of the subject of the statement to the benefit of the falsifier or the detriment of others. It is sufficiently

material if it might have affected the proceeding in or for which it was made … In the present instance [applicant] was benefited at least to the extent of eliminating delay …" *People v. Darcy*, 59 Cal. App. 2d 342, 349 (1943).

In addition to perjury, Mr. Kobayashi's conduct constitutes fraud and deceit under Cal Civ Code § 1710(3). This is so because it is "the suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." *Id.*

Mr. Kobayashi's fraud/perjury vitiates and nullifies the approval of the Project it was used to procure. "There is no question of the general doctrine that fraud vitiates the most solemn contracts, documents, and even judgments." *United States v. Throckmorton*, 98 U.S. 61, 64 (1878); *Crow v. Madsen*, 111 P.2d 7, 11 (Cal. Dist. Ct. App. 1941). Thus, approval of the Project and all underlying exemptions should be reversed, revoked and/or cancelled.

## IV.     The Project Presents an Increased Risk of Cancer Well Above the Acceptable SCAQMD Limits to the Children and Teachers at Palms Elementary School

Another exception to the use of a CEQA exemption is if a project has a "reasonable possibility" of having "a significant impact on the environment due to unusual circumstances." CEQA Guidelines §15300.2(c). A report by a well-respected environmental scientist shows that this project carries significant health risks to children and teachers at Palms Elementary.

Dr. Paul Rosenfeld is a Co-Founder and Principal Environmental Chemist at Soil / Water / Air Protection Enterprise ("SWAPE"). He has over twenty years' experience conducting remedial investigations, risk assessments, and developing cleanup programs for sites containing petroleum hydrocarbons, chlorinated solvents, pesticides, radioactive waste, PCBs, PAHs, dioxins/furans, volatile and semi-volatile organics, perchlorate, heavy metals, asbestos, PFOA, unusual polymers, fuel oxygenates (MTBE), and odors. Dr. Rosenfeld conducts contaminant fate and transport modeling in all environmental media and is a specialist regarding the analysis and modeling of airborne contaminants. [see http://www.swape.com/staff/paul-rosenfeld-ph-d/].

Appellants expressly incorporate the contents of Dr. Rosenfeld's December 5, 2017, "Comments on the 3568 Motor Avenue Project" as if fully set forth herein. [see Bates No. 001001 through 001006, Rosenfeld Report].

Dr. Rosenfeld reviewed the City's determination of CEQA exemptions for the Project [see Bates No. 001114 through 001131, Directors Determination]. In the Determination Letter, the City notes that:

> "Construction activities involving grading and foundation preparation would primarily generate PM2.5 and PM10 emissions. Mobile sources (such as diesel-fueled equipment onsite and traveling to and from the Project Site) would primarily generate NOx emissions. The application of architectural coatings would result primarily in the release of ROG emissions. The amount of emissions generated on a daily basis would vary, depending on the amount and types of construction activities occurring at the same time."

The City proposes that such emissions on the fence-line of the kindergarten playground, and within yards of the rest of the school, has no significant impact on the environment. However, hundreds of sensitive receptors are in the immediate vicinity of the site of the Project. "Sensitive receptors" include, but are not limited to, children and the elderly. They are most likely found at schools and nursing homes. [1]

Per the many declarations of the teachers and parents, the children run, play, breathe heavily and roll around on the ground in their outdoor play areas. Showering them with the above toxins certainly has an impact on their environment. [see Bates Nos. 001007 through 001085, Teachers' and Parents' Declarations].

Upon review, Dr. Rosenfeld concluded that "the Determination report and associated documents demonstrates that the Project's potential health risk impact posed to nearby sensitive receptors has not been adequately evaluated." [see Bates No. 001001, Rosenfeld Report]. Dr. Rosenfeld further concluded that "there is substantial evidence indicating that the proposed Project could result in a potentially significant impact to the surrounding environment, something that the Determination and associated documents failed to evaluate or even address." [see Bates No. 001005, Rosenfeld Report].

---

[1] The California Air Pollution Control Officer's Association (CAPCOA) categorizes receptors as sensitive receptors or work receptors. According to CAPCOA, "Sensitive receptors refer to those segments of the population most susceptible to poor air quality (i.e., children, the elderly, and those with pre-existing serious health problems affected by air quality). Land uses where sensitive individuals are most likely to spend time include schools and schoolyards, parks and playgrounds, daycare centers, nursing homes, hospitals, and residential communities (these sensitive land uses may also be referred to as sensitive receptors). Worker receptors refer to employees and locations where people work."

As part of Dr. Rosenfeld's review, he compared his analysis of a project similarly located near sensitive receptors, children. The screening level Health Risk Analysis demonstrated that the excess cancer risk posed to adults, children, and infants near the project would be, out of one million, approximately 43, 290 and 25, respectively. Furthermore, the analysis demonstrated that the excess cancer risk over the course of a residential lifetime (30 years) was approximately 580 in one million. The Southern California Air Quality Management District's maximum allowable threshold is 10 in one million. Independently, extrapolating for the instant project based upon number of units, the excess cancer risk over the course of a residential lifetime for receptors at Palms Elementary School would be 277 in one million – 27 times the SCAQMD threshold.[2]

Based upon the unusual circumstance of such a large number of sensitive receptors (300+ children) in the immediate vicinity of the Project site, and the multi-year timeframe within which the Project would emit toxic pollutants into the air the children breathe, and the ground upon which they run and play, a fair argument can be made that the Project would create the reasonable possibility of significant negative effects on the environment, per CEQA Guidelines §15300.2(c). Thus, the approval and exemptions should be revoked.

V.      The Project Violates the City's CEQA Shade Thresholds

The 'screening criteria' for shade/shadow impacts from the City's CEQA Thresholds Guide
(http://planning.lacity.org/Documents/MajorProjects/CEQAThresholdsGuide.pdf, pp. A.3-1 to A.3-10) is as follows:

- QUESTION: Would the project include light-blocking structures in excess of 60 feet in height above the ground elevation that would be located within a distance of three times the height of the proposed structure to a shadow-sensitive use on the north, northwest or northeast?

- *ANSWER: Clearly yes. The proposed building is over 70 ft and the Palms Elementary School play yard (a shadow-sensitive use) is well within 210 ft to the north/northeast (i.e., it's adjacent).*

---

[2] Extrapolated cancer risk depends upon all other factors being equal and is determined as follows:

Step 1 ---> "View" Cancer Risk (divided by)  "View" # of Units  =  Cancer Risk Ratio
Step 2 ---> Cancer Risk Ratio  (multiplied by) "Motor Ave" # of Units  =  "Motor Ave" Cancer Risk

- THEREFORE: Further study is indicated (as opposed to a categorical exemption).

A project impact would normally be considered significant if shadow-sensitive uses would be shaded by project-related structures for more than three hours between the hours of 9:00 a.m. and 3:00 p.m. Pacific Standard Time (between late October and early April), or for more than four hours between the hours of 9:00 a.m. and 5:00 p.m. Pacific Daylight Time (between early April and late October). [see 2006 L.A. CEQA Thresholds Guide, pp. A.3-1 to A.3-10].

Here the developer's own shade studies demonstrate unacceptable shading during the proscribed time periods. [see Bates Nos. 001109 through 001113, Shade Studies]. Accordingly, this should have precluded the City from exempting this Project from CEQA. Exemptions cannot be claimed if there is a reasonable possibility that the project will result in a significant adverse impact. There is such a reasonable possibility here. The City's failure to consider and properly evaluate the impact of shade is an appropriate basis for revoking the Project's approval and all exemptions.

## VI.    The Project Violates the City's CEQA Construction Noise Thresholds

The 'screening criteria' for noise impacts from the City's CEQA Thresholds Guide (pp. I.1-1 to I.1-9) is as follows:

- QUESTION: Would construction activities occur within 500 feet of a noise sensitive use?

- *ANSWER: Clearly yes. Palms Elementary School and its play yard (both noise-sensitive uses) are well within 500 ft of the Project (i.e., it's adjacent).*

- THEREFORE: Further study is indicated (as opposed to a categorical exemption).

"Noise sensitive uses include residences, transient lodgings, schools, libraries, churches, hospitals, nursing homes, auditoriums, concert halls, amphitheaters, playgrounds, and parks. Determine whether construction activities would occur within 500 feet of a noise sensitive use or during the hours specified in the Screening Criteria." *Id.* at (p. I.1-3).

In order to determine the impacts of the Project, it is necessary to "[r]eview the description of the proposed project, including the duration of construction activities.

Identify the type, amount, and scheduling of construction equipment to be used during each construction phase, and the distance from construction activities to noise sensitive uses. Calculate the noise emissions from individual equipment by using the noise levels shown in Exhibits I.1-1 and I.1-2, or other applicable references, the distance to the noise sensitive uses, and noise attenuation standards." *Id.* at (p. I.1-4).

In the instant case, the City was required to make a determination of the impacts of the Project as specified by its own CEQA guidelines, but did not. In fact, it could not – as there was no information provided by the developer as to the "type, amount, and scheduling of construction equipment to be used during each construction phase." Thus, no calculations as to noise levels of individual equipment were ever made, or considered.

Because it is incumbent upon the developer to demonstrate CEQA compliance, this should have precluded the City from exempting this Project from CEQA. The developer's failure to include appropriate information, and the City's failure to demand it, precluded the demonstration that there is not a reasonable possibility that the project will result in a significant adverse impact upon the environment. Accordingly, the Project's approval and any exemptions should be reversed, revoked and overturned upon this basis.

## VII.    The Noise and Toxins from the Project Will Irreparably Harm the Children's Educational Environment and Interests

Education is of utmost importance. "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). In fact, in California, it is a fundamental right. "Among other things ... for California purposes, education remains a fundamental interest 'which [lies] at the core of our free and representative form of government [fn.] . . ..' (citation omitted)." *Butt v. State of Cal.*, 4 Cal. 4th 668, 683 (1992).

In this case, the Project at 3568 Motor Avenue, will severely infringe upon each of the children's educational rights and fundamental interests by compromising, and in some cases eliminating, the safety and effectiveness of their learning environments. The declarations of the teachers and parents explain that their children are, *inter alia*, easily distracted by sharp, as well as ambient noises. Their children are also subject to allergies and physical ailments related to airborne irritants. Additionally, many of the teachers' declarations detail the additional harm their Deaf and Hard of Hearing ("DHH") students would suffer.

The DHH teachers relate that elementary school years are the point in the students' lives wherein they are gaining the bedrock understandings of how to socialize with and understand each other, as well as children without hearing challenges, and that preventing that process from happening would have far-reaching consequences for the rest of their lives.

These students require a quiet environment in which to learn. The construction noise will be highly distracting, will directly interfere with their learning, and in some instances will even be painful to these young students with disabilities. Many of the DHH students wear sound amplifying listening devices which make all sounds louder. In their classrooms, even air conditioners must meet certain dampened sound requirements. As an accommodation for all the students in DHH classrooms at Palms, there are carpets on the classroom floors, fabric on the walls, and drop ceilings to minimize sound reverberation. Ongoing construction noise would make it difficult, and in many cases impossible, for students to distinguish between voices and other sources of information – as opposed to noise and other sounds which should be disregarded. So-called "new listeners" – students who have just activated cochlear implants – would experience pain and listening fatigue, but not even know how to express what is happening to them – or why.

Each of the DHH children has an Individualized Education Program ("IEP") mandating that she or he be provided with an educational environment which enables her or him to effectively access the curriculum at Palms Elementary. Cal Govt. Code §11135, *et seq.* As to the particular educational rights of the DHH children, and the fundamental educational rights of all the children at Palms Elementary, the City's approval of the Project directly violates them all.

The irreparable harm to the children's educational environments and interests constitutes a substantive due process violation – as well as an unusual circumstance indicating a reasonable possibility of significant negative effects on the environment, per CEQA Guidelines §15300.2(c). Thus, the approval and exemptions should be reversed, revoked and overturned.

## VIII. The City's Approval and Grant of Exemptions Violated the Rights of Persons With Disabilities

Appellants hereby incorporate as if fully set forth herein, the December 4, 2017, letter from Olu K. Orange and Dan Stormer to the City of Los Angeles' Department on Disability. [see Bates Nos. 001095 through 00108, Notice of Forthcoming Litigation].

## IX.    The City's Approval and Grant of Exemptions Violated the Children's, Parents' and Teachers' Procedural Due Process Rights

`       The City's approval was done with absolutely no meaningful notice to the children, parents or teachers. The teachers and parents all state that they received no notice about the Project until just before or just after Thanksgiving of 2017. Moreover, that notice came as word of mouth from other parents or teachers, never the City. The Director's Determination purports to allow for a 17-day period to appeal from the date it was mailed to the date it becomes final – thus, from September 1, 2017 to September 18, 2017. Moreover, it states that it may only be appealed by:

" ... an applicant or any owner or tenant of a property abutting, across the street or alley from, or having a common corner with the subject property" [Bates No. 001131, Director's Determination]

The children, parents and teachers at Palms Elementary do not fit within any of those categories. Thus, by the terms of the City's notice – they are afforded no right to receive notice and be heard as to their objections or an appeal, despite the fact that they are the ones who will be directly and negatively affected by the project for an extended period of time.

Also, each of the City's Affidavits of Mailing from the Planning Dept. file indicate that no hearing was ever held as to the Project, and that aside from the applicant and other City departments, letters were only mailed to abutting property owners – not even abutting property tenants. [see Bates Nos. 001135 through 001137, Mailing Affidavits]. With important and fundamental rights at stake, this certainly does not comport with due process.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950). This may include an obligation, upon learning that an attempt at notice has failed, to take "reasonable follow-up measures" that may be available. *Jones v. Flowers*, 547 U.S. 220, 235 (2006). The notice must be sufficient to enable the recipient to determine what is being proposed and what he must do to prevent the deprivation of his interest. *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970). Ordinarily, service of the notice must be reasonably structured to assure that the person to whom it is directed receives it. *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965); *Robinson v. Hanrahan*, 409 U.S. 38 (1974); *Greene v. Lindsey*, 456 U.S. 444 (1982). Thus, the notice of hearing and the opportunity to be heard "must be granted

at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Of the sixteen days between September 1st and 18th of 2017, six of them were weekend days, and five of them are reasonably subtracted for mailing (see Cal Code Civ Proc §1005(b)). Thus, even if the City had mailed notice to the children's parents or teachers, they would have had only five working days to figure out how to mount a challenge to the project.

What the City did in this case is clearly inadequate, ineffective, sham notice – and certainly a violation of due process. With the fundamental rights to health and education of children at stake, due process would certainly require an earnest effort to inform the children via their parents. Anything else is inconceivable.

"A student's right to a public education is a property interest protected by the Due Process Clause. *Goss v. Lopez*, 419 U.S. 565, 576 (1975). At the very minimum, a student facing "interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Id.* at 579. "[S]ome form of hearing is required before an individual is finally deprived of a property [or liberty] interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). ("Parties whose rights are to be affected are entitled to be heard.") *Baldwin v. Hale*, 68 U.S. (1 Wall.) 223, 233 (1863).

The City's abject failure to notify the children, parents and teachers in this case is a textbook due process violation. Thus, no deprivation of their rights would ever pass judicial muster. Indeed, this appeal was filed within a very short time (less than 30 days) of when the parents' and teachers' declarations indicate they learned of the Project.

Appellants request that this Honorable Council afford the children, parents and teachers of Palms Elementary School an opportunity to be heard by granting this appeal, reversing the approval of the Project and all its exemptions, and requiring that the Project be subjected to a full and thorough environmental impact and health review – with reasonable and appropriate notice to the appellants herein.

## X. In Conclusion

The City's use of a Categorical Exemption for this project violates CEQA, as well as various other state and federal laws and constitutional rights. Upon the foregoing bases, this appeal should be granted, the approval of the Project and all its exemptions should be reversed, and the Project be subjected to a full and thorough environmental impact and health review – with reasonable and appropriate notice to

the appellants herein. This appeal will be followed by concurrent state and federal
court legal actions. The initiation and maintenance of such actions does not withdraw
or cancel this appeal.

Respectfully submitted,
ORANGE LAW OFFICES, P.C.

Olu K. Orange, Esq.

:: exhibits ::

cc:

Shawna L. Parks, Esq.                           Dan Stormer, Esq.
LAW OFFICE OF SHAWNA L. PARKS                   HADSELL STORMER & RENICK LLP
4470 W. Sunset Blvd., Ste. 107-347              128 N. Fair Oaks Ave., Suite 204
Los Angeles, CA 90027                           Pasadena, CA 91103
Tel/Fax: 323.389.9239                           Tel: 626.585.9600
sparks@parks-law-office.com                     Fax: 626.577.7079
                                                dstormer@hadsellstormer.com

**STATE OF CALIFORNIA**        }        ss.
**COUNTY OF LOS ANGELES**    }

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010

On December 12, 2017, I served the following Document(s): **CEQA APPEAL of Case No. DIR-2016-4880-DB; ENV-2016-4881-CE and EXHIBITS (001001 through 001137)** upon the interested parties in this action addressed as follows:

| CITY OF LOS ANGELES | HIRO KOBAYASHI | DAYNA SAYLES |
|---|---|---|
| CITY COUNCIL | 3568 MOTOR LLC | three6ixty |
| via CITY CLERK | 800 S. FIGUEROA ST #960 | 4309 Overland Ave. |
| 200 N. Spring St, Rm 395 | LOS ANGELES, CA 90017 | Culver City, CA 90230 |
| Los Angeles, CA 90012 | Tel: (213) 488-9039 | Tel. (310) 204-3500 |
| TEL: (213) 978-1133 | 3568Motor@RBMofCA.com | info@three6ixty.net |
| Clerk.CPS@lacity.org | (*via email & certified mail) | (via email only) |
| (*via email & certified mail) | | |
| PAUL KORETZ, CD 5 | VINCENT P. BERTONI, AICP | DAVID R. HOLMQUIST, ESQ. |
| CITY HALL | DIRECTOR | LAUSD GENERAL COUNSEL |
| 200 N SPRING ST #440 | LA DEPT of CITY PLANNING | 333 South Beaudry Ave |
| LOS ANGELES, CA 90012 | 200 N. SPRING ST, RM 525 | Los Angeles, CA 90017 |
| Tel. (213) 473-7005 | Los ANGELES, CA 90012 | P: (213) 241-7600 |
| paul.koretz@lacity.org | Tel. (213) 978-1271 | David.Holmquist@lausd.net |
| (via email only) | vince.bertoni@lacity.org | (via email only) |
| | (*via email & certified mail) | |

☐ **(Via Hand Delivery)** I caused hand-delivered service of the above-mentioned materials upon the above-mentioned recipient(s) as addressed by leaving the materials with the person indicated, or with a person, of the age of majority, apparently responsible for the premises.

☒ **(Via U.S. Mail [Federal or State])** I am readily familiar with the practice for the collection and processing of correspondence for mailing with the UNITED STATES POSTAL SERVICE; such envelope will be deposited with the UNITED STATES POSTAL SERVICE on the above date according to ordinary business practices.

☒ **(Via Email)** By transmitting from my business address a true copy thereof from my sending computer addressed to each individual at its receiving computer email address set forth above at the time indicated on the transmission line thereon.

**Executed on December 12, 2017, at Los Angeles, California.**

☒ **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(Federal)** I declare that I am employed in the office of a member of the bar of this Court at whose discretion the service was made.

Otu K. Orange, Esq.

PROOF OF SERVICE

# EXHIBITS
## 001001 through 001137



**SWAPE** | Technical Consultation, Data Analysis and
Litigation Support for the Environment

2656 29ᵗʰ Street, Suite 201
Santa Monica, CA 90405

Paul E. Rosenfeld, Ph.D.
(310) 795-2335
prosenfeld@swape.com

December 5, 2017

Olu K. Orange
Orange Law Offices, P.C.
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010

**Subject:   Comments on the 3568 Motor Avenue Project**

Dear Mr. Orange,

We have reviewed the September 2017 Director's Determination Density Bonus & Affordable Housing
Incentives ("Determination") and associated attachments for the proposed 3568 Motor Avenue Project
("Project") located in the City of Los Angeles ("City"). The proposed Project includes the demolition of an
existing one-story three-unit commercial building, and the construction of a six-story mixed-use
commercial and residential building providing 42 apartment units, including a minimum of 4 units for
Very Low-Income Households, and 1,770 square feet of ground-floor retail. The project proposes a total
of 54 vehicular parking spaces and a total of 44 long-term and 7 short-term bicycle parking spaces. The
project consists of 20 vehicular parking spaces at the ground floor and 34 residential parking spaces in
one subterranean parking level. The total project size is limited to 29,807 square feet, and the building
will measure approximately 72 feet and 7 inches in height. The proposed project requests a haul
route to export 6,000 cubic yards of soil. Two non-protected trees are being removed.

According to the Determination report, the proposed Project qualifies for a Class 32 Categorical
Exemption, as the Project 1) is consistent with the City's General Plan and zoning; 2) occurs within City
limits on a project site of no more than five acres substantially surrounded by urban uses; 3) has no
value as habitat for endangered, rare, or threatened species; 4) will not result in any significant effects
relating to traffic, noise, air quality, or water quality; and 5) the site can be adequately served by all
required utilities and public services. Therefore, no further environmental review is required.

However, review of the Determination report and associated documents demonstrates that the
Project's potential health risk impact posed to nearby sensitive receptors has not been adequately
evaluated. Specifically, the Determination report fails to evaluate, whatsoever, the diesel particulate
matter (DPM) emissions that would be emitted during construction and operation of the proposed
Project, and therefore, there is no way to verify that a significant unmitigated air quality impact will not

1



occur once construction commences. The California Air Pollution Control Officer's Association (CAPCOA) categorizes receptors as sensitive receptors or work receptors. According to CAPCOA,

> "Sensitive receptors refer to those segments of the population most susceptible to poor air quality (i.e., children, the elderly, and those with pre-existing serious health problems affected by air quality). Land uses where sensitive individuals are most likely to spend time include schools and schoolyards, parks and playgrounds, daycare centers, nursing homes, hospitals, and residential communities (these sensitive land uses may also be referred to as sensitive receptors). Worker receptors refer to employees and locations where people work."[1]

Thus, it is critical that the proposed Project's health related impact is evaluated, as there are numerous residences and the Palms Elementary School located directly across from the Project site. Due to the lack of evidence supporting the conclusion that the Project will not result in a significant health related impact, we find the Determination's conclusion that the Project would not result in significant impacts to be unsubstantiated, as the health impacts associated with construction and operation of the proposed Project have not been adequately addressed. A health risk assessment (HRA) should have been prepared to adequately assess the potential impacts that the Project could have on the health impacts to sensitive receptors. As such, a proper analysis of the Project's health related impacts must be conducted before the Project can claim a Class 32 Categorical Exemption under the California Environmental Quality Act (CEQA).

## Air Quality

### Diesel Particulate Matter Health Risk Emissions Inadequately Evaluated

In order to determine if the proposed Project would qualify for a Class 32 Categorical Exemption under CEQA, the Project Applicant must demonstrate that the Project would not result in significant adverse impacts. The Determination report concludes that the Project would not result in significant adverse impacts related to air quality because "the proposed Project will not cause the SCAQMD's recommended threshold levels to be exceeded" (pp. 14). Specifically, the Determination report states,

> "The project, a 29,782-square foot mixed-use building will replace an approximately 6,768-square foot existing commercial building. The project will not result in significant impacts related to air quality because it falls below interim air threshold established by DCP staff. Interim thresholds were developed by DCP staff based on CalEEMod model runs relying on reasonable assumptions, consulting with AQMD staff, and surveying published air quality studies for which criteria air pollutants did not exceed the established SCAQMD construction and operational thresholds. Possible project-related air quality concerns will derive from the mobile source emissions generated from the proposed residential uses for the project site. Operational emissions for project-related traffic will be less than significant. In addition to mobile sources from vehicles, general development causes smaller amounts of "area source" air pollution to be

---

[1] "Health Risk Assessments for Proposed Land Use Projects." CAPCOA, July 2009, *available at:* http://www.capcoa.org/wp-content/uploads/downloads/2010/05/CAPCOA_HRA_LU_Guidelines_8-6-09.pdf

2

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001002**

generated from on-site energy consumption (natural gas combustion) and from off-site electrical generation. These sources represent a small percentage of the total pollutants. The inclusion of such emissions adds negligibly to the total significant project-related emissions burden generated by the proposed project. The proposed project will not cause the SCAQMD's recommended threshold levels to be exceeded. Operational emission impacts will be at a less-than-significant level" (pp. 14).

In 2012, pursuant to Senate Bill 226 (SB 226), the Office of Planning and Research (OPR) developed and adopted additions to CEQA Guidelines that set forth a streamlined CEQA review process for infill projects.[2] CEQA Guidelines Section 15332, referred to as Class 32 Exemption, allows infill developments within urbanized areas to be exempt from CEQA review if a proposed development meets specific criteria.[3] However, one of the mandatory criterion listed in Section 15332 of the CEQA Guidelines state that projects can be characterized as infill developments only if "approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality".[4] As a result of the Determination report's assertion that the Project would not result in significant impacts, it concludes that the proposed Project is "categorically exempt from environmental review" (pp. 14). The Determination report states,

> "The proposed incentives will not have a specific adverse impact. A 'specific adverse impact' is defined as 'a significant, quantifiable, direct and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete' (LAMC Section 12.22.A.25(b)). The proposed Project and potential impacts were analyzed in accordance with the California Environmental Quality Act (CEQA) Guidelines and the City's L.A. CEQA Thresholds Guide. These two documents establish guidelines and thresholds of significant impact, and provide the data for determining whether or not the impacts of a proposed Project reach or exceed those thresholds. Analysis of the proposed Project determined that it is Categorically Exempt from environmental review pursuant to State CEQA Guidelines Article 19, Sections 15304 (Class 4) and 15332 (Class 32), and City CEQA Guidelines Article III, Section 1, Class 4 Category 1. The Class 32 Exemption is intended to promote infill development within urbanized areas" (pp. 10).

This reasoning and subsequent conclusion, however, are incorrect, as the Determination report fails to evaluate, whatsoever, the potential health-related impacts that construction and operation of the proposed Project would pose to nearby sensitive receptors. Simply because the proposed Project is an infill project does not mean that the Project's potential health related impact would inherently be less than significant. Thus, it is evident that although the proposed Project is an infill development project, it should not be exempt from a CEQA review until the Project's health-related impacts are properly

---

[2] "CEQA Streamlining for Infill Projects (SB 226)." The Governor's Office of Planning and Research, *available at:* https://www.opr.ca.gov/s_sb226.php

[3] "State CEQA Guideline Section 15183.3: Streamlining for Infill Projects." OPR, February 2013, *available at:* https://www.opr.ca.gov/docs/Section_15183.3_feb2013.pdf

[4] "CEQA Guidelines Section 15332." California Natural resources Agency, *available at:* http://resources.ca.gov/ceqa/guidelines/art19.html

3

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001003

assessed. As such, we find the conclusions made within the Determination to be unsubstantiated and should not be relied upon to determine Project significance.

According to the South Coast Air Quality Management District (SCAQMD), the lead air pollution control agency for the proposed Project, a health risk assessment should be performed for any project that is expected to generate mobile emissions from diesel powered equipment and trucks. According to SCAQMD's Mobile Source Toxics Analysis page on AQMD's website (emphasis added),

"In August 2002, the SCAQMD's Mobile Source Committee approved the 'Health Risk Assessment Guidance for Analyzing Cancer Risks from Mobile Source Diesel Emissions.' This document provided guidance for analyzing cancer risks from diesel particulate matter from mobile sources at facilities such as truck stops and warehouse distribution centers. Subsequently, SCAQMD staff revised the aforementioned document to expand the analysis to provide technical guidance for analyzing cancer risks from potential diesel particulate emissions impacts from truck idling and movement (such as, but not limited to, truck stops, warehouse and distribution centers, or transit centers), ship hoteling at ports, and train idling. This revised guidance document titled, 'Health Risk Assessment Guidance for Analyzing Cancer Risks from Mobile Source Diesel Idling Emissions for CEQA Air Quality Analysis' was presented to and approved by the SCAQMD's Mobile Source Committee at its March 28, 2003 committee meeting. It is suggested that projects with diesel powered mobile sources use the following guidance document to quantify potential cancer risks from the diesel particulate emission". [5]

As you can see in the excerpt above, the SCAQMD explicitly states that in the event that the proposed Project generates or attracts vehicular trips, a mobile source health risk assessment must be prepared. As noted in the Determination report, Project construction is expected to "temporarily create emissions of dusts, fumes, equipment exhaust, and other air contaminants", therefore, it is reasonable to assume that a significant amount of DPM, a known human carcinogen, will be emitted from the exhaust stacks of construction equipment the Project proposes to use (p. 13). Once operational, the Project's commercial land use will result in frequent truck deliveries, or approximately 153 daily truck trips according to the Project's Transportation Impact Study, while the Project's residential land uses are expected to generate approximately 326 daily vehicle trips (Transportation Study, pp. 41). Thus, it is reasonable to assume that large amounts of diesel exhaust will be generated over the duration of Project operation. As such, a proper HRA should have been conducted prior to approval of the Project, as long-term exposure to DPM and other toxic air contaminants (TACs) may result in a significant health risk impact and therefore, should be properly assessed.

Furthermore, it is critical that a proper HRA be prepared for the proposed Project, as health risk analyses conducted for similar CEQA projects within the City of Los Angeles have demonstrated significant impacts. For example, SWAPE conducted a screening-level HRA for The View project (SCH No.

---

[5] "Mobile Source Toxics Analysis." SCAQMD, *available at:* http://www.aqmd.gov/home/regulations/ceqa/air-quality-analysis-handbook/mobile-source-toxics-analysis

4

2017041016][6] to determine whether or not the project would result in significant health risk impacts. The View project proposed to construct a multi-family residence lot and 88 attached residential condominium dwelling units on 1.84 acres of land. SWAPE's screening level HRA demonstrated that the excess cancer risk posed to adults, children, and infants located approximately 1 meter away from the Project site (similar to the proposed Project) would be approximately 43, 290, and 250 in one million, respectively.[7] Furthermore, the analysis demonstrated that the excess cancer risk over the course of a residential lifetime (30 years) was approximately 580 in one million.[8] The infant, child, adult, and lifetime cancer risks all exceeded the SCAQMD's threshold of 10 in one million. Thus, our analysis demonstrated that that when the project's health-related impacts were properly assessed, we found that emissions released during construction and operation of The View project would pose a significant health risk to nearby sensitive receptors. Seeing as The View project is similar to the proposed Project, it is reasonable to assume that the 3558 Motor Avenue Project could also result in similar, significant health-related impacts. As such, a proper HRA should have been conducted prior to Project approval, as exposure to DPM and other TACs may result in a significant health risk impact and therefore, should be properly assessed.[9]

A quantitative analysis of the Project's health-related impacts should have been prepared and the results of this analysis should have been compared to applicable thresholds. The SCAQMD provides a specific numerical threshold of 10 in one million for determining a project's health risk impact.[10] Therefore, the Project Applicant should have conducted an assessment that compares the Project's combined construction and operational health risk to this threshold in order to determine the Project's health risk impact. By failing to prepare an HRA, the Determination fails to provide a comprehensive analysis of the sensitive receptor impacts that may occur as a result of exposure to substantial air pollutants.

Due to the reasons listed above, we find that there is substantial evidence indicating that the proposed Project could result in a potentially significant impact to the surrounding environment, something that the Determination and associated documents failed to evaluate or even address. Without the findings of a quantified HRA, the Project lacks a comprehensive analysis of the sensitive receptor impacts that may occur as a result of exposure to the Project's potentially substantial air pollutant emissions. As such, a proper analysis must be conducted in order to determine the impact that the proposed Project will have

---

[6] The View Initial Study/Mitigated Negative Declaration (SCH No. 2017041016), *available at:*
http://uba1979.org/assets/RPC_staff_recommendations_re_the_View_07.21.2017.pdf
[7] See SWAPE October 23, 2017 Comments for The View Project, p. 10
[8] *Ibid.*
[9] We acknowledge that The View project has a larger building square footage and lot acreage compared to the proposed Project. However, as discussed, the excess cancer risk posed by The View project far exceeds applicable thresholds. Additionally, the proposed Project includes 1,770 square feet of commercial land use, which will result in frequent truck and delivery vehicle trips during operation. Therefore, it is possible that the cancer risk for the proposed Project, although smaller than The View project, could still result in a significant health-related impact.
[10] http://www.aqmd.gov/docs/default-source/ceqa/handbook/scaqmd-air-quality-significance-thresholds.pdf?sfvrsn=2

5

on the health of school children attending the Palms Elementary School and on residents living near the
Project site.

Finally, due to the ongoing nature of this matter, we reserve the right to modify our work, opinion, and
any information presented in this document, and any revisions in the future, as reasonably accessible
information becomes available that materially-affects the findings and conclusions stated herein.

Sincerely,

*Paul Rosenfeld*

Paul E. Rosenfeld, Ph.D.

*Hadley Nolan*

Hadley Nolan

6

## DECLARATION OF BRITTANY DORN

I, BRITTANY DORN, declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I am employed as an elementary school teacher for the Los Angeles Unified School District at Palms Elementary School ("Palms"). I began teaching at Palms on July 8, 2015.

3. I attended college at Concordia University majoring in Liberal Arts and earned a Bachelor of Arts degree in the year 2012. I have earned a Master of Science degree in the field of Education of the Deaf from California Lutheran University in the year 2016. Additionally, I possess the following professional certification: Education Specialist Instruction Credential - Deaf and Hard of Hearing Authorization and English Learner Authorization, 2015.

4. Palms students are in pre-kindergarten through fifth grade classes. Our school day begins at 8:10 A.M. and ends at 2:33 P.M.

5. I currently teach children who are deaf and hard of hearing in grades four and five. The children in my class are boys and girls ages nine through eleven. All eight of my students have disabilities. Listed by number, the following students have the following disabilities and require the following curricular and environmental accommodations to learn and participate effectively in class:

Page 1

a) STUDENT #1: STUDENT #1 is ten years old and is hard of hearing. STUDENT #1's disability was confirmed in January 2011. According to her audiological report dated 11/13/17, she has a bilateral moderate to profound precipitously sloping sensorineural hearing loss. STUDENT #1 wears sound amplifying listening devices in order to effectively access the curriculum, socialize with other students and experience the world around her. She wears a cochlear implant on her left ear and a hearing aid on her right ear. Based upon my experience and observations of STUDENT #1, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, her social and educational development for the duration of the construction project. Sound amplification devices are only effective in educational environments wherein noise can be controlled. For example, ongoing noise sources such as air conditioners must meet certain dampened sound requirements. We have carpets on the classroom floor, fabric on the walls, and a drop ceiling to minimize sound reverberation. Any acoustic interruptions are amplified and make it impossible for students who are new to sounds to discern which sounds are voices and sources of information which need to be interpreted, as opposed to sounds which should be filtered out as noise. STUDENT #1 is considered a "new listener," because she just got her cochlear implant activated in October 2017. Therefore, her brain is still getting used to processing sounds electronically rather than acoustically and a filter has not yet been developed. By the end of the day STUDENT #1 suffers from listening fatigue. School is much more difficult for her because she has to work to hear every sound. It really wears her out by the end of the day. With additional background noise due to construction, she will tire much sooner and access to her education will be compromised. Moreover, amplification of sharp unexpected sounds can be painful because there is no chance to adjust volume, and ongoing repetitive sounds can be annoying and cause headaches. She often takes off her implant complaining that it is too loud, even in our noise-controlled classroom environment. Without her processor

Page 2

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001008

connected to her implant, she is completely deaf on the left. STUDENT #1 does not use sign language and relies on her listening and spoken language to communicate. She cannot learn if she is not wearing her equipment. In addition, STUDENT #1 is highly distractible and has trouble focusing in class. Noise from the construction project would make it very difficult for her to focus on her teacher, peers, and her work in class and deprive STUDENT #1 of an adequate learning environment.

b) STUDENT #2: STUDENT #2 is ten years old and is hard of hearing. STUDENT #2's disability was confirmed shortly after failing the Newborn Hearing Screening. According to his audiological report dated 3/9/17, he has a bilateral moderate sensorineural hearing loss. STUDENT #2 wears sound amplifying listening devices in order to effectively access the curriculum, socialize with other students and experience the world around him. He wears bilateral hearing aids. Based upon my experience and observations of STUDENT #2, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, his social and educational development for the duration of the construction project. He faces the same challenges as the previous student due to his hearing impairment regarding noise. In addition, I have observed that STUDENT #2 is extra sensitive to noise, often taking off his hearing aids when his mainstream class is noisy and always during recess. He reports that at times he does not wear his hearing aids at home because the traffic noise outside his apartment is so bothersome. STUDENT #2 also has environmental allergies that will be severely impacted by the construction pollution that will enter our yard and classroom. He takes medication for his allergies daily.

c) STUDENT #3: STUDENT #3 is nine years old and is hard of hearing. STUDENT #3's disability was confirmed shortly after failing the Newborn Hearing Screening. According to her audiological report dated 3/2/17, she has a moderate sloping to profound mixed hearing loss in the right ear and a mild sloping to severe hearing loss in the left ear. STUDENT #3 wears sound amplifying listening devices in order to

Page 3

1    effectively access the curriculum, socialize with other students and experience the
2    world around her. She wears bilateral hearing aids. Based upon my experience and
3    observations of STUDENT #3, the ongoing noise and distraction of a construction
4    project just outside our classroom windows would severely disrupt, if not totally
5    compromise, her social and educational development for the duration of the
6    construction project. She faces the same challenges as students STUDENT #1 and
7    STUDENT #2 due to her hearing impairment regarding noise. In addition,
8    STUDENT #3 is highly distractible and has trouble focusing in class. The noise from
9    the construction will make it very difficult for her to focus on her teacher, peers, and
10   her work in class.

11   d) STUDENT #4: STUDENT #4 is nine years old and is hard of hearing. STUDENT
12      #4's disability was confirmed shortly after failing the Newborn Hearing Screening.
13      According to his audiological report dated 3/12/17, he has a bilateral mild to
14      moderate sensorineural hearing loss. STUDENT #4 wears sound amplifying
15      listening devices in order to effectively access the curriculum, socialize with other
16      students and experience the world around him. He wears bilateral hearing aids.
17      Based upon my experience and observations of STUDENT #4, the ongoing noise
18      and distraction of a construction project just outside our classroom windows would
19      severely disrupt, if not totally compromise, his social and educational development
20      for the duration of the construction project. He faces the same challenges as
21      STUDENT #1, STUDENT #2 and STUDENT #3 due to his hearing impairment
22      regarding noise. In addition, STUDENT #4 is highly distractible and has trouble
23      focusing in class. The noise from the construction will make it very difficult for him
24      to focus on his teacher, peers, and his work in class.

25   e) STUDENT #5: STUDENT #5 is ten years old and is hard of hearing. STUDENT
26      #5's disability was confirmed shortly after failing the Newborn Hearing Screening.
27      According to his audiological report dated 11/6/17 he has a moderately-severe to
28      moderate conductive hearing loss secondary to atresia. He wears a sound amplifying

Page 4

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001010

listening device in order to effectively access the curriculum, socialize with other students and experience the world around him. He wears a Bone Anchored Hearing Aid. Based upon my experience and observations of STUDENT #5, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, his social and educational development for the duration of the construction project. He faces the same challenges as students STUDENT #1, STUDENT #2, STUDENT #3 and STUDENT #4 due to his hearing impairment regarding noise. STUDENT #5 attends a general education classroom that is approximately 8 yards from the construction site for 95% of his instructional day. For 75% of his day, STUDENT #2. attends the same general education class as STUDENT #5.

f) STUDENT #6: STUDENT #6 is eleven years old and is hard of hearing. STUDENT #6's disability was confirmed shortly after failing the Newborn Hearing Screening. According to his audiological report dated 9/13/17 he has a moderate to severe conductive hearing loss secondary to atresia. He wears a sound amplifying listening device in order to effectively access the curriculum, socialize with other students and experience the world around him. He wears a Bone Anchored Hearing Aid. Based upon my experience and observations of STUDENT #6, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, his social and educational development for the duration of the construction project. He faces the same challenges as the students in items (a) through (e) above due to his hearing impairment regarding noise.

g) STUDENT #7: STUDENT #7 is ten years old and is hard of hearing. STUDENT #7's disability was confirmed prior to 24 months of age. According to her audiological report dated 4/3/17, she has a moderate to severe sensorineural hearing loss in the left ear and is deaf in her right ear. STUDENT #7 wears a sound amplifying listening device in order to effectively access the curriculum, socialize

Page 5

1    with other students and experience the world around her. She wears a hearing aid on
2    her left ear. Based upon my experience and observations of STUDENT #7, the
3    ongoing noise and distraction of a construction project just outside our classroom
4    windows would severely disrupt, if not totally compromise, her social and
5    educational development for the duration of the construction project. She faces the
6    same challenges as the students in items (a) through (f) due to her hearing
7    impairment regarding noise.

8  h) STUDENT #8: STUDENT #8 is nine years old and is hard of hearing. STUDENT
9    #8's disability was confirmed shortly after failing the Newborn Hearing Screening.
10    According to her audiological report dated 2/6/17, she has a bilateral moderate
11    sensorineural hearing loss. STUDENT #8 wears sound amplifying listening devices
12    in order to effectively access the curriculum, socialize with other students and
13    experience the world around her. She wears bilateral hearing aids. Based upon my
14    experience and observations of STUDENT #8, the ongoing noise and distraction of a
15    construction project just outside our classroom windows would severely disrupt, if
16    not totally compromise, her social and educational development for the duration of
17    the construction project. She faces the same challenges as the students in items (a)
18    through (g) due to her hearing impairment regarding noise. STUDENT #8 attends a
19    general education classroom that is on our premises approximately 12 yards from the
20    construction site for 60% of her instructional day.

21

22  6. The Deaf and Hard of Hearing program has been at Palms for more than 30 years.
23    This year, the program has tripled in size, indicating that it is a strong program that
24    families want to send their children to. We currently have 33 students at Palms with
25    hearing impairment and are getting new preschoolers every month as those in the
26    LAUSD parent-infant program turn three years old. These 33 students are extra
27    sensitive to noise because they all wear sound amplification devices. Some of these
28    devices increase sound output by up to 50 dB at certain frequencies. For some of our

Page 6

1    students it is painful to hear traffic (~80dB), industrial noise (~100dB), and heavy
2    machinery (~120dB). For some who have less gain on their hearing aids, it may not
3    be painful, but it will be distracting to try to learn with such an increased signal to
4    noise ratio.

5

6    7. The students in my class are placed there because they have gaps in their academic
7       achievement because of their language delays. In some cases this is due to late
8       identification of hearing loss and therefore late amplification. In some cases it is
9       because they are not hearing all the sounds the English language uses. In other cases
10      it is because they have missed a lot of school due to surgeries (for cochlear
11      implantation, BAHA implantation, ear reconstruction, and/or additional surgeries
12      due to related syndromes such as cleft palette repair), recovery from these surgeries,
13      and many audiological appointments. My students are behind academically because
14      of factors that are out of their control. I try to maximize their learning for every
15      minute they are in school.

16

17   8. The demolition and construction of the building next to Palms Elementary will
18      greatly affect my students. The noise of the construction will impede their learning to
19      a devastating degree. My students do not use American Sign Language. They rely on
20      their impaired listening skills to access information and communicate. Their hearing
21      aids, BAHAs, and cochlear implants amplify all sounds that come into their
22      processors, not just speech. With the noise coming from construction, they will not
23      be able to hear me and, more importantly, will not be able to hear their peers. This
24      will stifle their ability to engage in and receive communication and expression.
25      Moreover, this will affect their learning as well as safety on the yard and their social
26      development.

27

28

Page 7

9. All eight of my students have Individual Education Programs with accommodations they are legally entitled to. Each has an accommodation for "reduced noise" in their learning environment. We teach their peers to not tap their pencils, to sit still in their squeaky chairs, and to only speak one at a time. We keep the door and windows closed and the air conditioner off for as long as we can stand it. The teachers wear microphones during instructional time and sharpen pencils after school when students are not around to be bothered by the noise. If there is construction noise next door to our school, I will not be able to provide the accommodation of reduced noise that my students need to succeed.

10. My classroom is less than 30 yards from the 3568 Motor Ave construction site. My students also attend general education classes that are as close as half of that distance from the site. Students from my class, as well as other classes, have their recess/play times on the open-air playground which is within a few yards of that construction site. In my observation, the children run, play and inhale rapidly and heavily when on the playground.

11. I In addition, increased traffic during construction and after because of additional tenants will make it less safe for our children to be dropped off and picked up in the morning. Seven of my eight students ride a bus to school every day. As responsible fourth and fifth graders, they are not required to hold an adult's hand when they step off the bus and walk down the sidewalk to the school gate. With more traffic, chances of accidents increase. An adult is nearby, but may not be close enough to alert a student if there is danger because they often do not wear their amplification until they get into the classroom. My other student, who is dropped off by family, will face the same dangers as he steps out of his parents' car.

Page 8

12. From what I have read, I understand that the 3568 Motor Ave construction project will release emissions into the air containing PM2.5 and PM10 particulate matter, nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic substances. I am extremely concerned for my students' health, as well as my own. I grew up in a family employed by the construction industry. I know that construction workers take precautions against these dangers, such as masks and eye protection. Our children will not have these precautions and will be exposed to the dangerous pollution every day.

13. I did not know about this project until a colleague informed me as I was walking out of school the day before our Thanksgiving break 11/17/17. Most of the families of our students do not know about this construction and will be upset when they find out how it will impact their children's education and health.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on December 3rd, 2017.

_Bethanyka_

Signature of Declarant

Page 9

Declaration
**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001015**

## DECLARATION OF Christal Lord

I, Christal Lord, declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I employed as an elementary school teacher for the Los Angeles Unified School District at Palms Elementary School. I began teaching at Palms on August 18, 2015. Prior to teaching at Palms, I taught at Tenth Street Elementary for 13 years, an LAUSD school.

3. I attended college at the University of California, Santa Barbara majoring in Sociology and earned a Bachelor of Arts degree in the year 2000. I have earned a Masters degree in the field of Education from the University of Los Angeles in the year 2003. Additionally, I possess the following professional certification as a National Board Certification (NBC) it is an advanced teaching credential that goes beyond state licensure. NBC has national standards for what accomplished teachers should know and be able to do. I also have a BCLAD, which in California is a bilingual authorization called the Bilingual, Crosscultural, Language and Academic Development credential.

4. Palms students are in pre-kindergarten through fifth grade classes. Our school day begins at 8:10 am and ends at 2:33 pm. Teachers must be at work by 7:50pm till 2:50pm.

5. I currently teach a class of 22 children in grade 1. The children in my class are boys and girls ages 6 through 8. Of my 22 students, 4 of them have learning disabilities. I

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001016

1    also have 16 students who are considered English Language Learners (ELD), who

2    need me to add learning modifications in order for them to process the English

3    language.

4

5    6. Listed by letter, the following students have the following disabilities and require

6    the following curricular and environmental accommodations to learn and participate

7    effectively in class:

8

9    - Student A: One of my students is a little girl repeating first grade and she is 7

10   years old. She has been receiving special education services since 2/5/2014. She

11   receives speech language impairment (SLI) and Resource Specialist Program

12   (RSP).   She gets distracted very easily during lessons, and I know this

13   construction project would be detrimental to her education. The ongoing noise

14   and distraction of a construction project just outside our classroom windows

15   would severely disrupt, if not totally compromise, her social and educational

16   development for the duration of the construction project.

17   - Student B:. Second student, is a little girl repeating first grade and she is 7 years

18   old. She has been receiving special education services since 8/15/2017. She

19   receives Resource Specialist Program (RSP) and is currently having neurological

20   studies done by medical professionals. She needs to have a quiet environment in

21   order to process information; this construction will cause more damage with her

22   neurological issues.

23   - Student C: Third student is a little girl repeating first grade and she is 7 years old.

24   She has been receiving special education services since 8/15/2017. She receives

25   Resource Specialist Program (RSP). She needs to learn during collaborative

26   groups, and with the constant noise from the construction site, that will hinder her

27   learning.

28

Page 2

1       -   Student D: The fourth student is a little boy who is 6 years old, initials S.G.F. He
2           has been receiving special education services since 1/28/2016. He receives
3           Speech Language Impairment (SLI) and Resource Specialist Program (RSP).
4           S.G.F is starting to learn how to speak in complete sentences. He is very shy and
5           it is difficult to hear him in my classroom setting. The noises from the
6           construction site will make teaching him how to speak more difficult.

7

8     7. My classroom is about 15 yards from the 3568 Motor Ave construction site. Students
9         from my class, as well as other classes, have their recess and lunch on the
10       playground outside. We are also mandated by the state to provide 100 minutes a
11       week of physical education. If this construction project goes through, students
12       attempting to eat and do physical activity will be bombarded with all the fumes,
13       noise, and dust coming from this project. They plan to build over 34 parking spots
14       underground; the demolition, excavation and construction will negatively impact our
15       students' and staff's health. The project is 29,807 square feet and will be 72 feet and
16       7 inches high, with 54 vehicular parking spots in total.

17

18     8. On November 26, 2018, I walked around the neighborhood and I asked neighbors
19       adjacent to the construction site if they had been notified and if they were aware of
20       the 72 feet 7 inch project that is planned to be developed in their backyard. The
21       community is not aware of the project and those that heard about it had no idea of
22       the magnitude of the project. I took a picture of the notice from the developer
23       recently posted on the building and it says it is a 4-story development, which is a lie
24       and misleading to the public. I have the picture and it is dated 11/26/17. When I
25       spoke to Senior City Planner for the Department of City Planning of Los
26       Angeles, Debbie Lawrence, she kept saying that this is a by-right project. I asked
27       her why the Director's Determination document which is 18 pages long said nothing
28       about how close in proximity the elementary school is to the construction site, it

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001018

shares the fence-line with our kindergarten yard were pre-kindergarten DHH (Deaf and Hard of Hearing) and kindergarten classes play and do physical education courses which are mandated by the state. I also asked her why no environmental report was done, considering over 350 children and staff health will be affected by this construction site. Again she said out of the 42 dwelling units, 4 are for low income housing, we should not have to sacrifice our health for a measly 4 units, so the developer can destroy our health and community.

9. In response to my questions about why the children weren't considered and why parents got no notice and opportunity to be heard, Ms. Lawrence insisted to me that this project is a "by right density bonus" project which means it does not need environmental review. She also said that the 18-page Determination letter was only sent to abutting and common corner property owners because they are the only ones who can object. She then said that we cannot stop the developer or the project because it is his property.

10. I am very worried about the traffic impact this project will have on our community. Currently Motor only has two lanes, in the Determination report it stated that 6,000 cubic yards of soil will be transported from construction site. I don't understand how this will be done in a safe manner. Our students are dropped off on Motor Avenue in the mornings and afternoons. The parents have a hard time finding parking as it is, and with all the parking spaces being taken up by construction materials, how will parents be able to drop and pick up their children in a safe manner. The developer is trying to say it is offering low income housing but out of the 42 units, only four are for low income units. The rest will be $2500.00 a month for one-bedroom apartments. If you have only one-bedrooms available, this developer is not looking to provide housing for families in the Palms community. There will most likely be at least 2 people in each one bedroom adding 50 or more

Page 4

1    cars to our tiny Palms community. This again will affect parents being able to drop

2    off and pick up their children safety. It takes only one child being injured during this

3    construction process and this is a big liability for everyone involved.

4

5    11. From what I have read, I understand that the 3568 Motor Ave construction project

6    will release emissions into the air containing PM2.5 and PM10 particulate matter,

7    nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic

8    substances. I am extremely concerned for my students' health, as well as my own.

9    Many students and staff have issues with allergies and asthma.

10

11   12. I was not notified about the details of this project till November 15, 2017 at the

12   Palms Neighborhood Council Meeting. The councilmembers voted against the

13   project that evening and said it was the first time they have ever voted against a

14   development project. The developers were changing their proposals and the council

15   members did not agree with the impact this massive construction site would have on

16   children of Palms Elementary.

17

18   13. On November 30, 2017 an internal meeting was held regarding this development

19   project, with the developers and Paul Koretz's councilmembers team, but I was told I

20   was not allowed to go to meeting; they did not want me there because I oppose the

21   project. I have been researching this project since November 15, 2017 and wanted to

22   share my findings. I took pictures and sent a video link to each city planner that

23   approved the plan, and only have heard from one Senior City planner (Debbie

24   Lawrence) out of the six who signed the document. I have emailed Vincent Bertoni

25   (Director of City Planning), Faisal Roble (Principal City Planner), Michelle Singh

26   (City Planner), Connie Chauv (City Planning Associate), Paul Koretz

27   (Councilmember for 5th district), Mike Feuer (City Attorney), none of these people

28   have gotten back to me, our children and community deserve to be heard on their

Page 5

1  objections to this project, and an explanation. 1 am worried about the respiratory

2  illnesses and health issues this construction project will cause to the students and

3  staff of Palms Elementary. 1 also know that our Deaf and Hard of Hearing students

4  will be negatively impacted and the noise from the construction will alter their

5  hearing devices in a negative manner.

6

7  I declare, under penalty of perjury under the laws of the State of California, and the

8  United States of America, that above statement is true and correct, and that this declaration

9  was executed in the County of Los Angeles, California, on December 3, 2017.

10

11  _Christal Ford_

12  Signature of Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001021

## DECLARATION OF SONIA SALAZAR-ZAVALA

I, Sonia Salazar-Zavala, declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I am employed as a full-time elementary school teacher for the Los Angeles Unified School District ("LAUSD") at Palms Elementary School ("Palms"). I began teaching at Palms in August of 2011. Prior to teaching at Palms, I taught at Crescent Heights Magnet School for two years, then I taught as a substitute teacher for LAUSD for four years. Two of those years were as a long-term substitute for Palms Elementary.

3. I attended college at California State University, Long Beach. I majored in Liberal Studies and earned a Bachelor of Arts, Liberal Studies and a Multi-Subject Teaching Credential in 2006. Additionally, I possess a Medical Assistant Certificate, and a Medical Terminology Certificate.

4. Palms students are in Pre-Kindergarten through Fifth grade classes. Our school day begins at 8:10 every morning and ends at 2:33 every Monday, Wednesday, Thursday, and Friday. Every Tuesday, students are dismissed at 1:33 P.M.

5. I currently teach a class of 23 children in Kindergarten. The children in my class are boys and girls ages 5 and 6. Of my 23 students, 3 of them have disabilities, and three other students are undergoing observations and evaluations for the possibility of having a disability. Listed by number, the following students have the following disabilities and require the following accommodations to learn and participate effectively in class:

Page 1

a) Students #1, #2 and #3: Each of these three students has a speech disability. Each student needs to listen carefully to the teacher to learn how to speak well and the teacher needs to be able to listen to each student and try to understand each student's speech to translate what each student is trying to say.

b) Students #4 and #5: Both of these students are being tested for a speech disability. Each student needs to listen carefully to the teacher to learn how to speak well and the teacher needs to be able to listen to each student and try to understand each student's speech to translate what each student is trying to say.

c) Student #6: This student is being observed and evaluated for a speech disability and a possible diagnosis on the Autistic Spectrum. Loud noises startle him, he also needs quiet time for one-to-one mini-lessons, and he easily gets distracted by noises.

6. All of my students are English Language Learners. They are students that need additional lessons to be able to understand and learn English. I have some students that respond using some words in Spanish and I help them translate the words into English. A quiet and calm environment is needed for my class to learn and achieve their educational their goals as well as keep pace with grade-level standards.

7. Every student of mine plays on the kindergarten playground area, which shares a fence-line with the 3568 Motor Avenue construction area. From my observations, students from my classroom and students from other classrooms (Kindergartners and Pre-Kindergarten DHH Students) use the playground area to eat, to run, and to play. The students touch the tables, the benches, and the playground equipment (balls, tricycles, playhouse, and apparatus). Students also sit and roll on the floor like every child does when they are playing and having fun.

Page 2

8. My Students and everything in the playground area will be exposed to the toxins that will be released to the atmosphere during demolition, excavation and construction. Students at Palms Elementary will be breathing the toxins and touching them. Toxins will fall on their food and drinks. Students will be in danger of getting sick and dying. The toxins that the students will be exposed to are toxins that cause cancer and breathing problems.

9. Not only will students from Palms Elementary be exposed to toxins which can lead to death – they will also be suffering from the loud noises during the demolition and the construction. Palms Elementary School serves students with Hearing Disabilities. These children were born with a disability and given the gift to hear. Some students are just learning how to use the gift of hearing. The students have hearing devices implanted in their ears and head. The sounds are amplified to help them to hear. These poor and innocent children will be suffering from headaches and not even know how to transcribe what they are going through because most cannot speak clearly. They cannot speak clearly because they are learning how to use the implants and are just learning what words are and how to communicate.

10. From what I have read, I understand that the 3568 Motor Ave construction project will release emissions into the air containing PM2.5 and PM10 particulate matter, nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic substances. I am extremely concerned for my students and their health, as well as my own.

11. I have only been informed about the project late in the month of November 2017. Prior to late November, teachers including myself, were not informed about the

Page 3

1      project. We, teachers, were never given the opportunity to object to, or vote against,

2      the project. Everything has been hidden from us and the community.

3

4      I declare, under penalty of perjury under the laws of the State of California, and the

5      United States of America, that above statement is true and correct, and that this declaration

6      was executed in the County of Los Angeles, California, on December 3rd, 2017.

7

8      Sonia Salazar-Zavala

9      Signature of Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 4

Declaration

# DECLARATION OF KRISTEN A. WARD

I, Kristen A. Ward declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I employed as an elementary school teacher for the Los Angeles Unified School District at Palms Elementary School ("Palms"). I began teaching at Palms on August 14, 2017. For the past three years I have also provided speech, listening, and language one-on-one family services at No Limits for deaf children. Prior to teaching at Palms, I taught at Melrose Elementary Magnet for five years and Southern Ohio Educational Service Center- Region 14 Hopewell for five years.

3. I attended college at Vanderbilt University majoring in Special Education: Deaf and Hard of Hearing and Elementary Education and earned a Bachelor of Science degree in the year 2006. I earned a Masters degree in the field of Special Education: Deaf and Hard of Hearing from the University of San Diego in the year 2012. Additionally, I received a professional certification and/or license for Parent Education and Training certification through the University of California Los Angeles in 2016. I am currently working toward my National Board Certification and Character Education Development certificate through the University of San Diego. I hold the following credentials in the state of California: Education Specialist Instruction Credential for deaf and hard of hearing (with authorization in Autism Spectrum Disorder and English Learner) and my Multiple Subject Teaching Credential.

Page 1

PALMS ELEMENTARY / OBJECTORS EXHIBITS 001026

4. I currently teach a class of seven children in second and third grade. The children in my class are boys and girls ages seven through nine years old. Of my seven students, all of them have disabilities. Listed by number, the following students have the following disabilities and require the following curricular and environmental accommodations to learn and participate effectively in class:

a) STUDENT #1: STUDENT #1 is an 8.3 year-old girl in the third grade. She was diagnosed with a bilateral profound sensorineural auditory neuropathy at approximately 6 months. She was implanted with two cochlear implants on 10/3/11, at 2 years, 1 month. Thus making her hearing age 6 years, 2 months. She currently wears two Nucleus 6 Cochlear Implants. STUDENT #1 has attended a special day Listening and Spoken Language Deaf and Hard of Hearing program since preschool. She also receives weekly services from Los Angeles Unified School System's educational audiologist and Speech and Language Pathologist. She receives additional audiology and auditory verbal therapy outside of school. STUDENT #1 receives the following accommodations: Cochlear Implants, FM system/ classroom amplification; preferential seating in close proximity to speaker and/or learning activity; small group instruction; obtain student's attention prior to speaking; auditory first input; gestural cues when necessary; acoustic highlighting; adult language models; reduced auditory distractions/ background noise, extended time when necessary; additional practice; clear modeling, step-by-step phrasing, rephrasing, repetition, and clarification of oral information, instructional materials, and directions; instructions and test questions read aloud; pre/ post teaching; explicit vocabulary and language instruction; frequent checks for understanding; realia and visual aids; visual supplements (interactive whiteboard, document reader, speakers, charts, picture vocabulary lists, outlined lectures); peer note taker; captioning; frequent listening breaks. For all curriculum and assessments that require STUDENT

Page 2

PALMS ELEMENTARY / OBJECTORS EXHIBITS 000027

1    #1 to respond to audio/listening stimuli, STUDENT #1 will have access to hearing
2    and/or amplification technology as appropriate. STUDENT #1 received a "Review
3    Three Year Evaluation" in October, 2017. According to The Test of Auditory
4    Comprehension, administered on October 6, 2017, STUDENT #1 was not able to
5    comprehend a 7-10 sentence story containing simple, compound and complex
6    grammatical structures in a quiet environment. This student is a level 1, beginner,
7    English language learner. Based upon my experience and observations of STUDENT
8    #1, the ongoing noise and distraction of a construction project just 5 yards from our
9    classroom windows would severely disrupt and compromise, her social and
10   educational development for the duration of the construction project. Amplification
11   devices are effective in educational environments wherein noise can be controlled.
12   For example, ongoing noise sources such as air conditioners must meet certain
13   dampened sound requirements. As an accommodation for STUDENT #1, and all the
14   students in my classroom, we have carpets on our classroom floor, fabric on the
15   walls, and a drop ceiling to minimize sound reverberation. Acoustic interruptions/
16   background noise will make it difficult for STUDENT #1 to listen and comprehend
17   critical information when masked by background noise. This will cause her to miss
18   important academic information due to distractibility and her ability to comprehend
19   the lessons through background noise.

20   b) STUDENT #2: STUDENT #2 is an 8.7 year old boy in the third grade. He was
21   diagnosed with a bilateral moderate to profound sensorineural hearing loss. He
22   received amplification for the first time in Kindergarten around January of 2014, at
23   approximately 5.4 years old. Thus making his hearing age, approximately 3.10 years.
24   He currently wears two hearing aids. Aided test results completed at House
25   Children's Center in August 2016 with STUDENT #2's Phonak Sky Q50 UP hearing
26   aids were in the mild to moderate range of hearing loss. STUDENT #2 has attended
27   a special day Listening and Spoken Language Deaf and Hard of Hearing program

Page 3

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001028

since January 2014. He also receives weekly services from Los Angeles Unified School System's educational audiologist, auditory verbal therapist, and Speech and Language Pathologist. He receives outside audiology services. STUDENT #2 receives the following accommodations: Hearing aids, FM system, captioning, specialized seating arrangements, obtain student's attention prior to speaking, reduced auditory distractions, realia, extra time, rephrasing information and directions, check for understanding, visual supplements (interactive whiteboard, document reader, speakers, charts, vocabulary lists, outlined lectures), peer note taker, frequent listening breaks, extra time when needed, step-by-step directions, instructions and test questions read aloud, pre/post teaching, adult language models, explicit vocabulary and language instruction. STUDENT #2 received a "Review Three Year Evaluation" in March of 2017. He received assessments in listening, language, speech, and overall academics using the following test: The Test of Auditory Comprehension, (TAC), Kaufman Test of Educational Achievement 3rd Edition (KTEA-3), One Word Receptive Picture Vocabulary Test (OWRPVT), One Word Expressive Picture Vocabulary Test (OWEPVT). The TAC was administered 1/23/17, STUDENT #2 was unable to comprehend speech phrases containing 4 critical elements (i.e. I saw the orange car and large cat). According to the OWRPVT, he received an age equivalence of 3.0 years old. He received a score of 2.1 years old on the expressive vocabulary test. According to the KTEA-3 he received the grade equivalence of <PK.0 in both Oral Expressions and Listening Comprehension. He is also an English language learner. According to last year's California English Language Development Test scores, STUDENT #2 received a score of 1- Beginner. Based on my experiences, the student's hearing loss, and test scores provided above, STUDENT #2 will have a very difficult time hearing with background noise and distraction. STUDENT #2 is a hard working student and tries his best; however, his hearing loss, language and listening delays make it difficult for

Page 4

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001029

1       him to accurately hear and comprehend spoken language without a quiet
2       environment. Based upon my experience and observations of STUDENT #2, the
3       ongoing noise and distraction of a construction project just 5 yards from our
4       classroom windows would severely disrupt and compromise his social and
5       educational development for the duration of the construction project. Acoustic
6       interruptions/ background noise will be amplified through his hearing aids and make
7       it impossible for him to listen and discern which sounds are voices and information
8       that needs to be processed from unimportant noise. As a fairly new listener, these
9       tasks are already difficult for him. His hearing loss makes listening, focusing, and
10      comprehending the information presented throughout the day more difficult which
11      causes listening fatigue. As STUDENT #2 becomes increasingly exhausted he will
12      miss more information, affect his memory recall, and retention. Additional
13      background noise due to construction will cause him to tire earlier in the day. This
14      will cause him to miss important academic information due to his lack of attention,
15      distractibility, and fatigue.

16  c)  STUDENT #3: STUDENT #3 is a 7.2 year old girl in the second grade. She was
17      diagnosed with severe to profound sensorineural hearing loss in the right ear and a
18      profound sensorineural hearing loss in the left ear. She received a cochlear implant
19      on her left ear in March 2012 at the House Ear Institute CARE Center. at
20      approximately 1.5 years old. Thus making her hearing age, 5 years, 8 months. She
21      currently wears a Nucleus 5 cochlear implant. STUDENT #3 has attended Palm's
22      special day Listening and Spoken Language Deaf and Hard of Hearing program for
23      the past two years. She also receives weekly services from Los Angeles Unified
24      School System's educational audiologist, auditory verbal therapist, and Speech and
25      Language Pathologist. She receives outside audiology services. She has been in and
26      out of foster care since she was approximately 3 years old. She is currently living
27      with her grandmother and 1 of 3 siblings. According to Grandmother, STUDENT #3

PALMS ELEMENTARY / OBJECTORS EXHIBITS:001030

has been diagnosed with Post Traumatic Stress Disorder (PTSD), Attention Deficit Hyperactivity Disorder (ADHD), and Anxiety Attachment disorder. She is not taking medicine for her ADHD. She receives counseling and additional services through California Children Services. STUDENT #3 receives the following accommodations: Preferential setting, checking for understanding, acoustically appropriate setting. Based upon my experience and observations of STUDENT #3, the ongoing noise and distraction of a construction project just 5 yards from our classroom windows would severely disrupt, if not totally compromise, her social and educational development for the duration of the construction project. Acoustic interruptions/ background noise will be amplified through her cochlear implant and increase difficulty level for her to hear and comprehend important information. Not only will the construction project affect her ability to hear and listen to classroom instruction but STUDENT #3 often exhibits hyperactivity, attention and focus difficulties, off-task behaviors, and tantrums. STUDENT #3's academics are impeded by her hearing loss, PTSD and ADHD. She is easily distracted and requires consistent redirecting. She becomes distracted by her peers, outside events, noises, her emotions, and exhaustion. She has difficulty with authority and social emotional skills. STUDENT #3 occasionally has tantrums, which last approximately 30-45 minutes when she becomes too overwhelmed. Her tantrums are typically brought on by changes in her schedule or home situations. Her hearing loss, PTSD, and ADHD make listening, focusing, and comprehending the information presented throughout the day more difficult which causes her to experience listening fatigue. Listening fatigue increases the likelihood of STUDENT #3 experiencing a tantrum. Additional background noise due to construction will cause her to tire earlier in the day. This will cause her to miss important academic information due to her lack of attention, distractibility, and emotions.

Page 8

d) STUDENT #4: STUDENT #4 is an 8.9 year old girl in the second grade. STUDENT #4's main diagnosis is "Other Health Impairments". STUDENT #4 has a rare disorder which causes the following: intellectual delays, vision problems, hearing loss, sensory sensitivity, aggressive behavior, social difficulties, and oppositional defiance. STUDENT #4 has moderate to severe hearing loss at the right ear and moderately-severe loss at the left ear. She wears two Phonak Q50m13 hearing aids. STUDENT #4 has attended a special day Listening and Spoken Language Deaf and Hard of Hearing program since August 2017. Prior to this placement she was in an unspecified special day classroom. She also receives weekly services from Los Angeles Unified School System's educational audiologist, Speech and Language Pathologist, and Occupational Therapist. She is currently being evaluated for adaptive physical education and physical therapy. She uses assistive technology, a keyboard for writing. She receives outside audiology services. STUDENT #4's accommodations include: FM system, small group instruction, repetition, natural gesture cues, modeling, additional practice. Clear modeling of correct sounds and positive reinforcement for attempting to produce correct sounds and expanded utterances. Adult language opportunities to practice expressing ideas and feelings in daily routines, preferential seating in close proximity to speaker and/or learning activity. Repetition of all instructional material and directions; use of realia and visual aids; classroom amplification; prompting; cuing; repetition and clarification of oral information; frequent checks for understanding; extended time for tasks; acoustic highlighting, auditory-only input, and a reduction in background noise when possible. For all curriculum and assessments that require STUDENT #4 to respond to audio/listening stimuli, STUDENT #4 will have access to hearing and/or amplification technology as appropriate. Based upon my experience and observations of STUDENT #4, the ongoing noise and distraction of a construction project just 5 yards from our classroom windows would severely disrupt, if not

Page 7

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001032

1    totally compromise. her social and educational development for the duration of the
2    construction project. Acoustic interruptions/ background noise will be amplified
3    through her hearing aids and make it impossible for her to listen and discern which
4    sounds are voices and information that needs to be processed from unimportant.
5    noise. Not only will the construction project affect her ability to hear and listen to
6    classroom instruction but STUDENT #4 often exhibits aggressive and oppositional
7    behaviors when she experiences change, loud noises, frustration, when working
8    independently, and when she is tired. She is easily distracted and has difficulty with
9    authority. Her hearing loss makes listening, focusing, and comprehending the
10    information presented throughout the day more difficult which causes her to
11    experience listening fatigue. As STUDENT #4 becomes increasingly exhausted the
12    likelihood of her exhibiting aggressive behaviors and oppositional defiance increase
13    drastically. Additional background noise due to construction will cause her to tire
14    earlier in the day. This will cause her to miss important academic information due to
15    her lack of attention, distractibility, and emotions. Moreover, amplification of sharp
16    unexpected sounds are painful for her due to her sensory sensitivity.

17    e) STUDENT #5: STUDENT #5 is a 9.7 year old girl in the third grade. She has a
18    moderate rising to mild conductive hearing loss at the left ear and a severe to
19    moderate conductive loss at the right ear. STUDENT #5 has right ear microtia and
20    atresia and had outer ear surgery in November 2013. STUDENT #5 uses a Bone
21    Anchored Hearing Aid, BP100 on a softband and has used a Phonak Bolero behind-
22    the-ear hearing aid at the left ear since December 2015. STUDENT #5 has attended a
23    special day Listening and Spoken Language Deaf and Hard of Hearing program
24    since preschool. She also receives weekly services from Los Angeles Unified School
25    System's educational audiologist and Speech and Language Pathologist. She
26    receives outside audiology services. STUDENT #5 receives the following
27    accommodations: Hearing aid, bone conductive hearing aid, FM system, captioning,

28

PALMS ELEMENTARY / OBJECTORS EXHIBITS 001033

1   specialized seating arrangements, obtain student's attention prior to speaking,
2   reduced auditory distractions, realia, extra time, rephrasing information and
3   directions, check for understanding, visual supplements (interactive whiteboard,
4   document reader, speakers, charts, vocabulary lists, outlined lectures), peer note
5   taker, frequent listening breaks, step-by-step directions, instructions and test
6   questions read aloud, pre/post teaching, adult language models, explicit vocabulary
7   and language instruction. STUDENT #5 received a "Review Three-Year Evaluation"
8   in April of 2017. She was assessed using The Test of Auditory Comprehension
9   (TAC), Kaufman Test of Educational Achievement 3rd Edition (KTEA-3), and the
10  One Word Receptive Picture Vocabulary Test (OWRPVT). On the TAC, STUDENT
11  #5 was not able to comprehend a 7-10 sentence story containing simple, compound
12  and complex grammatical structures in a quiet environment, one-on-one. On the
13  OWRPVT, STUDENT #5 received an age equivalence of 5.6 years. She received a
14  score of <PK.0 in Oral Expressions and PK.1 in Listening Comprehension on the
15  KTEA-3. Based upon my experience and observations of STUDENT #5, the
16  ongoing noise and distraction of a construction project just 5 yards from our
17  classroom windows would severely disrupt, if not totally compromise, her social and
18  educational development for the duration of the construction project. Acoustic
19  interruptions/ background noise will be amplified through her bone conductive
20  hearing aid and hearing aid, which will make it difficult for her to listen and
21  comprehend academics. This will cause her to miss important academic information
22  due to distractibility.

23  f)  STUDENT #6: STUDENT #6 is an 8.2 year old girl in the third grade. STUDENT
24      #6 was initially diagnosed with hearing loss May 2012 at 2 years 8 months. She
25      received a Nucleus 6 cochlear implant for her right ear in March 2014 at
26      approximately 4.6 years old. She has a severe hearing loss in her left ear in which
27      she wears a hearing aid. Thus making her hearing age, approximately 3. 9 years old.

28

Page 9

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001034

STUDENT #6 has attended a special day Listening and Spoken Language Deaf and Hard of Hearing program since 2014. She also receives weekly services from Los Angeles Unified School System's educational audiologist and Speech and Language Pathologist. She receives outside audiology services and auditory verbal therapy. As far as I know, STUDENT #6 is receiving counseling through an outside source due to behavior issues at home and attention difficulties. STUDENT #6 is a level 1-beginner English language learner. STUDENT #6 receives the following accommodations: FM system, CI, hearing aid, small group instruction, modeling, additional practice. Clear modeling of correct sounds and positive reinforcement for attempting to produce correct sounds and expanded utterances. Adult language opportunities to practice expressing ideas and feelings in daily routines, preferential seating in close proximity to speaker and/or learning activity. Repetition of all instructional material and directions; use of realia and visual aids; adult language modeling; classroom amplification; prompting; cuing; repetition and clarification of oral information; frequent checks for understanding; extended time for tasks; acoustic highlighting, auditory-only input first, gesture cues when needed, and a reduction in background noise. For all curriculum and assessments that require STUDENT #6 to respond to audio/listening stimuli, STUDENT #6 will have access to hearing and/or amplification technology as appropriate. Based upon my experience and observations of STUDENT #6, the ongoing noise and distraction of a construction project just 5 yards from our classroom windows would severely disrupt, if not totally compromise, her social and educational development for the duration of the construction project. Acoustic interruptions/ background noise will be amplified through her bone conductive hearing aid and hearing aid, which will make it difficult for her to listen and comprehend academics. This will cause her to miss important academic information due to distractibility. STUDENT #6 has difficulty focusing on her assignments and active listening. She is easily distracted. The

Page 10

PALMS ELEMENTARY / OBJECTORS EXHIBITS 002035

additional noise from the construction project will make it more difficult for her to complete her work and comprehend academics within the classroom.

g) STUDENT #7: STUDENT #7 is a 7.11 year old boy in the second grade. He has a mild to moderate sensorineural hearing loss in the right ear and a moderate sensorineural hearing loss in the left ear. His initial IEP was held on October 2, 2014, at approximately 4.9 years. He currently wears two Oticon Sensei Pro BTE hearing aids. STUDENT #7 has attended a special day Listening and Spoken Language Deaf and Hard of Hearing program since 2014. He also receives weekly services from Los Angeles Unified School System's educational audiologist and Speech and Language Pathologist. He receives outside audiology services and speech and language services. STUDENT #7 receives the following accommodations: Hearing aids, FM system/ classroom amplification; preferential seating in close proximity to speaker and/or learning activity; small group instruction; obtain student's attention prior to speaking, auditory first input, gestural cues when necessary; acoustic highlighting,; adult language models; reduced auditory distractions/ background noise, extended time when necessary; additional practice; clear modeling, step-by-step phrasing, rephrasing, repetition, and clarification of oral information, instructional materials, and directions; instructions and test questions read aloud; pre/ post teaching , explicit vocabulary and language instruction; frequent checks for understanding; realia and visual aids, visual supplements (interactive whiteboard, document reader, speakers, charts, vocabulary lists, outlined lectures); peer note taker, captioning; frequent listening breaks. For all curriculum and assessments that require STUDENT #7 to respond to audio/listening stimuli, STUDENT #7 will have access to hearing and/or amplification technology as appropriate. STUDENT #7 received a "Review Three-Year Evaluation" in October of 2017. He was assessed using the Test of Auditory Comprehension (TAC), Kaufman Test of Educational Achievement 3rd Edition (KTEA-3), One Word Receptive Picture Vocabulary Test (OWRPVT), One Word

PALMS ELEMENTARY / OBJECTORS EXHIBITS 001036

1    Expressive Picture Vocabulary Test (OWEPVT). When administered the TAC,
2    STUDENT #7 was not able to comprehend speech phrases containing four critical
3    elements (show me the 'broken...airplane...and new...shoes'). He received a score of
4    <PK.0 on Oral Expressions and Listening Comprehension on the KTEA-3 in a quiet
5    environment. On the OWRPVT he received an age equivalence of 4.2 years and 3.6
6    years on the OWEPVT. STUDENT #7 is also a level 1, beginner, English Language
7    learner. Based upon my experience and observations of STUDENT #7, the ongoing
8    noise and distraction of a construction project just 5 yards from our classroom
9    windows would severely disrupt his social and educational development for the
10   duration of the construction project. Acoustic interruptions/ background noise will be
11   amplified through his hearing aids and make it impossible for him to listen and
12   discern which sounds are voices and information that needs to be processed from
13   unimportant noise. Not only will the construction project affect his ability to hear
14   and listen to classroom instruction but STUDENT #7 exhibits signs of sensory
15   sensitivity to noise. He is easily distracted by outside sources increasing the
16   likelihood of off-task behaviors.

17

18   5. Additionally, I, Kristen A. Ward, the special day class Listening and Spoken
19   Language teacher have allergies, Attention Deficit Hyperactivity Disorder (ADHD)
20   and asthma. I currently take daily medication for my ADHD; however, even
21   medicated it is difficult for me to focus on tasks and stay organized without
22   becoming distracted. I am easily distracted by loud or novel noises. This makes it
23   extremely difficult for me to focus on the task at hand. As the teacher, I have the
24   most important job. I need to be focused with limited outside distractions so I can
25   provide my students with the best education I can.

26

27

28

Page 12

PALMS ELEMENTARY / OBJECTORS EXHIBITS 008037

6. My asthma will be badly impacted by the construction project. As an adult, my asthma is triggered by allergies, dust, weather changes, and illness. I was diagnosed with severe asthma at approximately 6 months due to pneumonia. I have been hospitalized several times due to my asthma. I am concerned that with all the debris, dust, and other chemicals floating around it will trigger my asthma. It will be very difficult for me to teach if I am having difficulty breathing or become ill.

7. My classroom touches the property line of the 3568 Motor Ave construction site. Students from my class, as well as other classes, have their recess/play times on the open-air playground which is within a few yards of that construction site. In my observation, the children run, play and inhale rapidly and heavily when on the playground.

8. The construction project will affect the learning environment and school. The building will shade the entirety of the Kindergarten play yard as well as many other buildings. The seven story building will have windows looking down on the students play areas – creating safety and security issues. Moreover, it is already difficult to find parking with the community especially on Wednesdays and Thursdays when the city does street cleaning. Employees at Palm's Elementary are already forced to double park and block in coworkers. Traffic and parking will be worse.

9. From what I have read, I understand that the 3568 Motor Ave construction project will release emissions into the air containing PM2.5 and PM10 particulate matter, nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic substances. I am extremely concerned for my students' health, as well as my own.

Page 13

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001038

1    10. I only learned of the 3568 Motor Avenue construction project in the past several

2    days. I find it very unsettling, disgraceful, and manipulative that Palms Elementary

3    teachers and parents were not notified about the construction project in advance. I do

4    not know how a company can decide, and be permitted, to build such a large project

5    in a residential area without taking into consideration the surrounding community.

6    There should have been environmental testing and opportunities for the community

7    to respond. This project was decided on without any thought about how it will affect

8    the students at Palms Elementary or the community.

9

10       I declare, under penalty of perjury under the laws of the State of California, and the

11   United States of America, that above statement is true and correct, and that this declaration

12   was executed in the County of  Los Angeles, California, on December 3rd, 2017.

13

14   _Miston A. Ward_

15   Signature of Declarant

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 14

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001039

**DECLARATION OF SHINKAI KARZAI**

I, Shinkai Karzai, declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I am employed as an elementary school teacher for the Los Angeles Unified School District at Palms Elementary School ("Palms"). I began teaching at Palms on August of 2011. I have been an educator for LAUSD since August of 1998.

3. I attended college at UCLA majoring in Sociology and earned a Bachelor of Arts degree in the year 1998. I have earned a Masters degree in the field of Public Administration from USC in the year 2002. Additionally, I possess the following professional certifications and/or licenses: Multi-subject Professional Clear Teaching Credential.

4. Palms students are in pre-kindergarten through fifth grade classes. Our school day begins at 8:10 a.m. and ends at 2:33 p.m.

5. I currently teach a class of 28 - 33 children in grade 4. The children in my class are boys and girls ages 9 through 10. I say 28 - 33 because students from two different Special Education classes mainstream in my class for various parts of the day. A total of 5 different students mainstream with me. The students who mainstream with me are 2 students from the Special Day Class and 3 from the DHH (Deaf and Hard of Hearing) class. In addition to the students who mainstream with me, two of my students, have disabilities. Listed by number, the following students have the

Page 1

following disabilities and require the following curricular and environmental accommodations to learn and participate effectively in class:

a) STUDENT #1: STUDENT #1 is 9 years old and has a specific learning disability. STUDENT #1's disability was confirmed on June of 2012. STUDENT #1's specific learning disability requires that he have the following accommodations; preferential seating, refocusing, small group instruction, repetition and clarification of directions and graphic organizers for writing, As I have worked with STUDENT #1, I have noticed that he gets distracted very easily and needs to be refocused often. The construction noise will cause him to be very distracted and therefore hinder his education.

b) STUDENT #2: STUDENT #2 is 10 years old. She has Specific Language Impairment. STUDENT #2's disability was confirmed on 2/10/2012. STUDENT #2's specific language impairment requires that she have the following accommodations; preferential seating, refocusing, small group instruction, repetition and clarification of directions and hands on materials for math as needed, In STUDENT #2's case she has a lot of trouble completing tasks because she gets distracted so easily. She has a lot of trouble with our normal day to day interruptions. It will be extremely difficult for her to complete tasks with constant noise coming from the construction site.

c) I also have 3 students from the DHH classroom that mainstream in my class for various amounts of time during the day. I know that the noise will be very detrimental to their learning.

d) In addition, I have 2 students from the Special Day Class that Mainstream with, I know that the noise from the construction site will be very distracting and affect their ability to access the curriculum.

Page 2

6. When I first heard of the 3568 Motor Avenue construction project my immediate thought was that it is going to cause a tremendous amount of traffic during drop-off and pick-up time. Traffic near and around the school is horrible in the morning. We have a very small lot for teachers and there is no parking on campus for parents. Parents have to park on the streets around the school. With a construction project of this magnitude, our traffic congestion problems will be exacerbated. I really worry about the safety of our students and their families. As I continued to think about this project and learned more about the details, it became clear to me that the noise during the school day was going to be another major problem. In my 19 years of experience as an elementary school teacher, I have observed that external noise is very detrimental to the learning process. Elementary age students are easily distracted. A car honking, a helicopter flying overhead easily distracts my students and I have to refocus their attention when that occurs. I know that the construction noise will be very distracting and harmful to my students. All of the noise will negatively impact their ability to access the curriculum and learn.

7. My classroom is less than 10 yards from the 3568 Motor Avenue construction site. Students from my class, as well as other classes, have their recess/play times on the open-air playground, part of which is immediately next to that construction site. My class uses the space for Physical Education instruction. My class works in the garden which is right behind my classroom and faces the construction project. I know that the size of the project will increase shade and therefore limit natural light that comes into my classroom. I will no longer be able to open my windows to get fresh air. Stale indoor air can also cause serious health problems.

8. From what I have read, I understand that the 3568 Motor Ave construction project will release emissions into the air containing PM2.5 and PM10 particulate matter, nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic

Page 3

1    substances. I am extremely concerned for my students' health, as well as my own.
2    This really worries me. As young children are very vulnerable to chemicals and dust.
3    Our school has many students that have asthma and other respiratory problems and
4    this will negatively impact their health. It is hard for me to believe that a building
5    this size would be allowed next to an elementary school, let alone be allowed to be
6    built during school hours. The safety and well-being of children and adults that work
7    at the school should be of utmost concern and not the profits of a developer. We are
8    not talking about a few months but two years! The proximity of the project to the
9    school should be a major concern for City officials and any developer when
10    considering the size of their building. I am hopeful that our City government will
11    protect the students and staff at Palms Elementary. The disruption to our daily lives,
12    the health risks and noise pollution this project brings to our community is not worth
13    the profits any developer will make.
14

15    I declare, under penalty of perjury under the laws of the State of California, and the
16    United States of America, that above statement is true and correct, and that this declaration
17    was executed in the County of Los Angeles, California, on December 3rd, 2017.
18
19
20    Signature of Declarant
21
22
23
24
25
26
27
28

Page 4

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001043

## DECLARATION OF MOLLY TEMPLE

I, Molly Temple, declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I employed as an elementary school teacher for the Los Angeles Unified School District at Palms Elementary School ("Palms"). I began teaching at Palms in August of 2012.

3. I attended college at the University of California, Los Angeles ("UCLA") majoring in World Arts and Cultures and earned a Bachelor of Arts degree in the year 2011. I also earned a Masters degree from UCLA in the field of Education in the year 2013.

4. Palms students are in pre-kindergarten through fifth grade classes. Our school day begins at 8:10 a.m. and ends at 2:33 p.m.

5. I currently teach a class of 25 children in first grade. The children in my class are boys and girls ages 6 through 7 years old.

6. I have several students who have environmental allergies from dust and debris. I also have students who have asthma. The construction proposed would greatly affect the health of these students. When a student needs to use their inhaler more often, they are missing out on important learning time. When young children are unable to focus on their work and learning due to their distracting and uncomfortable allergies, their ability to access the curriculum, express themselves to their peers, and effectively participate in the educational process is compromised.

Page 1

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001044

1

2     7. My classroom is less than 20 yards from the 3568 Motor Ave construction site.

3        Students from my class, as well as other classes, have their recess/play times on the

4        open-air playground which is within a few yards of that construction site. In my

5        observation, the children run, play and inhale rapidly and heavily when on the

6        playground.

7

8     8. From what I have read, I understand that the 3568 Motor Ave construction project

9        will release emissions into the air containing PM2.5 and PM10 particulate matter,

10       nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic

11       substances. I am extremely concerned for my students' health, as well as my own.

12

13    9. Students also fall, scrape their knees, roll on the ground, and play in the dirt in the tree

14       wells. The presence of particulates, dust and other toxins not only in the air, but also

15       that have settled on the ground, is a dangerous health risk for my students because they

16       will be making continued bodily contact with these materials over the course of the

17       demolition, excavation and construction – which I understand to be at least two years.

18

19   10. Four years ago, our school was given a grant to completely redo and install an outdoor

20       garden behind the kindergarten classrooms. This garden has been used as an important

21       place for hands on learning for all of our students. My students have been to the garden

22       several times. They have used the garden with their fifth grade reading buddies,

23       watered and planted seeds, use it as a comfortable place to read and work, and also use

24       it as a place for scientific observation. The height of the proposed building at 3568

25       Motor Avenue would put that garden in complete shade and compromise its

26       functionality. This will eliminate the garden as a needed learning resource for ALL

27       students at Palms Elementary.

28

Declaration

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001045**

1    11. It is unfair for the teachers and parents to not have been informed of this project. We

2        should have had timely and effective notice which informed us and allowed us to be

3        heard in this process. Leaving us out of the process shows a blatant disregard for our

4        community.

5

6        I declare, under penalty of perjury under the laws of the State of California, and the

7    United States of America, that above statement is true and correct, and that this declaration

8    was executed in the County of Los Angeles, California, on December 3rd, 2017.

9

10

11   Signature of Declarant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 3

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001046

## DECLARATION OF AMY FRANCO

I, Amy Franco, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son A.D.G, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2015. My child is 8 years old and is now in the 2nd grade, in Ms. Higashi's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child has been diagnosed with special needs or ailments and requires help to learn and participate in class. My child has congenital bilateral hearing loss, requiring the use of hearing aids. A.D.G. is currently under the care of an Ear, Nose, and Throat (ENT) doctor, and Audiologist. He is sensitive to loud noise, especially while wearing his hearing aids, and his hearing is impacted by surrounding noises. A.D.G. also suffers from seasonal allergies, diagnosed by his pediatrician, as evidenced by rhinorrhea and dry cough. My concern is that surrounding construction will not only impact his hearing while wearing hearing aids during school hours, but that any dust created by construction will impact his breathing and trigger his allergies. Both will greatly impact his health and education.

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001047

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was December 3, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on 12 / 4 / 17.

Signature of Declarant

Page 2

1          **DECLARATION OF ANA LAURA ANTONIO**

2   I, Ana Antonio, declare as follows:

3

4     1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C.,

5        3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a

6        witness, I could and would competently testify to the following based on personal

7        knowledge:

8

9     2. My daughter KQ, is a student at Palms Elementary School, located at 3520 Motor

10      Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms

11      in the year 2015. My child is 7 years old and is now in the 2 grade, in M s.

12      Higashi's class.

13

14     3. I am a member of the Palms Elementary Family Association and so is my child.

15

16     4. My child becomes very easily distracted as a result of noise. Sharp unexpected

17      noises, as well as ongoing noises, interfere with my child's ability to focus attention.

18

19     5. I did not know anything about the construction project at 3568 Motor Avenue until a

20      teacher from school told me after Thanksgiving this year. I believe the date was

21      November 30, 2017. Before that, I knew nothing about the construction.

22

23     6. From what I understand, the 3568 Motor Ave construction project will release

24      poisonous gas, dust and other particles into the air around my child's school and

25      playground. I am extremely concerned for the health of all the children and teachers

26      at the school. I oppose the project.

27

28

Page 1

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001049

1   I believe that the construction of the building will affect my daughter so negatively
2   because of all the noise they will be making using big machinery and also traffic will
3   get worse. We don't want the air to be contaminated with all the fumes that
4   demolition causes.

5

6       I declare, under penalty of perjury under the laws of the State of California, and the
7   United States of America, that above statement is true and correct, and that this declaration
8   was executed in the County of Los Angeles, California, on 12 / 4 / 17.

9

10  _____

11  Signature of Declarant

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001050

## DECLARATION OF Araceli Boyce

I, Araceli Boyce declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son N.B is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2017. My child is 5 years old and is now in the K grade, in Mr. Oropollo's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child has been assessed and/or diagnosed with special needs and requires help to learn and participate in class. My child is/has _Autism Spectrum Disorder and Mastocytosis he is being treated by Childrens hospital of los angeles for mastocytosis and was diagnosed with Authism by Westside Regional Center

-My child is easily spooked and distracted by loud noises, He has sensory issues that will interfere with his learning, His mastocytosis can be triggrered by enviormental changes, such as dust, fumes and chemical, if triggered he can experience severe reactions such as anaphaxis. He currently carries an epi pen in the event this occurs. Masto reaction can also cause him to experience aggressive behaviors that will impede on his and his peers safety along with it being a health issue .

Page 1

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 29, 2017. Before that, I knew nothing about the construction.

7. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

8. The construction will impact my childs routine which is extremely important when you are on the Autism Spectrum. The noise will effect him sensory wise and create distraction and an inability to focus. Traffic and no parking will create a delay in his routine aswell. But most importantly my concern is his Health and how the construction ma cause him to have a severe and life threathing attack.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on December 4, 2017

Signature of Declarant

Page 2

**DECLARATION OF Araceli Boyce**

I, Araceli Boyce declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness. I could and would competently testify to the following based on personal knowledge:

2. My Grandaughter H.B is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2017 My child is 6 years old and is now in the K grade, in Mr. Spencer's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child has been assessed and/or diagnosed with special needs or ailments and requires help to learn and participate in class. My child is/has Allergies
   Diagnosed by Dr. Chen Venice Family Clinic
   Dust, fumes will create allergic reactions severe enough to make her miss days of school instruction, causing her to get behind in her education.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

Page 1

1    6. I did not know anything about the construction project at 3568 Motor Avenue until a
2       teacher from school told me after Thanksgiving this year. I believe the date was
3       November 29, 2017. Before that, I knew nothing about the construction.
4
5    7. From what I understand, the 3568 Motor Ave construction project will release
6       poisonous gas, dust and other particles into the air around my child's school and
7       playground. I am extremely concerned for the health of all the children and teachers
8       at the school. I oppose the project.
9
10   8. This will create a strain on dropping off my children at school Traffic, parking is
11      already conjested in this area. The amount of noise will be a distraction and will
12      make focusing on school work and learning an extreme challenge for my
13      Granddaughter.
14
15      I declare under penalty of perjury under the laws of the State of California, and the
16   United States of America, that above statement is true and correct, and that this declaration
17   was executed in the County of Los Angeles, California, on _December 4, 2017
18
19   Araceli Boyce
20   Signature of Declarant
21
22
23
24
25
26
27
28

<div align="center">Page 2</div>

<div align="right">Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001054</div>

## DECLARATION OF ARACELI IBANEZ

I, Araceli Ibanez, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughet is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2016___. My child is 9 years old and is now in the 1 grade, in Miss Lord

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November __30__, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

7.

Page 1

1    He is going to expose her fragile body to a lot of toxin gases that can cause cancer to
2    her. If anything  happens to her it will be your only responsibility. The machines
3    will be dangerous to her in case of accident.

4

5    I declare, under penalty of perjury under the laws of the State of California, and the
6    United States of America, that above statement is true and correct, and that this declaration
7    was executed in the County of Los Angeles, California, on 12 / 06 / 2017

8

9    Araceli Ibañez

10   Signature of Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 2

## DECLARATION OF EFREN GONZALEZ

I, Efren Gonzalez, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughter Mallika Gonzalez, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2017. My child is 6 years old and is now in K grade, in Mr. Spencer's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child's classroom and play area is located next the construction site at 3568 Motor Ave and I believe it will impact my child's education and health due to noise, construction debris and will also generate a large amount of traffic in the Palms community.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was December, 23 2017. Before that, I knew nothing about the construction.

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001057

1    7. From what I understand, the 3568 Motor Ave construction project will release
2       poisonous gas, dust and other particles into the air around my child's school and
3       playground. I am extremely concerned for the health of all the children and teachers
4       at the school. I oppose the project.

5
6
7        I declare, under penalty of perjury under the laws of the State of California, and the
8    United States of America, that above statement is true and correct, and that this declaration
9    was executed in the County of Los Angeles, California, on 12 / 4 / 2017.

10
11   _____
12   Signature of Declarant
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Page 2

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001058

## DECLARATION OF ERIKA ANTONIO

I, Erika Antonio, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughter E.G. is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2012. My child is 9 years old and is now in the 4th grade, in Ms. Breeding.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 30, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001059

7. She is going to expose her fragile body to a lot of toxin gases that can cause cancer to her. .If anything happens to her it will be your only responsibility. The machines will be dangerous to her in case of accident.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on 12 / 06 / 2017

_Erika Antonio._

Signature of Declarant

Page 2

## DECLARATION OF ESTELA MARTINEZ

I, ESTELA MARTINEZ, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My Mario Garcia, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2016__. My child is 8 years old and is now in the 3 grade, in Ms Shannon class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November __30__, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

7. Im really concern about this construction because is dangerous for my son .

Page 1

1

2  He is going to expose he fragile body to a lot of toxin gases that can cause cancer to

3  her. .If anything  happens to her it will be your only responsibility. The machines

4  will be dangerous to his in case of accident.

5

6   I declare, under penalty of perjury under the laws of the State of California, and the

7  United States of America, that above statement is true and correct, and that this declaration

8  was executed in the County of  Los Angeles, California, on ___12___ / ___06___ /

9  _____2017__.

10

11  _____

12  Signature of Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001062

## DECLARATION OF

I, Felicia Guzman, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My R.S.L, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2017. My child is 5 years old and is now in the K grade, in Mr. Spencer class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child has been assessed and/or diagnosed with special needs or ailments and requires help to learn and participate in class. My child has extreme Allergies and takes medication daily. Due to dust it can cause his allergies to act out more.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 29, 2017. Before that, I knew nothing about the construction.

7. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

8. This will create more traffic, noise and dust.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on 12/04/2017.

Felicia Guzman

Signature of Declarant

Page 1

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001063

## DECLARATION OF JANET GUTIERREZ

I, Janet Gutierrez, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My Ximena G, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2016__. My child is 6 years old and is now in the first grade, in Mss Lord] class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November __30__, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001064

1    7. Im really concern about this construction because is dangerous for my daughter . she

2       is going to expose he fragile body to a lot of toxin gases that can cause cancer to her.

3       .If anything happens to her it will be your only responsibility. The machines will be

4       dangerous to her in case of accident.

5

6       I declare, under penalty of perjury under the laws of the State of California, and the

7   United States of America, that above statement is true and correct, and that this declaration

8   was executed in the County of Los Angeles, California, on ___12___ / ___06___ /

9       ____2017____

10

11

12   Signature of Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 2

## DECLARATION OF JUANITA FRANCO

I, Juanita Franco, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughter E.T., is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2013. My child is 9 years old and is now in the 4th grade, in Ms. Karzai's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child has been diagnosed with ailments and requires help to learn and participate in class. My child has asthma. The dust and pollution from the construction project will make it difficult for her to breath.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 15, 2017. Before that, I knew nothing about the construction.

7. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and

Page 1

1       playground. I am extremely concerned for the health of all the children and teachers

2       at the school. I oppose the project.

3

4       I declare, under penalty of perjury under the laws of the State of California, and the

5 United States of America, that above statement is true and correct, and that this declaration

6 was executed in the County of Los Angeles, California, on 12 / 4 / 2017.

7

8     *signature*

9 Signature of Declarant

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 2

## DECLARATION OF Karla Garcia

I, Karla Garcia , declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son "A.G." , is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2015. My child is 6 years old and is now in the 1st grade, in

3. Ms.Temple class.

4. I am a member of the Palms Elementary Family Association and so is my child.

5. My child has been assessed and/or diagnosed with special needs or ailments and requires help to learn and participate in class. My child is/has environmental allergies. his ENT is Dr. McCalpin and my son takes medication daily.constant exposure to dust and chemicals are no good for his little lungs.

6. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

7. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 29, 2017. Before that, I knew nothing about the construction.

8. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

9. this project would have negative effects on our teachers, our community and on our children. Tabor is a narrow street that can not accomodate big trucks. our school has fought back before against co-location and we're speaking out now for the health and well-being of our children.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on 12 / 4 /2017 .

Signature of Declarant

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001068

## DECLARATION OF MARIA DEL CARMEN SANTOS

I, Maria Del Carmen Santos , declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son J.S, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2016. My child is 7 years old and is now in the 1st grade, in Ms. Lord class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 30, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

Page 1

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001069

1  I think this will affect not only my son but the the whole school. The kids wont have

2  any quiet time to learn, to focus with all the noise of the excavation, the drilling and

3  blowing. We sent our kids to school to learn not to suffer dust and noise.

4

5

6  I declare, under penalty of perjury under the laws of the State of California, and the

7  United States of America, that above statement is true and correct, and that this declaration

8  was executed in the County of Los Angeles, California, on 12 / 04 /17.

9

10  Maria Del carmen Santos

11  Signature of Declarant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 2

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001070

# DECLARATION OF MARTHA GARCIA

I, Martha Garcia, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughter Martha, is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2016__. My child is 6 years old and is now in the 1 grade, in Mss Lord class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November __30__, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

7. I'm really concern about this construction because is dangerous for my daugther .

Page 1

1

2      She is going to expose he fragile body to a lot of toxin gases that can cause cancer to

3      her. .If anything  happens to her it will be your only responsibility. The machines

4      will be dangerous to her in case of accident.

5

6      I declare, under penalty of perjury under the laws of the State of California, and the

7      United States of America, that above statement is true and correct, and that this declaration

8      was executed in the County of Los Angeles, California, on 12 / 06 / 2017

9

10     _Mon/h.t_ ___

11     Signature of Declarant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001072

# DECLARATION OF MARTHA GARCIA

I, Martha Garcia, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son Miguel is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2016__. My child is 9 years old and is now in the 1 grade, in Mss. Shannon

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November __30__, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

7. I'm really concern about this construction because is dangerous for my son.

Page 1

1    He is going to expose he fragile body to a lot of toxin gases that can cause cancer to

2    her. If anything happens to him it will be your only responsibility. The machines

3    will be dangerous to him in case of accident.

4

5    I declare, under penalty of perjury under the laws of the State of California, and the

6    United States of America, that above statement is true and correct, and that this declaration

7    was executed in the County of Los Angeles, California, on 12 / 06 / 2017

8

9    Martha Gari

10   Signature of Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 2

Declaration

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001074

## DECLARATION OF MUNA ABDULKADER

I, Muna Abdulkader, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son ["Z.J."], is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2015. My child is 7 years old and is now in the 2ND grade, in Ms. Higashi's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child has been assessed and/or diagnosed with special needs or ailments and requires help to learn and participate in class. My child sneezes when there is dust and has red eyes when there is dust.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 28, 2017. Before that, I knew nothing about the construction.

7. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001075

1    playground. I am extremely concerned for the health of all the children and teachers
2    at the school. I oppose the project.

3

4    8.  As a parent I don't want my kids to breathe all the stuff from the construction area.
5        This will make it difficult to drop of my kids on time because of the traffic. But, I
6        mostly worry about how this will affect my children's health. This will also be
7        distracting me kid' from learning at their best.

8

9        I declare, under penalty of perjury under the laws of the State of California, and the
10   United States of America, that above statement is true and correct, and that this declaration
11   was executed in the County of Los Angeles, California, on 12/4/2017.

12

13   _Mussa_

14   Signature of Declarant

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001076

1                      **DECLARATION OF Salvador Vasquez**

2    I, Salvador declare as follows:

3

4    1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C.,

5        3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a

6        witness, I could and would competently testify to the following based on personal

7        knowledge:

8

9    2. My son. MV, is a student at Palms Elementary School, located at 3520 Motor Ave,

10        Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the

11        year 2017.My child is5 years old and is now in the kindergarten, in Mr. Spencer's

12        class.

13

14    3. I am a member of the Palms Elementary Family Association and so is my child.

15

16    4. My child becomes very easily distracted as a result of noise. Sharp unexpected

17        noises as well as ongoing noises, interfere with my child's ability to focus attention.

18

19    5. I did not know anything about the construction project at 3568 Motor Avenue until a

20        teacher from school told me after Thanksgiving this year. I believe the date was

21        November 29th, 2017. Before that, I knew nothing about the construction.

22

23    6. From what I understand, the 3568 Motor Ave construction project will release

24        poisonous gas, dust and other particles into the air around my child's school and

25        playground. I am extremely concerned for the health of all the children and teachers

26        at the school. I oppose the project.

27

28

7. This project will negatively impact the community by adding congestion to traffic, and environmental footprint. It will also affect the health of our son who has allergies.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles. California, on 12/04/2017.

Signature of Declarant

PARTIES ELEMENTARY / OBJECTORS EXHIBITS 001078

## DECLARATION OF Sarah Strohecker

I, Sarah Strohecker, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son MV is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2017. My child is 5 years old and is now in the kindergarten, in Mr. Spencer's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention. My child is also easily scared and startled, and I don't want him to be afraid of coming to school each morning.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 29, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

Page 1

1

2   7. Although I understand that some sort of construction is imminent I was hoping that
3   the well being of out children would be taken into consideration and that
4   construction would either begin during the summer, weekends or after school hours.
5   The amount of dust and dirt will seriously flare up my child's allergies. I am also
6   concerned that the constant amount of dust that will be present will cause my child to
7   have asthma or asthma like symptoms. In addition to affecting the health of the
8   children of Palm Elementary there will be an enormous increase in traffic and
9   congestion that will cause headaches, increase commute times and possibly even
10  increase the likelyhood traffic collisions. I am very disappointed that no concern was
11  shown for the well being of the children at Palms Elementary, I have to wonder is
12  this what you would want going on around you children? And if there are health
13  consequences due to construction who will assume responsibility? All of these issues
14  should have been considered and addressed before construction was approved. I
15  understand that construction will take place eventually but there are things that need
16  to be addressed and accommodations need to be made for the health and well being
17  of our children.

18  I declare, under penalty of perjury under the laws of the State of California, and the
19  United States of America, that above statement is true and correct, and that this declaration
20  was executed in the County of Los Angeles, California, on __12__ / __4____ / 17____.

21
22  _Signature_
23  Signature of Declarant

24
25
26
27
28

Page 2

## DECLARATION OF Violeta Garcia

I, Violet Garcia declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughter S.T is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2017. My child is 5 years old and is now in the kinder grade, in Mr. spencer's class.

3. I am a member of the Palms Elementary Family Association and so is my daughter.

4. My child is highly sensitive to dust and debree. She suffers with red eyes and uncontrollable sneezing.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 28, 2017. Before that, I knew nothing about the construction.

7. From what I understand, the 3568 Motor Ave construction project will release poisonous gas. dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

8. As a parent of a student in kinder, my child is going to be right next to the construction with only a see through fence separating her from the construction. The debris will be everywhere. She will be inhaling the dust and chemical and will not be able to even go outside for recess or to see the school garden. the traffic will be ridiculous in a 2 lane street and the construction vehicles will be blocking everything.My child will be unable to concentrate in class not to mention the teacher will not be able to teach my child. it is not a good idea to build a building so big next to a school, especially an elementary school.

9. I declare. under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on 12/04/17.

Signature of Declarant

Page 1

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001081

## DECLARATION OF VIRGINIA GARCIA

I, Virginia Garcia, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My daughter "M.B.", is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2012. My child is 10 years old and is now in the 5th grade, in Ms. Dunham's class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child in my opinion will be affected by the dust/pollution/noise/distraction of an ongoing construction project that will interfere with her schooling.

5. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

6. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 30, 2017. Before that, I knew nothing about the construction.

Page 1

Declaration
**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001082**

7. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

8. The construction will affect the environment around the school, due to will increase traffic and will be very distracted.

I declare, under penalty of perjury under the laws of the State of California, and the United States of America, that above statement is true and correct, and that this declaration was executed in the County of Los Angeles, California, on 12 / 04/ 2017.

Signature of Declarant

Page 2

Declaration
**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001083**

# DECLARATION OF ZENAIDA GARCIA

I, Zenaida Garcia, declare as follows:

1. I am over 18 years of age. My contact address is c/o: Orange Law Offices, P.C., 3435 Wilshire Blvd., Suite 2910, Los Angeles, CA 90010. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. My son B.R.G is a student at Palms Elementary School, located at 3520 Motor Ave, Los Angeles, CA 90034 ("Palms"). My child began attending school at Palms in the year 2013. My child is 8 years old and is now in the 2 grade, in Ms. Alston class.

3. I am a member of the Palms Elementary Family Association and so is my child.

4. My child becomes very easily distracted as a result of noise. Sharp unexpected noises, as well as ongoing noises, interfere with my child's ability to focus attention.

5. I did not know anything about the construction project at 3568 Motor Avenue until a teacher from school told me after Thanksgiving this year. I believe the date was November 30, 2017. Before that, I knew nothing about the construction.

6. From what I understand, the 3568 Motor Ave construction project will release poisonous gas, dust and other particles into the air around my child's school and playground. I am extremely concerned for the health of all the children and teachers at the school. I oppose the project.

7. The noise and dust will affect my son, I don't want him to get sick with all the dust and he wont be able to learn because of the noise.

Page 1

1

2          I declare, under penalty of perjury under the laws of the State of California, and the

3   United States of America, that above statement is true and correct, and that this declaration

4   was executed in the County of  Los Angeles, California, on  12 /04 / 17

5

6   *Zenaida*

7   Signature of Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Page 2

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001085

RECEIVED
CITY OF LOS ANGELES
AUG 10 2017
CITY PLANNING
PROJECT PLANNING

**APPLICATIONS:**

**DEPARTMENT OF CITY PLANNING APPLICATION**

---

*THIS BOX FOR CITY PLANNING STAFF USE ONLY*

Case Number _____

Env. Case Number _____

Application Type _____

Case Filed With (Print Name) _____ Date Filed _____

Application includes letter requesting:

☐ Waived hearing      ☐ Concurrent hearing      ☐ Hearing not be scheduled on a specific date (e.g. vacation hold)
                        Related Case Number _____

---

*Provide all information requested. Missing, incomplete or inconsistent information will cause delays. All terms in this document are applicable to the singular as well as the plural forms of such terms.*

1. **PROJECT LOCATION**

   Street Address[1] 3558-3570 S. Motor Ave / 10313 W. Tabor St _____ Unit/Space Number _____

   Legal Description[2] (Lot, Block, Tract) Lot 13 & 14, Block S, The Palms Tract MR 21 43/45

   Assessor Parcel Number 4314-014-002 _____ Total Lot Area 14,997 sq. ft.

2. **PROJECT DESCRIPTION**

   Present Use Commercial

   Proposed Use Mixed Use: Commercial & Residential

   Project Name (if applicable) 3568 S. Motor Ave

   Describe in detail the characteristics, scope and/or operation of the proposed project The new construction,
   operation and maintenance of a mixed-use building with 42 units, 54 parking stalls and 1,777 SF of commercial space

   10% density bonus, 10% affordable set aside (4 units) with one incentive for increased FAR

   Additional information attached      ■ YES      ☐ NO

   Complete and check all that apply:

   **Existing Site Conditions**

   ☐ Site is undeveloped or unimproved (i.e. vacant)          ☐ Site is located within 500 feet of a freeway or railroad

   ■ Site has existing buildings (provide copies of building      ■ Site is located within 500 feet of a sensitive use (e.g.
   permits)                                                        school, park)

   ☐ Site is/was developed with use that could release          ☐ Site has special designation (e.g. National Historic
   hazardous materials on soil and/or groundwater (e.g.           Register, Survey LA)
   dry cleaning, gas station, auto repair, industrial)

---

[1] Street Addresses must include all addresses on the subject/application site (as identified in ZIMAS—http://zimas.lacity.org)
[2] Legal Description must include all contiguously owned properties (even if they are not a part of the proposed project site)

CP-7771.1 [revised 03/31/2016]                                                                          Page 1 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001086



SUPERSEDED
By document dated: 8/10/17
Authorized by: CCH/MW



**APPLICATIONS:**

## DEPARTMENT OF CITY PLANNING APPLICATION

*THIS BOX FOR CITY PLANNING STAFF USE ONLY*

# DIR-2016-4880-DB

| | |
|---|---|
| **Case Number** | |
| **Env. Case Number** | ENV-2016-4881-EAF |
| **Application Type** | DB |
| **Case Filed With (Print Name)** | Eric Claros    Date Filed   12/23/16 |

Application includes letter requesting:

☐ Waived hearing    ☐ Concurrent hearing    ☐ Hearing not be scheduled on a specific date (e.g. vacation hold)
　　　　　　　　　　　Related Case Number

*Provide all information requested. Missing, incomplete or inconsistent information will cause delays.*
*All terms in this document are applicable to the singular as well as the plural forms of such terms.*

1. **PROJECT LOCATION**

   Street Address[1]  3558-3570 S. Motor Ave _____ Unit/Space Number _____

   Legal Description[2] (Lot, Block, Tract)  Lot 13 & 14, Block S, The Palms Tract MR 21 43/45 _____

   Assessor Parcel Number  4314-014-002 _____ Total Lot Area  14,997 sq. ft. _____

2. **PROJECT DESCRIPTION**

   Present Use  Commercial _____

   Proposed Use  Mixed Use: Commercial & Residential _____

   Project Name (if applicable)  3568 S. Motor Ave _____

   Describe in detail the characteristics, scope and/or operation of the proposed project  The new construction,
   operation and maintenance of a mixed-use building with 49 units, 55 parking stalls and 3,920 sq. ft of open space;
   35% density bonus, 11% set aside as affordable (5 units) with two incentives for increased FAR reduced open space.

   Additional information attached     ■ YES     ☐ NO

   Complete and check all that apply:

   **Existing Site Conditions**

   ☐ Site is undeveloped or unimproved (i.e. vacant)    ☐ Site is located within 500 feet of a freeway or railroad

   ■ Site has existing buildings (provide copies of building    ■ Site is located within 500 feet of a sensitive use (e.g.
   permits)    school, park)

   ☐ Site is/was developed with use that could release    ☐ Site has special designation (e.g. National Historic
   hazardous materials on soil and/or groundwater (e.g.    Register, Survey LA)
   dry cleaning, gas station, auto repair, industrial)

   [1] Street Addresses must include all addresses on the subject/application site (as identified in ZIMAS—http://zimas.lacity.org)
   [2] Legal Description must include all contiguously owned properties (even if they are not a part of the proposed project site)

CP-7771.1 [revised 03/31/2016]    Page 1 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 00108Z

PROPERTY OWNER

9. **PROPERTY OWNER AFFIDAVIT.** Before the application can be accepted, the owner of each property involved must provide a notarized signature to verify the application is being filed with their knowledge. Staff will confirm ownership based on the records of the City Engineer or County Assessor. In the case of partnerships, corporations, LLCs or trusts the agent for service of process or an officer of the ownership entity as authorized may sign as stipulated below.

- **Ownership Disclosure.** If the property is owned by a partnership, corporation, LLC or trust, a disclosure identifying the agent for service or process or an officer of the ownership entity must be submitted. The disclosure must list the names and addresses of the principal owners (25% interest or greater). The signatory must appear in this list of names. A letter of authorization, as described below, may be submitted provided the signatory of the letter is included in the Ownership Disclosure. Include a copy of the current partnership agreement, corporate articles, or trust document as applicable.

- **Letter of Authorization (LOA).** A LOA from a property owner granting someone else permission to sign the application form may be provided if the property is owned by a partnership, corporation, LLC or trust or in rare circumstances when an individual property owner is unable to sign the application form. To be considered for acceptance, the LOA must indicate the name of the person being authorized the file, their relationship to the owner or project, the site address, a general description of the type of application being filed and must also include the language in items A-D below. In the case of partnerships, corporations, LLCs or trusts the LOA must be signed and notarized by the authorized signatory as shown on the Ownership Disclosure or in the case of private ownership by the property owner. Proof of Ownership for the signatory of the LOA must be submitted with said letter.

- **Grant Deed.** Provide a Copy of the Grant Deed if the ownership of the property does not match City Records and/or if the application is for a Coastal Development Permit. The Deed must correspond <u>exactly</u> with the ownership listed on the application.

- **Multiple Owners.** If the property is owned by more than one individual (e.g. John and Jane Doe or Mary Smith and Mark Jones) notarized signatures are required of all owners.

A. I hereby certify that I am the owner of record of the herein previously described property located in the City of Los Angeles which is involved in this application or have been empowered to sign as the owner on behalf of a partnership, corporation, LLC or trust as evidenced by the documents attached hereto.

B. I hereby consent to the filing of this application on my property for processing by the Department of City Planning.

C. I understand if the application is approved, as a part of the process the City will apply conditions of approval which may be my responsibility to satisfy including, but not limited to, recording the decision and all conditions in the County Deed Records for the property.

D. By my signature below, I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct.

*Property Owner's signatures must be signed/notarized in the presence of a Notary Public.*
*The City requires an original signature from the property owner with the "wet" notary stamp.*
*A Notary Acknowledgement is available for your convenience on following page.*

Signature _____     Date __12/6/2016__

Print Name __HIROTAKA  KOBAYASHI__

Signature _____     Date _____

Print Name _____

CP-7771.1 [revised 03/31/2016]     Page 5 of 8

<u>PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001088</u>

Space Below For Notary's Use

California All-Purpose Acknowledgement                                                    Civil Code ' 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _LOS ANGELES_

On _DECEMBER   6,2016_ before me, _MARY SATO, NOTARY PUBLIC_
(Insert Name of Notary Public and Title)

personally appeared _HIROTAKA KOBAYASHI_ who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf on which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____                          (Seal)
Signature

```
MARY SATO
COMM. #2041394
Notary Public · California
Los Angeles County
My Comm. Expires Sep. 30, 2017
```

CP-7771.1 (revised 03/31/2016)

APPLICANT

10. **APPLICANT DECLARATION.** A separate signature from the applicant, whether they are the property owner or not, attesting to the following, is required before the application can be accepted.

A. I hereby certify that the information provided in this application, including plans and other attachments, is accurate and correct to the best of my knowledge. Furthermore, should the stated information be found false or insufficient to fulfill the requirements of the Department of City Planning, I agree to revise the information as appropriate.

B. I hereby certify that I have fully informed the City of the nature of the project for purposes of the California Environmental Quality Act (CEQA) and have not submitted this application with the intention of segmenting a larger project in violation of CEQA. I understand that should the City determine that the project is part of a larger project for purposes of CEQA, the City may revoke any approvals and/or stay any subsequent entitlements or permits (including certificates of occupancy) until a full and complete CEQA analysis is reviewed and appropriate CEQA clearance is adopted or certified.

C. I understand that the environmental review associated with this application is preliminary, and that after further evaluation, additional reports, studies, applications and/or fees may be required. Additionally, I understand that this application will not be considered complete until the required environmental review is concluded.

D. I understand and agree that any report, study, map or other information submitted to the City in furtherance of this application will be treated by the City as public records which may be reviewed by any person and if requested, that a copy will be provided by the City to any person upon the payment of its direct costs of duplication.

E. I understand that the burden of proof to substantiate the request is the responsibility of the applicant. Additionally, I understand that planning staff are not permitted to assist the applicant or opponents of the project in preparing arguments for or against a request.

F. I understand that there is no guarantee, expressed or implied, that any permit or application will be granted. I understand that each matter must be carefully evaluated and that the resulting recommendation or decision may be contrary to a position taken or implied in any preliminary discussions.

G. I understand that if this application is denied, there is no refund of fees paid.

H. I understand and agree to defend, indemnify, and hold harmless, the City, its officers, agents, employees, and volunteers (collectively "City), from any and all legal actions, claims, or proceedings (including administrative or alternative dispute resolution (collectively "actions"), arising out of any City process or approval prompted by this Action, either in whole or in part. Such actions include but are not limited to: actions to attack, set aside, void, or otherwise modify, an entitlement approval, environmental review, or subsequent permit decision; actions for personal or property damage; actions based on an allegation of an unlawful pattern and practice; inverse condemnation actions; and civil rights or an action based on the protected status of the petitioner or claimant under state or federal law (e.g. ADA or Unruh Act). I understand and agree to reimburse the City for any and all costs incurred in defense of such actions. This includes, but it not limited to, the payment of all court costs and attorneys' fees, all judgments or awards, damages, and settlement costs. The indemnity language in this paragraph is intended to be interpreted to the broadest extent permitted by law and shall be in addition to any other indemnification language agreed to by the applicant.

I. By my signature below, I declare under penalty of perjury, under the laws of the State of California, that all statements contained in this application and any accompanying documents are true and correct, with full knowledge that all statements made in this application are subject to investigation and that any false or dishonest answer to any question may be grounds for denial or subsequent revocation of license or permit.

*The City requires an original signature from the applicant. The applicant's signature below does not need to be notarized.*

Signature: _____   Date: _12/6/2018_

Print Name: _Altouna  Kormann_

CP-7771.1 [revised 03/31/2016]                                                    Page 7 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001090

**Odic** Environmental

Tel 888-ODICENV 888-634-2368
Fax 213-380-0505

Environmental Consulting & Real Estate Due Diligence
3255 Wilshire Blvd. Suite 1510
Los Angeles, CA 90010

## RELIANCE LETTER

July 16, 2015

To:     Wells Fargo Bank ("Lender")

        and

        U.S. Small Business Administration ("SBA")

Re:     Borrower Name: Arthur Munoz
        Project Address ("Property"): 3568 Motor Avenue, Los Angeles, CA 90034
        Environmental Investigation Report Number(s): 6359167ESAI

Dear Lender and SBA:

Hyung Kim ("Environmental Professional") meets the definition of an Environmental Professional as defined by 40 C.F.R. § 312.10(b) and has performed the following "Environmental Investigation(s)" (check all that apply):

____ A Transaction Screen of the Property dated _____, 20____, conducted in accordance with ASTM International's most recent standard (currently ASTM E1528-14);

_X_ A Phase I (or an Updated Phase I) Environmental Site Assessment of the Property dated July 16, 2015, conducted in accordance with ASTM International's most recent standard (currently ASTM E1527-13). In addition, the Environmental Professional has addressed the performance of the "additional inquiries" set forth at 40 C.F.R. § 312.22;

____ A Phase II Environmental Site Assessment of the Property dated _____, 20____, conducted in accordance with generally-accepted industry standards of practice and consisting of a scope of work that would be considered reasonable and sufficient to identify the presence, nature and extent of a Release as it impacts the Property.

Reliance by SBA and Lender. Environmental Professional (and Environmental Professional's firm, where applicable) understand(s) that the Property may serve as collateral for an SBA guaranteed loan, a condition for which is an Environmental Investigation of the Property by an Environmental Professional. Environmental Professional (and Environmental Professional's firm, where applicable) authorize(s) Lender and SBA to use and rely upon the Environmental Investigation. Further, Environmental Professional (and Environmental Professional's firm, where applicable) authorize(s) Lender and SBA to release a copy of the Environmental Investigation to the borrower for information purposes only. This letter is not an update or modification to the Environmental Investigation. Environmental Professional (and Environmental Professional's firm, where applicable) makes no representation or warranty, express or implied, that the condition of the Property on the date of this letter is the same or similar to the condition of the Property described in the Environmental Investigation.

Insurance Coverage. Environmental Professional (and/or Environmental Professional's firm, where applicable) certifies that he or she or the firm is covered by errors and omissions liability insurance with a minimum coverage of $1,000,000 per claim (or occurrence) and that evidence of this insurance is attached. As to the Lender and SBA, Environmental Professional (and

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001091**



**Odic Environmental**

Environmental Consulting & Real Estate Due Diligence
3255 Wilshire Blvd. Suite 1510
Los Angeles, CA 90010

Tel 888-ODICENV 888-634-2368
Fax 213-380-0505

Environmental Professional's firm, where applicable) specifically waive(s) any dollar amount
limitations on liability up to $1,000,000.

Waiver of Right to Indemnification. Environmental Professional and Environmental Professional's
firm waive any right to indemnification from the Lender and SBA.

Impartiality. Environmental Professional certifies that (1) to the best of his or her knowledge,
Environmental Professional is independent of and not a representative, nor an employee or
affiliate of seller, borrower, operating company, or any person in which seller has an ownership
interest; and (2) the Environmental Professional has not been unduly influenced by any person
with regard to the preparation of the Environmental Investigation or the contents thereof.

Acknowledgment. The undersigned acknowledge(s) and agree(s) that intentionally falsifying or
concealing any material fact with regard to the subject matter of this letter or the Environmental
Investigations may, in addition to other penalties, result in prosecution under applicable laws
including 18 U.S.C. § 1001.

Environmental Professional
Printed Name: Hyung Kim

(Note: The Environmental Professional must **always** sign this letter above. If the
Environmental Professional is employed or retained by an Environmental Firm, then an
authorized representative of the firm must also sign below).

Signature of representative of firm who is authorized to sign this letter
Printed Name & Title: Eric Miller, President
Name of Environmental Firm: Odic Environmental
Enclosure: Evidence of Insurance

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001092**

## 8.0 RECOMMENDATIONS AND OPINIONS

ODIC performed a Phase I Environmental Site Assessment of the Property in conformance with the
scope and limitations of ASTM Standard Practice E1527-13.

The Property consists of a 14,977-square-foot rectangular-shaped parcel improved with a single-story
commercial building subdivided into three units totaling 6,768 square feet. Currently, the Property is
occupied by a grocery store (Palms Super Market), coin laundry (Palms Laundry Mat), and a party
supplies store (Party Supplies).

Based on a review of historical city directories, the Property was formerly occupied by Safeway Stores
Incorporated in 1942, Palms Super Market from 1954 to at least 2000, and Palms Laundry and Cleaners
from 1958 to at least 1985. However, ODIC was unable to ascertain documented evidence that onsite
dry-cleaning operation was practiced by the Palms Laundry.

According to the SCAQMD EMI database, several businesses are listed, as shown below, under the
business name of Palms Cleaners, but none of these facilities are located at the Property.

| 79040 | PALMS CLEANERS 18515 BURBANK BLVD., TARZANA, CA 91356 |
|---|---|
| 100064 | PALMS CLEANERS, BYUNG HEE LEE |
| 140406 | PALMS CLEANERS, CHARLES RYU DBA 156 BONITA AVE , SAN DIMAS, CA |
| 141497 | PALMS CLEANERS, KWANG H. LEE DBA 25910 IRIS AVE , MORENO VALLEY |

Mr. Arthur Munoz, business and Property owner, was interviewed during site reconnaissance. Mr. Munoz
indicated that he has been associated with the Property since approximately 2006 when he purchased
the market at the Property. He subsequently acquired the laundry mat in 2010 and the party supply
business in 2014. To his best knowledge, no underground storage tanks  or significant amounts of
hazardous materials have ever been used on the site.

Mr. Munoz stated that longtime customers and residents in the area remember the Property as a market
and laundry, and no drycleaners actually occupied the Property. He believes that a drop-off drycleaning
service may have been offered by the laundry.

To the best of his knowledge, and according to business customers and residents, the site has always
been used as a market and laundry, and no drycleaners used to be located within the premises.

ODIC reviewed all available records at the City of Los Angeles building department and Fire Department
Hazmat Unit as well as UST Division; however, no records were found indicating any historical drycleaner
business at the Property.

Reviewed historical building permits did not have any business permits or records as an actual PCE-using
dry-cleaning plant facility, or plumbing/electric permits (boiler, distillation, condenser, etc.) which would be
typically associated for a commercial drycleaners. Any drycleaners using PCE solvent is typically listed
and identified as RCRA hazardous waste (HAZNET database) generator (PCE is federal F-coded
hazardous waste) and SCAQMD FINDS (all drycleaners are required to be permitted by SCAQMD
particularly after 1980). Since the Property address is not listed in any of these databases, it is highly
likely that the Palms Laundry and Cleaners was a drop-off agency at least since 1980.

Since drycleaners using PCE-based solvent generate waste PCE as hazardous wastes, they are listed as
RCRA waste generators, and should also be identified under the SCAQMD database.  Again, the
Property is not listed in any environmental database provided by EDR as Haznet, RCRA Generator, or
SCAQMD FINDS EMI. It should be however noted that Palms Laundry and Cleaners occupied the
Property since at least 1958. Since this is during a period of little or no regulatory oversight, permitting or





*Phase I Environmental Site Assessment Report*
*Project No. 6359167-ESAI*
*- 40 -*

compliance, there is still an unresolved concern about possible dry-cleaning operation conducted by Palms Laundry and Cleaners. This is identified as a potential environmental concern and significant data gap which affects our ability to determine RECs in connection with the Property.

ODIC is still in the process of conducting additional inquiry to obtain more information about the historical listing of Palms Laundry and Cleaners, by interviewing longtime residents in the vicinity of the Property. As stated in Section 5.2 of this Report, a response from public agencies such as County of Los Angeles Fire Department and Sanitation District is pending as of this date, which is identified as a data gap.

In the event that additional information is later found or identified to confirm actual PCE-solvent use related to the former Palms Laundry and Cleaners, such information should be reviewed for re-evaluation of the environmental risk for the Property. If Client/User of this Report desires an additional level of comfort in ascertaining the absence or presence of contamination with PCE and chlorinated organic solvent in the subsurface beneath the Property, subsurface investigation can be conducted in the areas of concern.

It should be noted that, effective on October 1, 2010, US SBA started requiring mandatory Phase II Environmental Site Assessment for onsite dry cleaners that may have been operated for more than five years.

Source: https://www.sba.gov/sites/default/files/sops/serv_sops_50105c_loan_0.pdf

Even though it is highly likely and reasonable that the former listing of Palms Laundry and Cleaners may have been a drop-off agency cleaners at least since early 1980s when the AQMD required permitting of drycleaners, Palms Laundry and Cleaners is known to have occupied the Property since at least 1958 which is before the period of regulatory compliance and permitting required by Clean Air Act in 1970, or 1991 when the Air Resources Board identified Perchoroethylene (Perc) as a toxic air contaminant (TAC) under California's Toxic Air Contaminant Identification and Control Program (Health and Safety Code section 39650 et. seq.) or SCAQMD Rule 1421 Control of Perchloroethylene Emissions from Dry Cleaning System.

Due to the data gap identified in this Phase I ESA, as to the former listing of Palms Laundry and Cleaners which is identified to have occupied the Property since 1958, Phase II Environmental Site Assessment is considered a prudent lending practice to comply with SBA SOP 50-10 which became effective since 2010.

ORANGE LAW OFFICES, P.C.
3435 Wilshire Blvd., Ste. 2910
Los Angeles, CA 90010
Tel: (213) 735-9900
www.orangelawoffices.com

HADSELL STORMER & RENICK LLP
128 N Fair Oaks Ave #204
Pasadena, CA 91103
Tel: (626) 585-9600
https://www.hadsellstormer.com

December 4, 2017.

Stephen David Simon
Executive Director
Department on Disability
City of Los Angeles
201 N Figueroa St., Ste 100
Los Angeles, CA 90012-2694
Tel: (213) 202-2764
Fax: (213) 202-2715
stephen.simon@lacity.org

## BY FAX & EMAIL ONLY

Dear Mr. Simon:

We write on behalf of several disabled children attending pre-Kindergarten through fifth
grade classes at Palms Elementary school ("Palms") in the City of Los Angeles ("the
City"). We request that the City cease its ongoing discrimination against disabled persons
in the administration and operation of its planning and development programs. This
request will be followed by legal action if the City does not take immediate steps to
remedy the problem, protect the children at Palms, and implement policies protective of
all similarly situated persons.

Online, your Department on Disability ("DoD") states that it is committed to *"ensuring
full access to employment, programs, facilities and services; through strategic
management and partnership education, advocacy, training, research and improved
service delivery; for the benefit of persons with disabilities, providers of essential
resources and policymakers."* Thus, addressing this request to you as its Director is
appropriate.

Currently, the City's Department of City Planning ("Planning Dept.") does not consider
the special needs of disabled persons in its California Environmental Quality Act
("CEQA") analyses during its project approval process. At the earliest phases of

Page 1

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001095

community and environmental impact screening – the exemption phase, [1] developers are given the green light to move ahead with demolition, excavation and construction projects that the Planning Dept. labels as "exempt" for not crossing *predetermined templates* of environmental "thresholds of significance." Exemptions granted based upon these predetermined thresholds purportedly mean that a project will have no significant impact on the environment, including the people, surrounding the project. In the case of persons with special needs, this is simply untrue.

The predetermined thresholds used to exempt the projects *do not* include any consideration of persons with special needs. Instead, the thresholds *are* set based upon consideration of what is acceptable to persons under "normally acceptable" circumstances.[2] The Planning Dept.'s use of this process to exempt and approve projects is discriminatory and it is harmful to disabled Angelenos.

Title II of the Americans with Disabilities Act ("ADA"), in particular, prohibits discrimination against individuals with disabilities in the provision of services, programs, or activities by public entities. 42 U.S.C. § 12132. Section 504, in turn, requires that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Ninth Circuit has held that "there is no significant difference in the analysis of rights and obligations created by" the ADA and Section 504. *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).

In this case, the children with special needs attending Palms Elementary School are qualified individuals with disabilities. They are also being discriminated against and denied the benefits of the City's services (CEQA analyses by the Planning Dept. are *supposed* to protect the environment and persons in it). Moreover, they are being excluded from consideration in the provided services because of their disability.[3]

A reasonable accommodation would be to simply include disability assessment factors as part of the templates. The textbook ADA/Section 504 violation is completed by the fact that the City receives federal funds.

---

[1] CEQA Flowchart available here:

https://upload.wikimedia.org/wikipedia/commons/e/ec/CEQA_Process_Flow_Chart.gif

[2] Thresholds available here:

http://www.environmentla.org/programs/Thresholds/Complete%20Threshold%20Guide%20200
6.pdf

[3] The ADA applies with equal force to facially neutral policies that discriminate against individuals with disabilities. See *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (explaining that the Ninth Circuit has "repeatedly recognized that facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistent enforced.").

Page 2

Federal courts have made clear that public agencies must take affirmative steps to act in consideration of persons with disabilities, regardless of having facially neutral policies. Specifically, in granting summary judgment against the City for failing to provide for disabled Angelenos in its emergency management planning, the Court in *Communities Actively Living Independent and Free, et al v. City of Los Angeles*, USDC-CACD Case No. CV09-0287 CBM (2009), stated:

> "The City's response that its lack of affirmative action with respect to individuals with disabilities somehow absolves the City of liability is not only unavailing but also contrary to clearly-established precedent. See *McGary*, 386 F.3d at 1266 (explaining because the ADA 'guard[s] against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field.'). Because individuals with disabilities require special needs, the City disproportionately burdens them through its facially neutral practice of administering its program in a manner that fails to address such needs." (Docket No. 140, at 25:17-25).

The Court went further to state, "the Court finds that Plaintiffs are denied the benefits of the City's emergency preparedness program because the City's practice of failing to address the needs of individuals with disabilities discriminates against such individuals by denying them meaningful access to the City's emergency preparedness program." (Docket No. 140, at 26:17-21).[4]

Moreover, as to CEQA, California courts have stated that agencies cannot rely on thresholds of significance to absolve themselves of the responsibility to engage in proper analyses. In *Mejia v. City of Los Angeles*, 130 Cal. App. 4th 322, 342 (2005), the City relied upon a predetermined threshold to declare that a project did not have a significant environmental impact. In disagreeing, the court concluded that "[a] public agency cannot apply a threshold of significance or regulatory standard 'in a way that forecloses the consideration of any other substantial evidence showing there may be a significant effect.'"

Together, the state and federal courts' decisions mean that the City's Planning Dept. must consider persons with special needs, and their needs and circumstances, in its processes and activities – including those regarding environmental impact permitting. The harm

---

[4] If qualified individuals are denied "meaningful access" to a benefit because of their disability, the public entity must provide reasonable modifications. *Mark H. Lemahieu*, 513 F.3d 922, 937 (9th Cir. 2008). The accompanying regulation provides that a "[b]enefit includes provision of services, financial aid or disposition (i.e. treatment, handling, decision, sentencing confinement, or other prescription of conduct)." 28 C.F.R. § 42.540(j).

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001097

created by not doing so is exemplified by the plight of the children at Palms Elementary School.

At Palms, there are 32 Pre-K deaf and hard of hearing ("DHH") children, 59 kindergarten children, and a number of children in other grades (through 5th) with disabilities that are highly sensitive to noise. Immediately adjacent (literally, on the fence line of the playground) the City has green-lit demolition, excavation and construction of a huge apartment building. The City did no impact study because it used the predetermined template of thresholds of significance which has no consideration of persons with disabilities. Additionally, the parents and teachers got no notice of the project.

The Planning Dept.'s online files indicate that the project will emit construction noise as well as poisons containing PM2.5 and PM10 particulate matter, nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic substances. [5] Showering the children with these toxins for the *estimated* two-year period of the project is unfathomable. Worse yet, is the impact that the noise and toxins will have upon the DHH children.

Many of the special needs teachers have completed sworn declarations about the hardship their disabled students face in light of the City's failure to include them. An example, the declaration of Brittany Dorn, is attached to this letter.[6] The deaf and hard of hearing teachers relate that elementary school years are the point in the students' lives wherein they are gaining the bedrock understandings of how to socialize with and understand each other, as well as children without hearing challenges, and that preventing that process from happening would have far-reaching consequences for the rest of their lives.

The construction noise would be highly distracting, and in some cases painful. Many of the DHH students wear sound amplifying listening devices which make all sounds louder. In their classrooms, even air conditioners must meet certain dampened sound requirements. As an accommodation for all the students in DHH classrooms at Palms, there are carpets on the classroom floors, fabric on the walls, and drop ceilings to minimize sound reverberation. Ongoing construction noise would make it difficult, and in many cases impossible, for students to distinguish between voices and other sources of information – as opposed to noise and other sounds which should be disregarded. So-called "new listeners" – students who have just activated cochlear implants – would experience pain and listening fatigue, but not even know how to express what is happening to them – or why.

---

[5] September 1, 2017, "Directors Determination," Case No. DIR-2016-4880-DB

[6] Others are available upon request.

Page 4

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001098

We, the undersigned counsel, write to request that the City do the right thing by these
children and other disabled persons. Over the past few years, our offices collaborated
with the City to resolve *Rodriguez v. City of Los Angeles* gang injunction class action
case. In so doing, we found in the City willing partners with which we created a $30
million dollar program for Angelenos which not only restores their civil rights, but makes
their lives better for the long term.

Similar action by the City is needed to protect the children at Palms Elementary School,
and all other similarly situated Angelenos with disabilities. Should the City take action
with which our firms can collaborate, we are open to working together. However, if
something is not done by the City immediately to protect the children at Palms
Elementary School – we will pursue all available legal and equitable options to protect
them ourselves.

Kindest regards,

ORANGE LAW OFFICES, P.C.                          HADSELL STORMER & RENICK LLP

Olu K. Orange, Esq.                               Dan Stormer, Esq.

:: attachment ::

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001099

## DECLARATION OF BRITTANY DORN

I, BRITTANY DORN, declare as follows:

1. I am over 18 years of age. My business address is 3520 Motor Ave, Los Angeles, CA 90034. If called and sworn as a witness, I could and would competently testify to the following based on personal knowledge:

2. I am employed as an elementary school teacher for the Los Angeles Unified School District at Palms Elementary School ("Palms"). I began teaching at Palms on July 8, 2015.

3. I attended college at Concordia University majoring in Liberal Arts and earned a Bachelor of Arts degree in the year 2012. I have earned a Master of Science degree in the field of Education of the Deaf from California Lutheran University in the year 2016. Additionally, I possess the following professional certification: Education Specialist Instruction Credential - Deaf and Hard of Hearing Authorization and English Learner Authorization, 2015.

4. Palms students are in pre-kindergarten through fifth grade classes. Our school day begins at 8:10 A.M. and ends at 2:33 P.M.

5. I currently teach children who are deaf and hard of hearing in grades four and five. The children in my class are boys and girls ages nine through eleven. All eight of my students have disabilities. Listed by number, the following students have the following disabilities and require the following curricular and environmental accommodations to learn and participate effectively in class:

Page 1

Case 2:17-cv-09003-JAK-PJW  Document 208-13  Filed 06/24/20  Page 197 of 636  Page ID
#:6354

a) STUDENT #1: STUDENT #1 is ten years old and is hard of hearing. STUDENT #1's disability was confirmed in January 2011. According to her audiological report dated 11/13/17, she has a bilateral moderate to profound precipitously sloping sensorineural hearing loss. STUDENT #1 wears sound amplifying listening devices in order to effectively access the curriculum, socialize with other students and experience the world around her. She wears a cochlear implant on her left ear and a hearing aid on her right ear. Based upon my experience and observations of STUDENT #1, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, her social and educational development for the duration of the construction project. Sound amplification devices are only effective in educational environments wherein noise can be controlled. For example, ongoing noise sources such as air conditioners must meet certain dampened sound requirements. We have carpets on the classroom floor, fabric on the walls, and a drop ceiling to minimize sound reverberation. Any acoustic interruptions are amplified and make it impossible for students who are new to sounds to discern which sounds are voices and sources of information which need to be interpreted, as opposed to sounds which should be filtered out as noise. STUDENT #1 is considered a "new listener," because she just got her cochlear implant activated in October 2017. Therefore, her brain is still getting used to processing sounds electronically rather than acoustically and a filter has not yet been developed. By the end of the day STUDENT #1 suffers from listening fatigue. School is much more difficult for her because she has to work to hear every sound. It really wears her out by the end of the day. With additional background noise due to construction, she will tire much sooner and access to her education will be compromised. Moreover, amplification of sharp unexpected sounds can be painful because there is no chance to adjust volume, and ongoing repetitive sounds can be annoying and cause headaches. She often takes off her implant complaining that it is too loud, even in our noise-controlled classroom environment. Without her processor

Page 2

1    connected to her implant, she is completely deaf on the left. STUDENT #1 does not
2    use sign language and relies on her listening and spoken language to communicate.
3    She cannot learn if she is not wearing her equipment. In addition, STUDENT #1 is
4    highly distractible and has trouble focusing in class. Noise from the construction
5    project would make it very difficult for her to focus on her teacher, peers, and her
6    work in class and deprive STUDENT #1 of an adequate learning environment.

7    b) STUDENT #2: STUDENT #2 is ten years old and is hard of hearing. STUDENT
8    #2's disability was confirmed shortly after failing the Newborn Hearing Screening.
9    According to his audiological report dated 3/9/17, he has a bilateral moderate
10   sensorineural hearing loss. STUDENT #2 wears sound amplifying listening devices
11   in order to effectively access the curriculum, socialize with other students and
12   experience the world around him. He wears bilateral hearing aids. Based upon my
13   experience and observations of STUDENT #2, the ongoing noise and distraction of a
14   construction project just outside our classroom windows would severely disrupt, if
15   not totally compromise, his social and educational development for the duration of
16   the construction project. He faces the same challenges as the previous student due to
17   his hearing impairment regarding noise. In addition, I have observed that STUDENT
18   #2 is extra sensitive to noise, often taking off his hearing aids when his mainstream
19   class is noisy and always during recess. He reports that at times he does not wear his
20   hearing aids at home because the traffic noise outside his apartment is so
21   bothersome. STUDENT #2 also has environmental allergies that will be severely
22   impacted by the construction pollution that will enter our yard and classroom. He
23   takes medication for his allergies daily.

24   c) STUDENT #3: STUDENT #3 is nine years old and is hard of hearing. STUDENT
25   #3's disability was confirmed shortly after failing the Newborn Hearing Screening.
26   According to her audiological report dated 3/2/17, she has a moderate sloping to
27   profound mixed hearing loss in the right ear and a mild sloping to severe hearing loss
28   in the left ear. STUDENT #3 wears sound amplifying listening devices in order to

Page 3

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001102

1    effectively access the curriculum, socialize with other students and experience the
2    world around her. She wears bilateral hearing aids. Based upon my experience and
3    observations of STUDENT #3, the ongoing noise and distraction of a construction
4    project just outside our classroom windows would severely disrupt, if not totally
5    compromise, her social and educational development for the duration of the
6    construction project. She faces the same challenges as students STUDENT #1 and
7    STUDENT #2 due to her hearing impairment regarding noise. In addition,
8    STUDENT #3 is highly distractible and has trouble focusing in class. The noise from
9    the construction will make it very difficult for her to focus on her teacher, peers, and
10    her work in class.

11    d) STUDENT #4: STUDENT #4 is nine years old and is hard of hearing. STUDENT
12    #4's disability was confirmed shortly after failing the Newborn Hearing Screening.
13    According to his audiological report dated 3/12/17, he has a bilateral mild to
14    moderate sensorineural hearing loss. STUDENT #4 wears sound amplifying
15    listening devices in order to effectively access the curriculum, socialize with other
16    students and experience the world around him. He wears bilateral hearing aids.
17    Based upon my experience and observations of STUDENT #4, the ongoing noise
18    and distraction of a construction project just outside our classroom windows would
19    severely disrupt, if not totally compromise, his social and educational development
20    for the duration of the construction project. He faces the same challenges as
21    STUDENT #1, STUDENT #2 and STUDENT #3 due to his hearing impairment
22    regarding noise. In addition, STUDENT #4 is highly distractible and has trouble
23    focusing in class. The noise from the construction will make it very difficult for him
24    to focus on his teacher, peers, and his work in class.

25    e) STUDENT #5: STUDENT #5 is ten years old and is hard of hearing. STUDENT
26    #5's disability was confirmed shortly after failing the Newborn Hearing Screening.
27    According to his audiological report dated 11/6/17 he has a moderately-severe to
28    moderate conductive hearing loss secondary to atresia. He wears a sound amplifying

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001103

listening device in order to effectively access the curriculum, socialize with other students and experience the world around him. He wears a Bone Anchored Hearing Aid. Based upon my experience and observations of STUDENT #5, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, his social and educational development for the duration of the construction project. He faces the same challenges as students STUDENT #1, STUDENT #2, STUDENT #3 and STUDENT #4 due to his hearing impairment regarding noise. STUDENT #5 attends a general education classroom that is approximately 8 yards from the construction site for 95% of his instructional day. For 75% of his day, STUDENT #2. attends the same general education class as STUDENT #5.

f) STUDENT #6: STUDENT #6 is eleven years old and is hard of hearing. STUDENT #6's disability was confirmed shortly after failing the Newborn Hearing Screening. According to his audiological report dated 9/13/17 he has a moderate to severe conductive hearing loss secondary to atresia. He wears a sound amplifying listening device in order to effectively access the curriculum, socialize with other students and experience the world around him. He wears a Bone Anchored Hearing Aid. Based upon my experience and observations of STUDENT #6, the ongoing noise and distraction of a construction project just outside our classroom windows would severely disrupt, if not totally compromise, his social and educational development for the duration of the construction project. He faces the same challenges as the students in items (a) through (e) above due to his hearing impairment regarding noise.

g) STUDENT #7: STUDENT #7 is ten years old and is hard of hearing. STUDENT #7's disability was confirmed prior to 24 months of age. According to her audiological report dated 4/3/17, she has a moderate to severe sensorineural hearing loss in the left ear and is deaf in her right ear. STUDENT #7 wears a sound amplifying listening device in order to effectively access the curriculum, socialize

Page 5

1    with other students and experience the world around her. She wears a hearing aid on

2    her left ear. Based upon my experience and observations of STUDENT #7, the

3    ongoing noise and distraction of a construction project just outside our classroom

4    windows would severely disrupt, if not totally compromise, her social and

5    educational development for the duration of the construction project. She faces the

6    same challenges as the students in items (a) through (f) due to her hearing

7    impairment regarding noise.

8    h) STUDENT #8: STUDENT #8 is nine years old and is hard of hearing. STUDENT

9    #8's disability was confirmed shortly after failing the Newborn Hearing Screening.

10    According to her audiological report dated 2/6/17, she has a bilateral moderate

11    sensorineural hearing loss. STUDENT #8 wears sound amplifying listening devices

12    in order to effectively access the curriculum, socialize with other students and

13    experience the world around her. She wears bilateral hearing aids. Based upon my

14    experience and observations of STUDENT #8, the ongoing noise and distraction of a

15    construction project just outside our classroom windows would severely disrupt, if

16    not totally compromise, her social and educational development for the duration of

17    the construction project. She faces the same challenges as the students in items (a)

18    through (g) due to her hearing impairment regarding noise. STUDENT #8 attends a

19    general education classroom that is on our premises approximately 12 yards from the

20    construction site for 60% of her instructional day.

21

22    6. The Deaf and Hard of Hearing program has been at Palms for more than 30 years.

23    This year, the program has tripled in size, indicating that it is a strong program that

24    families want to send their children to. We currently have 33 students at Palms with

25    hearing impairment and are getting new preschoolers every month as those in the

26    LAUSD parent-infant program turn three years old. These 33 students are extra

27    sensitive to noise because they all wear sound amplification devices. Some of these

28    devices increase sound output by up to 50 dB at certain frequencies. For some of our

Declaration
**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001105**

students it is painful to hear traffic (~80dB), industrial noise (~100dB), and heavy machinery (~120dB). For some who have less gain on their hearing aids, it may not be painful, but it will be distracting to try to learn with such an increased signal to noise ratio.

7. The students in my class are placed there because they have gaps in their academic achievement because of their language delays. In some cases this is due to late identification of hearing loss and therefore late amplification. In some cases it is because they are not hearing all the sounds the English language uses. In other cases it is because they have missed a lot of school due to surgeries (for cochlear implantation, BAHA implantation, ear reconstruction, and/or additional surgeries due to related syndromes such as cleft palette repair), recovery from these surgeries, and many audiological appointments. My students are behind academically because of factors that are out of their control. I try to maximize their learning for every minute they are in school.

8. The demolition and construction of the building next to Palms Elementary will greatly affect my students. The noise of the construction will impede their learning to a devastating degree. My students do not use American Sign Language. They rely on their impaired listening skills to access information and communicate. Their hearing aids, BAHAs, and cochlear implants amplify all sounds that come into their processors, not just speech. With the noise coming from construction, they will not be able to hear me and, more importantly, will not be able to hear their peers. This will stifle their ability to engage in and receive communication and expression. Moreover, this will affect their learning as well as safety on the yard and their social development.

Page 7

9. All eight of my students have Individual Education Programs with accommodations they are legally entitled to. Each has an accommodation for "reduced noise" in their learning environment. We teach their peers to not tap their pencils, to sit still in their squeaky chairs, and to only speak one at a time. We keep the door and windows closed and the air conditioner off for as long as we can stand it. The teachers wear microphones during instructional time and sharpen pencils after school when students are not around to be bothered by the noise. If there is construction noise next door to our school, I will not be able to provide the accommodation of reduced noise that my students need to succeed.

10. My classroom is less than 30 yards from the 3568 Motor Ave construction site. My students also attend general education classes that are as close as half of that distance from the site. Students from my class, as well as other classes, have their recess/play times on the open-air playground which is within a few yards of that construction site. In my observation, the children run, play and inhale rapidly and heavily when on the playground.

11.1 In addition, increased traffic during construction and after because of additional tenants will make it less safe for our children to be dropped off and picked up in the morning. Seven of my eight students ride a bus to school every day. As responsible fourth and fifth graders, they are not required to hold an adult's hand when they step off the bus and walk down the sidewalk to the school gate. With more traffic, chances of accidents increase. An adult is nearby, but may not be close enough to alert a student if there is danger because they often do not wear their amplification until they get into the classroom. My other student, who is dropped off by family, will face the same dangers as he steps out of his parents' car.

Page 8

Declaration
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001107

1    12. From what I have read, I understand that the 3568 Motor Ave construction project

2        will release emissions into the air containing PM2.5 and PM10 particulate matter,

3        nitrogen oxide gases, reactive organic gases, 'fugitive dust,' and other toxic

4        substances. I am extremely concerned for my students' health, as well as my own. I

5        grew up in a family employed by the construction industry. I know that construction

6        workers take precautions against these dangers, such as masks and eye protection.

7        Our children will not have these precautions and will be exposed to the dangerous

8        pollution every day.

9

10   13. I did not know about this project until a colleague informed me as I was walking out

11       of school the day before our Thanksgiving break 11/17/17. Most of the families of

12       our students do not know about this construction and will be upset when they find

13       out how it will impact their children's education and health.

14

15       I declare, under penalty of perjury under the laws of the State of California, and the

16   United States of America, that above statement is true and correct, and that this declaration

17   was executed in the County of Los Angeles, California, on December 3rd, 2017.

18

19       _Bettany Ka_

20   Signature of Declarant

21

22

23

24

25

26

27

28

Declaration
**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001108**







DEA

MOTOR APARTMENTS

3668 MOTOR AVENUE
LOS ANGELES, CA 90034

SUN STUDY - SPRING EQUINOX

1607

05-01-2017

1" = 50'-0"

A093

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001410

MOTOR APARTMENTS

3568 MOTOR AVENUE
LOS ANGELES, CA 90034

A095



PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001412

MOTOR APARTMENTS

3568 MOTOR AVENUE
LOS ANGELES, CA 90034

A096



PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001813

MOTOR APARTMENTS

3655 MOTOR AVENUE
LOS ANGELES, CA 90034

A097

DEPARTMENT OF
CITY PLANNING

CITY PLANNING COMMISSION

DAVID H. J. AMBROZ
PRESIDENT

RENEE DAKE WILSON
VICE-PRESIDENT

CAROLINE CHOE
RICHARD KATZ
JOHN W. MACK
SAMANTHA MILLMAN
MARC MITCHELL
VERONICA PADILLA-CAMPOS
DANA M. PERLMAN

ROCKY WILES
COMMISSION OFFICE MANAGER
(213) 978-1300

# CITY OF LOS ANGELES
CALIFORNIA



ERIC GARCETTI
MAYOR

EXECUTIVE OFFICES
200 N. SPRING STREET, ROOM 525
LOS ANGELES, CA 90012-4801

VINCENT P. BERTONI, AICP
DIRECTOR
(213) 978-1271

KEVIN J. KELLER, AICP
EXECUTIVE OFFICER
(213) 978-1272

LISA M. WEBBER, AICP
DEPUTY DIRECTOR
(213) 978-1274

JAN ZATORSKI
DEPUTY DIRECTOR
(213) 978-1273

http://planning.lacity.org

## DIRECTOR'S DETERMINATION
## DENSITY BONUS & AFFORDABLE HOUSING INCENTIVES

September 1, 2017

| | |
|---|---|
| **Applicant/Owner** | **Case No.** DIR-2016-4880-DB |
| Hiro Kobayashi | **CEQA:** ENV-2016-4881-CE |
| 3568 Motor LLC | **Location:** 3558-3570 South Motor Avenue, |
| 800 South Figueroa Street, | 10313 West Tabor Street |
| Suite 960 | **Council District:** 5 – Koretz |
| Los Angeles, CA 90017 | **Neighborhood Council:** Palms |
| | **Community Plan Area:** Palms – Mar Vista – Del Rey |
| **Representative** | **Land Use Designation:** General Commercial |
| Dana Sayles | **Zone:** C2-1 |
| Three5ixty | **Legal Description:** Block: S, Tract: THE PALMS, |
| 4309 Overland Avenue | Lot: 13 |
| Culver City, CA 90230 | |

**Last Day to File an Appeal:** September 18, 2017

### DETERMINATION – Density Bonus/Affordable Housing Incentives Program

Pursuant to the Los Angeles Municipal Code (LAMC) Section 12.22 A.25, I have reviewed the proposed project and as the designee of the Director of Planning, I hereby:

**Approve** the following incentive requested by the applicant for a project totaling 42 dwelling units. The project will reserve 10 percent, or 4 dwelling units, of the 38 total base dwelling units permitted on the site for Very Low Income household occupancy for a period of 55 years. The Density Bonus includes the following requested incentive:

1.  **Floor Area Ratio.** A 32.5 percent increase in the allowable Floor Area Ratio allowing a total floor area ratio of 1.98:1 in lieu of the normal maximum of 1.5:1.

Determined, based on the whole of the administrative record the project is exempt from the California Environmental Quality Act (CEQA) pursuant to State CEQA Guidelines Article 19, Sections 15304 and 15332, and City CEQA Guidelines Article III, Section 1, Class 4 Category 1, and there is no substantial evidence demonstrating that an exception to a categorical exemption pursuant to CEQA Guidelines, Section 15300.2 applies.

**Adopt** the attached Findings.

<u>PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001114</u>

**CONDITIONS OF APPROVAL**

1. **Site Development.** Except as modified herein, the project shall be in substantial conformance with the plans and materials submitted by the Applicant, stamped "Exhibit A," and attached to the subject case file. No change to the plans will be made without prior review by the Department of City Planning, West/Coastal/South Project Planning Division, and written approval by the Director of Planning. Each change shall be identified and justified in writing. Minor deviations may be allowed in order to comply with the provisions of the Los Angeles Municipal Code or the project conditions.

2. **Residential Density.** The project shall be limited to a maximum density of 42 residential units including Density Bonus Units.

3. **Affordable Units.** A minimum of 4 units, that is 10 percent of the base 38 dwelling units, shall be reserved as affordable units, as defined by the State Density Bonus Law 65915 (c)(1) or (c)(2). No additional affordable units are required per Assembly Bill (AB) 2222 as replacement units as HCIDLA has determined there are currently no affordable units on-site.

4. **Changes in Restricted Units.** Deviations that increase the number of restricted affordable units or that change the composition of units or change parking numbers shall be consistent with LAMC Section 12.22 A.25 (9a-d).

5. **Housing Requirements.** Prior to issuance of a building permit, the owner shall execute a covenant to the satisfaction of the Los Angeles Housing and Community Investment Department (HCIDLA) to make 4 units available to Very Low Income Households, for rental as determined to be affordable to such households by HCIDLA for a period of 55 years. Enforcement of the terms of said covenant shall be the responsibility of HCIDLA. The applicant will present a copy of the recorded covenant to the Department of City Planning for inclusion in this file. The project shall comply with any monitoring requirements established by the HCIDLA. Refer to the Density Bonus Legislation Background section of this determination.

6. **Floor Area.** The project shall be limited to 29,807 square feet of floor area, as shown in Exhibit "A".

7. **Automobile Parking.** Based upon the number and/or type of dwelling units proposed 42 parking spaces shall be provided for the project. Vehicle parking shall be provided consistent with LAMC Section 12.22 A.25, Parking Option 1, which permits one on-site parking space for each residential unit with one or fewer bedrooms; two on-site parking spaces for each residential unit with two to three bedrooms; and two-and-one-half parking spaces for each residential unit with four or more bedrooms. The Bicycle Parking Ordinance, LAMC Section 12.21.A.4, allows affordable residential projects to reduce required vehicle parking by 10 percent. Based upon the number and type of dwelling units proposed and the 10 percent reduction per the Bicycle Ordinance, 38 residential parking spaces shall be provided. The project shall provide 42 residential parking spaces as provided in Exhibit A. For the commercial uses, the project shall provide 7 commercial parking spaces, at a ratio of one space for every 250 square feet of commercial square footage.

8. **Automobile Parking for Commercial Uses.** As required by LAMC Section 12.21 A.4(c), the project shall provide a minimum of 7 automobile parking spaces for the 1,770 square feet of commercial uses, at a ratio of one space for every 250 square feet of commercial square footage. The project shall provide 12 commercial parking spaces as provided in Exhibit A.

9. **Adjustment of Parking.** In the event that the number of Restricted Affordable Units should increase, or the composition of such units should change (i.e. the number of bedrooms, or the

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001115**

number of units made available to Senior Citizens and/or Disabled Persons), or the applicant selects another Parking Option (including Bicycle Parking Ordinance) and no other Condition of Approval or incentive is affected, then no modification of this determination shall be necessary, and the number of parking spaces shall be re-calculated by the Department of Building and Safety based upon the ratios set forth above.

10. **Bicycle Parking.** Bicycle parking shall be provided consistent with LAMC 12.21 A.16. Long-term bicycle parking shall be provided at a rate of one per dwelling unit or guest room. Additionally, short-term bicycle parking shall be provided at a rate of one per ten dwelling units or guest rooms, with a minimum of two short-term bicycle parking spaces. Short-term and long-term bicycle parking for general retail stores requires one bicycle parking space per 2,000 square feet, with a minimum of two bicycle parking spaces for both long- and short-term bicycle parking. Based upon the number of dwelling units, 42 long-term and 5 short-term bicycle parking spaces shall be provided on-site for residential uses. In addition, 2 long-term and 2 short-term bicycle parking spaces shall be provided for commercial uses. Both long-term and short-term bicycle parking must be located consistent with LAMC Section 12.21 A.16.

### Administrative Conditions

11. **Final Plans.** Prior to the issuance of any building permits for the project by the Department of Building and Safety, the applicant shall submit all final construction plans that are awaiting issuance of a building permit by the Department of Building and Safety for final review and approval by the Department of City Planning. All plans that are awaiting issuance of a building permit by the Department of Building and Safety shall be stamped by Department of City Planning staff "Plans Approved". A copy of the Plans Approved, supplied by the applicant, shall be retained in the subject case file.

12. **Notations on Plans.** Plans submitted to the Department of Building and Safety, for the purpose of processing a building permit application shall include all of the Conditions of Approval herein attached as a cover sheet, and shall include any modifications or notations required herein.

13. **Approval, Verification and Submittals.** Copies of any approvals, guarantees or verification of consultations, review of approval, plans, etc., as may be required by the subject conditions, shall be provided to the Department of City Planning prior to clearance of any building permits, for placement in the subject file.

14. **Code Compliance.** Use, area, height, and yard regulations of the zone classification of the subject property shall be complied with, except where granted conditions differ herein.

15. **Department of Building and Safety.** The granting of this determination by the Director of Planning does not in any way indicate full compliance with applicable provisions of the Los Angeles Municipal Code Chapter IX (Building Code). Any corrections and/or modifications to plans made subsequent to this determination by a Department of Building and Safety Plan Check Engineer that affect any part of the exterior design or appearance of the project as approved by the Director, and which are deemed necessary by the Department of Building and Safety for Building Code compliance, shall require a referral of the revised plans back to the Department of City Planning for additional review and sign-off prior to the issuance of any permit in connection with those plans.

16. **Covenant.** Prior to the issuance of any permits relative to this matter, an agreement concerning all the information contained in these conditions shall be recorded in the County

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001116

Recorder's Office. The agreement shall run with the land and shall be binding on any subsequent property owners, heirs or assign. The agreement must be submitted to the Department of City Planning for approval before being recorded. After recordation, a copy bearing the Recorder's number and date shall be provided to the Department of City Planning for attachment to the file.

### 17. Indemnification and Reimbursement of Litigation Costs.

Applicant shall do all of the following:

- (i)    Defend, indemnify and hold harmless the City from any and all actions against the City relating to or arising out of, in whole or in part, the City's processing and approval of this entitlement, including but not limited to, an action to attack, challenge, set aside, void, or otherwise modify or annul the approval of the entitlement, the environmental review of the entitlement, or the approval of subsequent permit decisions, or to claim personal property damage, including from inverse condemnation or any other constitutional claim.

- (ii)   Reimburse the City for any and all costs incurred in defense of an action related to or arising out of, in whole or in part, the City's processing and approval of the entitlement, including but not limited to payment of all court costs and attorney's fees, costs of any judgments or awards against the City (including an award of attorney's fees), damages, and/or settlement costs.

- (iii)  Submit an initial deposit for the City's litigation costs to the City within 10 days' notice of the City tendering defense to the Applicant and requesting a deposit. The initial deposit shall be in an amount set by the City Attorney's Office, in its sole discretion, based on the nature and scope of action, but in no event shall the initial deposit be less than $50,000. The City's failure to notice or collect the deposit does not relieve the Applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

- (iv)   Submit supplemental deposits upon notice by the City. Supplemental deposits may be required in an increased amount from the initial deposit if found necessary by the City to protect the City's interests. The City's failure to notice or collect the deposit does not relieve the Applicant from responsibility to reimburse the City pursuant to the requirement in paragraph (ii).

- (v)    If the City determines it necessary to protect the City's interest, execute an indemnity and reimbursement agreement with the City under terms consistent with the requirements of this condition.

The City shall notify the applicant within a reasonable period of time of its receipt of any action and the City shall cooperate in the defense. If the City fails to notify the applicant of any claim, action, or proceeding in a reasonable time, or if the City fails to reasonably cooperate in the defense, the applicant shall not thereafter be responsible to defend, indemnify or hold harmless the City.

The City shall have the sole right to choose its counsel, including the City Attorney's office or outside counsel. At its sole discretion, the City may participate at its own expense in the defense of any action, but such participation shall not relieve the applicant of any obligation imposed by this condition. In the event the Applicant fails to comply with this condition, in whole or in part, the City may withdraw its defense of the action, void its approval of the entitlement, or take any other action. The City retains the right to make all decisions with respect to its representations in any legal proceeding, including its inherent right to abandon or settle litigation.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001117

For purposes of this condition, the following definitions apply:

"City" shall be defined to include the City, its agents, officers, boards, commissions, committees, employees, and volunteers.

. "Action" shall be defined to include suits, proceedings (including those held under alternative dispute resolution procedures), claims, or lawsuits. Actions includes actions, as defined herein, alleging failure to comply with any federal, state or local law.

Nothing in the definitions included in this paragraph are intended to limit the rights of the City or the obligations of the Applicant otherwise created by this condition.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001118

## PROJECT BACKGROUND

The site is located in the Palms – Mar Vista – Del Rey Community Plan area at the northeastern corner of Motor Avenue and Tabor Street, and consists of two lots that measure approximately 14,997 square feet in lot area. The subject site is zoned C2-1, with a General Plan land use designation of General Commercial. The C2-1 zone permits a 1.5:1 Floor Area Ratio ("FAR") and unlimited height. The subject property is within the West Los Angeles Transportation Improvement and Mitigation Specific Plan and in a Transit Priority Area.

The proposed project includes the demolition of an existing one-story three-unit commercial building, and the construction of a six-story mixed-use commercial and residential building providing 42 apartment units, including a minimum of 4 units for Very Low Income Households, and 1,770 square feet of ground-floor retail. The project proposes a total of 54 vehicular parking spaces and a total of 44 long-term and 7 short-term bicycle parking spaces. The project consists of 20 vehicular parking spaces at the ground floor and 34 residential parking spaces in one subterranean parking level. The total project size is limited to 29,807 square feet, and the building will measure approximately 72 feet and 7 inches in height. The proposed project requests a haul route to export 6,000 cubic yards of soil. Two non-protected trees are being removed.

The proposed project will provide pedestrian-oriented retail, enhanced paving, off-street parking, bicycle parking, and planters to enhance this portion of Motor Avenue and Tabor Street. Parking access is located off the alley, opening Motor Avenue and Tabor Street for pedestrian and bicycle access only. Open space is provided in the form of front-facing private balconies along Motor Avenue and Tabor Street, an inner courtyard and outdoor deck on Level 2, and an outdoor deck on Level 6. The amenities on Level 2 include stained color concrete paving, steel frame seating areas, COR-TEN steel and built-in benches, 30-inch high steel planters, a green wall, portable barbecues, and fiberglass rectangular planters, as provided in Exhibit "A". Eight (8) new street trees will be planted along the sidewalk on Motor Avenue and Tabor Avenue per the Urban Forestry Division. The proposed project will provide a total of 51 bicycle parking spaces, and five percent (4 spaces) of the required vehicular parking will be configured as electric vehicle charging stations.

Pursuant to LAMC Section 12.22.A.25, the applicant requests a Density Bonus Compliance Review. In consideration of 4 affordable units, the applicant seeks one on-menu incentive: a 32.5 percent increase in Floor Area Ratio (FAR) from 1.5:1 to 1.98:1.

In accordance with California State Law (including Senate Bill 1818, and Assembly Bills 2280 and 2222), the applicant is proposing to utilize Section 12.22 A.25 (Density Bonus) of the Los Angeles Municipal Code (LAMC), which permits a density bonus of 35 percent. The project is requesting a density bonus of 32.5 percent. This allows for a maximum of 52 total dwelling units in lieu of the otherwise maximum density limit of 38 dwelling units on the property. A density bonus is automatically granted in exchange for the applicant setting aside a portion of dwelling units, in this case 4 units, for habitation by Very Low Income Households for a period of 55 years. Consistent with the Density Bonus Ordinance, the Applicant is also automatically granted a reduction in required parking based on two Parking Options, and a reduction based on the Bicycle Parking Ordinance. The Applicant selected Parking Option 1, which requires a total of 42 residential parking spaces. The Applicant also selected an automobile parking reduction based on the Bicycle Parking Ordinance. Based on the 10 percent automobile parking reduction with the replacement of bicycle parking spaces in excess of the normally required bicycle parking spaces, the proposed project shall provide a minimum of 38 automobile spaces and a minimum of 51 bicycle parking spaces.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001119

**Housing Replacement**

With Assembly Bill 2222, applicants of Density Bonus projects filed as of January 1, 2015 must demonstrate compliance with the housing replacement provisions which require replacement of rental dwelling units that either exist at the time of application of a Density Bonus project, or have been vacated or demolished in the five-year period preceding the application of the project. This applies to all pre-existing units that have been subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to persons and families of lower or very low income; subject to any other form of rent or price control; or occupied by Low or Very Low Income Households. A Determination made by the Los Angeles Housing and Community Investment Department (HCIDLA) dated February 24, 2017 concluded that there are no residential units on the property within the last five years; AB 2222 does not apply to commercial structures, so no AB 2222 replacement affordable units are required. Per Density Bonus state law, the proposed project will be required to provide 4 units affordable to Very Low Income Households. This is reflected in the Conditions of Approval. Refer to the Density Bonus Legislation Background section of this determination for additional information.

**LAMC Criteria**

As permitted by LAMC Section 12.22 A.25 the applicant is requesting two incentives that will facilitate the provision of affordable housing at the site: a 32.5 percent increase in the allowable FAR from 1.5:1 to 1.98. Pursuant to LAMC Section 12.22 A.25 (e)(2), in order to be eligible for any on-menu incentives, a Housing Development Project (other than an Adaptive Reuse Project) shall comply with the following criteria, which it does:

   a.   *The façade of any portion of a building that abuts a street shall be articulated with a change of material or a break in plane, so that the façade is not a flat surface.*

   The proposed mixed-use development abuts two streets, Motor Avenue and Tabor Street, as well as a full 20-foot wide alley to the rear and side. As provided in Exhibit "A", the street-facing facades are articulated to modulate the building wall and create distinct breaks in the building plane. The building design incorporates a variety of recesses, stepbacks, and varied rooflines, and different materials to add architectural interest to the building and create distinct breaks in the building plane. The building façade is articulated horizontally to create distinct vertical components through the use of varied building planes and materials. The building materials include corrugated metal siding, longboard wood siding, cement plaster, clear anodized storefront system, steel canopies, glass guardrails, and perforated metal sun shades as provided in Exhibit "A". Together, these elements are applied to create sufficient breaks in plane and articulation.

   b.   *All buildings must be oriented to the street by providing entrances, windows architectural features and/or balconies on the front and along any street facing elevation.*

   The subject site has a frontage of approximately 100 feet along Motor Avenue and 150 feet along Tabor Street. The proposed project has one residential entrance and two commercial entrances along Tabor Street, with balconies along both Motor Avenue and Tabor Street. The vehicular entrance is provided along the rear alley that is accessed from Tabor Street. The proposed project includes many architectural features to help define the main entrances. For instance, the residential lobby is recessed to create a distinct break from the commercial storefront. The commercial entrances are accentuated through steel canopies and storefront system to create transparency at the ground floor along Tabor Street.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001120

c.   *The Housing Development Project shall not involve a contributing structure in a
     designated Historic Preservation Overlay Zone (HPOZ) and shall not involve a
     structure that is a City of Los Angeles designated Historic-Cultural Monument (HCM).*

     The proposed project is not located within a designated Historic Preservation Overlay
     Zone, nor does it involve a property that is designated as a City Historic-Cultural
     Monument.

d.   *The Housing Development Project shall not be located on a substandard street in a
     Hillside Area or in a Very High Fire Hazard Severity Zone as established in Section
     57.25.01 of the LAMC.*

     The project is not located in a Hillside Area, nor is it located in a Very High Fire Hazard
     Severity Zone.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001121

The project proposes an allowance for a 1.98:1 Floor Area Ratio (FAR) in lieu of the normal maximum 1.5:1 FAR. The proposed project qualifies for a Density Bonus FAR increase because it is located within 1,500 feet of several transit stops as defined by LAMC Section 12.22.A.25. The subject site is located at the intersection of Motor Avenue and Tabor Street, and is served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, and is within 1,500 feet of Transit Stops served by Culver City Bus Line 3 and Big Blue Bus Lines 17 and Rapid 12.

## DENSITY BONUS/AFFORDABLE HOUSING INCENTIVES COMPLIANCE FINDINGS

1. **Pursuant to Section 12.22 A.25(c) of the LAMC, the Director shall approve a density bonus and requested incentive(s) unless the director finds that:**

   a. *The incentives are not required to provide for affordable housing costs as defined in California Health and Safety Code Section 50052.5 or Section 50053 for rents for the affordable units.*

   The record does not contain substantial evidence that would allow the Director to make a finding that the requested incentives are not necessary to provide for affordable housing costs per State Law. The California Health & Safety Code Sections 50052.5 and 50053 define formulas for calculating affordable housing costs for Very Low, Low, and Moderate Income Households. Section 50052.5 addresses owner-occupied housing and Section 50053 addresses rental households. Affordable housing costs are a calculation of residential rent or ownership pricing not to exceed 25 percent gross income based on area median income thresholds dependent on affordability levels.

   The list of on-menu incentives in 12.22 A.25 was pre-evaluated at the time the Density Bonus Ordinance was adopted to include types of relief that minimize restrictions on the size of the project. As such, the Director will always arrive at the conclusion that the density bonus on-menu incentives are required to provide for affordable housing costs because the incentives by their nature increase the scale of the project.

   The requested incentive, an increase in the Floor Area Ratio, is expressed in the Menu of Incentives per LAMC 12.22 A.25(f) and, as such, permit exceptions to zoning requirements that result in building design or construction efficiencies that provide for affordable housing costs. The requested incentive allows the developer to expand the building envelope so the additional units can be constructed and the overall space dedicated to residential uses is increased. The incentive supports the applicant's decision to set aside 4 Very Low Income dwelling units for 55 years.

   *Floor Area Ratio Increase:* The subject site is zoned C2-1 which allows 38 units on the 14,997 square foot site, with a maximum 1.5:1 Floor Area Ratio (FAR) and unlimited building height. The FAR Increase Incentive permits a percentage increase in the allowable Floor Area Ratio equal to the percentage of Density Bonus for which the Housing Development Project is eligible, not to exceed 35 percent. While the proposed project qualifies for a maximum 2.025:1 FAR, the proposed project is actually providing a maximum 1.98 FAR and is proposing 29,782 square feet of floor area. The proposed 1.98:1 FAR creates 7,311 additional square feet.

| FAR by-right | Buildable Lot Area (sf) | Total Floor Area (sf) |
|---|---|---|
| 1.5:1 | 14,997 | 14,997 X 1.5= 22,495.5 |

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001122



| FAR proposed | Buildable Lot Area (sf) | Total Floor Area (sf) | Additional Floor Area (sf) |
|---|---|---|---|
| 1.98:1 | 14,997 | 29,806.5 | 29,806.5- 22,495.5= 7,311 |

b. *The Incentive will have specific adverse impact upon public health and safety or the physical environment, or on any real property that is listed in the California Register of Historical Resources and for which there is no feasible method to satisfactorily mitigate or avoid the specific adverse impact without rendering the development unaffordable to Very Low, Low and Moderate Income households. Inconsistency with the zoning ordinance or the general plan land use designation shall not constitute a specific, adverse impact upon the public health or safety.*

The proposed incentives <u>will not</u> have a specific adverse impact. A "specific adverse impact" is defined as "a significant, quantifiable, direct and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete" (LAMC Section 12.22.A.25(b)). The proposed Project and potential impacts were analyzed in accordance with the California Environmental Quality Act (CEQA) Guidelines and the City's L.A. CEQA Thresholds Guide. These two documents establish guidelines and thresholds of significant impact, and provide the data for determining whether or not the impacts of a proposed Project reach or exceed those thresholds. Analysis of the proposed Project determined that it is Categorically Exempt from environmental review pursuant to State CEQA Guidelines Article 19, Sections 15304 (Class 4) and 15332 (Class 32), and City CEQA Guidelines Article III, Section 1, Class 4 Category 1. The Class 32 Exemption is intended to promote infill development within urbanized areas.

The proposed project qualifies for a Categorical Exemption because it conforms to the definition of "In-fill Projects" as follows:

**(a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations:**

The project is consistent with the following Elements of the General Plan: Framework Element, Land Use Element (Palms – Mar Vista – Del Rey Community Plan), Housing Element, and the Mobility Element.

**Framework Element:** The Citywide General Plan Framework is a guide for communities to implement growth and development policies by providing a comprehensive long-range view of the City as a whole. The Framework establishes categories of land use that are broadly described by ranges of intensity/density, heights, and lists of typical uses. The Framework Element's land use designation of General Commercial has corresponding zones of C2 and [Q]C2. The subject site is designated for General Commercial land uses and zoned C2-1; therefore, the subject site is consistent with the Framework Element.

**Land Use Element (Palms – Mar Vista – Del Rey Community Plan):** The subject site is located within the Palms – Mar Vista – Del Rey Community Plan ("Community Plan"). The Community Plan designates the site for General Commercial land uses, which has corresponding zones of C1.5, C2, C4, RAS3, and RAS4. The subject site is zoned C2-1, and is therefore consistent with the Community Plan's land use designation. The C2-

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001123**

1 zoning of the subject site allows for residential uses at R4 density, unlimited building height and a maximum Floor Area Ratio (FAR) of 1.5:1. The subject site has a lot area of approximately 14,997 square feet, which allows a by-right density 38 residential units in conjunction with LAMC Sections 12.14 A.1(a), 12.13.5 A.1, and 12.11, and up to a maximum of 52 residential units through the Density Bonus pursuant to LAMC Section 12.22 A.25 and Assembly Bill (AB) 2501. The proposed Project is for the construction of new six-story 42-unit mixed-use development containing 1,770 square feet of ground-floor retail and measuring 72 feet and 7 inches in height. The proposed uses, density, and height are allowed by the Community Plan's land use designation in combination with the site's zoning in combination with state Density Bonus law.

**Housing Element:** The Housing Element indicates that not only are more housing units needed to accommodate the City's growth, but that these units need to be a broader array of typologies to meet evolving household types and sizes. In addition, the Housing Element includes an Inventory of Sites for Housing (Housing Element Exhibit H) that identifies parcels suitable for additional residential development without the need for any discretionary zoning action by the City. The site's Assessor Parcel Number (APN # 4314014002) has been identified in the Inventory, and is therefore meeting Housing Element provisions of providing housing on these applicable sites. As mentioned, the proposed Project will demolish an existing commercial building and construct 42 new residential units. The proposed Project will therefore provide a net increase of 42 residential units within close proximity to jobs, transit, and other amenities including an elementary school. Pursuant to Density Bonus requirements, 4 of the total units will be reserved for Very Low Income households, and is therefore achieving the Housing Element goal of providing affordable units and promoting mixed-income developments.

**Mobility Element:** The Mobility Element sets forth objectives and policies to establish a citywide strategy to achieve long-term mobility and accessibility within the City of Los Angeles. The subject site is located at the intersection of Motor Avenue and Tabor Street, and is served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, as well as by local and regional bus lines operated by Culver City Bus, Big Blue Bus, Los Angeles Metro, and LADOT. Specifically, the subject site is within 1,500 feet of Transit Stops served by Culver City Bus Line 3 and Big Blue Bus Lines 17 and Rapid 12; and the subject site is within 0.5 miles from Transit Stops served by Metro Bus Lines 33 and 733, Big Blue Bus Line 5, and LADOT Line Commuter Express Line 431. The proposed Project will allow for a reduction of vehicle trips by placing high-density residential within proximity to public transit, as well as existing retail and amenities along Motor Avenue and the greater Palms neighborhood. Furthermore, the location of ground floor commercial uses and residential lobby will facilitate a pedestrian-oriented environment by providing transparency at the street level, thereby activating the streets. The project also involves the dedication of 3 feet along Motor Avenue and 5 feet along Tabor Street; therefore the building wall will be set back further from the street and allow for wider sidewalks to facilitate pedestrian activity. The proposed Project will also provide bicycle parking spaces in accordance with the Bicycle Parking Ordinance and LAMC Section 12.21 A.16 for residents and visitors, thereby facilitating bicycle ridership.

The subject site is also located within the West Los Angeles Transportation Improvement and Mitigation Specific Plan. The West Los Angeles Transportation Improvement and Mitigation Specific Plan does not address development issues. It identifies trip fee requirements for non-residential projects.

Consistent with the Palms – Mar Vista – Del Rey Community Plan and General Plan, the proposed 42-unit mixed-use development adds new mixed-income multi-family

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001124

housing to Los Angeles' housing supply in a neighborhood which is conveniently located to a variety of community services including transit stops. The project meets parking, yard, open space, and landscaping requirements, with modifications to allow additional FAR, and reduced parking through the Density Bonus Ordinance. Therefore, the project is consistent with the applicable general plan designation and all applicable general plan policies as well as with the applicable zoning designation and regulations.

*(b)   The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses:*

The subject site is located in close at the intersection of Motor Avenue and Tabor Street in the Palms neighborhood. The development consists of a mixed-use project on a lot that is approximately 14,997 square feet (0.344 acres) in size, and is wholly within the City of Los Angeles.

The subject site is substantially surrounded by urban uses in close proximity to major arterials including Motor Avenue to the west and Palms Boulevard to the north. Lots adjacent to the subject site are zoned R3-1, C2-1, and [Q]PF-1XL, and are developed with low- to mid-rise multi-family and commercial uses Neighboring lots to the east (across the alley) are zoned R3-1 and developed with multi-family uses. The lot to the north (across the alley) is zoned [Q]PF-1XL and developed with an elementary school. The subject site is also served by a variety of transit options including the Metro Expo Line (806) Palms Station, which is located approximately 0.3 miles from the subject site, as well as by local and regional bus lines operated by the Culver City Bus, Big Blue Bus, Los Angeles Metro, and LADOT. Therefore, it can be found that the proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.

*(c)   The project site has no value as habitat for endangered, rare or threatened species:*

The subject site is located within an established area that is fully-developed with a commercial corridor with low- to medium-density multi-family and commercial uses. The site is previously disturbed and surrounded by development. There are no protected trees on the site. The project does not involve the removal of healthy, mature, scenic trees because the trees being removed (palm) are not protected trees. Therefore, the site is not, and has no value as, a habitat for endangered, rare or threatened species.

*(d)   Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality:*

The proposed project replaces an existing one-story commercial building, adding 42 new housing units and 1,770 square feet of ground-floor commercial to the subject site.

Based upon the existing mobility and circulation networks in direct proximity to the proposed project, the introduction of 42 additional units to the community will result in no traffic impacts. The traffic impact analysis, prepared by Overland Traffic Consultants, Inc. dated May 1, 2017, concluded the Project will result in net project trip generation of 179 daily trips with thirty (30) a.m. peak hour trips and two (2) p.m. peak hour trips. The traffic impact analysis also indicated there will be no significant traffic impacts at the intersection of Motor Avenue and Palms Boulevard, at the intersection of Motor Avenue and Tabor Avenue, and at the driveway off of Linwood Avenue. The traffic impact analysis was reviewed by the Los Angeles Department of Transportation (LADOT). In a memo dated May 30, 2017, LADOT determined that the analysis adequately describes

---

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001125

the project-related impact of the proposed development. Therefore, the project will not have any significant impacts to traffic.

The Department of Building and Safety will require a haul route for the export of 6,000 cubic yards of soil in a Special Grading Area. Regulatory Compliance Measures (RCMs) include the submittal of a Geology and Soils Report to the Department of Building and Safety (DBS), and compliance with a Geology and Soils Report Approval Letter, issued by DBS on March 8, 2017 (LOG # 96213-01), which details conditions of approval that must be followed. In addition, the RCMs require that design and construction of the building must conform to the California Building Code, and grading on site shall comply with the City's Landform Grading Manual, as approved by the Department of Building and Safety Grading Division. According to Navigate LA, within 500 feet of the subject site, there is one other haul route application in conjunction with the construction of a new 5-story, 49-unit apartment building over 1 level of subterranean parking, located at 3628-3642 South Motor Avenue, which is currently pending. In light of the increase in construction activity in Grading Hillside Areas and the increase in associated truck traffic related to the import and export of soil, a haul route monitoring program is being implemented by the Department of Building and Safety for Council Districts 4 and 5 for added enforcement to ensure safety and to protect the quality of life of area residents. As part of this program, a haul route monitor is assigned to a geographic area to monitor haul routes and keep track of daily activities in order to minimize impacts to neighboring residents. Haul routes are tracked via a Map for each district to identify the locations of construction sites for which a haul route was required. The haul route approval will include RCMs and recommended conditions prepared by LADOT to be considered by the Board of Building and Safety Commissioners to reduce the impacts of construction related hauling activity, monitor the traffic effects of hauling, and reduce haul trips in response to congestion. Therefore, no foreseeable cumulative impacts are expected

The project will be subject to Regulatory Compliance Measures (RCMs), which require compliance with the City of Los Angeles Noise Ordinance; pollutant discharge, dewatering, stormwater mitigations; and Best Management Practices for stormwater runoff. The project must comply with the adopted City of Los Angeles Noise Ordinances Nos. 144,331 and 161,574, as well as any subsequent Ordinances, which prohibit the emission or creation of noise beyond certain levels. These Ordinances cover both operational noise levels (i.e., post-construction), and any construction noise impacts. These RCMs will ensure the project will not have significant impacts on noise and water. As a result of this mandatory compliance, the proposed project will not result in any significant impacts on noise or water.

The building construction phase includes the construction of the proposed building on the subject property, which grading and a haul-route for the importing/exporting of approximately 6,000 cubic yards of dirt, connection of utilities, laying irrigation for landscaping, architectural coatings, paving, and landscaping the subject property. These construction activities would temporarily create emissions of dusts, fumes, equipment exhaust, and other air contaminants. Construction activities involving grading and foundation preparation would primarily generate PM2.5 and PM10 emissions. Mobile sources (such as diesel-fueled equipment onsite and traveling to and from the Project Site) would primarily generate NOx emissions. The application of architectural coatings would result primarily in the release of ROG emissions. The amount of emissions generated on a daily basis would vary, depending on the amount and types of construction activities occurring at the same time.

Nevertheless, appropriate dust control measures would be implemented as part of the Proposed Project during each phase of development, as required by SCAQMD Rule 403

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001126

- Fugitive Dust. Specifically, Rule 403 control requirements include, but are not limited to, applying water in sufficient quantities to prevent the generation of visible dust plumes, applying soil binders to uncovered areas, reestablishing ground cover as quickly as possible, utilizing a wheel washing system to remove bulk material from tires and vehicle undercarriages before vehicles exit the Project Site, and maintaining effective cover over exposed areas.

Best Management Practices (BMP) will be implemented that would include (but not be limited to) the following:

- Unpaved demolition and construction areas shall be wetted at least three times daily during excavation and construction, and temporary dust covers shall be used to reduce emissions and meets SCAQMD Rule 403;
- All dirt/soil loads shall be secured by trimming, watering or other appropriate means to prevent spillage and dust;
- General contractors shall maintain and operate construction equipment to minimize exhaust emissions; and
- Trucks shall not idle but be turned off.

The project, a 29,782-square foot mixed-use building will replace an approximately 6,768-square foot existing commercial building. The project will not result in significant impacts related to air quality because it falls below interim air threshold established by DCP staff. Interim thresholds were developed by DCP staff based on CalEEMod model runs relying on reasonable assumptions, consulting with AQMD staff, and surveying published air quality studies for which criteria air pollutants did not exceed the established SCAQMD construction and operational thresholds. Possible project-related air quality concerns will derive from the mobile source emissions generated from the proposed residential uses for the project site. Operational emissions for project-related traffic will be less than significant. In addition to mobile sources from vehicles, general development causes smaller amounts of "area source" air pollution to be generated from on-site energy consumption (natural gas combustion) and from off-site electrical generation. These sources represent a small percentage of the total pollutants. The inclusion of such emissions adds negligibly to the total significant project-related emissions burden generated by the proposed project. The proposed project will not cause the SCAQMD's recommended threshold levels to be exceeded. Operational emission impacts will be at a less-than-significant level.

The development of the project would not result in any significant effects relating to water quality. The project is not adjacent to any water sources and construction of the project will not create any impact to water quality. The project will be subject to Regulatory Compliance Measures (RCMs) for pollutant discharge, dewatering, stormwater mitigations, and Best Management Practices for stormwater runoff. Furthermore, the project will comply with the City's stormwater management provisions per LAMC 64.70.

The subject property has a slope of less than 10 percent and is not in a waterway, wetland, or officially designated scenic area. Therefore, there is no substantial evidence that the proposed project will have a specific adverse impact on the physical environment.

Furthermore, the subject site is located within a Transit Priority Area (TPA) as defined by Public Resources Code (PRC) Section 21099(a)(7) and Zoning Information (ZI) File 2452, due to its location within one-half mile of a major transit stop. Therefore, pursuant to SB 743 and PRC Section 21099 (d)(1), "aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a Transit Priority Area shall not be considered significant impacts on the environment". Therefore,

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001127



the project's aesthetic impacts, such as visual resources, aesthetic character, shade and
shadow, light and glare, shall not be considered a significant impact on the environment
for CEQA purposes.

**(e)    The site can be adequately served by all required utilities and public
services;**

The project site will be adequately served by all public utilities and services given that
the construction of a mixed-use development will be on a site which has been previously
developed and is consistent with the general plan. The site is currently and adequately
served by the City's Department of Water and Power, the City's Bureau of Sanitation,
the Southern California (SoCal) Gas Company, the Los Angeles Police Department, the
Los Angeles Fire Department, Los Angeles Unified School District, Los Angeles Public
Library, and other public services. These utilities and public services have continuously
served the neighborhood for more than 50 years. In addition, the California Green Code
requires new construction to meet stringent efficiency standards for both water and
power, such as high-efficiency toilets, dual-flush water closets, minimum irrigation
standards, LED lighting, etc. As a result of these new building codes, which are required
of all projects, it can be anticipated that the proposed project will not create any impact
on existing utilities and public services through the net addition of 42 dwelling units.

The project and its related haul route application can be characterized as in-fill
development within urban areas for the purpose of qualifying for Class 32 Categorical
Exemption as a result of meeting the five conditions listed above.

## DENSITY BONUS LEGISLATION BACKGROUND

The California State Legislature has declared that "[t]he availability of housing is of vital statewide
importance," and has determined that state and local governments have a responsibility to "make
adequate provision for the housing needs of all economic segments of the community." Section
§65580, subds. (a), (d). Section 65915 further provides that an applicant must agree to, and the
municipality must ensure, the "continued affordability of all Low and Very Low Income units that
qualified the applicant" for the density bonus.

With Senate Bill 1818 (2004), state law created a requirement that local jurisdictions approve a
density bonus and up to three "concessions or incentives" for projects that include defined levels
of affordable housing in their projects. In response to this requirement, the City created an
ordinance that includes a menu of incentives (referred to as "on-menu" incentives) comprised of
eight zoning adjustments that meet the definition of concessions or incentives in state law
(California Government Code Section 65915). The eight on-menu incentives allow for: 1) reducing
setbacks; 2) reducing lot coverage; 3) reducing lot width, 4) increasing floor area ratio (FAR); 5)
increasing height; 6) reducing required open space; 7) allowing for an alternative density
calculation that includes streets/alley dedications; and 8) allowing for "averaging" of FAR, density,
parking or open space. In order to grant approval of an on-menu incentive, the City utilizes the
same findings contained in state law for the approval of incentives or concessions.

California State Assembly Bill 2222 went into effect January 1, 2015, and with that Density Bonus
projects filed as of that date must demonstrate compliance with the housing replacement
provisions which require replacement of rental dwelling units that either exist at the time of
application of a Density Bonus project, or have been vacated or demolished in the five-year period
preceding the application of the project. This applies to all pre-existing units that have been
subject to a recorded covenant, ordinance, or law that restricts rents to levels affordable to
persons and families of lower or very low income; subject to any other form of rent or price control

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001128

(including Rent Stabilization Ordinance); or is occupied by Low or Very Low Income Households (i.e., income levels less than 80 percent of the area median income [AMI]). The replacement units must be equivalent in size, type, or both and be made available at affordable rent/cost to, and occupied by, households of the same or lower income category as those meeting the occupancy criteria. Prior to the issuance of any Director's Determination for Density Bonus and Affordable Housing Incentives, the Housing and Community Investment Department (HCIDLA) is responsible for providing the Department of City Planning, along with the applicant, a determination letter addressing replacement unit requirements for individual projects. The City also requires a Land Use Covenant recognizing the conditions be filed with the County of Los Angeles prior to granting a building permit on the project.

Assembly Bill 2222 also increases covenant restrictions from 30 to 55 years for projects approved after January 1, 2015. This determination letter reflects these 55 year covenant restrictions.

Under Government Code Section § 65915(a), § 65915(d)(2)(C) and § 65915(d)(3) the City of Los Angeles complies with the State Density Bonus law by adopting density bonus regulations and procedures as codified in Section 12.22 A.25 of the Los Angeles Municipal Code. Section 12.22 A.25 creates a procedure to waive or modify Zoning Code standards which may prevent, preclude or interfere with the effect of the density bonus by which the incentive or concession is granted, including legislative body review. The Ordinance must apply equally to all new residential development.

In exchange for setting aside a defined number of affordable dwelling units within a development, applicants may request up to three incentives in addition to the density bonus and parking relief which are permitted by right. The incentives are deviations from the City's development standards, thus providing greater relief from regulatory constraints. Utilization of the Density Bonus/Affordable Housing Incentives Program supersedes requirements of the Los Angeles Municipal Code and underlying ordinances relative to density, number of units, parking, and other requirements relative to incentives, if requested.

For the purpose of clarifying the Covenant Subordination Agreement between the City of Los Angeles and the United States Department of Housing and Urban Development (HUD) note that the covenant required in the Conditions of Approval herein shall prevail unless pre-empted by State or Federal law.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001129

## TIME LIMIT – OBSERVANCE OF CONDITIONS

All terms and conditions of the Director's Determination shall be fulfilled before the use may be established. Pursuant to LAMC Section 12.25 A.2, the instant authorization is further conditional upon the privileges being utilized within **three years** after the effective date of this determination and, if such privileges are not utilized, building permits are not issued, or substantial physical construction work is not begun within said time and carried on diligently so that building permits do not lapse, the authorization shall terminate and become void.

## TRANSFERABILITY

This determination runs with the land. In the event the property is to be sold, leased, rented or occupied by any person or corporation other than yourself, it is incumbent that you advise them regarding the conditions of this grant. If any portion of this approval is utilized, then all other conditions and requirements set forth herein become immediately operative and must be strictly observed.

## VIOLATIONS OF THESE CONDITIONS, A MISDEMEANOR

The applicant's attention is called to the fact that this grant is not a permit or license and that any permits and licenses required by law must be obtained from the proper public agency. Furthermore, if any condition of this grant is violated or not complied with, then the applicant or his successor in interest may be prosecuted for violating these conditions the same as for any violation of the requirements contained in the Municipal Code, or the approval may be revoked.

Section 11.00 of the LAMC states in part (m): "It shall be unlawful for any person to violate any provision or fail to comply with any of the requirements of this Code. Any person violating any of the provisions or failing to comply with any of the mandatory requirements of this Code shall be guilty of a misdemeanor unless that violation or failure is declared in that section to be an infraction. An infraction shall be tried and be punishable as provided in Section 19.6 of the Penal Code and the provisions of this section. Any violation of this Code that is designated as a misdemeanor may be charged by the City Attorney as either a misdemeanor or an infraction.

Every violation of this determination is punishable as a misdemeanor unless provision is otherwise made, and shall be punishable by a fine of not more than $1,000 or by imprisonment in the County Jail for a period of not more than six months, or by both a fine and imprisonment."

## APPEAL PERIOD - EFFECTIVE DATE

**The Determination in this matter will become effective and final fifteen (15) days after the date of mailing of the Notice of Director's Determination** unless an appeal there from is filed with the City Planning Department. It is strongly advised that appeals be filed early during the appeal period and in person so that imperfections/incompleteness may be corrected before the appeal period expires. Any appeal must be filed on the prescribed forms, accompanied by the required fee, a copy of this Determination, and received and receipted at a public office of the Department of City Planning on or before the above date or the appeal will not be accepted. Forms are available on-line at http://planning.lacity.org.

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001130

Planning Department public offices are located at:

| | | |
|---|---|---|
| *Downtown Office* | *Valley Office* | *West Office* |
| *Figueroa Plaza* | *Marvin Braude Constituent* | *West Los Angeles Development* |
| *201 North Figueroa Street,* | *Service Center* | *Services Center* |
| *4th Floor* | *6262 Van Nuys Boulevard,* | *1828 Sawtelle Boulevard,* |
| *Los Angeles, CA 90012* | *Suite 251* | *2nd Floor* |
| *(213) 482-7077* | *Van Nuys, CA 91401* | *Los Angeles, CA 90025* |
| | *(818) 374-5050* | *(310) 231-2912* |

**Only an applicant or any owner or tenant of a property abutting, across the street or alley from, or having a common corner with the subject property can appeal this Density Bonus Compliance Review Determination.** Per the Density Bonus Provision of State Law (Government Code Section §65915) the Density Bonus Increase in units above the base density zone limits and the appurtenant parking reductions are not a discretionary action and therefore cannot be appealed. Only the requested incentives are appealable. Per Section 12.22 A.25 of the LAMC, appeals of Density Bonus Compliance Review cases are heard by the City Planning Commission.

Verification of condition compliance with building plans and/or building permit applications are done at the Development Services Center of the Department of City Planning at either Figueroa Plaza in Downtown Los Angeles or the Marvin Braude Constituent Service Center in the Valley. In order to assure that you receive service with a minimum amount of waiting, applicants are encouraged to schedule an appointment with the Development Services Center either through the Department of City Planning website at http://planning.lacity.org or by calling (213) 482-7077 or (818) 374-5050. The applicant is further advised to notify any consultant representing you of this requirement as well.

The time in which a party may seek judicial review of this determination is governed by California Code of Civil Procedures Section 1094.6. Under that provision, a petitioner may seek judicial review of any decision of the City pursuant to California Code of Civil Procedure Section 1094.5, only if the petition for writ of mandate pursuant to that section is filed no later than the 90th day following the date on which the City's decision becomes final.

VINCENT P. BERTONI, AICP
Director of Planning

Approved by:

Faisal Roble, Principal City Planner

Reviewed by:

Michelle Singh, City Planner

Reviewed by:

Debbie Lawrence, AICP, Senior City Planner

Prepared by:

Connie Chauv, City Planning Associate
connie.chauv@lacity.org

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001131**

**FINDINGS / SPECIALIZED REQUIREMENTS**

**CLASSIFICATION OR CALEXEMPTION**

## WHAT IS A CEQA?

CEQA, or the California Environmental Quality Act, is a statute that requires state and local agencies to identify the significant environmental impacts of their actions by conducting environmental review before making a determination on a project. Environmental review procedures are used to identify a project's potential impacts, develop ways to reduce those impacts, and report the results of the analysis to the public.

## WHAT IS A CATEGORICAL EXEMPTION?

Every discretionary action requires environmental review pursuant to CEQA. However, the CEQA Guidelines include a list of classes of projects which have been determined to not have a significant effect on the environment, also known as Categorical Exemptions. If your project falls within one of these classes, it is exempt from the provisions of CEQA and no environmental review is required.

## WHAT IS THE CLASS 32 CATEGORICAL EXEMPTION?

The Class 32 "Infill" Categorical Exemption (CEQA Guideline Section 15332), hereafter referred to as the Class 32 Exemption, exempts infill development within urbanized areas if it meets certain criteria. The class consists of environmentally benign infill projects that are consistent with the local General Plan and Zoning requirements. This class is not intended for projects that would result in any significant traffic, noise, air quality, or water quality impacts. It may apply to residential, commercial, industrial, and/or mixed-use projects.

## HOW DO I QUALIFY?

In addition to general statewide guidelines, all public agencies are required to adopt specific criteria, objectives and procedures for implementing CEQA. In the City of Los Angeles, the Class 32 Exemption is available only for projects that: (a) do not trigger Site Plan Review; or (b) trigger Site Plan review, but the Initial Study shows that a Negative Declaration may be adopted. The Class 32 Exemption *is not* available for any project that requires mitigation measures to reduce potential environmental impacts to less than significant. Additionally, there are exceptions to the exemptions depending on the nature or location of the project, pursuant to CEQA Section 15300.2. For a proposed project to qualify, you must be able to demonstrate that it does not fall under the following Exceptions:

a. *The project and successive projects of the same type in the same place will result in cumulative impacts;*

b. *There are unusual circumstances creating the reasonable possibility of significant effects;*

c. *The project may result in damage to scenic resources, including, but not limited to, trees, historic buildings, rock outcroppings, or similar resources, within an officially designated scenic highway;*

d. *The project is located on a site that the Department of Toxic Substances Control and the Secretary of the Environmental Protection have identified, pursuant to Government code section 65962.5, as being affected by hazardous wastes or clean-up problems; or*

e. *The project may cause a substantial adverse change in the significance of an historical resource.*

**PALMS ELEMENTARY / OBJECTORS EXHIBITS 001132**

**HOW DO I REQUEST A CLASS 32 EXEMPTION?**

If your project does not fall under any of the Exceptions listed above, you may request a Class 32 Exemption by indicating on your Environmental Assessment Form (EAF) that you would like your project to be considered by checking the box under Section 5. As part of the preliminary review of the project, the Project Planner will determine whether it is eligible for a Class 32 Exemption. In order for the Project Planner to make such a determination, you will still need to file an EAF, demonstrate that your proposed project does not fall under one of the above Exceptions, and provide the CEQA justifications listed below.

**WHAT DO I NEED TO SUBMIT?**

When filing a request for the Class 32 Exemption, the following items are required:

1. An Environmental Assessment Form (EAF) (CP-1204), including required exhibits, materials and fees pursuant to Los Angeles Municipal Code (LAMC) Section 19.05. This includes the "Environmental Assessment Form (EAF)/Initial Study leading to Negative Declaration or Mitigation Negative Declaration". A "Publication Fee for Negative Declaration or Mitigated Negative Declaration" fee will not be charged unless it is determined that the project is not eligible for the Class 32 Exemption.

2. Any supporting documents and/or technical studies to corroborate your position that the proposed project is eligible for the Class 32 Exemption, and/or to further substantiate the justifications listed under Paragraph 3 below. Examples of supporting documents, and when they may be required, are listed below.

   a. **Traffic Study.** A Traffic Study may be required for projects which exceed the Traffic Study Exemption Thresholds set by the Department of Transportation (DOT). In order to determine whether or not a Traffic Study is required, the Applicant shall submit a DOT Referral Form after case filing. If it is determined that a Traffic Study is required, the Applicant shall have one prepared and reviewed by DOT. A DOT Interdepartmental Correspondence Letter will be transmitted to Planning staff and must reflect that no significant traffic impacts will result from the proposed project in order for the project to qualify for the Class 32 Exemption.

   b. **Air Quality (AQ) Study.** Working with the South Coast Air Quality Management District (SCAQMD), Department staff has established interim air quality screening criteria to determine if a project requires an Air Quality Assessment. The purpose of this assessment is to evaluate the regional significance of criteria pollutant emissions from both the construction and operation of a proposed project. The analysis is provided utilizing the California Emissions Estimator Model (CalEEMod). The selected screening criteria is based on a survey of published air quality studies for which the criteria pollutants did not exceed the established SCAQMD construction or operational thresholds.

   If the proposed project has less than 80 residential units OR less than 75,000 square feet of non-residential use, AND involves less than 20,000 cubic yards of soil export, it will not likely exceed the SCAQMD construction or operational thresholds, and therefore will not require an Assessment. If your proposed project exceeds this screening criteria, an air quality assessment will be required. An Air Quality Study may also be required if prompted by the South Coast Air Quality Management District (SCAQMD), if the CE is challenged or if the project is particularly controversial. The applicant may voluntarily provide one it is anticipated that this information will be requested by another party.

   Please note this does not mean the project will have any significant impacts under CEQA, just that further analysis is required. The criteria can be used for all CEQA clearances, including Class 32 (Infill Development) exemptions pursuant to Section 15332 of the CEQA Guidelines.

   c. **Noise Study.** A Noise Study is not required. However, the applicant must provide substantial evidence that there will not be significant noise impacts as this will disqualify them from eligibility for the Class 32 Exemption (see State CEQA Guidelines Sections 15064(b) and 15064.7). LAMC Chapter XI, Article 2, Section 112.05 on construction noise may be used to demonstrate that the project will not result in a significant impact. Under this standard, the applicant must at minimum demonstrate compliance with LAMC Section 112.05. The record evidence would need to support the conclusion that construction noise

 PALMS ELEMENTARY / OBJECTORS EXHIBITS 002133

would not exceed the 75 dBA limitation in 112.05. If necessary, features to reduce noise to below-threshold levels (75 dBA) can be incorporated into the project design. If, however, the applicant cannot demonstrate to the City's satisfaction (pursuant to the evidentiary requirements of CEQA) that construction noise will be reduced to below-threshold levels (75 dBA) then a MND or EIR would be appropriate.

d. **Phase I and/or II Environmental Site Assessment (ESA).** A Phase I ESA may be required if the project site was previously developed with a dry cleaning, auto repair, gasoline station, industrial/manufacturing use, or other similar type of use that may have resulted in site contamination. If the Phase I ESA states that the site is contaminated, a Phase II ESA will be required. Only if the Phase II ESA demonstrates that the site has been fully remediated without mitigation is the project still eligible for the Class 32 Exemption.

e. **Historic Resource Assessment.** A Historic Resource Assessment may be required if the Project site is listed on the National Register of Historic Place, California Register of Historical Resources, or the Los Angeles Historic-Cultural Monuments Register; or is found to be a potential historic resource in HistoricPlacesLA, SurveyLA or based on discussion with the Office of Historic Resources. If it can be demonstrated that the project complies with the Secretary of Interior's Standards, the project may still be eligible for the CE. An historic resource impact report may be required.

3. Written justification that the proposed Project meets the following criteria:

a. The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations.

b. The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.

c. The project site has no value as habitat for endangered, rare or threatened species.

d. Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.

e. The site can be adequately served by all required utilities and public services.

As mentioned above, technical studies may be required in order to substantiate the above justification. If they are not submitted with your application, they may be requested by the Project Planner prior to acceptance of the Class 32 Exemption. Note also that the assigned Project Planner will determine what CEQA clearance will ultimately be required after the request has been submitted.

# City of Los Angeles
## Department of City Planning

## Affidavit of Mailing

### Case Number:  DIR-2016-4880-DB

This Affidavit concerns (check one of the following):

☐  **Public Hearing**

☐  **Staff Report / Appeal Staff Report**

☒  **Determination / Letter of Decision (LOD)**

I, ___Moira Gomez___, certify that I am an employee of the City of Los Angeles,
on September 1 2017 , mailed, postage prepaid, to the applicant
　(Date)
and all parties required by the Municipal Code, as indicated below, on the case
indicated above, a true copy of which is attached:

<table>
<tr><td>

**Public Hearing**

**Check Recipients Below:**

☐ Owner, Applicant and Representative
☐ Abutting Property Owners
☐ Abutting Property Owners and Tenants
☐ 100-foot Radius
☐ 500-foot Radius
☐ HPOZ or DRB Board
☐ Council Office No._____
☐ Certified Neighborhood Council
　_____
☐ 100-foot Coastal Notice
☐ Group Coastal Notice
☐ State Coastal Commission
☐ Adjacent City/ies
☐ Los Angeles Unified School District
☐ Caltrans
☐ Other _____

</td><td>

**Staff Report / Appeal /
Determination / Letter of Decision**

**Check Recipients Below:**

☒ Owner, Applicant and Representative
☒ Abutting Property Owners
☐ Abutting Property Owners and Tenants
☐ Persons who signed in at the hearing
☐ Persons who requested notice in writing
☒ Council Office No.　5
☒ Certified Neighborhood Council
　Palms
☒ Department of Building and Safety
☒ Department of Transportation
☒ Other _BOE, DONE_

</td></tr>
</table>

_Moira Gomez_
Staff Signature

## City of Los Angeles
## Department of City Planning

## Affidavit of Mailing

### Case Number: DIR-2016-4880-DB (Application Deemed Complete)

This Affidavit concerns (check one of the following):

☐  **Public Hearing**

☐  **Staff Report / Appeal Staff Report**

☒  **Determination / Letter of Decision (LOD)**

I, Megan Malone-Brown, certify that I am an employee of the City of Los Angeles,
on August 14, 2017, mailed, postage prepaid, to the applicant
    (Date)
and all parties required by the Municipal Code, as indicated below, on the case
indicated above, a true copy of which is attached:

| **Public Hearing** | **Staff Report / Appeal / Determination / Letter of Decision** |
|---|---|
| **Check Recipients Below:** | **Check Recipients Below:** |
| ☐ Owner, Applicant and Representative | ☒ Owner, Applicant and Representative |
| ☐ Abutting Property Owners | ☐ Abutting Property Owners |
| ☐ Abutting Property Owners and Tenants | ☐ Abutting Property Owners and Tenants |
| ☐ 100-foot Radius | ☐ Persons who signed in at the hearing |
| ☐ 500-foot Radius | ☐ Persons who requested notice in writing |
| ☐ HPOZ or DRB Board | ☒ Council Office No. 5 |
| ☐ Council Office No. ____ | ☐ Certified Neighborhood Council |
| ☐ Certified Neighborhood Council | |
| _____ | _____ |
| ☐ 100-foot Coastal Notice | ☐ Department of Building and Safety |
| ☐ Group Coastal Notice | ☐ Department of Transportation |
| ☐ State Coastal Commission | ☐ Other _____ |
| ☐ Adjacent City/ies | |
| ☐ Los Angeles Unified School District | |
| ☐ Caltrans | |
| ☐ Other _____ | |

_Staff Signature_

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001136

## City of Los Angeles
## Department of City Planning

## Affidavit of Mailing

### Case Number: DIR-2016-4880-DB - Hold Notice

This Affidavit concerns (check one of the following):

☐ **Public Hearing**

☐ **Staff Report / Appeal Staff Report**

☒ **Determination / Letter of Decision (LOD)**

I, _____ Moira Gomez ___, certify that I am an employee of the City of Los Angeles,
on January 31, 2017, mailed, postage prepaid, to the applicant
    (Date)
and all parties required by the Municipal Code, as indicated below, on the case
indicated above, a true copy of which is attached:

| **Public Hearing** | **Staff Report / Appeal / Determination / Letter of Decision** |
|---|---|
| **Check Recipients Below:** | **Check Recipients Below:** |
| ☐ Owner, Applicant and Representative | ☒ Owner, Applicant and Representative |
| ☐ Abutting Property Owners | ☐ Abutting Property Owners |
| ☐ Abutting Property Owners and Tenants | ☐ Abutting Property Owners and Tenants |
| ☐ 100-foot Radius | ☐ Persons who signed in at the hearing |
| ☐ 500-foot Radius | ☐ Persons who requested notice in writing |
| ☐ HPOZ or DRB Board | ☐ Council Office No. _____ |
| ☐ Council Office No._____ | ☐ Certified Neighborhood Council |
| ☐ Certified Neighborhood Council | |
| _____ | _____ |
| ☐ 100-foot Coastal Notice | ☐ Department of Building and Safety |
| ☐ Group Coastal Notice | ☐ Department of Transportation |
| ☐ State Coastal Commission | ☐ Other _____ |
| ☐ Adjacent City/ies | |
| ☑ Los Angeles Unified School District | |
| ☑ Caltrans | |
| ☐ Other _____ | |

Staff Signature

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001137

1 | **STATE OF CALIFORNIA** } ss.
2 | **COUNTY OF LOS ANGELES** }

3 | I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 3435 Wilshire Blvd., Suite 2910, Los
4 | Angeles, CA 90010

5 | On December 12, 2017, I served the following Document(s): **CEQA APPEAL of Case No. DIR-2016-4880-DB; ENV-2016-4881-CE and EXHIBITS (001001 through 001137)** upon the
6 | interested parties in this action addressed as follows:

7 | 
8 | 
9 | 
10 | 

| CITY OF LOS ANGELES | HIRO KOBAYASHI | DAYNA SAYLES |
|---|---|---|
| CITY COUNCIL | 3568 MOTOR LLC | three6ixty |
| via CITY CLERK | 800 S. FIGUEROA ST #960 | 4309 Overland Ave. |
| 200 N. Spring St, Rm 395 | LOS ANGELES, CA 90017 | Culver City, CA 90230 |
| Los Angeles, CA 90012 | Tel: (213) 488-9039 | Tel. (310) 204-3500 |
| TEL: (213) 978-1133 | 3568Motor@RBMofCA.com | info@three6ixty.net |
| Clerk.CPS@lacity.org | (*via email & certified mail) | (via email only) |
| (*via email & certified mail) | | |
| PAUL KORETZ, CD 5 | VINCENT P. BERTONI, AICP | DAVID R. HOLMQUIST, ESQ. |
| CITY HALL | DIRECTOR | LAUSD GENERAL COUNSEL |
| 200 N SPRING ST #440 | LA DEPT of CITY PLANNING | 333 South Beaudry Ave |
| LOS ANGELES, CA 90012 | 200 N. SPRING ST, RM 525 | Los Angeles, CA 90017 |
| Tel. (213) 473-7005 | Los ANGELES, CA 90012 | P: (213) 241-7600 |
| paul.koretz@lacity.org | Tel. (213) 978-1271 | David.Holmquist@lausd.net |
| (via email only) | vince.bertoni@lacity.org | (via email only) |
| | (*via email & certified mail) | |

16 |
17 | ☐ **(Via Hand Delivery)** I caused hand-delivered service of the above-mentioned materials upon the above-mentioned recipient(s) as addressed by leaving the materials with the person indicated, or
18 | with a person, of the age of majority, apparently responsible for the premises.

19 | ☒ **(Via U.S. Mail [Federal or State])** I am readily familiar with the practice for the collection and processing of correspondence for mailing with the UNITED STATES POSTAL SERVICE; such
20 | envelope will be deposited with the UNITED STATES POSTAL SERVICE on the above date according to ordinary business practices.

21 |
22 | ☒ **(Via Email)** By transmitting from my business address a true copy thereof from my sending computer addressed to each individual at its receiving computer email address set forth above at the
23 | time indicated on the transmission line thereon.

24 | **Executed on December 12, 2017, at Los Angeles, California.**

25 | ☒ **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.
26 | ☒ **(Federal)** I declare that I am employed in the office of a member of the bar of this Court at
27 | whose discretion the service was made.

28 |

Otti K. Orange, Esq.

PROOF OF SERVICE

1 | Olu K. Orange, Esq. (SBN 213653)
ORANGE LAW OFFICES, P.C.
2 | 3435 Wilshire Blvd., No. 2910
Los Angeles, CA 90010
3 | T: (213) 736-9900/F: (213) 417-8800
orangelawoffices@att.net
4

5 | Shawna L. Parks, Esq. (SBN 208301)
LAW OFFICE OF SHAWNA L. PARKS
6 | 4470 W. Sunset Blvd.,
Ste. 107-347
7 | Los Angeles, CA 90027
Tel/Fax: (323) 389-9239
8 | sparks@parks-law-office.com

9 | Janeen Steel (SBN 211401)
10 | Patricia A. Van Dyke (SBN 160033)
LEARNING RIGHTS LAW CENTER
11 | 205 S. Broadway, Ste 808
Los Angeles, CA 90012
12 | T: (213) 542-1834/F: (213) 489-4033
13 | janeen@learningrights.org
patsy@learningrights.org
14

**FILED**
Superior Court of California
County of Los Angeles

MAY 0 9 2018

Sherri R. Carter, Executive Officer/Clerk
By_____, Deputy
Noli M Raya

15

16                     **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

17                                   **CENTRAL DISTRICT**

18 | S.G., a minor, by and through her *guardian ad litem*, Brittany Dorn, *et al.* | ) Case No.: BS171903
19 | | )
20 |                          Plaintiffs, | ) [Proposed] Order on Petitioners' Ex Parte
|                          v. | ) Application for Leave to Take Discovery
21 | | )
22 | CITY OF LOS ANGELES, *ET AL.* | ) Date: May 9, 2018
|                                  | ) Time: 8:30 a.m.
23 |                          Defendants. | ) Place: Department 28
|                                  | ) Judge: Hon. Yvette M. Palazuelos
24 | Hiro Kobayashi, *et. al* | )
25 |                          Real Parties in Interest | )

26

27

28

[Proposed] Order on Plaintiffs' Ex Parte Application for Leave to Take Discovery

EX 5

1    This matter having come before the Court upon Petitoners' Ex Parte Application for

2 Leave to Take Discovery, after hearing on May 9, 2018, and upon consideration of the moving
and opposition papers, arguments and all other matters presented to the Court,

3    IT IS HEREBY ORDERED that Petitioners are granted leave to take limited discovery

4 relating to the exhaustion of administrative remedies, including the status of the CEQA appeal

5 filed by Petitioners on December 13, 2018, relating to the granting of a categorical exemption for

6 the construction project located at 3568 Motor Avenue, Los Angeles, CA, 90034 ("Project"), the

7 conduct of any CEQA appeal relating to the Project, communications regarding Petitioner's

8 CEQA appeal, and the rules and procedures applicable to CEQA appeals to the City Council.
Petitioners may take the deposition of the City's person most knowledge pursuant to C.C.P.

9 Section 2025.230, including a request for production of documents pursuant to C.C.P. Section

10 2025.280, as well as depositions of Members of the Planning Department and City Council. All

11 discovery permitted under this Order shall be completed on or before June 10, 2018.

12
So Ordered this ___ MAY 0 9 2018
13                  day of May, 2018:

14

15 Honorable Yvette M. Palazuelos

16 Superior Court Judge

17

18

19

20

21

22

23

24

25

26

27

28
[Proposed] Order on Plaintiffs' Ex Parte Application for Leave to Take Discovery



# LOS ANGELES UNIFIED SCHOOL DISTRICT
*Facilities Services Division*

May 11, 2018

**Via Email**

Councilmember Paul Koretz

200 N. Spring Street, Suite 440

Los Angeles, CA 90012

Re:     Proposed Development by RBM of California, Inc.

3568 Motor Avenue, Los Angeles, CA 90034

Councilmember Koretz,

Since the fall of 2017, District representatives have been in discussion with the principals of RBM of California [Developer], particularly Mr. Hiro Kobayashi, and his consultants regarding the planned 42 unit mixed use development at 3568 Motor Avenue, Los Angeles, CA 90034 ("Building") adjacent to Palms Elementary School, which is located at 3520 Motor Avenue, Los Angeles CA 90034 ("School"). The School and the Building site are separated by a twenty foot wide alley. The Building is currently designed to be setback approximately twenty feet from the southern property boundary of the School, including the alley.

Mr. Kobayashi and his team have been very cooperative and provided District staff with all of the information we have requested in an effort to determine the potential impacts, if any, the development of the Building would have on the School, students and staff. As a result of our discussions the Developer has agreed to implement a number of safety measures that will benefit the School, including, but not limited to:

- Perform demolition over the winter 2017 break when School is out and students, teachers and staff are not present (COMPLETED)
- Include the alley behind the school in the construction fencing plan, which will deter illegal dumping, criminal activity and homeless camps (COMPLETED)
- Prior to commencing construction of the Building, erect a temporary safety and noise barrier on the Building site approximately twenty feet south of the School property line, at their sole cost and expense and maintain this safety barrier for the duration of the construction of the Building.
- Begin excavation and construction activities over the summer break when students, teachers and staff are not present (This assumes they begin construction this summer. If

*Ex 6*



## LOS ANGELES UNIFIED SCHOOL DISTRICT
*Facilities Services Division*

the building permit is delayed, we would not expect the Developer would place their project on hold for another full year).

In an effort to avoid potential impacts that the proximity of the Building may have on the School, we are considering making changes to the kindergarten playground area, constructing a concrete block wall at the south property line and trash area, providing additional landscaping, as well as striping for a new staff parking area and installing new fencing and gates.  In addition, we are considering making improvements to four classrooms, primarily occupied by the Deaf and Hard of Hearing (DHH) program for students with special needs, and for any other priorities as determined by District and the School.

The Developer has agreed to donate $500,000 to the School ("Donation") in the hopes of providing a tangible benefit for the School and its students with some of the changes described above, and for any other priorities as determined by the School and District.  The Donation would only be made if a building permit(s) for the Building is issued by the City of Los Angeles. The Developer has also agreed that, other than a temporary safety barrier, they will not commence construction of the Building until it has delivered the Donation to District.

The acceptance of the Donation requires approval by the Board of Education ("BOE") and is scheduled to be heard at the June 12 BOE meeting.  We anticipate that the BOE will favorably approve the acceptance of the Donation.

Please feel free to contact me if you have any questions.

Regards,

Al Graziol

Al Graziol

Asset Development Director

Cc:    Mr. Hiro Kobayashi

Donna Kanemaru

**DEPARTMENT OF
CITY PLANNING**

CITY PLANNING COMMISSION

DAVID H. J. AMBROZ
PRESIDENT

RENEE DAKE WILSON
VICE-PRESIDENT

CAROLINE CHOE
VAHID KHORSAND
SAMANTHA MILLMAN
MARC MITCHELL
VERONICA PADILLA-CAMPOS
DANA M. PERLMAN
VACANT

ROCKY WILES
COMMISSION OFFICE MANAGER
(213) 978-1300

# CITY OF LOS ANGELES
CALIFORNIA



ERIC GARCETTI
MAYOR

**EXECUTIVE OFFICES**
200 N. SPRING STREET, ROOM 525
LOS ANGELES, CA 90012-4801

VINCENT P. BERTONI, AICP
DIRECTOR
(213) 978-1271

KEVIN J. KELLER, AICP
EXECUTIVE OFFICER
(213) 978-1273

LISA M. WEBBER, AICP
DEPUTY DIRECTOR
(213) 978-1274

http://planning.lacity.org

May 14, 2018

The Honorable City Council
City of Los Angeles
City Hall, Room 395
Los Angeles, California 90012

Dear Honorable Members:

**CONSIDERATION OF PROPOSED PROJECT AT 3568 SOUTH MOTOR AVENUE (CASE
NO. DIR-2016-4880-DB, ENV-2016-4881-CE) FOR CEQA EXEMPTION AS A SUSTAINABLE
COMMUNITIES PROJECT; CF 17-1394**

**CASE NO.**: DIR-2016-4880-DB; ENV-2016-4881-CE
**PROJECT NAME**: 3568 Motor
**PROJECT APPLICANT**: Hiro Kobayashi, 3568 Motor LLC
**PROJECT LOCATION/ADDRESS**: 3558-3570 S. Motor Ave.; 10313 W. Tabor St.
**COMMUNITY PLANNING AREA**: Palms-Mar Vista-Del Rey
**COUNCIL DISTRICT**: 5

On September 1, 2017, the Director of Planning approved Case No. DIR-2016-4880-DB for a
mixed-use project located at 3568 Motor Avenue in the Palms – Mar Vista – Del Rey
Community Plan. Pursuant to Los Angeles Municipal Code (LAMC) Section 12.22 A.25, the
project was approved for Density Bonus and Affordable Housing Incentives for a 32.5 percent
increase in the allowable Floor Area Ratio (FAR) allowing a total FAR of 1.98:1 in lieu of the
normal maximum of 1.5:1, in consideration of providing 10 percent (or 4 dwelling units) of the
base dwelling units restricted to Very Low Income household occupancy.

The proposed Project involves the demolition of an existing one-story, three-unit, 6,768 square-
foot commercial building, and the construction, operation, and maintenance of a new six-story,
42-unit, mixed-use development containing 38 market rate units, 4 Very Low Income units, and
1,770 square feet of ground-floor retail. The Project proposes five residential levels over one
level of at-grade parking and commercial uses, and one level of subterranean parking, with a
total of 54 parking spaces. The total Project size is 29,807 square feet with a height of 72 feet
and 7 inches. Two non-protected trees will be removed. The project also involves a haul route
for the export of 6,000 cubic yards of dirt.

EX 7

The Honorable City Council
CF 17-1394
Page 2

The Director of Planning determined, based on the whole of the administrative record, the project is exempt from the California Environmental Quality Act (CEQA) pursuant to State CEQA Guidelines Article 19, Sections 15304 (Class 4) and 15332 (Class 32), and City CEQA Guidelines Article III, Section 1, Class 4 Category 1, and there is no substantial evidence demonstrating that an exception to a categorical exemption pursuant to CEQA Guidelines, Section 15300.2 applies. Justification for the categorical exemption was made under environmental Case No. ENV-2016-4881-CE.

On May 11, 2018, the applicant submitted a request for the City to consider whether the Project is exempt under Public Resources Code ("PRC") Section 21155.1 as a Sustainable Communities Project. The Sustainable Communities Project ("SCP") Exemption was adopted into State Law as part of Senate Bill 375 (2008), the Sustainable Communities and Climate Protection Act. The request and supplemental materials are enclosed herein.

To qualify for a full CEQA exemption as a Sustainable Communities project, the project must meet the criteria indicated on the attached checklist. As explained therein, the proposed project meets all of the following requirements set forth in Section 21155.1:

1. The project is consistent with the general use designation, density, building intensity, and applicable policies in the Southern California Association of Governments' adopted Sustainable Communities Strategy.
2. The project is at least 50 percent residential use based on total building square footage.
3. The project is at least 20 units/acre.
4. The project is located within ½ mile of a major transit stop or high quality transit corridor included in SCAG's Regional Transportation Plan.
5. The project can be adequately served by existing utilities and the project applicant will pay the applicable in-lieu or development fees.
6. The project will not impact wetlands or other wildlife habitats or impact protected species.
7. The project site is not located on a list of facilities and sites compiled pursuant to Section 65962.5 of the Government Code.
8. The project site has been subject to a preliminary endangerment assessment to determine the existence of any release of hazardous substance on the site and to determine the potential for exposure of future occupants to significant health hazards.
9. The project will not have a significant impact on historical resources.
10. The project site is not subject to wildland fire hazards, high fire risk or explosion, risk of a public health exposure, seismic risk, or landslide or flood hazard.
11. The project site is not located on developed open space.
12. The project is 15 percent more efficient than Title 24 standards and designed to use 25 percent less water than the regional average household.
13. The project site is 8 acres or less in total area.
14. The project is 200 residential units or less.
15. The project will not result in any net loss in the number of affordable housing units.
16. The project does not include any single level building exceeding 75,000 square feet.
17. The project will incorporate any applicable mitigation measures or performance standards adopted in prior applicable EIRs.
18. The project would not conflict with nearby operating industrial uses.
19. The project site is located within 1/2 mile of a rail station included in the RTP or within 1/4 mile of a High Quality Transit Corridor included in the RTP.
20. The project meets the requirement that at least five percent of the housing will be available to very-low-income households and legal commitments are in place to ensure the continued availability of the affordable units for a 55-year period.

The Honorable City Council
CF 17-1394
Page 3

Therefore, based on the above, the City has determined that, pursuant to the CEQA Section
21155.1, the project is a Transit Priority Project that meets all the requirements to be declared a
Sustainable Communities Project and is therefore eligible for a full CEQA exemption.

The City recommends that City Council:

> *DETERMINE that based on the whole of the administrative record, the Project is exempt
> from CEQA pursuant to Public Resources Code, Section 21155.1; FIND the Project is a
> transit priority project pursuant to PRC Section 21155; FIND the Project is a sustainable
> communities project that meets all of the requirements of subdivisions (a) and (b) and one
> of the requirements of subdivision (c) of Section 21155.1.*

The attached checklist and documentation fully discusses the project's eligibility for the
exemption.

Sincerely,

VINCENT P. BERTONI, AICP
Director of Planning

*Debbie Lawrence*

DEBBIE LAWRENCE, AICP
Senior City Planner

VPB:DL:cc

Enclosures
    Sustainable Communities Project Checklist
    Attachments

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CITY OF LOS ANGELES et al., | B290036 |
| Petitioners, | (Super. Ct. No. BS171903) |
| v. | **O R D E R** |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | **COURT OF APPEAL - SECOND DIST.**<br>𝔽 𝕀 𝕃 𝔼 𝔻 |
| Respondent; | **MAY 1 7 2018** |
| S.G. a Minor, etc., et al., | JOSEPH A. LANE          Clerk |
| Real Parties in Interest. | _____ Deputy Clerk |

THE COURT:

The court has read and considered the petition for writ of mandate filed May 15, 2018. The petition is denied because the challenged order limits discovery to the issue of whether petitioners (real parties here) can be excused from an exhaustion-of-remedies requirement for purposes of opposing a demurrer.

LUI, P.J.                    CHAVEZ, J                    HOFFSTADT, J.

CX 8

# Glaser Weil

10250 Constellation Blvd,
19th Floor
Los Angeles, CA 90067
310.553.3000 TEL
310.556.2920 FAX

Elisa L. Pasier

May 18, 2018

Direct Dial
310.556.7855
Direct Fax
310.843.2655
Email
epasier@glaserweil.com

## VIA MESSENGER

Los Angeles City Council
Planning & Land Use Management Committee
200 North Spring Street
Los Angeles, California 90012
c/o Sharon Dickinson, Legislative Assistant

Re:     3568 Motor Project
        (Council File 17-1394; Case Nos. DIR-2016-4880-DB, ENV-2016-4881-CE)

Chair Huizar and Honorable Committee Members:

We represent 3568 Motor, LLC (the "Applicant"), the Applicant of a proposed
42-unit mixed-use building with 38 market rate units and four very low income units
(the "Project") located at 3568 Motor Avenue (the "Property"). We write to urge you
to reject Olu K. Orange's (the "Appellant") appeal (the "Appeal") of the California
Environmental Quality Act ("CEQA") approval for the Project.

On September 1, 2017, the Director of Planning ("Director") approved a density
bonus and floor area ratio incentive ("Density Bonus") for the Project. (Case No. DIR-
2016-4880-DB.) No timely appeal was filed to the Density Bonus, and it therefore
became final and effective on September 18, 2017.

On September 1, 2017, the Director also adopted a Class 32 (Infill Projects) and
a Class 4 (Minor Alterations to Land) Categorical Exemption ("Categorical Exemption")
in connection with the Project. (Case No. ENV-2016-4881-CE.) Appellant's challenge
of the Categorical Exemption is the only item pending before the City Council.

We respectfully urge the Planning and Land Use Committee of the City Council
("PLUM") to reject the Appeal because:

- The Project qualifies as a Sustainable Communities Project, and is
  therefore exempt from CEQA pursuant to California Public Resources
  Code Sections 21155 and 21155.1 (the "Sustainable Communities
  Exemption"). Therefore, the Appeal is without merit.

- Even if the Project were not exempt from CEQA, the Project creates no
  significant environmental impacts or health risks to the community;

MERITAS LAW FIRMS WORLDWIDE

1473777.4

Ex 9

Planning & Land Use Management Committee
May 18, 2018
Page 2

    o  Phase I and II studies, including in depth soil borings and testing,
      confirm the Property's soil does not contain hazardous materials;

    o  The Project would not exceed thresholds of significance at the
      Palms Elementary School (the "School") established by the South
      Coast Air Quality Management District, including the thresholds
      for cancer and for sensitive receptors;

    o  Project noise levels would be below City of Los Angeles ("City")
      and Los Angeles Unified School District ("LAUSD") thresholds for
      both construction and operational noise;

    o  The Applicant is donating $500,000 to move the kindergarten
      playground away from the School property line, to relocate some
      of the classrooms used by Deaf and Hard of Hearing Students to
      the north of the School property, to add insulation to those same
      classroom (some of which have little or no insulation now), and to
      build an eight-foot high wall at the School property line;

    o  Potential Project shade impacts would be avoided upon relocation
      of the kindergarten playground, but even if that relocation did
      not occur, any potential shade impacts are not considered a
      significant impact pursuant to Public Resources Code Section
      21099(d)(1); and

    o  The Project would not harm educational interests, which impacts
      are not physical impacts to the environment protected by CEQA.

   • The City complied with all procedural notice and hearing requirements
    in approving the Project.

   For all of the reasons set forth herein, we respectfully request that PLUM deny
the appeal and uphold the City's CEQA determination.

**I. The Project is Exempt From CEQA as a Sustainable Communities Project.**

   As detailed by the City's extensive findings, the Project is statutorily exempt
from CEQA pursuant to Public Resources Code Sections 21155 and 21155.1 (i.e. the
Sustainable Communities Exemption). Under the Sustainable Communities Exemption,
the Project is completely outside of CEQA's ambit, and, therefore, Appellant's
arguments regarding any deficiency in the City's CEQA process are immaterial.

   The findings and documentation submitted by the City to the PLUM Committee
demonstrate that the Project: a) qualifies as Transit Priority Project (as defined in

1473777.4

Planning & Land Use Management Committee
May 18, 2018
Page 3

Public Resources Code Section 21155(b)); and b) meets the extensive criteria for a
"Sustainable Communities Project" set forth in Public Resources Code Section
21155.1. The Project is a Transit Priority Project because it is a mixed-use project
with four units deed restricted as very low income housing units located within less
than one-half mile of regional transit at the Palms Expo Line Station (10021 National
Boulevard). The Project is exactly the type of mixed income, transit centric, mixed-
use infill project the California Legislature seeks to promote and contemplated to be
exempt from CEQA.

As such, we urge the PLUM Committee to adopt the required findings and
exempt the Project from CEQA as a Sustainable Communities Project pursuant to
Public Resources Code Sections 21155 and 21155.1.

## II. Even if the Project Were Not Statutorily Exempt From CEQA, Which It Is, No Significant Impacts or Health Risks Would Be Created By the Project.

The Project is statutorily exempt from CEQA, meaning that even if Appellant
could show that the Project created a significant impact, which it cannot, such
impact would not defeat the City's use of the exemption. The adoption of a statutory
exemption lifts the burden from certain projects - here, a mixed use project with
low-income units within a transit priority area - of showing that no significant impacts
would occur. The Legislature has deemed transit priority projects to be of statewide
importance, something that is obvious given our housing crisis in Los Angeles.

Even so, as discussed below, the Project would not create any significant
impact on the environment and Appellant's claims attempting to defeat the
categorical exemption previously adopted are without merit. No significant impacts
would occur and there are no unusual circumstances.

### A. Expert Analysis Confirms That The Soil At The Property Is Uncontaminated.

Phase I and II studies performed by experts found that the soil at the Property
contains no hazardous materials. Appellant's claim that the Applicant lied on its City
Planning application for the Project with regards to the existence of hazardous
materials in the soil is mere posturing and belied by substantial evidence.

In its application, the Applicant indicated the Property had not been
"developed with use that could release hazardous materials on soil and/or
groundwater (e.g. dry cleaning...)." (Department of City Planning Applications
("Application") filed December 23, 2016 and August 10, 2017.) This response is true
and correct as shown in the Phase I Environmental Site Assessment for the Property
dated July 16, 2015 (Phase I ESA, Exhibit A) and Phase II Soils Assessment Report for
the Property dated September 1, 2015 (Phase II, Exhibit B). According to historical

1473777.4

Planning & Land Use Management Committee
May 18, 2018
Page 4

research, including an interview with the prior Property owner and longtime area residents, no dry cleaners actually occupied the Property. (Exhibit A, Phase I at 37.) Rather, the Property was previously home to a coin laundry use, which at some point may have provided drop-off dry cleaning service. There is no evidence that actual dry cleaning occurred at the Property, despite Appellant's speculative claims otherwise. (*Id.*) In addition, the Phase I concluded no underground storage tanks or evidence that significant amounts of hazardous materials have ever been used on the Property. (*Id.* at 44.)

The Phase II was prepared in an abundance of caution to allay any concerns about the potential dry cleaning operation. The Phase II included three soil borings and two temporary subslab gas probes to search for any indication of hazardous materials associated with dry cleaning operations. (Exhibit B, Phase II at 2-3.) The soil samples were then analyzed for volatile organic compounds ("VOCs") in the lab in accordance with rigorous United States Environmental Protection Agency standards. (*Id.* at 3.) The results of the assessment did not detect concentrations of the targeted VOCs above their respective practical quantitation limits. (*Id.* at 3-4.) The Phase II concluded the Property has not been impacted by former dry cleaning operations. (*Id.* at 5.)

Therefore, contrary to Appellant's speculative claims, the Project would not create any hazardous conditions. Since Appellant's claim is not based on substantial evidence in the record, Appellant's allegations are unfounded and must be denied.

**B.      Expert Analysis Confirms That The Project Will Not Increase Air Quality Risks.**

A detailed air quality impact analysis prepared by Urban Crossroads (Air Quality Analysis, Exhibit C) directly contradicts Appellant's fear mongering about health risks to students, faculty and staff at the School. While not required by CEQA because of the Sustainable Communities Exemption, the Air Quality Analysis was undertaken to ensure all interested parties that the Project would not create potential health risks at the School.

The Air Quality Analysis studied potential regional and localized impacts associated with Project construction and operational impacts. The Air Quality Analysis also includes a Health Risk Assessment. All potential impacts were analyzed against the thresholds of significance established by the South Coast Air Quality Management District ("SCAQMD"). The Air Quality Analysis utilized the California Emissions Estimator Model ("CalEEMod") version 2016.3.2, which is the latest version of CalEEMod for purposes of calculating criteria pollutants (NOx, VOC, PM10, PM2.5, SOx, and CO). (Air Quality Analysis at 23.) The Air Quality Analysis concludes that Project construction and operational emissions would not exceed SCAQMD thresholds for any

1473777.4

Planning & Land Use Management Committee
May 18, 2018
Page 5

criteria pollutant, and thus a less than significant impact would occur and no
mitigation is required. (*Id.* at 26, 28.)

The Air Quality Analysis considered the localized impacts at the School's
nearest outdoor playground area and classroom building closest to the Project. The
nearest outdoor playground is approximately 79 feet northwest of the Project Site and
the closest classroom building is roughly 31 feet north. (*Id.* at 29.) The Air Quality
Analysis concluded even at these nearby sensitive receptors, emissions would not
exceed SCAQMD numerical thresholds for any criteria pollutant. (*Id.* at 32.) After
evaluating these two sensitive receptors, the Air Quality Analysis concluded that a
less than significant impact would occur and no mitigation is required. (*Id.* at 32.)

Unlike Appellant's speculative assertions, the Air Quality Analysis found, based
upon objective standards, that the Project's construction and operation would not
create a toxic air environment or greater risk of cancer. (*Id.* at 44.) Any emissions
would be short-term in nature and would not reach the level of a health risk, which is
generally considered over a 70-year exposure time. (*Id.* at 37.) Furthermore, even
when considering the localized sensitive receptors at the playground and School
building, the Air Quality Analysis concluded Project construction and operation would
not exceed SCAQMD significance thresholds. (*Id.* at 44.)

Appellant misplaces its reliance on a report by Dr. Paul Rosenfeld (the "SWAPE
Report") to support its argument that the Project will be harmful to the students and
employees at the School. The SWAPE Report does not conclude that the Project will
create impacts; it concludes that testing should be done to analyze potential impacts.
(SWAPE Report at 2.) As described above, such testing was done and found that the
Project's emissions would be below applicable thresholds. The SWAPE Report further
speculates - based solely on data from a totally different project - that impacts might
occur. (*Id.* at 4-5.) The Air Quality Analysis directly contradicts any and all of the
claims in the SWAPE Report.

Moreover, the SWAPE Report exaggerates the relationship between the
property line of the School and the Property. Specifically, it states that the Project is
on the "fence-line" of the kindergarten playground and "within yards" of the rest of
the School. In fact, the Property and the School are separated by an approximately
20-foot alley which divides both the north and east property lines of the Property
from the School. For all of these reasons, the SWAPE Report contains no relevant
information and Appellant's contentions are purely speculative.

In sum, the Project will not create risks for the School, and Appellant's
arguments should be denied.

1473777.4

Planning & Land Use Management Committee
May 18, 2018
Page 6

C.    Project Noise Levels Are Below City And LAUSD Thresholds.

A comprehensive noise impact analysis prepared by Urban Crossroads (Noise
Analysis, Exhibit D) pointedly disproves Appellant's claims about potential Project
noise impacts. Similar to the Air Quality Analysis, the Noise Analysis is not required
by CEQA because of the Sustainable Communities Exemption. Nevertheless, the Noise
Analysis was undertaken to ensure that the Project would not create potential noise
impacts at the School.

Like all infill developments in the City, the Project will be constructed in
compliance with the City's noise thresholds, and given the proximity of the School, in
accordance with LAUSD's thresholds. Specifically, Project construction would not
exceed noise levels of 5 dBA and 3 dBA above existing ambient noise levels at the
sensitive receiver locations at the School (see *Id.* at 41 for Receiver Locations).
Compliance with these thresholds would be achieved through adherence with the
City's Noise Ordinance by: 1) installation of a minimum 12-foot high temporary
construction noise barrier at the northern and eastern boundaries of the Project; and
2) restriction of shoring activities to a time period when the School is not in session.

In addition, the Project would implement best practices to further reduce
construction noise. During construction, equipment will be regularly maintained and
equipped with mufflers and staging will occur as far away from the School as
possible. (*Id.* at 5.) Construction and hauling activities would be limited to 7:00 am
to 9:00 pm on weekdays and 8:00 am to 6:00 pm on Saturday. To lessen potential
noise and vibration, shoring activities will be restricted to when School is not in
session. (*Id.* at 4, 42, 46.) It is also important to note that the sensitive receptors at
the School are not considered sensitive receptors when the School is out of session,
and only then will shoring activities take place.

To reduce long term operational noise, a permanent eight-foot concrete block
wall will be constructed at the School property line. (*Id.* at 36, 39.) A daytime
operation noise level increase of up to 0.2 dBA $L_{eq}$ is expected, which increase would
likely not be perceived at the School. Any increase would also be overshadowed by
existing and future traffic noise sources in the area, and is well below the City's and
LAUSD's threshold of significance.

The Appeal alleges harm to students in the School's Deaf and Hard of Hearing
("DHH") program, but fails to cite any particulars as to appropriate noise thresholds
or evidence that the Project would exceed permitted standards for these students.
In fact, LAUSD has no special thresholds for DHH students. (Letter from LAUSD;
Exhibit E).

Moreover, the Applicant is donating $500,000 to LAUSD to minimize disruption
to these children. Amongst other things, that money will be used to relocate the

1473777.4

Planning & Land Use Management Committee
May 18, 2018
Page 7

kindergarten playground away from the School's property line, to move the DHH students to the northern portion of the School property, and to insulate the DHH classrooms. These changes will actually improve the sound attenuation for these children, above and beyond what is in place now.

Therefore, Appellant's concerns about potential noise impacts are without merit and the Appeal should be denied.

**D.     The Project's Potential Shade Impacts Are Exempt From Review Pursuant To Senate Bill 743.**

Contrary to the plain language of Senate Bill ("SB 743"), Appellant claims the Project violates the City's CEQA shade thresholds and that this should have precluded the City from exempting the Project from CEQA. This argument must fail because SB 743 amended CEQA to provide that aesthetic impacts, which include shade impacts, of mixed-use projects on an urban infill site within a transit priority area "shall not be considered significant impacts on the environment." (Pub. Res. Code Section 21099(d)(1).) The Property is an infill site because it is located in an urban area and was previously developed with commercial uses. (Pub. Res. Code Section 21099(a)(4).) The Property is in a Transit Priority Area because it is within one-half mile of the Palms Expo Line Station (10021 National Boulevard). (Pub. Res. Code Section 21099(a)(7).)

The City's identification of the Property in a Transit Priority Zone is confirmed by the City's Zoning Information File No. 2451 ("ZI") dated February 10, 2016, which defines the locations of Transit Priority Areas within the City. The ZI also reaffirmed that aesthetic impacts shall not be considered a significant impact on the environment when the provisions of SB 743 apply. Accordingly, potential shade impacts associated with the Project are not considered significant because aesthetic impacts in a Transit Priority Area are not considered to be impacts under CEQA.

Notwithstanding, the Applicant is sensitive to potential shade on a small portion of the kindergarten playground (located on the School's southern property line) that may result from implementation of the Project. While not required by State law or City code, the Applicant is working collaboratively with the LAUSD to decrease or eliminate any potential shading to the kindergarten playground. The Applicant is donating $500,000 to LAUSD for improvements at the School, including relocation of the playground away from its existing location. (Playground Relocation Plan, Exhibit F.) Thus, even though potential shade impacts are exempt from review, the Applicant has gone above and beyond to eliminate any potential shade impacts to the School.

Planning & Land Use Management Committee
May 18, 2018
Page 8

### E. The Project Will Not Impact Educational Interests, Which Are Not Environmental Impacts Studied Under CEQA.

The Applicant recognizes the sensitive nature of building the Project in close proximity to the School. That is why it has engaged with the School's principal and LAUSD administration for many months and has been in regular communication with LAUSD. In its letter dated May 11, 2018, LAUSD confirmed that Applicant had been working closely with the school to implement needed safety measures. The Applicant's intention is to follow LAUSD's recommendations. As a conscientious neighbor, the Applicant is taking extraordinary measures to reduce potential construction impacts.

Furthermore, what is before the PLUM Committee is a question of environmental impacts, all of which have been shown to be less than significant. The "educational interests" raised by Appellant are outside of CEQA's scope; CEQA does not require the study of social and educational impacts. (*Citizen Action To Serve All Students v. Thornley* (1990) 222 Cal. App. 3d 748, 758 (holding that the social and academic impact on students from a school closing were not cognizable significant environmental impacts under CEQA). Being outside of CEQA, such issues are also outside the proper scope of the Appeal.

### F. While Important, the Rights of Disabled Persons Is Not A CEQA Consideration.

Appellant's claims regarding the rights of individuals with disabilities are not issues properly raised in a CEQA appeal. Indeed, Appellant's own letter recognizes the central flaw in his claim. While there are a myriad of federal and state laws that protect the rights of disabled persons, CEQA is not one of them. CEQA focuses on physical changes to the environment. (CEQA Guidelines Section 15358(b).) Therefore, these arguments are an invalid basis for upholding the Appeal and must be denied.

### III. The City Approved The Project By Following All Procedural Requirements.

The City followed the procedures set forth in the Los Angeles Municipal Code ("LAMC") and state law in approving the Density Bonus and adopting the Categorical Exemption. Appellant's argument that the City violated procedural due process rights is not grounded in law or fact; it is based solely on Appellant's dislike of the actual law because he was not entitled to notice and hearing. Appellant's opinion is not a sufficient grounds to uphold the Appeal.

The Appellant failed to file an appeal to the Density Bonus within the allowable appeal period, and the Density Bonus decision is final. However, so there can be no question as to the propriety of the City's actions in adopting the Density Bonus, we shall briefly outline the extent to which the City afforded the public with all required

Planning & Land Use Management Committee
May 18, 2018
Page 9

due process protections required under the law. The LAMC requires the following
procedures for approval of a density bonus:

- ✓ The Director shall be the initial decisionmaker for density bonus
  applications seeking on menu incentives, as was the case here. (LAMC
  Section 12.22.A.25(g)(2)(i)b.)

- ✓ The Director shall approve the density bonus unless the Director can make
  certain findings. (LAMC Section 12.22.A.25(g)(2)(i)c.) These findings were
  inapplicable to the Project.

- ✓ No hearing is required. (LAMC Section 12.22.A.25(g); Gov't Code Section
  65915(a)(3) [authorizing local governments to adopt procedures and
  timelines for processing a density bonus application].) Despite Appellant's
  protestations, there is nothing in the LAMC or the Government Code that
  requires a hearing to be held for a density bonus project. In fact, the
  Government Code and LAMC mandate approval of density bonus projects
  which comply with applicable standards.

- ✓ The City shall provide a copy of the Director's written determination to the
  project, to all owners of properties abutting, across the street or alley
  from, or having a common corner with the subject property, and to the
  local Certified Neighborhood Council. (LAMC Section 12.22.A.25(g)(2)(i)d.)
  Here, the Director's written determination was mailed to parties entitled to
  notice on or about September 1, 2017

- ✓ There is a 15 day appeal period for the Director's Determination. The
  applicant or any owner or tenant of a property across the street or alley
  from, or having a common corner with the subject property, may appeal.
  (LAMC Section 12.22.A.25(g)(2)(i)e,f.) Here, while the LAMC provides a 15
  calendar day appeal period, potential appellants were given 17 days to
  appeal (from September 1, 2017 until September 18, 2017). September 18,
  2017 came and went without an appeal. In fact, this Appeal was not sent to
  the City until December 12, 2017, almost three months after expiration of
  the appeal period.

Appellant's real bone of contention is that Appellant himself did not receive
notice. He claims that the City's procedures, themselves, violate due process
protections. Yet, Appellant has provided no evidence that the City's actions would
abrogate anyone's fundamental rights. Instead, Appellant makes speculative claims
about the impacts of the Project. The Applicant is sensitive to the Project site's
proximity to the School, which is why it is working closely with LAUSD to minimize any
potential disruptions. This includes the donation of $500,000 to move the
kindergarten playground away from the School property line, to relocate the

1473777.4

Planning & Land Use Management Committee
May 18, 2018
Page 10

classrooms used by DHH students to the north of the School property, to add
insulation to those same classrooms (some of which have little or no insulation now),
and to build a eight-foot high wall at the School property line. These changes will
improve the environment for children at the School. No violation of fundamental
rights has been shown by Appellant, nor does any exist.

For all of the reasons set forth herein, we urge you to deny the Appeal and
allow the Project to move forward. The Project is a mixed-use housing project with
affordable units in a Transit Priority Area. During this critical housing shortage, we
urge you to allow this Project to move forward in accordance with the priorities in
City and state policies.

Sincerely yours,

ELISA L. PASTER
of GLASER WEIL FINK HOWARD AVCHEN & SHAPIRO LLP

ELP:ep

CC:  Faisal Alserri, Director of Planning and Land Use, Council District 5
     Connie Chauv, City Planning Associate, Department of City Planning

1473777.4



## 3568 Motor Avenue
### AIR QUALITY IMPACT ANALYSIS
### CITY OF LOS ANGELES

PREPARED BY:

Haseeb Qureshi
hqureshi@urbanxroads.com
(949) 336-5987

Alyssa Tamase
atamase@urbanxroads.com
(949) 336-5988

MAY 4, 2018

11469-03 AQ Report

*3568 Motor Avenue Air Quality Impact Analysis*

# TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................................I
APPENDICES .........................................................................................................................II
LIST OF EXHIBITS..................................................................................................................III
LIST OF TABLES ....................................................................................................................III
LIST OF ABBREVIATED TERMS.............................................................................................IV
EXECUTIVE SUMMARY ........................................................................................................1

    Construction-Source Emissions ........................................................................................1
    Operational-Source Emissions..........................................................................................1

1     INTRODUCTION .........................................................................................................3

    1.1    Site Location...............................................................................................................3
    1.2    Project Description ....................................................................................................3
    1.3    Standard Regulatory Requirements/Best Available Control Measures (BACMs)........3
    1.4    Construction-Source Mitigation Measures .................................................................4
    1.5    Operational-Source Mitigation Measures ...................................................................4

2     AIR QUALITY SETTING.................................................................................................8

    2.1    South Coast Air Basin.................................................................................................8
    2.2    Regional Climate .......................................................................................................8
    2.3    Wind Patterns and Project Location .........................................................................10
    2.4    Existing Air Quality ..................................................................................................10
    2.5    Regional Air Quality .................................................................................................13
    2.6    Local Air Quality ......................................................................................................13
    2.7    Regulatory Background.............................................................................................18

3     PROJECT AIR QUALITY IMPACT .................................................................................22

    3.1    Introduction .............................................................................................................22
    3.2    Standards of Significance .........................................................................................22
    3.3    Project-Related Sources of Potential Impact ............................................................23
    3.4    Construction Emissions ............................................................................................23
    3.5    Operational Emissions .............................................................................................26
    3.6    Localized Significance - Construction Activity............................................................28
    3.7    Localized Significance – Long-Term Operational Activity ...........................................33
    3.8    CO "Hot Spot" Analysis ............................................................................................33
    3.9    Air Quality Management Planning............................................................................35
    3.10   Toxic Air Pollutants During Project Construction and Operations..............................37
    3.11   Potential Impacts to Sensitive Receptors .................................................................44
    3.12   Odors.......................................................................................................................45
    3.13   Cumulative Impacts .................................................................................................45

4     FINDINGS & CONCLUSIONS.......................................................................................47

    4.1    Construction-Source Emissions................................................................................47
    4.2    Operational-Source Emissions .................................................................................47

5     REFERENCES .............................................................................................................49
6     CERTIFICATION.........................................................................................................51

# APPENDICES

**APPENDIX 3.1: STATE/FEDERAL ATTAINMENT STATUS OF CRITERIA POLLUTANTS**
**APPENDIX 3.2: CALEEMOD CONSTRUCTION EMISSIONS MODEL OUTPUTS**
**APPENDIX 3.3: CALEEMOD OPERATIONAL EMISSIONS MODEL OUTPUTS**
**APPENDIX 3.4: RISK CALCULATION AND AERMOD OUTPUTS**

URBAN
CROSSROADS

## LIST OF EXHIBITS

EXHIBIT 1-A:  LOCATION MAP ...................................................................................................5
EXHIBIT 1-B:  SITE PLAN........................................................................................................6
EXHIBIT 3-A:  RECEIVER LOCATIONS ......................................................................................30
EXHIBIT 3-B:  MODELED SOURCES AND RECEPTORS FOR HRA ..............................................41

## LIST OF TABLES

TABLE 2-1: AMBIENT AIR QUALITY STANDARDS (1 OF 2).......................................................11
TABLE 2-1: AMBIENT AIR QUALITY STANDARDS (2 OF 2)........................................................12
TABLE 2-2: ATTAINMENT STATUS OF CRITERIA POLLUTANTS IN THE SOUTH COAST AIR BASIN (SCAB) 13
TABLE 2-3: PROJECT AREA AIR QUALITY MONITORING SUMMARY 2014-2016.........................14
TABLE 3-1: MAXIMUM DAILY EMISSIONS THRESHOLDS (1 OF 2) ...........................................22
TABLE 3-1: MAXIMUM DAILY EMISSIONS THRESHOLDS (2 OF 2) ...........................................23
TABLE 3-2: CONSTRUCTION DURATION........................................................................................25
TABLE 3-3: EQUIPMENT LIST..................................................................................................25
TABLE 3-4: MAXIMUM DAILY CONSTRUCTION EMISSIONS SUMMARY....................................26
TABLE 3-5: MAXIMUM DAILY OPERATIONAL EMISSIONS SUMMARY .....................................28
TABLE 3-6: MAXIMUM DAILY DISTURBED-ACREAGE...............................................................32
TABLE 3-7: LOCALIZED SIGNIFICANCE SUMMARY CONSTRUCTION (1 OF 2) .........................33
TABLE 3-8: CO MODEL RESULTS .............................................................................................35
TABLE 3-9: TRAFFIC VOLUMES ..............................................................................................35
TABLE 3-10:  SUMMARY OF RISK ATTRIBUTABLE TO PROJECT CONSTRUCTION ....................44



## LIST OF ABBREVIATED TERMS

| (1) | Reference |
|---|---|
| µg/m3 | Microgram per Cubic Meter |
| AADT | Annual Average Daily Trips |
| AQIA | Air Quality Impact Analysis |
| AQMD | Air Quality Management District |
| AQMP | Air Quality Management Plan |
| ARB | California Air Resources Board |
| BACM | Best Available Control Measures |
| CAA | Federal Clean Air Act |
| CAAQS | California Ambient Air Quality Standards |
| CalEEMod | California Emissions Estimator Model |
| Caltrans | California Department of Transportation |
| CAPCOA | California Air Pollution Control Officers Association |
| CARB | California Air Resources Board |
| CCR | California Code of Regulations |
| CEQA | California Environmental Quality Act |
| CFR | Code of Federal Regulations |
| CO | Carbon Monoxide |
| DPM | Diesel Particulate Matter |
| EPA | Environmental Protection Agency |
| LST | Localized Significance Threshold |
| NAAQS | National Ambient Air Quality Standards |
| NO2 | Nitrogen Dioxide |
| NOx | Oxides of Nitrogen |
| Pb | Lead |
| PM10 | Particulate Matter 10 microns in diameter or less |
| PM2.5 | Particulate Matter 2.5 microns in diameter or less |
| PPM | Parts Per Million |
| Project | 3568 Motor Avenue |
| ROG | Reactive Organic Gases |
| SCAB | South Coast Air Basin |
| SCAQMD | South Coast Air Quality Management District |
| SIPs | State Implementation Plans |
| SRA | Source Receptor Area |
| TAC | Toxic Air Contaminant |
| TIA | Traffic Impact Analysis |

URBAN
CROSSROADS

| TOG | Total Organic Gases |
|-----|---------------------|
| VMT | Vehicle Miles Traveled |
| VOC | Volatile Organic Compounds |
| VPH | Vehicles Per Hour |



*This page intentionally left blank*

## EXECUTIVE SUMMARY

### CONSTRUCTION-SOURCE EMISSIONS

#### REGIONAL IMPACTS

For regional emissions, the Project would not exceed the numerical thresholds of significance
established by the South Coast Air Quality Management District (SCAQMD). Thus a less than
significant impact would occur for Project-related construction-source emissions and no
mitigation is required.

#### LOCALIZED IMPACTS

For localized emissions, the Project would not exceed the SCAQMD's localized significance
threshold. Thus a less than significant impact would occur and no mitigation is required.

Project construction-source emissions would not conflict with the applicable Air Quality
Management Plan (AQMP).

#### ODORS

Established requirements addressing construction equipment operations, and construction
material use, storage, and disposal requirements act to minimize odor impacts that may result
from construction activities. Moreover, construction-source odor emissions would be
temporary, short-term, and intermittent in nature and would not result in persistent impacts
that would affect substantial numbers of people. Potential construction-source odor impacts
are therefore considered less-than-significant.

### OPERATIONAL-SOURCE EMISSIONS

#### REGIONAL IMPACTS

For regional emissions, the Project would not exceed the numerical thresholds of significance
established by the SCAQMD. Thus, a less than significant impact would occur for Project-related
operational-source emissions and no mitigation is required.

#### LOCALIZED IMPACTS

Project operational-source emissions would not result in or cause a significant localized air
quality impact as discussed in the operational LSTs section of this report. The proposed Project
would not result in a significant CO "hotspot" as a result of Project related traffic during
ongoing operations, nor would the Project result in a significant adverse health impact as
discussed in Section 3.8, thus a less than significant impact to sensitive receptors during
operational activity is expected.



## ODORS

Substantial odor-generating sources include land uses such as agricultural activities, feedlots, wastewater treatment facilities, landfills or various heavy industrial uses. The Project does not propose any such uses or activities that would result in potentially significant operational-source odor impacts. Potential sources of operational odors generated by the Project would include disposal of miscellaneous residential refuse. Moreover, SCAQMD Rule 402 acts to prevent occurrences of odor nuisances (1). Consistent with City requirements, all Project-generated refuse would be stored in covered containers and removed at regular intervals in compliance with solid waste regulations. Potential operational-source odor impacts are therefore considered less-than-significant.

# 1    INTRODUCTION

This report presents the results of the air quality impact analysis (AQIA) prepared by Urban Crossroads, Inc., for the 3568 Motor Avenue (referred to as "Project").

The purpose of this AQIA is to evaluate the potential impacts to air quality associated with construction and operation of the proposed Project in response to an appeal filed to the California Environmental Qualiaty Act (CEQA) documentation prepared for the Project and recommend measures to mitigate impacts considered potentially significant in comparison to established regulatory thresholds.

## 1.1    SITE LOCATION

The proposed 3568 Motor Avenue Project is located at the northern corner of the intersection of Motor Avenue and Tabor Street in the City of Los Angeles, as shown on Exhibit 1-A. Existing residential and commercial/office land uses are located south, east, and west of the Project site, and Palms is located north of Project site boundary and is separated by a 20-foot wide alley.

## 1.2    PROJECT DESCRIPTION

The Project is proposed to include the development of 42 multi-family residential dwelling units and 1,800 square feet of retail use, as shown on Exhibit 1-B. For the purposes of this AQIA, it is assumed that the Project will be constructed and at full occupancy in 2020.

## 1.3    STANDARD REGULATORY REQUIREMENTS/BEST AVAILABLE CONTROL MEASURES (BACMs)

Measures listed below (or equivalent language) shall appear on all Project grading plans, construction specifications and bid documents, and the City shall ensure such language is incorporated prior to issuance of any development permits.

SCAQMD Rules that are currently applicable during construction activity for this Project include but are not limited to: Rule 1113 (Architectural Coatings) (2); Rule 431.2 (Low Sulfur Fuel); Rule 403 (Fugitive Dust) (3); and Rule 1186 / 1186.1 (Street Sweepers) (4). It should be noted that BACMs are not mitigation as they are standard regulatory requirements.

The following measures shall be incorporated into Project plans and specifications as implementation of Rule 403 (4):

- All clearing, grading, earth-moving, or excavation activities shall cease when winds exceed 25 mph per SCAQMD guidelines in order to limit fugitive dust emissions.
- The contractor shall ensure that all disturbed unpaved roads and disturbed areas within the Project are watered at least three (3) times daily during dry weather. Watering, with complete coverage of disturbed areas, shall occur at least three times a day, preferably in the mid-morning, afternoon, and after work is done for the day.
- The contractor shall ensure that traffic speeds on unpaved roads and Project site areas are reduced to 15 miles per hour or less.

3

### 1.4   CONSTRUCTION-SOURCE MITIGATION MEASURES

Project construction-source emissions will be less than significant. Therefore, no mitigation measures are required.

### 1.5   OPERATIONAL-SOURCE MITIGATION MEASURES

Project operational-source emissions will be less than significant. Therefore, no mitigation measures are required.

*3568 Motor Avenue Air Quality Impact Analysis*

**EXHIBIT 1-A: LOCATION MAP**



*3568 Motor Avenue Air Quality Impact Analysis*

**EXHIBIT 1-B: SITE PLAN**



*This page intentionally left blank*

## 2    AIR QUALITY SETTING

This section provides an overview of the existing air quality conditions in the Project area and region.

### 2.1    SOUTH COAST AIR BASIN

The Project site is located in the South Coast Air Basin (SCAB) within the jurisdiction of SCAQMD (5). The SCAQMD was created by the 1977 Lewis-Presley Air Quality Management Act, which merged four county air pollution control bodies into one regional district. Under the Act, the SCAQMD is responsible for bringing air quality in areas under its jurisdiction into conformity with federal and state air quality standards. As discussed above, the Project site is located within the South Coast Air Basin, a 6,745-square mile subregion of the SCAQMD, which includes portions of Los Angeles, Riverside, and San Bernardino Counties, and all of Orange County. The larger South Coast district boundary includes 10,743 square miles.

The SCAB is bound by the Pacific Ocean to the west and the San Gabriel, San Bernardino, and San Jacinto Mountains to the north and east. The Los Angeles County portion of the Mojave Desert Air Basin is bound by the San Gabriel Mountains to the south and west, the Los Angeles / Kern County border to the north, and the Los Angeles / San Bernardino County border to the east. The Riverside County portion of the Salton Sea Air Basin is bound by the San Jacinto Mountains in the west and spans eastward up to the Palo Verde Valley.

### 2.2    REGIONAL CLIMATE

The regional climate has a substantial influence on air quality in the SCAB. In addition, the temperature, wind, humidity, precipitation, and amount of sunshine influence the air quality.

The annual average temperatures throughout the SCAB vary from the low to middle 60s (degrees Fahrenheit). Due to a decreased marine influence, the eastern portion of the SCAB shows greater variability in average annual minimum and maximum temperatures. January is the coldest month throughout the SCAB, with average minimum temperatures of 47°F in downtown Los Angeles and 36°F in San Bernardino. All portions of the SCAB have recorded maximum temperatures above 100°F.

Although the climate of the SCAB can be characterized as semi-arid, the air near the land surface is quite moist on most days because of the presence of a marine layer. This shallow layer of sea air is an important modifier of SCAB climate. Humidity restricts visibility in the SCAB, and the conversion of sulfur dioxide to sulfates is heightened in air with high relative humidity. The marine layer provides an environment for that conversion process, especially during the spring and summer months. The annual average relative humidity within the SCAB is 71 percent along the coast and 59 percent inland. Since the ocean effect is dominant, periods of heavy early morning fog are frequent and low stratus clouds are a characteristic feature. These effects decrease with distance from the coast.

More than 90 percent of the SCAB's rainfall occurs from November through April. The annual average rainfall varies from approximately nine inches in Riverside to fourteen inches in downtown Los Angeles. Monthly and yearly rainfall totals are extremely variable. Summer rainfall usually consists of widely scattered thunderstorms near the coast and slightly heavier shower activity in the eastern portion of the SCAB with frequency being higher near the coast.

Due to its generally clear weather, about three-quarters of available sunshine is received in the SCAB. The remaining one-quarter is absorbed by clouds. The ultraviolet portion of this abundant radiation is a key factor in photochemical reactions. On the shortest day of the year there are approximately 10 hours of possible sunshine, and on the longest day of the year there are approximately 14 1/2 hours of possible sunshine.

The importance of wind to air pollution is considerable. The direction and speed of the wind determines the horizontal dispersion and transport of the air pollutants. During the late autumn to early spring rainy season, the SCAB is subjected to wind flows associated with the traveling storms moving through the region from the northwest. This period also brings five to ten periods of strong, dry offshore winds, locally termed "Santa Anas" each year. During the dry season, which coincides with the months of maximum photochemical smog concentrations, the wind flow is bimodal, typified by a daytime onshore sea breeze and a nighttime offshore drainage wind. Summer wind flows are created by the pressure differences between the relatively cold ocean and the unevenly heated and cooled land surfaces that modify the general northwesterly wind circulation over southern California. Nighttime drainage begins with the radiational cooling of the mountain slopes. Heavy, cool air descends the slopes and flows through the mountain passes and canyons as it follows the lowering terrain toward the ocean. Another characteristic wind regime in the SCAB is the "Catalina Eddy," a low level cyclonic (counterclockwise) flow centered over Santa Catalina Island which results in an offshore flow to the southwest. On most spring and summer days, some indication of an eddy is apparent in coastal sections.

In the SCAB, there are two distinct temperature inversion structures that control vertical mixing of air pollution. During the summer, warm high-pressure descending (subsiding) air is undercut by a shallow layer of cool marine air. The boundary between these two layers of air is a persistent marine subsidence/inversion. This boundary prevents vertical mixing which effectively acts as an impervious lid to pollutants over the entire SCAB. The mixing height for the inversion structure is normally situated 1,000 to 1,500 feet above mean sea level.

A second inversion-type forms in conjunction with the drainage of cool air off the surrounding mountains at night followed by the seaward drift of this pool of cool air. The top of this layer forms a sharp boundary with the warmer air aloft and creates nocturnal radiation inversions. These inversions occur primarily in the winter, when nights are longer and onshore flow is weakest. They are typically only a few hundred feet above mean sea level. These inversions effectively trap pollutants, such as NOX and CO from vehicles, as the pool of cool air drifts seaward. Winter is therefore a period of high levels of primary pollutants along the coastline.

9

## 2.3   WIND PATTERNS AND PROJECT LOCATION

The distinctive climate of the Project area and the SCAB is determined by its terrain and geographical location. The Basin is located in a coastal plain with connecting broad valleys and low hills, bounded by the Pacific Ocean in the southwest quadrant with high mountains forming the remainder of the perimeter.

Wind patterns across the south coastal region are characterized by westerly and southwesterly on-shore winds during the day and easterly or northeasterly breezes at night. Winds are characteristically light although the speed is somewhat greater during the dry summer months than during the rainy winter season.

## 2.4   EXISTING AIR QUALITY

Existing air quality is measured at established SCAQMD air quality monitoring stations. Monitored air quality is evaluated and in the context of ambient air quality standards. These standards are the levels of air quality that are considered safe, with an adequate margin of safety, to protect the public health and welfare. National Ambient Air Quality Standards (NAAQS) and California Ambient Air Quality Standards (CAAQS) currently in effect, as well health effects of each pollutant regulated under these standards are shown in Table 2-1 (6) (7).

The determination of whether a region's air quality is healthful or unhealthful is determined by comparing contaminant levels in ambient air samples to the state and federal standards presented in Table 2-1. The air quality in a region is considered to be in attainment by the state if the measured ambient air pollutant levels for O3, CO, SO2, NO2, PM10, and PM2.5 are not equaled or exceeded at any time in any consecutive three-year period; and the federal standards (other than O3, PM10, PM2.5, and those based on annual averages or arithmetic mean) are not exceeded more than once per year. The O3 standard is attained when the fourth highest eight-hour concentration in a year, averaged over three years, is equal to or less than the standard. For PM10, the 24-hour standard is attained when the expected number of days per calendar year with a 24-hour average concentration above 150 $\mu g/m^3$ is equal to or less than one. For PM2.5, the 24 hour standard is attained when 98 percent of the daily concentrations, averaged over three years, are equal to or less than the standard.

**TABLE 2-1: AMBIENT AIR QUALITY STANDARDS (1 OF 2)**

## Ambient Air Quality Standards

| Pollutant | Averaging Time | California Standards [1] | | National Standards [2] | | |
|---|---|---|---|---|---|---|
| | | Concentration [3] | Method [4] | Primary [3,5] | Secondary [3,6] | Method [7] |
| Ozone (O₃)[8] | 1 Hour | 0.09 ppm (180 µg/m³) | Ultraviolet Photometry | — | Same as Primary Standard | Ultraviolet Photometry |
| | 8 Hour | 0.070 ppm (137 µg/m³) | | 0.070 ppm (137 µg/m³) | | |
| Respirable Particulate Matter (PM10)[9] | 24 Hour | 50 µg/m³ | Gravimetric or Beta Attenuation | 150 µg/m³ | Same as Primary Standard | Inertial Separation and Gravimetric Analysis |
| | Annual Arithmetic Mean | 20 µg/m³ | | — | | |
| Fine Particulate Matter (PM2.5)[9] | 24 Hour | — | Gravimetric or Beta Attenuation | 35 µg/m³ | Same as Primary Standard | Inertial Separation and Gravimetric / Beta Analysis 100 |
| | Annual Arithmetic Mean | 12 µg/m³ | | 12.0 µg/m³ | 15 µg/m³ | |
| Carbon Monoxide (CO) | 1 Hour | 20 ppm (23 mg/m³) | Non-Dispersive Infrared Photometry (NDIR) | 35 ppm (40 mg/m³) | — | Non-Dispersive Infrared Photometry (NDIR) |
| | 8 Hour | 9.0 ppm (10 mg/m³) | | 9 ppm (10 mg/m³) | — | |
| | 8 Hour (Lake Tahoe) | 6 ppm (7 mg/m³) | | — | — | |
| Nitrogen Dioxide (NO₂)[10] | 1 Hour | 0.18 ppm (339 µg/m³) | Gas Phase Chemiluminescence | 100 ppb (188 µg/m³) | — | Gas Phase Chemiluminescence |
| | Annual Arithmetic Mean | 0.030 ppm (57 µg/m³) | | 0.053 ppm (100 µg/m³) | Same as Primary Standard | |
| Sulfur Dioxide (SO₂)[11] | 1 Hour | 0.25 ppm (655 µg/m³) | Ultraviolet Fluorescence | 75 ppb (196 µg/m³) | — | Ultraviolet Fluorescence; Spectrophotometry (Pararosaniline Method) |
| | 3 Hour | — | | — | 0.5 ppm (1300 µg/m³) | |
| | 24 Hour | 0.04 ppm (105 µg/m³) | | 0.14 ppm (for certain areas)[11] | — | |
| | Annual Arithmetic Mean | — | | 0.030 ppm (for certain areas)[11] | — | |
| Lead[12,13] | 30 Day Average | 1.5 µg/m³ | Atomic Absorption | — | — | High Volume Sampler and Atomic Absorption |
| | Calendar Quarter | — | | 1.5 µg/m³ (for certain areas)[12] | Same as Primary Standard | |
| | Rolling 3-Month Average | — | | 0.15 µg/m³ | — | |
| Visibility Reducing Particles[14] | 8 Hour | See footnote 14 | Beta Attenuation and Transmittance through Filter Tape | | No | |
| Sulfates | 24 Hour | 25 µg/m³ | Ion Chromatography | | National | |
| Hydrogen Sulfide | 1 Hour | 0.03 ppm (42 µg/m³) | Ultraviolet Fluorescence | | Standards | |
| Vinyl Chloride[12] | 24 Hour | 0.01 ppm (26 µg/m³) | Gas Chromatography | | | |

See footnotes on next page ...

For more information please call ARB-PIO at (916) 322-2990.

California Air Resources Board (5/4/16)

## TABLE 2-1: AMBIENT AIR QUALITY STANDARDS (2 OF 2)

1. California standards for ozone, carbon monoxide (except 8-hour Lake Tahoe), sulfur dioxide (1 and 24 hour), nitrogen dioxide, and particulate matter (PM10, PM2.5, and visibility reducing particles), are values that are not to be exceeded All others are not to be equaled or exceeded. California ambient air quality standards are listed in the Table of Standards in Section 70200 of Title 17 of the California Code of Regulations.

2. National standards (other than ozone, particulate matter, and those based on annual arithmetic mean) are not to be exceeded more than once a year. The ozone standard is attained when the fourth highest 8-hour concentration measured at each site in a year, averaged over three years, is equal to or less than the standard. For PM10, the 24 hour standard is attained when the expected number of days per calendar year with a 24-hour average concentration above 150 µg/m³ is equal to or less than one. For PM2.5, the 24-hour standard is attained when 98 percent of the daily concentrations, averaged over three years, are equal to or less than the standard. Contact the U.S. EPA for further clarification and current national policies.

3. Concentration expressed first in units in which it was promulgated. Equivalent units given in parentheses are based upon a reference temperature of 25°C and a reference pressure of 760 torr. Most measurements of air quality are to be corrected to a reference temperature of 25°C and a reference pressure of 760 torr, ppm in this table refers to ppm by volume, or micromoles of pollutant per mole of gas.

4. Any equivalent measurement method which can be shown to the satisfaction of the ARB to give equivalent results at or near the level of the air quality standard may be used.

5. National Primary Standards: The levels of air quality necessary, with an adequate margin of safety to protect the public health.

6. National Secondary Standards: The levels of air quality necessary to protect the public welfare from any known or anticipated adverse effects of a pollutant.

7. Reference method as described by the U.S. EPA. An "equivalent method" of measurement may be used but must have a "consistent relationship to the reference method" and must be approved by the U.S. EPA.

8. On October 1, 2015, the national 8-hour ozone primary and secondary standards were lowered from 0.075 to 0.070 ppm.

9. On December 14, 2012, the national annual PM2.5 primary standard was lowered from 15 µg/m³ to 12.0 µg/m³. The existing national 24-hour PM2.5 standards (primary and secondary) were retained at 35 µg/m³, as was the annual secondary standard of 15 µg/m³. The existing 24-hour PM10 standards (primary and secondary) of 150 µg/m³ also were retained. The form of the annual primary and secondary standards is the annual mean, averaged over 3 years.

10. To attain the 1-hour national standard, the 3-year average of the annual 98th percentile of the 1-hour daily maximum concentrations at each site must not exceed 100 ppb, Note that the national 1-hour standard is in units of parts per billion (ppb). California standards are in units of parts per million (ppm). To directly compare the national 1-hour standard to the California standards the units can be converted from ppb to ppm. In this case, the national standard of 100 ppb is identical to 0.100 ppm.

11. On June 2, 2010, a new 1-hour SO₂ standard was established and the existing 24-hour and annual primary standards were revoked. To attain the 1-hour national standard, the 3-year average of the annual 99th percentile of the 1-hour daily maximum concentrations at each site must not exceed 75 ppb. The 1971 SO₂ national standards (24-hour and annual) remain in effect until one year after an area is designated for the 2010 standard, except that in areas designated nonattainment for the 1971 standards, the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standards are approved.

    Note that the 1-hour national standard is in units of parts per billion (ppb). California standards are in units of parts per million (ppm). To directly compare the 1-hour national standard to the California standard the units can be converted to ppm. In this case, the national standard of 75 ppb is identical to 0.075 ppm.

12. The ARB has identified lead and vinyl chloride as "toxic air contaminants" with no threshold level of exposure for adverse health effects determined. These actions allow for the implementation of control measures at levels below the ambient concentrations specified for those pollutants.

13. The national standard for lead was revised on October 15, 2008 to a rolling 3-month average. The 1978 lead standard (1.5 µg/m³ as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978 standard, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standard are approved.

14. In 1989, the ARB converted both the general statewide 10-mile visibility standard and the Lake Tahoe 30-mile visibility standard to instrumental equivalents, which are "extinction of 0.23 per kilometer" and "extinction of 0.07 per kilometer" for the statewide and Lake Tahoe Air Basin standards, respectively.

For more information please call ARB-PIO at (916) 322-2990                            California Air Resources Board (5/4/16)



12



## 2.5    REGIONAL AIR QUALITY

The SCAQMD monitors levels of various criteria pollutants at 38 permanent monitoring stations and 5 single-pollutant source Lead (Pb) air monitoring sites throughout the air district (8). In 2015, the federal and state ambient air quality standards (NAAQS and CAAQS) were exceeded on one or more days for ozone, PM10, and PM2.5 at most monitoring locations (9). No areas of the SCAB exceeded federal or state standards for NO2, SO2, CO, sulfates or lead. See Table 2-2 for attainment designations for the SCAB   (10). Appendix 3.2 provides geographic representation of the state and federal attainment status for applicable criteria pollutants within the SCAB.

**TABLE 2-2: ATTAINMENT STATUS OF CRITERIA POLLUTANTS IN THE SOUTH COAST AIR BASIN (SCAB)**

| Criteria Pollutant | State Designation | Federal Designation |
|---|---|---|
| Ozone - 1hour standard | Nonattainment | Nonattainment ("extreme") |
| Ozone - 8 hour standard | Nonattainment | Nonattainment ("extreme") |
| PM$_{10}$ | Nonattainment | Attainment (Maintenance) |
| PM$_{2.5}$ | Nonattainment | Nonattainment ("serious") |
| Carbon Monoxide | Attainment | Attainment (Maintenance) |
| Nitrogen Dioxide | Attainment | Unclassifiable/Attainment |
| Sulfur Dioxide | Attainment | Unclassifiable/Attainment |
| Lead[1] | Attainment | Nonattainment (Partial) |

Source: State/Federal designations were taken from http://www.arb.ca.gov/desig/adm/adm.htm
Note: See Appendix 3.2 for a detailed map of State/National Area Designations within the South Coast Air Basin

## 2.6    LOCAL AIR QUALITY

Relative to the Project site, the nearest long-term air quality monitoring site for Ozone (O$_3$), Carbon Monoxide (CO), and Nitrogen Dioxide (NO$_2$)is the South Coast Air Quality Management District Northwest Coastal LA County monitoring station (SRA 2), located approximately 3.37 miles northwest of the Project site. Data for Particulate Matter (PM$_{10}$) and Ultra-Fine Particulates (PM$_{2.5}$) was obtained from the Central LA monitoring station (SRA 1) 10.56 miles northeast of the Project site. It should be noted that the Central LA station was utilized in lieu of the Northwest Coastal LA County monitoring station only where data was not available from the nearest monitoring site.

The most recent three (3) years of data available is shown on Table 2-3 and identifies the number of days ambient air quality standards were exceeded for the study area, which is was considered to be representative of the local air quality at the Project site (11). Additionally,

---

[1] The Federal nonattainment designation for lead is only applicable towards the Los Angeles County portion of the SCAB.

data for SO2 has been omitted as attainment is regularly met in the South Coast Air Basin and few monitoring stations measure SO2 concentrations.

**TABLE 2-3: PROJECT AREA AIR QUALITY MONITORING SUMMARY 2014-2016**

| POLLUTANT | STANDARD | YEAR | | |
|---|---|---|---|---|
| | | 2014 | 2015 | 2016 |
| Ozone (O₃) | | | | |
| Maximum 1-Hour Concentration (ppm) | | 0.116 | 0.102 | 0.085 |
| Maximum 8-Hour Concentration (ppm) | | 0.094 | 0.072 | 0.073 |
| Number of Days Exceeding State 1-Hour Standard | > 0.09 ppm | 1.0 | 2.0 | 0 |
| Number of Days Exceeding State 8-Hour Standard | > 0.07 ppm | 6.0 | 3.0 | 2.0 |
| Number of Days Exceeding Federal 1-Hour Standard | > 0.12 ppm | 0 | 0 | 0 |
| Number of Days Exceeding Federal 8-Hour Standard | > 0.070 ppm | 5.0 | 2.0 | 2.0 |
| Number of Days Exceeding Health Advisory | ≥ 0.15 ppm | – | – | – |
| Carbon Monoxide (CO) | | | | |
| Maximum 1-Hour Concentration (ppm) | | 2.0 | 1.6 | 2.2 |
| Maximum 8-Hour Concentration (ppm) | | 1.3 | 1.4 | 1.1 |
| Number of Days Exceeding Federal 1-Hour Standard | > 35 ppm | – | – | – |
| Nitrogen Dioxide (NO₂)* | | | | |
| Maximum 1-Hour Concentration (ppm) | | 0.064 | 0.068 | 0.055 |
| Annual Arithmetic Mean Concentration (ppm) | | 0.013 | 0.012 | 0.012 |
| Number of Days Exceeding State 1-Hour Standard | > 0.18 ppm | – | – | – |
| Particulate Matter ≤ 10 Microns (PM₁₀) | | | | |
| Maximum 24-Hour Concentration (µg/m³) | | 87.0 | 88.0 | 67.0 |
| Annual Arithmetic Mean (µg/m³) | | 35.4 | 33.0 | 32.4 |
| Number of Samples | | 359.0 | 336.0 | 277.0 |
| Number of Samples Exceeding State Standard | > 50 µg/m³ | 32. | 26.0 | 18.0 |
| Number of Samples Exceeding Federal Standard | > 150 µg/m³ | 0 | 0 | 0 |
| Particulate Matter ≤ 2.5 Microns (PM₂.₅)* | | | | |
| Maximum 24-Hour Concentration (µg/m³) | | 59.9 | 56.4 | 44.4 |
| Annual Arithmetic Mean (µg/m³) | | 12.4 | 12.4 | 11.8 |
| Number of Samples Exceeding Federal 24-Hour Standard | > 35 µg/m³ | 6 | 7 | 2 |

– = data not available from SCAQMD or ARB; *Data from the Riverside County 2 monitoring station is only available up to year 2014. As such, data from the Lake Elsinore monitoring station is used for the year 2015.

Criteria pollutants are pollutants that are regulated through the development of human health based and/or environmentally based criteria for setting permissible levels. Criteria pollutants, their typical sources, and effects are identified below:

- Carbon Monoxide (CO): Is a colorless, odorless gas produced by the incomplete combustion of carbon-containing fuels, such as gasoline or wood. CO concentrations tend to be the highest during the winter morning, when little to no wind and surface-based inversions trap the pollutant at ground levels. Because CO is emitted directly from internal combustion engines, unlike ozone, motor vehicles operating at slow speeds are the primary source of CO in the Basin. The highest ambient CO concentrations are generally found near congested transportation corridors and intersections.

- Sulfur Dioxide (SO2): Is a colorless, extremely irritating gas or liquid. It enters the atmosphere as a pollutant mainly as a result of burning high sulfur-content fuel oils and coal and from chemical processes occurring at chemical plants and refineries. When SO2 oxidizes in the atmosphere, it forms sulfates (SO4). Collectively, these pollutants are referred to as sulfur oxides (SOX).

- Nitrogen Oxides (Oxides of Nitrogen, or NOx): Nitrogen oxides (NOx) consist of nitric oxide (NO), nitrogen dioxide (NO2) and nitrous oxide (N2O) and are formed when nitrogen (N2) combines with oxygen (O2). Their lifespan in the atmosphere ranges from one to seven days for nitric oxide and nitrogen dioxide, to 170 years for nitrous oxide. Nitrogen oxides are typically created during combustion processes, and are major contributors to smog formation and acid deposition. NO2 is a criteria air pollutant, and may result in numerous adverse health effects; it absorbs blue light, resulting in a brownish-red cast to the atmosphere and reduced visibility. Of the seven types of nitrogen oxide compounds, NO2 is the most abundant in the atmosphere. As ambient concentrations of NO2 are related to traffic density, commuters in heavy traffic may be exposed to higher concentrations of NO2 than those indicated by regional monitors.

- Ozone (O3): Is a highly reactive and unstable gas that is formed when volatile organic compounds (VOCs) and nitrogen oxides (NOX), both byproducts of internal combustion engine exhaust, undergo slow photochemical reactions in the presence of sunlight. Ozone concentrations are generally highest during the summer months when direct sunlight, light wind, and warm temperature conditions are favorable to the formation of this pollutant.

- PM10 (Particulate Matter less than 10 microns): A major air pollutant consisting of tiny solid or liquid particles of soot, dust, smoke, fumes, and aerosols. The size of the particles (10 microns or smaller, about 0.0004 inches or less) allows them to easily enter the lungs where they may be deposited, resulting in adverse health effects. PM10 also causes visibility reduction and is a criteria air pollutant.

- PM2.5 (Particulate Matter less than 2.5 microns): A similar air pollutant consisting of tiny solid or liquid particles which are 2.5 microns or smaller (which is often referred to as fine particles). These particles are formed in the atmosphere from primary gaseous emissions that include sulfates formed from SO2 release from power plants and industrial facilities and nitrates that are formed from NOX release from power plants, automobiles and other types of combustion sources. The chemical composition of fine particles highly depends on location, time of year, and weather conditions. PM2.5 is a criteria air pollutant.

- Volatile Organic Compounds (VOC): Volatile organic compounds are hydrocarbon compounds (any compound containing various combinations of hydrogen and carbon atoms) that exist in the ambient air. VOCs contribute to the formation of smog through atmospheric photochemical reactions and/or may be toxic. Compounds of carbon (also known as organic compounds) have different levels of reactivity; that is, they do not react at the same speed or do not form ozone to the same extent when exposed to photochemical processes. VOCs often have an odor, and some examples include gasoline, alcohol, and the solvents used in paints. Exceptions to the VOC designation include: carbon monoxide, carbon dioxide, carbonic acid, metallic carbides or



carbonates, and ammonium carbonate. VOCs are a criteria pollutant since they are a precursor to O3, which is a criteria pollutant. The SCAQMD uses the terms VOC and ROG (see below) interchangeably.

- **Reactive Organic Gases (ROG):** Similar to VOC, Reactive Organic Gases (ROG) are also precursors in forming ozone and consist of compounds containing methane, ethane, propane, butane, and longer chain hydrocarbons, which are typically the result of some type of combustion/decomposition process. Smog is formed when ROG and nitrogen oxides react in the presence of sunlight. ROGs are a criteria pollutant since they are a precursor to O3, which is a criteria pollutant. The SCAQMD uses the terms ROG and VOC (see previous) interchangeably.

- **Lead (Pb):** Lead is a heavy metal that is highly persistent in the environment. In the past, the primary source of lead in the air was emissions from vehicles burning leaded gasoline. As a result of the removal of lead from gasoline, there have been no violations at any of the SCAQMD's regular air monitoring stations since 1982. Currently, emissions of lead are largely limited to stationary sources such as lead smelters. It should be noted that the Project is not anticipated to generate a quantifiable amount of lead emissions. Lead is a criteria air pollutant.

Health Effects of Air Pollutants

Ozone

Individuals exercising outdoors, children, and people with preexisting lung disease, such as asthma and chronic pulmonary lung disease, are considered to be the most susceptible sub-groups for ozone effects. Short-term exposure (lasting for a few hours) to ozone at levels typically observed in Southern California can result in breathing pattern changes, reduction of breathing capacity, increased susceptibility to infections, inflammation of the lung tissue, and some immunological changes. Elevated ozone levels are associated with increased school absences. In recent years, a correlation between elevated ambient ozone levels and increases in daily hospital admission rates, as well as mortality, has also been reported. An increased risk for asthma has been found in children who participate in multiple sports and live in communities with high ozone levels.

Ozone exposure under exercising conditions is known to increase the severity of the responses described above. Animal studies suggest that exposure to a combination of pollutants that includes ozone may be more toxic than exposure to ozone alone. Although lung volume and resistance changes observed after a single exposure diminish with repeated exposures, biochemical and cellular changes appear to persist, which can lead to subsequent lung structural changes.

Carbon Monoxide

Individuals with a deficient blood supply to the heart are the most susceptible to the adverse effects of CO exposure. The effects observed include earlier onset of chest pain with exercise, and electrocardiograph changes indicative of decreased oxygen supply to the heart. Inhaled CO has no direct toxic effect on the lungs, but exerts its effect on tissues by interfering with oxygen transport and competing with oxygen to combine with hemoglobin present in the blood to form carboxyhemoglobin (COHb). Hence, conditions with an increased demand for oxygen supply can be adversely affected by exposure to CO. Individuals most at risk include fetuses,



patients with diseases involving heart and blood vessels, and patients with chronic hypoxemia (oxygen deficiency) as seen at high altitudes.

Reduction in birth weight and impaired neurobehavioral development have been observed in animals chronically exposed to CO, resulting in COHb levels similar to those observed in smokers. Recent studies have found increased risks for adverse birth outcomes with exposure to elevated CO levels; these include pre-term births and heart abnormalities.

Particulate Matter

A consistent correlation between elevated ambient fine particulate matter (PM10 and PM2.5) levels and an increase in mortality rates, respiratory infections, number and severity of asthma attacks and the number of hospital admissions has been observed in different parts of the United States and various areas around the world. In recent years, some studies have reported an association between long-term exposure to air pollution dominated by fine particles and increased mortality, reduction in life-span, and an increased mortality from lung cancer.

Daily fluctuations in PM2.5 concentration levels have also been related to hospital admissions for acute respiratory conditions in children, to school and kindergarten absences, to a decrease in respiratory lung volumes in normal children, and to increased medication use in children and adults with asthma. Recent studies show lung function growth in children is reduced with long term exposure to particulate matter.

The elderly, people with pre-existing respiratory or cardiovascular disease, and children appear to be more susceptible to the effects of high levels of PM10 and PM2.5.

Nitrogen Dioxide

Population-based studies suggest that an increase in acute respiratory illness, including infections and respiratory symptoms in children (not infants), is associated with long-term exposure to NO2 at levels found in homes with gas stoves, which are higher than ambient levels found in Southern California. Increase in resistance to air flow and airway contraction is observed after short-term exposure to NO2 in healthy subjects. Larger decreases in lung functions are observed in individuals with asthma or chronic obstructive pulmonary disease (e.g., chronic bronchitis, emphysema) than in healthy individuals, indicating a greater susceptibility of these sub-groups.

In animals, exposure to levels of NO2 considerably higher than ambient concentrations results in increased susceptibility to infections, possibly due to the observed changes in cells involved in maintaining immune functions. The severity of lung tissue damage associated with high levels of ozone exposure increases when animals are exposed to a combination of ozone and NO2.

Sulfur Dioxide

A few minutes of exposure to low levels of SO2 can result in airway constriction in some asthmatics, all of whom are sensitive to its effects. In asthmatics, increase in resistance to air flow, as well as reduction in breathing capacity leading to severe breathing difficulties, are



observed after acute exposure to SO2. In contrast, healthy individuals do not exhibit similar acute responses even after exposure to higher concentrations of SO2.

Animal studies suggest that despite SO2 being a respiratory irritant, it does not cause substantial lung injury at ambient concentrations. However, very high levels of exposure can cause lung edema (fluid accumulation), lung tissue damage, and sloughing off of cells lining the respiratory tract.

Some population-based studies indicate that the mortality and morbidity effects associated with fine particles show a similar association with ambient SO2 levels. In these studies, efforts to separate the effects of SO2 from those of fine particles have not been successful. It is not clear whether the two pollutants act synergistically or one pollutant alone is the predominant factor.

Lead

Fetuses, infants, and children are more sensitive than others to the adverse effects of Pb exposure. Exposure to low levels of Pb can adversely affect the development and function of the central nervous system, leading to learning disorders, distractibility, inability to follow simple commands, and lower intelligence quotient. In adults, increased Pb levels are associated with increased blood pressure.

Pb poisoning can cause anemia, lethargy, seizures, and death; although it appears that there are no direct effects of Pb on the respiratory system. Pb can be stored in the bone from early age environmental exposure, and elevated blood Pb levels can occur due to breakdown of bone tissue during pregnancy, hyperthyroidism (increased secretion of hormones from the thyroid gland) and osteoporosis (breakdown of bony tissue). Fetuses and breast-fed babies can be exposed to higher levels of Pb because of previous environmental Pb exposure of their mothers.

Odors

The science of odor as a health concern is still new. Merely identifying the hundreds of VOCs that cause odors poses a big challenge. Offensive odors can potentially affect human health in several ways. First, odorant compounds can irritate the eye, nose, and throat, which can reduce respiratory volume. Second, studies have shown that the VOCs that cause odors can stimulate sensory nerves to cause neurochemical changes that might influence health, for instance, by compromising the immune system. Finally, unpleasant odors can trigger memories or attitudes linked to unpleasant odors, causing cognitive and emotional effects such as stress.

## 2.7 REGULATORY BACKGROUND

### 2.7.1 FEDERAL REGULATIONS

The U.S. EPA is responsible for setting and enforcing the NAAQS for O3, CO, NOx, SO2, PM10, and lead (6). The U.S. EPA has jurisdiction over emissions sources that are under the authority of the federal government including aircraft, locomotives, and emissions sources outside state waters (Outer Continental Shelf). The U.S. EPA also establishes emission standards for vehicles



sold in states other than California. Automobiles sold in California must meet the stricter emission requirements of the CARB.

The Federal Clean Air Act (CAA) was first enacted in 1955, and has been amended numerous times in subsequent years (1963, 1965, 1967, 1970, 1977, and 1990). The CAA establishes the federal air quality standards, the NAAQS, and specifies future dates for achieving compliance (12). The CAA also mandates that states submit and implement State Implementation Plans (SIPs) for local areas not meeting these standards. These plans must include pollution control measures that demonstrate how the standards will be met.

The 1990 amendments to the CAA that identify specific emission reduction goals for areas not meeting the NAAQS require a demonstration of reasonable further progress toward attainment and incorporate additional sanctions for failure to attain or to meet interim milestones. The sections of the CAA most directly applicable to the development of the Project site include Title I (Non-Attainment Provisions) and Title II (Mobile Source Provisions). Title I provisions were established with the goal of attaining the NAAQS for the following criteria pollutants O3, NO2, SO2, PM10, CO, PM2.5, and lead. The NAAQS were amended in July 1997 to include an additional standard for O3 and to adopt a NAAQS for PM2.5. Table 3-1 (previously presented) provides the NAAQS within the basin.

Mobile source emissions are regulated in accordance with Title II provisions. These provisions require the use of cleaner burning gasoline and other cleaner burning fuels such as methanol and natural gas. Automobile manufacturers are also required to reduce tailpipe emissions of hydrocarbons and nitrogen oxides (NOx). NOx is a collective term that includes all forms of nitrogen oxides (NO, NO2, NO3) which are emitted as byproducts of the combustion process.

### 2.7.2 CALIFORNIA REGULATIONS

The CARB, which became part of the California EPA in 1991, is responsible for ensuring implementation of the California Clean Air Act (AB 2595), responding to the federal CAA, and for regulating emissions from consumer products and motor vehicles. The California CAA mandates achievement of the maximum degree of emissions reductions possible from vehicular and other mobile sources in order to attain the state ambient air quality standards by the earliest practical date. The CARB established the CAAQS for all pollutants for which the federal government has NAAQS and, in addition, establishes standards for sulfates, visibility, hydrogen sulfide, and vinyl chloride. However at this time, hydrogen sulfide and vinyl chloride are not measured at any monitoring stations in the SCAB because they are not considered to be a regional air quality problem. Generally, the CAAQS are more stringent than the NAAQS (7) (6).

Local air quality management districts, such as the SCAQMD, regulate air emissions from stationary sources such as commercial and industrial facilities. All air pollution control districts have been formally designated as attainment or non-attainment for each CAAQS.

Serious non-attainment areas are required to prepare air quality management plans that include specified emission reduction strategies in an effort to meet clean air goals. These plans are required to include:

- Application of Best Available Retrofit Control Technology to existing sources;

- Developing control programs for area sources (e.g., architectural coatings and solvents) and indirect sources (e.g. motor vehicle use generated by residential and commercial development);

- A District permitting system designed to allow no net increase in emissions from any new or modified permitted sources of emissions;

- Implementing reasonably available transportation control measures and assuring a substantial reduction in growth rate of vehicle trips and miles traveled;

- Significant use of low emissions vehicles by fleet operators;

- Sufficient control strategies to achieve a five percent or more annual reduction in emissions or 15 percent or more in a period of three years for ROGs, NOx, CO and PM10. However, air basins may use alternative emission reduction strategy that achieves a reduction of less than five percent per year under certain circumstances.

### 2.7.3 AIR QUALITY MANAGEMENT PLANNING

Currently, the NAAQS and CAAQS are exceeded in most parts of the SCAB for PM10, PM2.5, and ozone. In response, the SCAQMD has adopted a series of Air Quality Management Plans (AQMPs) to meet the state and federal ambient air quality standards (13). AQMPs are updated regularly in order to more effectively reduce emissions, accommodate growth, and to minimize any negative fiscal impacts of air pollution control on the economy. A detailed discussion on the AQMP and Project consistency with the AQMP is provided in Section 3.8.

URBAN
CROSSROADS

*This page intentionally left blank*

URBAN
CROSSROADS

# 3  PROJECT AIR QUALITY IMPACT

## 3.1  INTRODUCTION

The Project has been evaluated to determine if it will violate an air quality standard or contribute to an existing or projected air quality violation. Additionally, the Project has been evaluated to determine if it will result in a cumulatively considerable net increase of a criteria pollutant for which the SCAB is non-attainment under an applicable federal or state ambient air quality standard.  The significance of these potential impacts is described in the following section.

## 3.2  STANDARDS OF SIGNIFICANCE

The criteria used to determine the significance of potential Project-related air quality impacts are taken from the Initial Study Checklist in Appendix G of the State CEQA Guidelines (14 California Code of Regulations §§15000, et seq.). Based on these thresholds, a project would result in a significant impact related to air quality if it would (14):

- Conflict with or obstruct implementation of the applicable air quality plan.
- Violate any air quality standard or contribute to an existing or projected air quality violation.
- Result in a cumulatively considerable net increase of any criteria pollutant for which the project region is in non-attainment under an applicable federal or state ambient air quality standard (including releasing emissions, which exceed quantitative thresholds for ozone precursors).
- Expose sensitive receptors to substantial pollutant concentrations.
- Create objectionable odors affecting a substantial number of people.

The SCAQMD has also developed regional and localized significance thresholds for other regulated pollutants, as summarized at Table 3-1 (15). The SCAQMD's CEQA Air Quality Significance Thresholds (March 2015) indicate that any projects in the SCAB with daily emissions that exceed any of the indicated thresholds should be considered as having an individually and cumulatively significant air quality impact.

### TABLE 3-1: MAXIMUM DAILY EMISSIONS THRESHOLDS (1 OF 2)

| Pollutant | Construction | Operations |
|---|---|---|
| Regional Thresholds | | |
| NOx | 100 lbs/day | 55 lbs/day |
| VOC | 75 lbs/day | 55 lbs/day |
| PM10 | 150 lbs/day | 150 lbs/day |
| PM2.5 | 55 lbs/day | 55 lbs/day |
| Sox | 150 lbs/day | 150 lbs/day |
| CO | 550 lbs/day | 550 lbs/day |

| Lead | 3 lbs/day | 3 lbs/day |
|---|---|---|

**TABLE 3-1: MAXIMUM DAILY EMISSIONS THRESHOLDS (2 OF 2)**

| Pollutant | Construction | Operations |
|---|---|---|
| **Localized Thresholds** | | |
| NOx | 103 lbs/day (demolition and preconstruction) | N/A |
| | 103 lbs/day (shoring) | |
| | 103 lbs/day (excavation, soil export, and grading) | |
| CO | 562 lbs/day (demolition and preconstruction) | N/A |
| | 562 lbs/day (shoring) | |
| | 562 lbs/day (excavation, soil export, and grading) | |
| PM10 | 4 lbs/day (demolition and preconstruction) | N/A |
| | 4 lbs/day (shoring) | |
| | 4 lbs/day (excavation, soil export, and grading) | |
| PM2.5 | 3 lbs/day (demolition and preconstruction) | N/A |
| | 3 lbs/day (shoring) | |
| | 3 lbs/day (excavation, soil export, and grading) | |

### 3.3 PROJECT-RELATED SOURCES OF POTENTIAL IMPACT

Land uses such as the Project affect air quality through construction-source and operational-source emissions.

On October 17, 2017, the SCAQMD in conjunction with the California Air Pollution Control Officers Association (CAPCOA) and other California air districts, released the latest version of the California Emissions Estimator Model™ (CalEEMod™) v2016.3.2. The purpose of this model is to calculate construction-source and operational-source criteria pollutant (NOx, VOC, PM10, PM2.5, SOx, and CO) and greenhouse gas (GHG) emissions from direct and indirect sources; and quantify applicable air quality and GHG reductions achieved from mitigation measures (16). Accordingly, the latest version of CalEEMod™ has been used for this Project to determine construction and operational air quality emissions. Output from the model runs for both construction and operational activity are provided in Appendix 3.2 through Appendix 3.3.

### 3.4 CONSTRUCTION EMISSIONS

Construction activities associated with the Project will result in emissions of CO, VOCs, NOx, SOx, PM10, and PM2.5. Construction related emissions are expected from the following construction activities:

- Demolition and Preconstruction
- Shoring

URBAN CROSSROADS

- Excavation, Soil Export, and Grading
- Building Construction
- Paving
- Architectural Coating

Demolition activities for the Project was conducted on December 2017 through January 2018. Construction is expected to commence in June 2018 and will last through December 2020. Construction duration by phase is shown on Table 3-2. The construction schedule utilized in the analysis, shown in Table 3-1, represents a "worst-case" analysis scenario should construction occur any time after the respective dates since emission factors for construction decrease as time passes and the analysis year increases due to emission regulations becoming more stringent.[2]  The duration of construction activity was estimated based on CalEEMod model defaults and a 2020 opening year. The detailed summary of construction equipment, shown on Table 3-3, was estimated based on CalEEMod model defaults and past project experience. The site specific construction fleet may vary due to specific project needs at the time of construction. The duration of construction activity and associated equipment both represent a reasonable approximation of the expected construction fleet as required per CEQA guidelines. Please refer to specific detailed modeling inputs/outputs contained in Appendix 3.2 and 3.3 of this analysis.

Dust is typically a major concern during rough grading activities. Because such emissions are not amenable to collection and discharge through a controlled source, they are called "fugitive emissions". Fugitive dust emissions rates vary as a function of many parameters (soil silt, soil moisture, wind speed, area disturbed, number of vehicles, depth of disturbance or excavation, etc.). The CalEEMod model was utilized to calculate fugitive dust emissions resulting from this phase of activity. According to information provided by the client, the Project will require approximately 6,000 cubic yards of soil export.

The Project site required the demolition of a 4,768 square foot market, a 1,000 square foot laundry facility, and a 1,000 square foot Zumba dance studio. As such, demolition of the three building structures would produce approximately 6,768 square foot of building construction debris.

Construction emissions for construction worker vehicles traveling to and from the Project site, as well as vendor trips (construction materials delivered to the Project site) were estimated based on information CalEEMod model defaults.

---

[2] As shown in the California Emissions Estimator Model (CalEEMod) User's Guide Version 2013.2, Table 3.4 "OFFROAD Equipment Emission Factors" as the analysis year increases, emission factors for the same equipment pieces decrease due to the natural turnover of older equipment being replaced by newer less polluting equipment and new regulatory requirements.



*3568 Motor Avenue Air Quality Impact Analysis*

### TABLE 3-2: CONSTRUCTION DURATION

| Phase Name | Start Date | End Date | Days |
|---|---|---|---|
| Demolition and Preconstruction | 12/18/17 | 01/05/18 | 15 |
| Shoring | 06/08/2018 | 06/29/2018 | 16 |
| Excavation, Soil Export, and Grading | 06/30/2018 | 07/24/2018 | 17 |
| Building Construction | 07/25/2018 | 10/13/2020 | 580 |
| Paving | 10/14/2020 | 11/06/2020 | 18 |
| Architectural Coating | 11/07/2020 | 12/02/2020 | 18 |

### TABLE 3-3: EQUIPMENT LIST

| Phase Name | Equipment Type | Amount | Usage Hours |
|---|---|---|---|
| Demolition and Preconstruction | Concrete/Industrial Saws | 1 | 8 |
| | Excavators | 1 | 8 |
| Shoring | Crawler Tractors | 1 | 8 |
| | Other Construction Equipment[3] | 1 | 5 |
| Excavation, Soil Export, and Grading | Crawler Tractors | 1 | 8 |
| | Excavators | 1 | 8 |
| | Graders | 1 | 8 |
| Building Construction | Cranes | 1 | 0.5 |
| | Forklifts | 1 | 2 |
| | Generator Sets | 1 | 8 |
| | Other Construction Equipment | 1 | 8 |
| | Electric Welders | 1 | 1 |
| Paving | Crawler Tractors | 1 | 8 |
| | Other Construction Equipment | 1 | 8 |
| | Pavers | 1 | 8 |
| | Paving Equipment | 1 | 8 |
| | Rollers | 1 | 8 |
| Architectural Coating | Air Compressors | 1 | 8 |

---

[3] CalEEMod does not include certain types of equipment. Thus Other Construction Equipment will be used to represent the Drill Rig used during Shoring, the Man-Lift used during Building Construction, and the Cement Truck used during Paving activities.



### 3.4.1 CONSTRUCTION EMISSIONS SUMMARY

The SCAQMD Rules that are currently applicable during construction activity for this Project include but are not limited to: Rule 1113 (Architectural Coatings) (17), Rule 431.2 (Low Sulfur Fuel) (18); Rule 403 (Fugitive Dust) (19); and Rule 1186 / 1186.1 (Street Sweepers) (20). Notwithstanding, credit for BACMs AQ-1 (Rule 403) have been taken.

The estimated maximum daily construction emissions are summarized on Table 3-4. Detailed construction model outputs are presented in Appendix 3.2. Under the assumed scenarios, emissions resulting from the Project construction would not exceed numerical thresholds established by the SCAQMD for any criteria pollutant. Therefore, a less than significant impact would occur and no mitigation is required.

**TABLE 3-4: MAXIMUM DAILY CONSTRUCTION EMISSIONS SUMMARY**

| Year | Emissions (pounds per day) | | | | | |
|---|---|---|---|---|---|---|
| | VOC | NOx | CO | SOx | PM10 | PM2.5 |
| 2017 | 0.99 | 8.92 | 7.54 | 0.01 | 0.78 | 0.54 |
| 2018 | 3.13 | 67.37 | 19.28 | 0.16 | 4.77 | 1.84 |
| 2019 | 1.27 | 11.23 | 10.48 | 0.02 | 1.08 | 0.68 |
| 2020 | 16.22 | 19.76 | 14.51 | 0.03 | 1.08 | 0.90 |
| Maximum Daily Emissions | 16.22 | 67.37 | 19.28 | 0.16 | 4.77 | 1.84 |
| SCAQMD Regional Threshold | 75 | 100 | 550 | 150 | 150 | 55 |
| Threshold Exceeded? | NO | NO | NO | NO | NO | NO |

### 3.5 OPERATIONAL EMISSIONS

Operational activities associated with the proposed Project will result in emissions of VOC, NOx, CO, SOx, PM10, and PM2.5. Operational emissions would be expected from the following primary sources:

- Area Source Emissions
- Energy Source Emissions
- Mobile Source Emissions

### 3.5.1 AREA SOURCE EMISSIONS

#### Architectural Coatings

Over a period of time the buildings that are part of this Project will be subject to emissions resulting from the evaporation of solvents contained in paints, varnishes, primers, and other surface coatings as part of Project maintenance. The emissions associated with architectural coatings were calculated using the CalEEMod model.

#### Consumer Products

Consumer products include, but are not limited to detergents, cleaning compounds, polishes, personal care products, and lawn and garden products. Many of these products contain organic compounds which when released in the atmosphere can react to form ozone and other photochemically reactive pollutants. The emissions associated with use of consumer products were calculated based on defaults provided within the CalEEMod model.

#### Hearths/Fireplaces

The emissions associated with use of hearths/fireplaces were calculated based on assumptions provided in the CalEEMod model. The Project is required to comply with SCAQMD Rule 445, which prohibits the use of wood burning stoves and fireplaces in new development. In order to account for the requirements of this Rule, the unmitigated CalEEMod model estimates were adjusted to remove wood burning stoves and fireplaces. As the project is required to comply with SCAQMD Rule 445, the removal of wood burning stoves and fireplaces is not considered "mitigation" although it must be identified as such in CalEEMod in order to treat the case appropriately.

#### Landscape Maintenance Equipment

Landscape maintenance equipment would generate emissions from fuel combustion and evaporation of unburned fuel. Equipment in this category would include lawnmowers, shedders/grinders, blowers, trimmers, chain saws, and hedge trimmers used to maintain the landscaping of the Project. The emissions associated with landscape maintenance equipment were calculated based on assumptions provided in the CalEEMod model.

#### 3.5.2  ENERGY SOURCE EMISSIONS

#### Combustion Emissions Associated with Natural Gas and Electricity

Electricity and natural gas are used by almost every project. Criteria pollutant emissions are emitted through the generation of electricity and consumption of natural gas. However, because electrical generating facilities for the Project area are located either outside the region (state) or offset through the use of pollution credits (RECLAIM) for generation within the SCAB, criteria pollutant emissions from offsite generation of electricity is generally excluded from the evaluation of significance and only natural gas use is considered. The emissions associated with natural gas use were calculated using the CalEEMod model.

#### 3.5.3  MOBILE SOURCE EMISSIONS

#### Vehicles

Project operational (vehicular) impacts are dependent on both overall daily vehicle trip generation and the effect of the Project on peak hour traffic volumes and traffic operations in the vicinity of the Project. The Project related operational air quality impacts derive primarily from vehicle trips generated by the Project. Trip characteristics available from the report, Technical Traffic Evaluation for the Proposed Residential Project at 3558-3570 Motor Avenue



(Overland Traffic Consultants, Inc.) 2017 were utilized in this analysis (21). Weekend trip generation rates from The Institute of Transportation Engineers Trip Generation Handbook, 9th Edition were also used in the analysis.

### 3.5.4 OPERATIONAL EMISSIONS SUMMARY

The estimated operation-source emissions are summarized on Table 3-5. Detailed operation model outputs are presented in Appendix 3.3. Under the assumed scenarios, emissions resulting from the Project operations would not exceed the numerical thresholds established by the SCAQMD for any criteria pollutant. Therefore, a less than significant impact would occur and no mitigation is required.

### TABLE 3-5: MAXIMUM DAILY OPERATIONAL EMISSIONS SUMMARY

| Operational Activities – Summer Scenario | Emissions (pounds per day) | | | | | |
|---|---|---|---|---|---|---|
| | VOC | NO$_x$ | CO | SO$_x$ | PM$_{10}$ | PM$_{2.5}$ |
| Area Source | 11.53 | 0.91 | 24.84 | 0.05 | 3.23 | 3.23 |
| Energy Source | 0.03 | 0.26 | 0.16 | 0.00 | 0.02 | 0.02 |
| Mobile Source | 1.00 | 4.73 | 11.42 | 0.04 | 2.89 | 0.80 |
| Total Maximum Daily Emissions | 12.56 | 5.90 | 36.41 | 0.09 | 6.14 | 4.05 |
| SCAQMD Regional Threshold | 55 | 55 | 550 | 150 | 150 | 55 |
| Threshold Exceeded? | NO | NO | NO | NO | NO | NO |
| Operational Activities – Winter Scenario | Emissions (pounds per day) | | | | | |
| | VOC | NO$_x$ | CO | SO$_x$ | PM$_{10}$ | PM$_{2.5}$ |
| Area Source | 11.53 | 0.91 | 24.84 | 0.05 | 3.23 | 3.23 |
| Energy Source | 0.03 | 0.26 | 0.16 | 0.00 | 0.02 | 0.02 |
| Mobile Source | 0.95 | 4.80 | 10.87 | 0.04 | 2.89 | 0.80 |
| Total Maximum Daily Emissions | 12.51 | 5.98 | 35.87 | 0.09 | 6.14 | 4.05 |
| SCAQMD Regional Threshold | 55 | 55 | 550 | 150 | 150 | 55 |
| Threshold Exceeded? | NO | NO | NO | NO | NO | NO |

### 3.6 LOCALIZED SIGNIFICANCE - CONSTRUCTION ACTIVITY

#### BACKGROUND ON LOCALIZED SIGNIFICANCE THRESHOLD (LST) DEVELOPMENT

The analysis makes use of methodology included in the SCAQMD *Final Localized Significance Threshold Methodology* (Methodology) (19). The SCAQMD has established that impacts to air quality are significant if there is a potential to contribute or cause localized exceedances of the federal and/or state ambient air quality standards (NAAQS/CAAQS). Collectively, these are referred to as Localized Significance Thresholds (LSTs).

The significance of localized emissions impacts depends on whether ambient levels in the vicinity of any given project are above or below State standards. In the case of CO and NO2, if ambient levels are below the standards, a project is considered to have a significant impact if project emissions result in an exceedance of one or more of these standards. If ambient levels

URBAN CROSSROADS

already exceed a state or federal standard, then project emissions are considered significant if they increase ambient concentrations by a measurable amount. This would apply to PM10 and PM2.5; both of which are non-attainment pollutants.

LSTs were developed in response to environmental justice and health concerns raised by the public regarding exposure of individuals to criteria pollutants in local communities. To address the issue of localized significance, the SCAQMD adopted LSTs that show whether a project would cause or contribute to localized air quality impacts and thereby cause or contribute to potential localized adverse health effects. The analysis makes use of methodology included in the SCAQMD *Final Localized Significance Threshold Methodology* (LST Methodology) (22).

EMISSIONS CONSIDERED

SCAQMD's Methodology clearly states that "off-site mobile emissions from the Project should NOT be included in the emissions compared to LSTs (23)." Therefore, for purposes of the construction LST analysis only emissions included in the CalEEMod "on-site" emissions outputs were considered.

### Sensitive Receptors/Receiver

To assess the potential for short-term construction air impacts, the following two receiver locations as shown on Exhibit 3-A were identified as representative locations for focused analysis. Sensitive receivers are generally defined as locations where people reside or where the presence of unwanted pollution could otherwise adversely affect the use of the land. Schools, when occupied, are considered to be air-sensitive land uses, and as such, the closest playground and classroom building within Palms are identified as sensitive receivers in this analysis. Other sensitive areas within Palms that are located at greater distances than those identified in this air study will experience lower air concentrations than those presented in this report due to the additional particle dispersion from distance and the shielding of intervening structures.

- R1:  Located approximately 79 feet northwest of the Project site, R1 represents the closest outdoor playground area within Palms to the Project site.  Note that when the school is not in session, this is no longer considered a noise-sensitive receiver location.

- R2:  Location R2 represents the closest classroom building within Palms to the Project site at roughly 31 feet north.  Note that when the school is not in session, this is no longer considered a sensitive receiver location.



*3568 Motor Avenue Air Quality Impact Analysis*

**EXHIBIT 3-A:  RECEIVER LOCATIONS**



**LEGEND:**

⊕  Receiver Locations  ——•  Distance from receiver to Project site boundary [in feet]

**URBAN**
CROSSROADS

The nearest sensitive receptor is the Palms Elementary School located 31 feet/9.5 meters north of the Project site. Notwithstanding, the *Methodology* explicitly states that *"It is possible that a project may have receptors closer than 25 meters. Projects with boundaries located closer than 25 meters to the nearest receptor should use the LSTs for receptors located at 25 meters* (24)." Therefore, LSTs for receptors located at 25 meters were utilized in this AQIA.

### APPLICABILITY OF LSTS FOR THE PROJECT

For this Project, the appropriate Source Receptor Area (SRA) for the LST is the Central Los Angeles County monitoring station (SRA 2). LSTs apply to carbon monoxide (CO), nitrogen dioxide (NO2), particulate matter ≤ 10 microns (PM10), and particulate matter ≤ 2.5 microns (PM2.5). The SCAQMD produced look-up tables for projects less than or equal to 5 acres in size.

In order to determine the appropriate methodology for determining localized impacts that could occur as a result of Project-related construction, the following process is undertaken:

- The CalEEMod model is utilized to determine the maximum daily on-site emissions that will occur during construction activity.
- The SCAQMD's Fact Sheet for Applying CalEEMod to Localized Significance Thresholds (21) is used to determine the maximum site acreage that is actively disturbed based on the construction equipment fleet and equipment hours as estimated in CalEEMod.
- If the total acreage disturbed is less than or equal to five acres per day, then the SCAQMD's screening look-up tables are utilized to determine if a Project has the potential to result in a significant impact (the SCAQMD recommends that Projects exceeding the screening look-up tables undergo dispersion modeling to determine actual impacts). The look-up tables establish a maximum daily emissions threshold in pounds per day that can be compared to CalEEMod outputs.

### MAXIMUM DAILY DISTURBED-ACREAGE

Table 3-6 is used to determine the maximum daily disturbed-acreage for purposes of modeling localized emissions. Based on Table 3-6, the proposed Project could actively disturb approximately 0.5 acre per day during shoring and 1 acre per day excavation, soil export, and grading activities of construction. It is important to note that 1 acre disturbed per day will be utilized for analytical purposes for demolition and shoring activities.



#### TABLE 3-6: MAXIMUM DAILY DISTURBED-ACREAGE

| Construction Phase | Equipment Type | Equipment Quantity | Acres graded per 8-hour day | Operating Hours per Day | Acres disturbed per day |
|---|---|---|---|---|---|
| Demolition and Preconstruction | Crawler Tractors | 2 | 0.5 | 8 | 1 |
|  | Graders | 0 | 0.5 | 8 | 0 |
|  | Rubber Tired Dozers | 0 | 0.5 | 8 | 0 |
|  | Scrapers | 0 | 1 | 8 | 0 |
| Total acres graded per day during Demolition and Preconstruction | | | | | 1 |
| Construction Phase | Equipment Type | Equipment Quantity | Acres graded per 8-hour day | Operating Hours per Day | Acres disturbed per day |
| Shoring | Crawler Tractors | 1 | 0.5 | 8 | 0.5 |
|  | Graders | 0 | 0.5 | 8 | 0 |
|  | Rubber Tired Dozers | 0 | 0.5 | 8 | 0 |
|  | Scrapers | 0 | 1 | 8 | 0 |
| Total acres graded per day during Shoring | | | | | 0.5 |
| Construction Phase | Equipment Type | Equipment Quantity | Acres graded per 8-hour day | Operating Hours per Day | Acres disturbed per day |
| Excavation, Soil Export, and Grading | Crawler Tractors | 1 | 0.5 | 8 | 0.5 |
|  | Graders | 1 | 0.5 | 8 | 0.5 |
|  | Rubber Tired Dozers | 0 | 0.5 | 8 | 0 |
|  | Scrapers | 0 | 1 | 8 | 0 |
| Total acres graded per day during Grading | | | | | 1 |

**CONSTRUCTION-SOURCE EMISSIONS LST ANALYSIS**

Since the total acreage disturbed is less than five acres per day for demolition and preconstruction, shoring and excavation, soil export, and grading activities, the SCAQMD's screening look-up tables are utilized in determining impacts. As previously noted, a 25-meter receptor distance is utilized to determine the LSTs for emissions of CO, $NO_2$, $PM_{10}$, and $PM_{2.5}$.

Table 3-7 identifies the localized impacts at the Palms. As shown below, emissions during construction activity would not exceed the SCAQMD's localized significance thresholds for any criteria pollutant and a less than significant impact would occur.

**URBAN**
CROSSROADS

TABLE 3-7: LOCALIZED SIGNIFICANCE SUMMARY CONSTRUCTION (1 OF 2)

| On-Site Demolition and Preconstruction Emissions | Emissions (pounds per day) | | | |
|---|---|---|---|---|
| | NOₓ | CO | PM₁₀ | PM₂.₅ |
| Maximum Daily Emissions | 0.55 | 7.78 | 0.19 | 0.04 |
| SCAQMD Localized Threshold | 103 | 562 | 4 | 3 |
| Threshold Exceeded? | NO | NO | NO | NO |
| On-Site Shoring Emissions | Emissions (pounds per day) | | | |
| | NOₓ | CO | PM₁₀ | PM₂.₅ |
| Maximum Daily Emissions | 0.75 | 8.25 | 0.23 | 0.05 |
| SCAQMD Localized Threshold | 103 | 562 | 4 | 3 |
| Threshold Exceeded? | NO | NO | NO | NO |
| On-Site Excavation, Soil Export, and Grading Emissions | Emissions (pounds per day) | | | |
| | NOₓ | CO | PM₁₀ | PM₂.₅ |
| Maximum Daily Emissions | 1.04 | 10.4 | 0.46 | 0.08 |
| SCAQMD Localized Threshold | 103 | 562 | 4 | 3 |
| Threshold Exceeded? | NO | NO | NO | NO |

### 3.7 LOCALIZED SIGNIFICANCE – LONG-TERM OPERATIONAL ACTIVITY

The proposed project involves the construction and operation of 42 multi-family residential dwelling units and 1,800 square feet of retail use. According to SCAQMD LST methodology, LSTs would apply to the operational phase of a proposed project, if the project includes stationary sources, or attracts mobile sources that may spend long periods queuing and idling at the site (e.g., transfer facilities and warehouse buildings). The proposed project does not include such uses, and thus, due to the lack of significant stationary source emissions, no long-term localized significance threshold analysis is needed.

### 3.8 CO "HOT SPOT" ANALYSIS

As discussed below, the Project would not result in potentially adverse CO concentrations or "hot spots." Further, detailed modeling of Project-specific carbon monoxide (CO) "hot spots" is not needed to reach this conclusion.

An adverse CO concentration, known as a "hot spot", would occur if an exceedance of the state one-hour standard of 20 ppm or the eight-hour standard of 9 ppm were to occur. At the time of the 1993 Handbook, the SCAB was designated nonattainment under the California AAQS and National AAQS for CO (25).

It has long been recognized that CO hotspots are caused by vehicular emissions, primarily when idling at congested intersections. In response, vehicle emissions standards have become increasingly stringent in the last twenty years. Currently, the allowable CO emissions standard in California is a maximum of 3.4 grams/mile for passenger cars (there are requirements for certain vehicles that are more stringent). With the turnover of older vehicles, introduction of

URBAN
CROSSROADS

cleaner fuels, and implementation of increasingly sophisticated and efficient emissions control technologies, CO concentration in the SCAB is now designated as attainment, as previously noted in Table 2-2. Also, CO concentrations in the Project vicinity have steadily declined, as indicated by historical emissions data presented previously at Table 2-3.

To establish a more accurate record of baseline CO concentrations affecting the SCAB, a CO "hot spot" analysis was conducted in 2003 for four busy intersections in Los Angeles at the peak morning and afternoon time periods. This "hot spot" analysis did not predict any violation of CO standards, as shown on Table 3-8.

Based on the SCAQMD's 2003 AQMP and the 1992 Federal Attainment Plan for Carbon Monoxide (1992 CO Plan), peak carbon monoxide concentrations in the SCAB were a result of unusual meteorological and topographical conditions and not a result of traffic volumes and congestion at a particular intersection. As evidence of this, for example, 9.3 ppm 8-hr CO concentration measured at the Long Beach Blvd. and Imperial Hwy. intersection (highest CO generating intersection within the "hot spot" analysis), only 0.7 ppm was attributable to the traffic volumes and congestion at this intersection; the remaining 8.6 ppm were due to the ambient air measurements at the time the 2003 AQMP was prepared (25). In contrast, the ambient 8-hr CO concentration within the Project study area is estimated at 1.4 ppm—1.6 ppm (please refer to previous Table 2-3). Therefore, even if the traffic volumes for the proposed Project were double or even triple of the traffic volumes generated at the Long Beach Blvd. and Imperial Hwy. intersection, coupled with the on-going improvements in ambient air quality, the Project would not be capable of resulting in a CO "hot spot" at any study area intersections.

Similar considerations are also employed by other Air Districts when evaluating potential CO concentration impacts. More specifically, the Bay Area Air Quality Management District (BAAQMD) concludes that under existing and future vehicle emission rates, a given project would have to increase traffic volumes at a single intersection by more than 44,000 vehicles per hour—or 24,000 vehicles per hour where vertical and/or horizontal air does not mix—in order to generate a significant CO impact (26).

Traffic volumes generating the CO concentrations for the "hot spot" analysis, shown on Table 3-9. The busiest intersection evaluated was that at Wilshire Blvd. and Veteran Ave., which has a daily traffic volume of approximately 100,000 vehicles per day. The 2003 AQMP estimated that the 1-hour concentration for this intersection was 4.6 ppm; this indicates that, should the daily traffic volume increase four times to 400,000 vehicles per day, CO concentrations (4.6 ppm x 4= 18.4 ppm) would still not likely exceed the most stringent 1-hour CO standard (20.0 ppm).[4] At buildout of the Project, the highest daily traffic volumes generated at the roadways within the vicinity of the Project are expected to generate less than the highest daily traffic volumes generated at the busiest intersection in the CO "hot spot" analysis. As such, the Project would not likely exceed the most stringent 1-hour CO standard.

The proposed Project considered herein would not produce the volume of traffic required to generate a CO "hot spot" either in the context of the 2003 Los Angeles hot spot study, or based

---

[4] Based on the ratio of the CO standard (20.0 ppm) and the modeled value (4.6 ppm).

on representative BAAQMD CO threshold considerations. Therefore, CO "hot spots" are not an environmental impact of concern for the proposed Project. Localized air quality impacts related to mobile-source emissions would therefore be less than significant.

#### TABLE 3-8: CO MODEL RESULTS

| Intersection Location | Carbon Monoxide Concentrations (ppm) | | |
|---|---|---|---|
| | Morning 1-hour | Afternoon 1-hour | 8-hour |
| Wilshire-Veteran | 4.6 | 3.5 | 4.2 |
| Sunset-Highland | 4 | 4.5 | 3.9 |
| La Cienega-Century | 3.7 | 3.1 | 5.8 |
| Long Beach-Imperial | 3 | 3.1 | 9.3 |

Source: 2003 AQMP

Notes: ppm: parts per million. Federal 1-hour standard is 35 ppm and the deferral 8-hour standard is 9.0 ppm.

#### TABLE 3-9: TRAFFIC VOLUMES

| Intersection Location | Peak Traffic Volumes (vph) | | | | |
|---|---|---|---|---|---|
| | Northbound (AM/PM) | Southbound (AM/PM) | Eastbound (AM/PM) | Westbound (AM/PM) | Total (AM/PM) |
| Wilshire-Veteran | 560/933 | 721/1,400 | 4,954/2,069 | 1,830/3,317 | 8,052/7,719 |
| Sunset-Highland | 1,551/2,238 | 2,304/1,832 | 1,417/1,764 | 1,342/1,540 | 6,614/5,374 |
| La Cienega-Century | 821/1,674 | 1,384/2,029 | 2,540/2,243 | 1,890/2,728 | 6,634/8,674 |
| Long Beach-Imperial | 756/1,150 | 479/944 | 1,217/2,020 | 1,760/1,400 | 4,213/5,514 |

Source: 2003 AQMP

Notes: vph-vehicles per hour

### 3.9 AIR QUALITY MANAGEMENT PLANNING

The Project site is located within the SCAB, which is characterized by relatively poor air quality. The SCAQMD has jurisdiction over an approximately 10,743 square-mile area consisting of the four-county Basin and the Los Angeles County and Riverside County portions of what use to be referred to as the Southeast Desert Air Basin. In these areas, the SCAQMD is principally responsible for air pollution control, and works directly with the Southern California Association of Governments (SCAG), county transportation commissions, local governments, as well as state and federal agencies to reduce emissions from stationary, mobile, and indirect sources to meet state and federal ambient air quality standards.

Currently, these state and federal air quality standards are exceeded in most parts of the Basin. In response, the SCAQMD has adopted a series of Air Quality Management Plans (AQMPs) to meet the state and federal ambient air quality standards. AQMPs are updated regularly in order to more effectively reduce emissions, accommodate growth, and to minimize any negative fiscal impacts of air pollution control on the economy.

In March 2017, the AQMD released the Final 2016 AQMP. The 2016 AQMP continues to evaluate current integrated strategies and control measures to meet the NAAQS, as well as, explore new and innovative methods to reach its goals. Some of these approaches include

utilizing incentive programs, recognizing existing co-benefit programs from other sectors, and developing a strategy with fair-share reductions at the federal, state, and local levels (27). Similar to the 2012 AQMP, the 2016 AQMP incorporates scientific and technological information and planning assumptions, including the 2016 RTP/SCS and updated emission inventory methodologies for various source categories (28). The Project's consistency with the AQMP will be determined using the 2016 AQMP as discussed below.

Criteria for determining consistency with the AQMP are defined in Chapter 12, Section 12.2 and Section 12.3 of the SCAQMD's CEQA Air Quality Handbook (1993) (29). These indicators are discussed below:

- Consistency Criterion No. 1: The proposed Project will not result in an increase in the frequency or severity of existing air quality violations or cause or contribute to new violations, or delay the timely attainment of air quality standards or the interim emissions reductions specified in the AQMP.

### Construction Impacts

Consistency Criterion No. 1 refers to violations of the CAAQS and NAAQS. CAAQS and NAAQS violations would occur LSTs were exceeded. As evaluated as part of the Project LST analysis (previously presented), the Project's localized construction-source emissions would not exceed applicable LSTs (after implementation of applicable mitigation measures).

### Operational Impacts

The Project regional analysis demonstrates that Project operational-source emissions would not exceed applicable thresholds, and would therefore not result in or cause violations of the CAAQS and NAAQS.

On the basis of the preceding discussion, the Project is determined to be consistent with the first criterion.

- Consistency Criterion No. 2: The Project will not exceed the assumptions in the AQMP based on the years of Project build-out phase.

### Overview

The 2016 AQMP demonstrates that the applicable ambient air quality standards can be achieved within the timeframes required under federal law. Growth projections from local general plans adopted by cities in the district are provided to the Southern California Association of Governments (SCAG), which develops regional growth forecasts, which are then used to develop future air quality forecasts for the AQMP. Development consistent with the growth projections in City of Los Angeles General Plan is considered to be consistent with the AQMP.

### Construction Impacts

Peak day emissions generated by construction activities are largely independent of land use assignments, but rather are a function of development scope and maximum area of



disturbance. Irrespective of the site's land use designation, development of the site to its maximum potential would likely occur, with disturbance of the entire site occurring during construction activities.

## Operational Impacts

According to the City General Plan, the Project site has a current land use designation of General Commercial (CG). The Project site is currently zoned as Commercial (C2) (30). The CG land use designation allows for local-serving commercial uses, including retail, restaurants, and personal and professional services; single family and multifamily residences; and residential and commercial mixed uses (31). The C2 zoning designation allows for retail, theaters, hotels, broadcasting studios, parking buildings, parks and playgrounds, retail with limited manufacturing, service stations and garages, retail contract businesses, and multiple dwelling uses (32).

The Project proposes to construct 42 multi-family residential dwelling units and 1,800 square feet of retail use. The Project would not exceed the development intensities allowed within the land use and zoning designations. The Project would not exceed regional or local thresholds and would therefore be considered to have a less than significant impact. As such, the development proposed by the Project would be consistent with the growth projections in the General Plan and is therefore considered consistent with the AQMP.

On the basis of the preceding discussion, the Project is determined to be consistent with the second criterion.

## AQMP Consistency Conclusion

The Project would not result in or cause NAAQS or CAAQS violations. The Project would not exceed the development intensities allowed within the land use and zoning designations. Additionally, the Project would not result in any construction-source or operational-source emissions exceedances. The Project is therefore considered to be consistent with the AQMP.

### 3.10 TOXIC AIR POLLUTANTS DURING PROJECT CONSTRUCTION AND OPERATIONS

The construction equipment would emit diesel particulate matter (DPM), which is a carcinogen. However, the DPM emissions would be short-term in nature and cease upon completion of the respective construction phase of development. Determination of health risks from DPM is typically considered over a 70-year exposure time. As such, considering the short time frame for construction, exposure to DPM during construction is anticipated to be less than significant.

Notwithstanding, in the abundance of caution a focused construction health risk assessment (HRA) has been prepared for this Project.

## Source Characterization

For on-site construction, emission estimates were based upon the Los Angeles-South Coast County profile generated by the CalEEMod land use emission software as presented in Appendix 3.2 whereby off-road $PM_{10}$ exhaust estimates were used as a surrogate for DPM





emissions. To assess localized impacts, construction phase, calendar year and number of days associated with each activity were identified to produce an average daily emission rate. Construction operations are reported to occur 5 days per week for 664 days as shown on Table 3-2, previously presented in this report.

For operational emissions, CalEEMod model estimates are associated with area, energy and mobile sources. On-site area source emissions include hearths and landscape maintenance equipment. Energy related emissions are associated with natural gas and electricity consumption. On-road mobile sources include running and start emissions. In consideration of these source categories, DPM emissions are only associated with a portion of the mobile source profile whereby the predominant source of emissions relate to vehicle miles traveled to and from the project site. Although a portion of start emissions are generated on-site, they are associated with gasoline fueled vehicles not diesel vehicles. To assume that these sources generate on-site DPM emissions is inconsistent with the CalEEMod operational profile. As such, exhaust emissions associated with operational sources were not considered in the refined health risk assessment.

### Exposure Quantification

In order to assess the impact of DPM emissions, air quality modeling utilizing the AMS/EPA Regulatory Model AERMOD was performed. AERMOD's air dispersion algorithms are based upon a planetary boundary layer turbulence structure and scaling concepts, including the treatment of surface and elevated sources in simple and complex terrain. AERMOD is a steady-state Gaussian plume model applicable to directly emitted air pollutants that employs best state-of-practice parameterizations for characterizing meteorological influences and atmospheric dispersion. AERMOD is the U.S. Environmental Protection Agency's guideline model for the assessment of near-field pollutant dispersion and was, therefore, utilized in the refined health risk assessment.

The SCAQMD provides guidance (*Localized Significance Threshold Methodology*, July 2008) on the evaluation of localized air quality impacts to public agencies conducting environmental review of projects located within its jurisdiction. As such, source treatment outlined in the Localized Significance Threshold (LST) methodology was utilized whereby exhaust emissions from construction equipment were treated as a set of side-by-side elevated volume sources with a release height of five and an initial vertical (sigma z) dimension of 1.4 meters. A horizontal (sigma y) parameter of 2.32 meters was utilized and produced by dividing a source separation distance of 5 meters by a standard deviation of 2.15.

Refined air dispersion models require meteorological information to account for local atmospheric conditions. Due to their sensitivity to individual meteorological parameters such as wind speed and direction, the U.S. Environmental Protection Agency recommends that meteorological data used as input into dispersion models be selected on the basis of relative spatial and temporal conditions that exist in the area of concern. In response to this recommendation, meteorological data from the SCAQMD Los Angeles Airport monitoring station was used to represent local weather conditions and prevailing winds. In a manner



consistent with SCAQMD guidance for the assessment of chronic exposures, maximum concentrations were produced by incorporating all five years of available data. The model scalar option was additionally invoked to account for emissions generated during construction related activity corresponding to 8 hours per day as reported in the CalEEMod construction profile from 8 a.m. to 4 p.m. (ending hours 9 to 16).

The modeling analysis also considered the spatial distribution of volume source emissions in relation to school-base receptors as identified in Section 3.6 of this report. A graphical representation of the source-receptor grid network is presented on Exhibit 3-B.

Appendix 3.4 provides a copy of the AERMOD dispersion model output file associated with the school-based scenarios.

### Risk Characterization

Carcinogenic compounds are not considered to have threshold levels (i.e., dose levels below which there are no risks). Any exposure, therefore, will have some associated risk. As a result, the SCAQMD has established a maximum incidence risk of 10 in one million for projects prepared under CEQA.

Health risks associated with exposure to carcinogenic compounds can be defined in terms of the probability of developing cancer as a result of exposure to a chemical at a given concentration. Under a deterministic approach (i.e., point estimate methodology), the cancer risk probability is determined by multiplying the chemical's annual concentration by its unit risk factor (URF). The URF is a measure of the carcinogenic potential of a chemical when a dose is received through the inhalation pathway. It represents an upper bound estimate of the probability of contracting cancer as a result of continuous exposure to an ambient concentration of one microgram per cubic meter ($\mu g/m^3$) over a 70 year lifetime. The URF and corresponding cancer potency factor for DPM utilized in the assessment was obtained from the *Consolidated Table of OEHHA/ARB Approved Risk Assessment Health Values.*

A review of available guidance was conducted to determine applicability of the use of early life exposure adjustments to identified carcinogens. The U.S. Environmental Protection Agency provides guidance relating to the use of early life exposure adjustment factors (*Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to Carcinogens*, EPA/630/R-003F) whereby adjustment factors are only considered when carcinogens act "through the mutagenic mode of action." The U.S. Environmental Protection Agency has identified 19 compounds that elicit a mutagenic mode of action for carcinogenesis. For diesel particulates, polycyclic aromatic hydrocarbons (PAHs) and their derivatives, which are known to exhibit a mutagenic mode of action, comprise < 1% of the exhaust particulate mass. To date, the U.S. Environmental Protection Agency reports that whole diesel engine exhaust has not been shown to elicit a mutagenic mode of action. However, for risk assessments conducted under the auspices of The Air Toxics "Hot Spots" Information and Assessment Act (AB 2588, Connelly, Statutes of 1987; Health and Safety Code Section 44300 et seq.) a weighting factor is applied to all carcinogens regardless of purported mechanism of action.

*3568 Motor Avenue Air Quality Impact Analysis*

URBAN
CROSSROADS

*3568 Motor Avenue Air Quality Impact Analysis*

**EXHIBIT 3-B: MODELED SOURCES AND RECEPTORS FOR HRA**



As a commenting agency, the SCAQMD has not provided definitive guidance nor developed policy relating to the applicability of applying early life exposure adjustment factors for projects conducted under CEQA. Additionally, the California Department of Toxic Substances Control (DTSC) which is charged with protecting individuals and the environment from the effects of toxic substances is also responsible for assessing, investigating and evaluating proposed school sites to ensure that selected properties are free of contamination or, if the properties are contaminated, have been remediated to a level that protects the health of students and staff. Notwithstanding this responsibility, the DTSC has adopted the U.S. Environmental Protection Agency's policy in the application of early life exposure adjustments. As such, incorporation of early life exposure adjustments for exposures to DPM emissions in the quantification of carcinogenic risk for construction of the proposed project were not considered in the refined health risk assessment.

To quantify dose, the procedure requires the incorporation of several discrete exposure variates. To account for exposures unique to the school-based populations, lifetime risk values were adjusted to account for exposure frequencies representative of reported operating days per year. For residential exposures, an exposure frequency of 260 days per year for 1.82 years (664 days) was assumed.

Point estimates for daily breathing rates representing the 95th percentile were employed for each school-based population representing the grade level and associated age range for each occupancy. For the residential exposure scenario, upper-bound breathing rates representing 3rd trimester and infant exposures were incorporated into the following dose algorithm:

$$Dose_{air} = C_{air} \times (BR/BW) \times A \times EF \times 10^{-6}$$

Where:

| | | |
|---|---|---|
| $Dose_{air}$ | = | dose through inhalation (mg/kg/day) |
| $C_{air}$ | = | concentration of contaminant in air ($\mu g/m^3$) |
| $(BR/BW)$ weight/day) | = | daily breathing rate normalized to body weight (L/kg body |
| A | = | inhalation absorption factor (unitless) |
| EF | = | exposure frequency (days/365 days) |
| $10^{-6}$ | = | micrograms to milligrams conversion |

Inhalation dose estimates for the identified age groups were incorporated into the following equation to produce carcinogenic risk estimates for occupancies commensurate with the duration of construction activity:

$$Risk_{inh} = Dose_{air} \times CPF \times ED/AT \times FAH$$

Where:

$Risk_{inh}$      =      inhalation cancer risk



| $Dose_{air}$ | $=$ | *daily inhalation dose (mg/kg/day)* |
| CPF | $=$ | *inhalation cancer potency factor ($mg/kg/day^1$)* |
| ED | $=$ | *exposure duration for specified age group (years)* |
| AT | $=$ | *averaging time (years)* |
| FAH | $=$ | *fraction of exposure time (default 1)* |

Tables 3-10 present the maximum predicted carcinogenic risk estimates for the school-based receptors. Appendix 3.4, Tables A1 through A3, column b identify the predicted DPM concentrations, columns f-h, present the URFs, corresponding cancer potency factor and dose estimates for exposures considered in the assessment. The cancer risk estimate is presented in column i.

URBAN
CROSSROADS

**TABLE 3-10: SUMMARY OF RISK ATTRIBUTABLE TO PROJECT CONSTRUCTION**

| Location | Maximum Lifetime Cancer Risk (Risk per Million) | Significance Threshold (Risk per Million) | Exceeds Significance Threshold |
|---|---|---|---|
| Palms Elementary School | 5.05 | 10 | NO |
| Location | Maximum Hazard Index | Significance Threshold | Exceeds Significance Threshold |
| Palms Elementary School | 0.09 | 1.0 | NO |

As noted above, the cancer risk estimates for school-based receptors were well below the SCAQMD significance threshold of ten in one million.

An evaluation of the potential noncancer effects of DPM exposures was also conducted. Under the point estimate approach, adverse health effects are evaluated by comparing the pollutant concentration with the appropriate Reference Exposure Level (REL). The REL presented in the *Consolidated Table of OEHHA/ARB Approved Risk Assessment Health Values* was considered in the assessment.

To quantify noncarcinogenic impacts, the hazard index approach was used. The hazard index assumes that subthreshold exposures adversely affect a specific organ or organ system (i.e., toxicological endpoint). To calculate the hazard index, the pollutant concentration or dose is divided by its toxicity value. Should the total equal or exceed one (i.e., unity), a health hazard is presumed to exist. No exposure frequency or duration adjustments are considered for noncarcinogenic exposures.

For chronic noncarcinogenic effects, the hazard index for the identified toxicological endpoint totaled less than one for all exposure scenarios.

### 3.11   POTENTIAL IMPACTS TO SENSITIVE RECEPTORS

The potential impact of Project-generated air pollutant emissions at Palms Elementary School, as a sensitive receptor, has also been considered.

Results of the LST analysis indicate that the Project would not exceed the SCAQMD localized significance thresholds during construction. Therefore sensitive receptors would not be subject to a significant air quality impact during Project construction.

Results of the LST analysis indicate that the Project would not exceed the SCAQMD localized significance thresholds during operational activity. The proposed Project would not result in a CO "hotspot" as a result of Project related traffic during ongoing operations, nor would the Project result in a significant adverse health impact as discussed in Section 3.8. Thus a less than significant impact to sensitive receptors during operational activity is expected.



### 3.12 ODORS

The potential for the Project to generate objectionable odors has also been considered. Land uses generally associated with odor complaints include:

- Agricultural uses (livestock and farming)
- Wastewater treatment plants
- Food processing plants
- Chemical plants
- Composting operations
- Refineries
- Landfills
- Dairies
- Fiberglass molding facilities

The Project does not contain land uses typically associated with emitting objectionable odors. Potential odor sources associated with the proposed Project may result from construction equipment exhaust and the application of asphalt and architectural coatings during construction activities and the temporary storage of typical solid waste (refuse) associated with the proposed Project's (long-term operational) uses. Standard construction requirements would minimize odor impacts from construction. The construction odor emissions would be temporary, short-term, and intermittent in nature and would cease upon completion of the respective phase of construction and is thus considered less than significant. It is expected that Project-generated refuse would be stored in covered containers and removed at regular intervals in compliance with the City's solid waste regulations. The proposed Project would also be required to comply with SCAQMD Rule 402 to prevent occurrences of public nuisances. Therefore, odors associated with the proposed Project construction and operations would be less than significant and no mitigation is required.

### 3.13 CUMULATIVE IMPACTS

The Project area is designated as an extreme non-attainment area for ozone, and a non-attainment area for $PM_{10}$, $PM_{2.5}$, and lead.

The AQMD has published a report on how to address cumulative impacts from air pollution: *White Paper on Potential Control Strategies to Address Cumulative Impacts from Air Pollution* (33). In this report the AQMD clearly states (Page D-3): ·

*"...the AQMD uses the same significance thresholds for project specific and cumulative impacts for all environmental topics analyzed in an Environmental Assessment or EIR. The only case where the significance thresholds for project specific and cumulative impacts differ is the Hazard Index (HI) significance threshold for toxic air contaminant (TAC) emissions. The project specific (project increment) significance threshold is HI > 1.0 while the cumulative (facility-wide) is HI > 3.0. It should be noted that the HI is only one of three TAC emission significance thresholds*

URBAN CROSSROADS

*considered (when applicable) in a CEQA analysis. The other two are the maximum individual cancer risk (MICR) and the cancer burden, both of which use the same significance thresholds (MICR of 10 in 1 million and cancer burden of 0.5) for project specific and cumulative impacts.*

*Projects that exceed the project-specific significance thresholds are considered by the SCAQMD to be cumulatively considerable. This is the reason project-specific and cumulative significance thresholds are the same.   Conversely, projects that do not exceed the project-specific thresholds are generally not considered to be cumulatively significant."*

Therefore, this analysis assumes that individual projects that do not generate operational or construction emissions that exceed the SCAQMD's recommended daily thresholds for project-specific impacts would also not cause a cumulatively considerable increase in emissions for those pollutants for which the Basin is in nonattainment, and, therefore, would not be considered to have a significant, adverse air quality impact. Alternatively, individual project-related construction and operational emissions that exceed SCAQMD thresholds for project-specific impacts would be considered cumulatively considerable.

### Construction Impacts

The Project-specific evaluation of emissions presented in the preceding analysis demonstrates that Project construction-source air pollutant emissions would not result in exceedances of regional thresholds. Therefore, Project construction-source emissions would be considered less than significant on a project-specific and cumulative basis.

### Operational Impacts

The Project-specific evaluation of emissions presented in the preceding analysis demonstrates that Project operational-source air pollutant emissions would not result in exceedances of regional thresholds. Therefore, Project operational-source emissions would be considered less than significant on a project-specific and cumulative basis.

# 4    FINDINGS & CONCLUSIONS

## 4.1    CONSTRUCTION-SOURCE EMISSIONS

*REGIONAL IMPACTS*

For regional emissions, the Project would not exceed the numerical thresholds of significance
established by the SCAQMD. Thus a less than significant impact would occur for Project-related
construction-source emissions and no mitigation is required.

*LOCALIZED IMPACTS*

For localized emissions, the Project would not exceed the SCAQMD's localized significance
threshold. Thus a less than significant impact would occur and no mitigation is required.

Project construction-source emissions would not conflict with the applicable AQMP.

*ODORS*

Established requirements addressing construction equipment operations, and construction
material use, storage, and disposal requirements act to minimize odor impacts that may result
from construction activities. Moreover, construction-source odor emissions would be
temporary, short-term, and intermittent in nature and would not result in persistent impacts
that would affect substantial numbers of people. Potential construction-source odor impacts
are therefore considered less-than-significant.

## 4.2    OPERATIONAL-SOURCE EMISSIONS

*REGIONAL IMPACTS*

For regional emissions, the Project would not exceed the numerical thresholds of significance
established by the SCAQMD. Thus a less than significant impact would occur for Project-related
operational-source emissions and no mitigation is required.

*LOCALIZED IMPACTS*

Project operational-source emissions would not result in or cause a significant localized air
quality impact as discussed in the operational LSTs section of this report. The proposed Project
would not result in a significant CO "hotspot" as a result of Project related traffic during
ongoing operations, nor would the Project result in a significant adverse health impact as
discussed in Section 3.8, thus a less than significant impact to sensitive receptors during
operational activity is expected.

*ODORS*

Substantial odor-generating sources include land uses such as agricultural activities, feedlots,
wastewater treatment facilities, landfills or various heavy industrial uses. The Project does not
propose any such uses or activities that would result in potentially significant operational-

source odor impacts.   Potential sources of operational odors generated by the Project would include disposal of miscellaneous residential refuse.   Moreover, SCAQMD Rule 402 acts to prevent occurrences of odor nuisances   [1]. Consistent with City requirements, all Project-generated refuse would be stored in covered containers and removed at regular intervals in compliance with solid waste regulations. Potential operational-source odor impacts are therefore considered less-than-significant.

URBAN
CROSSROADS

*3568 Motor Avenue Air Quality Impact Analysis*

## 5    REFERENCES

1. **South Coast Air Quality Management District.** RULE 402. Nuisance. [Online] May 7, 1976. [Cited: September 17, 2013.] http://www.aqmd.gov/docs/default-source/rule-book/rule-iv/rule-402.pdf?sfvrsn=4.

2. —. RULE 1113. Architectural Coatings. [Online] http://www.aqmd.gov/rules/reg/reg11/r1113.pdf.

3. —. RULE 403. Fugitive Dust. [Online] http://www.aqmd.gov/docs/default-source/rule-book/rule-iv/rule-403.pdf?sfvrsn=4.

4. —. RULE 1186. PM10 Emissions From Paved and Unpaved Roads, and Livestock Operations. [Online] http://www.aqmd.gov/docs/default-source/rule-book/reg-xi/rule-1186-1-less-polluting-sweepers.pdf?sfvrsn=4.

5. —. Southern California Air Basins. [Online] [Cited: November 13, 2013.] http://www.aqmd.gov/map/mapaqmd1.pdf.

6. **Environmental Protection Agency.** National Ambient Air Quality Standards (NAAQS). [Online] 1990. [Cited: November 13, 2013.] http://www.epa.gov/air/criteria.html.

7. **Air Resources Board.** California Ambient Air Quality Standards (CAAQS). [Online] 2009. [Cited: November 13, 2013.] http://www.arb.ca.gov/research/aaqs/caaqs/caaqs.htm.

8. **South Coast Air Quality Management District.** Annual Air Quality Monitoring Network Plan. [Online] July 2016. http://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-monitoring-network-plan/annual-air-quality-monitoring-network-plan-v2.pdf?sfvrsn=2.

9. **Environmental Protection Agency.** Monitor Values Report. [Online] [Cited: November 13, 2013.] http://www.epa.gov/airdata/ad_rep_mon.html.

10. **Air Resources Board.** Air Quality Standards and Area Designations. [Online] December 2015. http://www.arb.ca.gov/desig/desig.htm.

11. —. [Online] [Cited: November 13, 2013.] http://www.arb.ca.gov/adam/select8/sc8start.php.

12. **Environmental Protection Agency.** Air Pollution and the Clean Air Act. [Online] [Cited: November 13, 2013.] http://www.epa.gov/air/caa/.

13. **South Coast Air Quality Management District.** 2012 Air Quality Management Plan (AQMP). [Online] 2012. [Cited: November 13, 2013.] http://www.aqmd.gov/aqmp/2012aqmp/draft/index.html.

14. **California Environmental Quality Act.** Checklist. [Online] [Cited: September 17, 2014.] http://ceres.ca.gov/ceqa/guidelines/Appendix_G.html.

15. **South Coast Air Quality Management District.** SCAQMD Air Quality Significance Thresholds. [Online] March 2015. http://www.aqmd.gov/docs/default-source/ceqa/handbook/scaqmd-air-quality-significance-thresholds.pdf.

16. —. California Emissions Estimator Model. [Online] 2017. http://www.caleemod.com/.

17. —. RULE 1113. Architectural Coatings. [Online] http://www.aqmd.gov/rules/reg/reg11/r1113.pdf.

18. —. RULE 431.2, Sulfur Content of Liquid Fuels. [Online] http://www.aqmd.gov/rules/siprules/sr431-2.pdf.

19. —. RULE 403. Fugitive Dust. [Online] http://www.aqmd.gov/rules/reg/reg04/r403.pdf.

20. —. RULE 1186. PM10 Emissions From Paved and Unpaved Roads, and Livestock Operations. [Online] http://www.aqmd.gov/rules/reg/reg11/r1186.pdf.



21. **Overland Traffic Consultants, Inc.** *Technical Traffic Evaluation for the Proposed Residential Project at 3558-3570 Motor Avenue.* 2017.
22. **Lake Environmental.** US EPA Models. *Lake Environmental.* [Online] http://www.weblakes.com/download/us_epa.html.
23. **South Coast Air Quality Management District.** *Localized Significance Thresholds Methodology.* s.l. : South Coast Air Quality Managment District, 2003.
24. —. *Localized Significance Thresholds Methodology.* s.l. : South Coast Air Quality Managment District, 2008.
25. —. 2003 Air Quality Management Plan. [Online] 2003. http://www.aqmd.gov/aqmp/aqmd03aqmp.htm.
26. **Bay Area Air Quality Management District.** [Online] http://www.baaqmd.gov/.
27. **South Coast Air Quality Management District.** Final 2016 Air Quality Management Plan (AQMP). [Online] March 2017. http://www.aqmd.gov/docs/default-source/clean-air-plans/air-quality-management-plans/2016-air-quality-management-plan/final-2016-aqmp/final2016aqmp.pdf?sfvrsn=11.
28. **Southern California Association of Governments.** 2016-2040 Regional Transportation Plan/Sustainable Communities Strategy. [Online] April 2016. http://scagrtpscs.net/Documents/2016/final/f2016RTPSCS.pdf.
29. **South coast Air Quality Management District.** CEQA Air Quality Handbook (1993). [Online] 1993. [Cited: November 13, 2013.] http://www.aqmd.gov/ceqa/oldhdbk.html.
30. **Zimas.** Los Angeles GIS Maps & Statistics. [Online] http://zimas.lacity.org/.
31. **Corporation, American Legal Publishing.** American Legal Publishing Corporation. [Online] http://library.amlegal.com/nxt/gateway.dll/California/lapz/municipalcodechapteriplanningandzoningco/chapterigeneralprovisionsandzoning/article2specificplanning-zoningcomprehen?f=templates$fn=default.htm$3.0$vid=amlegal:lapz_ca$anc=.
32. **Angeles, City of Los.** Generalized Summary of Zoning Regulations. [Online] http://www.planning.lacity.org/HousingInitiatives/HousingElement/Final/HEAppendixE.pdf.
33. **Goss, Tracy A and Kroeger, Amy.** White Paper on Potential Control Strategies to Address Cumulative Impacts from Air Pollution. [Online] South Coast Air Quality Management District, 2003. http://www.aqmd.gov/rules/ciwg/final_white_paper.pdf.

*3568 Motor Avenue Air Quality Impact Analysis*

# 6    CERTIFICATION

The contents of this air study report represent an accurate depiction of the environmental impacts associated with the proposed 3568 Motor Avenue Project. The information contained in this air quality impact assessment report is based on the best available data at the time of preparation. If you have any questions, please contact me directly at (949) 336-5987.


Haseeb Qureshi
Senior Associate
URBAN CROSSROADS, INC.
260 E. Baker Street, Suite 200
Costa Mesa, CA 92626
(949) 336-5987
hqureshi@urbanxroads.com


### EDUCATION

Master of Science in Environmental Studies
California State University, Fullerton • May, 2010

Bachelor of Arts in Environmental Analysis and Design
University of California, Irvine • June, 2005


### PROFESSIONAL AFFILIATIONS

AEP – Association of Environmental Planners
AWMA – Air and Waste Management Association
ASTM – American Society for Testing and Materials


### PROFESSIONAL CERTIFICATIONS

Planned Communities and Urban Infill – Urban Land Institute • June, 2011
Indoor Air Quality and Industrial Hygiene – EMSL Analytical • April, 2008
Principles of Ambient Air Monitoring – California Air Resources Board • August, 2007
AB2588 Regulatory Standards – Trinity Consultants • November, 2006
Air Dispersion Modeling – Lakes Environmental • June, 2006



*This page intentionally left blank*

URBAN
CROSSROADS



# 3568 Motor Avenue

**NOISE IMPACT ANALYSIS**
**CITY OF LOS ANGELES**

PREPARED BY:

Bill Lawson, PE, INCE
blawson@urbanxroads.com
(949) 336-5979

Alex Wolfe, INCE
awolfe@urbanxroads.com
(949) 336-5977

MAY 4, 2018

11470-11 Noise Study

**URBAN**
CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................................................III
APPENDICES .................................................................................................................................................IV
LIST OF EXHIBITS .........................................................................................................................................IV
LIST OF TABLES ............................................................................................................................................V
LIST OF ABBREVIATED TERMS .....................................................................................................................VI
EXECUTIVE SUMMARY .................................................................................................................................1

    Operational Noise Analysis........................................................................................................................1
    Construction Noise Analysis ......................................................................................................................2
    Construction Vibration Analysis.................................................................................................................3
    Project Design Features.............................................................................................................................4

1    INTRODUCTION ....................................................................................................................................7

    1.1    Site Location.................................................................................................................................7
    1.2    Project Description........................................................................................................................7

2    FUNDAMENTALS .................................................................................................................................11

    2.1    Range of Noise ............................................................................................................................11
    2.2    Noise Descriptors ........................................................................................................................12
    2.3    Sound Propagation.......................................................................................................................12
    2.4    Noise Control ...............................................................................................................................13
    2.5    Noise Barrier Attenuation ...........................................................................................................13
    2.6    Vibration .....................................................................................................................................14

3    REGULATORY SETTING........................................................................................................................17

    3.1    State of California Noise Requirements.......................................................................................17
    3.2    City of Los Angeles General Plan Noise Element ........................................................................17
    3.3    City of Los Angeles CEQA Thresholds Guide ..............................................................................18
    3.4    City of Los Angeles Municipal Code Noise Standards .................................................................18
    3.5    Los Angeles Unified School District Noise Standards..................................................................18
    3.6    Vibration Standards .....................................................................................................................19

4    EXISTING NOISE LEVEL MEASUREMENTS ..........................................................................................21

    4.1    Measurement Procedure and Criteria.........................................................................................21
    4.2    Noise Measurement Locations....................................................................................................21
    4.3    Noise Measurement Results .......................................................................................................22

5    METHODS AND PROCEDURES.............................................................................................................25

    5.1    Operational Reference Noise Levels............................................................................................25
    5.2    Construction Noise Levels ...........................................................................................................27
    5.3    Construction Reference Noise Levels ..........................................................................................27
    5.4    Construction Vibration Assessment Methodology......................................................................28

6    RECEIVER LOCATIONS.........................................................................................................................31
7    OPERATIONAL IMPACTS .....................................................................................................................33

    7.1    Operational Noise Levels ............................................................................................................33
    7.2    City of Los Angeles Operational Noise Level Compliance ...........................................................35
    7.3    LAUSD Operational Noise Level Compliance ..............................................................................37
    7.4    Operational Noise Level Perception at Palms..............................................................................39

URBAN
CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

**8**   **CONSTRUCTION IMPACTS**........................................................................................................**41**
8.1   Construction Noise Analysis......................................................................................... 42
8.2   City of Los Angeles Construction Noise Level Compliance ............................................ 45
8.3   LAUSD Construction Noise Level Compliance............................................................... 47
8.4   Construction Noise Level Perception at Palms.............................................................. 49
8.5   Construction Vibration Levels...................................................................................... 49
**9**   **REFERENCES**.........................................................................................................................**51**
**10**   **CERTIFICATION**.....................................................................................................................**53**

## APPENDICES

**APPENDIX 3.1: CITY OF LOS ANGELES MUNICIPAL CODE**
**APPENDIX 4.1: STUDY AREA PHOTOS**
**APPENDIX 4.2: NOISE LEVEL MEASUREMENT WORKSHEETS**
**APPENDIX 7.1: OPERATIONAL NOISE LEVEL CALCULATIONS**
**APPENDIX 8.1: TEMPORARY CONSTRUCTION NOISE BARRIER ATTENUATION CALCULATIONS**

## LIST OF EXHIBITS

**EXHIBIT ES-A: PROJECT DESIGN FEATURES DURING CONSTRUCTION**.......................................**6**
**EXHIBIT 1-A: LOCATION MAP**.........................................................................................................**8**
**EXHIBIT 1-B: SITE PLAN**................................................................................................................**9**
**EXHIBIT 2-A: TYPICAL NOISE LEVELS**..........................................................................................**11**
**EXHIBIT 2-B: TYPICAL LEVELS OF GROUND-BORNE VIBRATION** ...................................................**15**
**EXHIBIT 4-A: NOISE MEASUREMENT LOCATION** ..........................................................................**23**
**EXHIBIT 6-A: RECEIVER LOCATIONS** ............................................................................................**32**
**EXHIBIT 7-A: OPERATIONAL NOISE SOURCE AND RECEIVER LOCATIONS**.......................................**34**
**EXHIBIT 8-A: CONSTRUCTION ACTIVITY AND RECEIVER LOCATIONS** ............................................**41**

URBAN
CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

## LIST OF TABLES

TABLE 4-1: 24-HOUR AMBIENT NOISE LEVEL MEASUREMENTS ............................................................22
TABLE 5-1: REFERENCE NOISE LEVEL MEASUREMENTS.................................................................25
TABLE 5-2: CONSTRUCTION REFERENCE NOISE LEVELS ...............................................................28
TABLE 5-3: VIBRATION SOURCE LEVELS FOR CONSTRUCTION EQUIPMENT.............................29
TABLE 7-1: PROJECT OPERATIONAL NOISE LEVELS ....................................................................35
TABLE 7-2: DAYTIME PROJECT OPERATIONAL NOISE LEVEL COMPLIANCE (CITY OF LA)......................36
TABLE 7-3: NIGHTTIME PROJECT OPERATIONAL NOISE LEVEL COMPLIANCE (CITY OF LA)...................36
TABLE 7-4: PROJECT OPERATIONAL NOISE LEVEL COMPLIANCE (LAUSD) ...........................................37
TABLE 7-5: OPERATIONAL NOISE LEVEL CONTRIBUTIONS (LAUSD) ....................................................38
TABLE 8-1: DEMOLITION ACTIVITY NOISE LEVELS .......................................................................42
TABLE 8-2: SHORING EQUIPMENT NOISE LEVELS.......................................................................43
TABLE 8-3: EXCAVATION, SOIL EXPORT, AND GRADING EQUIPMENT NOISE LEVELS.......................43
TABLE 8-4: BUILDING CONSTRUCTION EQUIPMENT NOISE LEVELS ................................................44
TABLE 8-5: PAVING EQUIPMENT NOISE LEVELS ........................................................................44
TABLE 8-6: ARCHITECTURAL COATING EQUIPMENT NOISE LEVELS .................................................45
TABLE 8-7: CONSTRUCTION NOISE LEVELS WITHOUT PROJECT DESIGN FEATURES............................45
TABLE 8-8: CONSTRUCTION NOISE LEVEL COMPLIANCE WITHOUT PDFS.........................................46
TABLE 8-9: CONSTRUCTION NOISE LEVEL COMPLIANCE WITH PDFS .................................................46
TABLE 8-12: CONSTRUCTION NOISE LEVEL INCREASES (SHORING)................................................48
TABLE 8-13: CONSTRUCTION NOISE LEVEL INCREASES (ALL OTHER STAGES) ..................................48
TABLE 8-14: CONSTRUCTION EQUIPMENT VIBRATION LEVELS WITHOUT PDFS..............................50

URBAN
CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

## LIST OF ABBREVIATED TERMS

| | |
|---|---|
| (1) | Reference |
| ANSI | American National Standards Institute |
| CNEL | Community Noise Equivalent Level |
| dBA | A-weighted decibels |
| EPA | Environmental Protection Agency |
| FHWA | Federal Highway Administration |
| FTA | Federal Transit Administration |
| INCE | Institute of Noise Control Engineering |
| LAUSD | Los Angeles Unified School District |
| $L_{eq}$ | Equivalent continuous (average) sound level |
| $L_{max}$ | Maximum level measured over the time interval |
| $L_{min}$ | Minimum level measured over the time interval |
| mph | Miles per hour |
| NR | Noise Reduction |
| PPV | Peak Particle Velocity |
| Project | 3568 Motor Avenue |
| RMS | Root-mean-square |
| VdB | Vibration Decibels |



## EXECUTIVE SUMMARY

Urban Crossroads, Inc. has prepared this noise study to evaluate the potential noise levels generated by the operation and construction of the proposed 3568 Motor Avenue development ("Project"). The Project site is located at the northern corner of the intersection of Motor Avenue and Tabor Street in the City of Los Angeles. The Project is proposed to include the development of 42 multi-family residential dwelling units and 1,800 square feet of retail use. This noise study has been prepared in response to an appeal to the California Environmental Quality Act (CEQA) documentation for the Project.

### OPERATIONAL NOISE ANALYSIS

Using reference noise levels to represent the potential noise sources within the 3568 Motor Avenue site, this analysis estimates the Project-related operational (stationary-source) noise levels at Palms Elementary School ("Palms") located to the north of the Project and separated by a 20-foot wide alley. The Project-related operational noise sources are expected to include: roof-top air conditioning units, parking garage entry gates, a pad-mounted transformer, and outdoor pool area activity.

### CITY OF LOS ANGELES OPERATIONAL NOISE LEVEL COMPLIANCE

The City of Los Angeles Municipal Code has set exterior noise limits to control community noise impacts from non-transportation noise sources (such as air-conditioning units, refrigeration, heating, pumping, and filtering equipment). Section 112.02 indicates that stationary noise sources shall not operate in such a manner as to cause the noise level at any sensitive use to exceed the existing ambient noise level by 5 dBA. (1) The analysis shows the daytime operational noise levels limit, per the City of Los Angeles Municipal Code, is 72.7 dBA L$_{eq}$, and the peak Project-only operational noise levels ranging from 38.3 to 54.9 dBA L$_{eq}$ will satisfy the standards at Palms. Further, the nighttime operational noise levels limits, per the City of Los Angeles Municipal Code, will range from 67.8 dBA L$_{eq}$, and the Project-only operational noise levels ranging from 38.3 to 54.9 will satisfy the standards at Palms.

### LAUSD OPERATIONAL NOISE LEVEL COMPLIANCE

Noise levels at the closest outdoor playground and exterior classroom building of Palms are analyzed in this noise study based on the noise standards identified in the January 23rd, 2017 comment letter prepared by the Los Angeles Unified School District (LAUSD) Office of Environmental Health and Safety. (2) The LAUSD comment letter identifies an operational exterior noise level standard of 67 dBA L$_{eq}$ and interior noise level standard of 52 dBA L$_{eq}$. In addition, operational and construction noise level increases, are based on the LAUSD letter, limited to 3 dBA or less over existing ambient conditions. (2)



1

The Project operational noise levels are evaluated at receiver locations R1 and R2, which represent the closest Palms outdoor playground area and classroom building, respectively, when school is in session. The receiver locations and this analysis assume the playground is relocated to the north of the planned parking lot shown on Exhibit ES-A. However, these receiver locations do not represent sensitive uses when school is out of session and unoccupied (e.g., over the summer break, etc.). The results of the analysis show that exterior Project operational noise levels at receiver locations R1 and R2 will range from 38.3 to 54.9 dBA $L_{eq}$, and therefore, will satisfy the LAUSD exterior noise level standard of 67 dBA $L_{eq}$.

The interior noise level is the difference between the predicted exterior noise level at the building façade and the noise reduction of the structure. Typical building construction will provide a minimum Noise Reduction (NR) of approximately 20 to 25 dBA with "windows closed." (3) As such, this analysis assumes a conservative 20 dBA interior noise reduction to assess Project operational noise levels based on the LAUSD interior noise levels standards for interior classroom spaces. The Project operational noise levels with the 20 dBA interior noise reduction will approach 34.9 dBA $L_{eq}$, and will satisfy the LAUSD 52 dBA $L_{eq}$ interior noise level standard at the closest classroom building represented by R2. The exterior noise levels ranging from 38.3 to 54.9 dBA $L_{eq}$ represent quiet urban daytime and nighttime noise levels and based on the existing ambient noise level of up to 67.7 dBA $L_{eq}$ measured adjacent to Palms and Motor Avenue, will be largely overshadowed by existing and future traffic noise sources in the Project study area.

Further, the Project will contribute a daytime operational noise level increase of up to 0.2 dBA $L_{eq}$ at receiver locations R1 and R2 and will satisfy with the LAUSD 3 dBA $L_{eq}$ increase above ambient standard. Noise level increases of less than 1 dBA are typically unable to be perceived except in carefully controlled laboratory experiments. (3) While some Project-related noise sources and/or short-term noise events may be audible to receivers within Palms, the findings of this analysis indicate that Project operational noise levels will remain below the LAUSD exterior, interior, and noise level increase standards. The results of the operational noise analysis include the additional barrier attenuation provided by the planned 6-foot high concrete block wall at the northern Project site boundary, as indicated in the Project Design Features (PDF) section.

## CONSTRUCTION NOISE ANALYSIS

Construction-related noise levels are expected to create temporary and intermittent high-level noise conditions at Palms when certain activities occur at the closest point to the nearby receiver locations from the edge of primary Project construction activity. The construction noise levels, without the planned PDFs, are expected to range from 72.7 to 77.9 dBA $L_{eq}$ at the Palms receiver locations. The Project Design Features (PDFs) described in this section are shown on Exhibit ES-A.

CITY OF LOS ANGELES CONSTRUCTION NOISE LEVEL COMPLIANCE

For construction activities lasting more than 10 days in a three-month period, such as activities at the Project site, the City of Los Angeles identifies a noise level standard of 5 dBA above the

URBAN
CROSSROADS

existing exterior ambient noise levels at adjacent sensitive receiver locations. Based on the construction noise levels without PDFs, Project construction noise levels would exceed the City of Los Angeles 5 dBA above existing ambient noise level standard at the Palms sensitive receiver locations (R1 and R2). Therefore, to reduce Project construction noise levels, multiple Project Design Features (PDFs) have been identified and included in the Project development to reduce the noise levels at adjacent sensitive receiver locations.

Temporary noise barrier attenuation has been calculated for a 12-foot high temporary noise barrier identified in the PDFs. The reduced construction noise levels with PDFs at Palms will approach 68.9 dBA L$_{eq}$ during shoring, and 65.3 dBA L$_{eq}$ during non-shoring construction activities, and will satisfy the City of Los Angeles 5 dBA plus ambient noise level standard.

**LAUSD CONSTRUCTION NOISE LEVEL COMPLIANCE**

The planning of Project construction during periods when Palms is not in session is considered a PDF for reducing construction noise levels, since receiver locations R1 and R2 would no longer be considered sensitive receivers if unoccupied at the time of Project construction. Nonetheless, this section analyzes Project shoring and non-shoring construction activities, capable of generating the highest construction noise levels, based on the LAUSD 3 dBA ambient noise level increase standard.

Based on reference shoring equipment noise levels, receiver location R2, which represents the closest classroom building to Project construction, would experience a noise level increase of 3.7 dBA L$_{eq}$, exceeding the LAUSD 3 dBA increase standard. As such, a PDF for Project construction includes restricting the shoring stage of construction to a time when Palms is not in session, thereby eliminating the temporary noise level increase since R2 would represent unoccupied school property. Based on the non-shoring construction activity noise levels for all other stages, receiver locations R1 and R2 would experience Project construction-related noise level increases between 0.9 to 2.0 dBA L$_{eq}$, which would remain below the LAUSD 3 dBA increase standard at Palms.

Noise level increases of up to 3.7 dBA L$_{eq}$ during shoring would be considered *barely perceptible* above existing ambient noise level conditions, and therefore, Project shoring activities as a PDF are restricted to time periods when school is not in session. Increases during all other construction stages of 2.0 dBA L$_{eq}$ are considered less than *barely perceptible* and will likely be largely overshadowed by existing traffic noise levels in the Project study area. (3) However, while Project construction noise levels are shown to satisfy the standards identified in this study with the planned PDFs, temporary Project construction-related noise sources will still be audible to adjacent sensitive receiver locations within Palms.

**CONSTRUCTION VIBRATION ANALYSIS**

Based on the reference vibration levels provided by the Federal Transit Administration (FTA) and Caltrans, a caisson drill represents the peak source of vibration with a reference peak particle velocity (PPV) of 0.089 in/sec at 25 feet. At distances ranging from 45 to 82 feet from the Project construction activities, construction vibration levels are expected to range from

URBAN CROSSROADS

0.015 to 0.037 in/sec PPV at the identified receptors. The Project-related vibration levels are shown to satisfy the Caltrans human annoyance threshold of 0.04 in/sec PPV and building damage threshold for older residential structures of 0.3 in/sec PPV at the outdoor playground and closest classroom building of Palms.

**PROJECT DESIGN FEATURES**

- **Operational Noise**
  - Construct the planned 6-foot high concrete block wall at the LAUSD property line. The barrier shall provide a weight of at least 4 pounds per square foot of face area with no decorative cutouts or line-of-sight openings between shielded areas and the Project site, and a minimum transmission loss of 20 dBA. (4) The barrier shall consist of a solid face from top to bottom. Unnecessary openings or decorative cutouts shall not be made. All gaps (except for weep holes) should be filled with grout or caulking. The noise barrier shall be constructed using the following materials:
    - Masonry block;
    - Earthen berm;
    - Or any combination of construction materials capable of the minimum weight of 4 pounds per square foot and a minimum transmission loss of 20 dBA.

- **Construction Noise**

  In accordance with LAMC Section 112.02, a regulatory control measure recognized by the Los Angeles Department of Building and Safety, the following project design features shall be incorporated into the Project:
  - Install minimum 12-foot high temporary construction noise barriers at the Project northern and eastern boundaries for the duration of Project construction activities as indicated on Exhibit ES-A. The noise control barriers must present a solid face from top to bottom. The noise control barrier must meet the minimum heights and be constructed as follows:
    - The barrier shall provide a minimum transmission loss of 20 dBA. (4) The noise barrier may be constructed using an acoustical blanket (e.g. vinyl acoustic curtains or quilted blankets) attached to the construction site perimeter fence or equivalent temporary fence posts;
    - The noise barriers must be maintained, and any damage promptly repaired. Gaps, holes, or weaknesses in the barrier or openings between the barrier and the ground shall be promptly repaired.
    - The noise control barriers and associated elements shall be completely removed, and the site appropriately restored upon the conclusion of the construction activity.
  - Shoring activities shall be restricted to a time period when Palms is not in session (e.g., summer break) since these activities represent the highest noise and vibration generating Project construction activities adjacent to the noise-sensitive outdoor playground and indoor classroom areas.



URBAN
CROSSROADS

- **Construction Best Practices**

  o Prior to approval of grading plans and/or issuance of building permits, plans shall include a note indicating that noise-generating Project construction activities shall only occur between the hours of 7:00 a.m. to 9:00 p.m. Monday through Friday; 8:00 a.m. to 6:00 p.m. on Saturday with no activity allowed on Sundays (City of Los Angeles CEQA Thresholds Guide). The Project construction supervisor shall ensure compliance with the note and the City of Los Angeles shall conduct periodic inspection at its discretion. (5)

  o During all Project site construction, the construction contractors shall equip all construction equipment, fixed or mobile, with properly operating and maintained mufflers, consistent with manufacturers' standards. The construction contractor shall place all stationary construction equipment so that emitted noise is directed away from the noise sensitive receptors nearest the Project site (City of Los Angeles CEQA Thresholds Guide). (5)

  o The construction contractor shall locate equipment staging in areas that will create the greatest distance between construction-related noise sources and Palms site (i.e., to the center) during all Project construction where feasible and permitted by the City of Los Angeles (City of Los Angeles CEQA Thresholds Guide). (5)

  o The construction contractor shall limit haul truck deliveries to the same hours specified for construction equipment (between the hours of 7:00 a.m. to 9:00 p.m. Monday through Friday; 8:00 a.m. to 6:00 p.m. on Saturday with no activity allowed on Sundays). The contractor shall prepare a haul route exhibit and shall design delivery routes to minimize the exposure of sensitive land uses or residential dwellings to delivery truck-related noise (City of Los Angeles CEQA Thresholds Guide). (5)





3568 Motor Avenue Noise Impact Analysis

## EXHIBIT ES-A: PROJECT DESIGN FEATURES DURING CONSTRUCTION



**LEGEND:**

🔵 Receiver Locations

▨ Construction Activity

─●  Distance from receiver to primary construction activity (in feet)

⌐┘ Temporary Noise Barrier

12'  Temporary Noise Barrier Height (in feet)



# 1  INTRODUCTION

This noise analysis has been completed to determine the noise impacts associated with the development of the proposed 3568 Motor Avenue ("Project"). This noise study describes the proposed Project, provides information regarding noise fundamentals, outlines the local regulatory setting, provides the study methods and procedures for operational and construction noise analysis, and evaluates the future exterior noise environment.

## 1.1  SITE LOCATION

The proposed 3568 Motor Avenue Project is located at the northern corner of the intersection of Motor Avenue and Tabor Street in the City of Los Angeles, as shown on Exhibit 1-A. Existing residential and commercial/office land uses are located south, east, and west of the Project site, and Palms is located north of Project site boundary and is separated by a 20-foot wide alley.

## 1.2  PROJECT DESCRIPTION

The Project is proposed to include the development of 42 multi-family residential dwelling units and 1,800 square feet of retail use, as shown on Exhibit 1-B. The on-site Project-related operational noise sources are expected to include: roof-top air conditioning units, parking garage entry gates, a pad-mounted transformer, and outdoor pool area activity.

*3568 Motor Avenue Noise Impact Analysis*

**EXHIBIT 1-A: LOCATION MAP**



*11470-11 Noise Study*

8

**URBAN**
CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

**EXHIBIT 1-B: SITE PLAN**



URBAN
CROSSROADS

*This page intentionally left blank*

URBAN CROSSROADS

## 2   FUNDAMENTALS

Noise has been simply defined as "unwanted sound." Sound becomes unwanted when it interferes with normal activities, when it causes actual physical harm or when it has adverse effects on health. Noise is measured on a logarithmic scale of sound pressure level known as a decibel (dB). A-weighted decibels (dBA) approximate the subjective response of the human ear to broad frequency noise source by discriminating against very low and very high frequencies of the audible spectrum. They are adjusted to reflect only those frequencies which are audible to the human ear. Exhibit 2-A presents a summary of the typical noise levels and their subjective loudness and effects that are described in more detail below.

**EXHIBIT 2-A: TYPICAL NOISE LEVELS**

| COMMON OUTDOOR ACTIVITIES | COMMON INDOOR ACTIVITIES | A - WEIGHTED SOUND LEVEL dBA | SUBJECTIVE LOUDNESS | EFFECTS OF NOISE |
|---|---|---|---|---|
| THRESHOLD OF PAIN | | 140 | | |
| NEAR JET ENGINE | | 130 | | |
| | | 120 | | |
| JET FLY-OVER AT 300m (1000 ft) | ROCK BAND | 110 | | |
| LOUD AUTO HORN | | 100 | | |
| GAS LAWN MOWER AT 1m (3 ft) | | 90 | | |
| DIESEL TRUCK AT 15m (50 ft), at 80 km/hr (50 mph) | FOOD BLENDER AT 1m (3 ft) | 80 | | |
| NOISY URBAN AREA, DAYTIME | VACUUM CLEANER AT 3m (10 ft) | 70 | LOUD | SLEEP DISTURBANCE |
| HEAVY TRAFFIC AT 80m (300 ft) | NORMAL SPEECH AT 1m (3 ft) | 60 | | |
| QUIET URBAN DAYTIME | LARGE BUSINESS OFFICE | 50 | MODERATE | |
| QUIET URBAN NIGHTTIME | THEATER, LARGE CONFERENCE ROOM (BACKGROUND) | 40 | | |
| QUIET SUBURBAN NIGHTTIME | LIBRARY | 30 | FAINT | |
| QUIET RURAL NIGHTTIME | BEDROOM AT NIGHT, CONCERT HALL (BACKGROUND) | 20 | | NO EFFECT |
| | BROADCAST/RECORDING STUDIO | 10 | VERY FAINT | |
| LOWEST THRESHOLD OF HUMAN HEARING | LOWEST THRESHOLD OF HUMAN HEARING | 0 | | |

*Source: Environmental Protection Agency Office of Noise Abatement and Control, Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety (EPA/ONAC 550/9-74-004) March 1974.*

### 2.1   RANGE OF NOISE

Since the range of intensities that the human ear can detect is so large, the scale frequently used to measure intensity is a scale based on multiples of 10, the logarithmic scale. The scale for measuring intensity is the decibel scale. Each interval of 10 decibels indicates a sound energy ten times greater than before, which is perceived by the human ear as being roughly twice as loud. (6) The most common sounds vary between 40 dBA (very quiet) to 100 dBA (very loud). Normal conversation at three feet is roughly at 60 dBA, while loud jet engine noises

URBAN CROSSROADS

equate to 110 dBA at approximately 100 feet, which can cause serious discomfort. (7) Another important aspect of noise is the duration of the sound and the way it is described and distributed in time.

## 2.2   NOISE DESCRIPTORS

Environmental noise descriptors are generally based on averages, rather than instantaneous, noise levels. The most commonly used figure is the equivalent level ($L_{eq}$). Equivalent sound levels are not measured directly but are calculated from sound pressure levels typically measured in A-weighted decibels (dBA). The equivalent sound level ($L_{eq}$) represents a steady state sound level containing the same total energy as a time varying signal over a given sample period and is commonly used to describe the "average" noise levels within the environment.

Peak hour or average noise levels, while useful, do not completely describe a given noise environment. Noise levels lower than peak hour may be disturbing if they occur during times when quiet is most desirable, namely evening and nighttime (sleeping) hours. To account for this, the Community Noise Equivalent Level (CNEL), representing a composite 24-hour noise level is utilized. The CNEL is the weighted average of the intensity of a sound, with corrections for time of day, and averaged over 24 hours. The time of day corrections require the addition of 5 decibels to dBA $L_{eq}$ sound levels in the evening from 7:00 p.m. to 10:00 p.m., and the addition of 10 decibels to dBA $L_{eq}$ sound levels at night between 10:00 p.m. and 7:00 a.m. These additions are made to account for the noise sensitive time periods during the evening and night hours when sound appears louder. CNEL does not represent the actual sound level heard at any time, but rather represents the total sound exposure. The City of Los Angeles relies on the 24-hour CNEL level to assess land use compatibility with transportation related noise sources.

## 2.3   SOUND PROPAGATION

When sound propagates over a distance, it changes in level and frequency content. The way noise reduces with distance depends on the following factors.

### 2.3.1   GEOMETRIC SPREADING

Sound from a localized source (i.e., a stationary point source) propagates uniformly outward in a spherical pattern. The sound level attenuates (or decreases) at a rate of 6 dB for each doubling of distance from a point source. Highways consist of several localized noise sources on a defined path and hence can be treated as a line source, which approximates the effect of several point sources. Noise from a line source propagates outward in a cylindrical pattern, often referred to as cylindrical spreading. Sound levels attenuate at a rate of 3 dB for each doubling of distance from a line source. (6)

### 2.3.2   GROUND ABSORPTION

The propagation path of noise from a highway to a receptor is usually very close to the ground. Noise attenuation from ground absorption and reflective wave canceling adds to the attenuation associated with geometric spreading. Traditionally, the excess attenuation has also



Case 2:17-cv-09003-JAK-PJW Document 208-13 Filed 06/24/20 Page 336 of 636 Page ID #:6493

been expressed in terms of attenuation per doubling of distance. This approximation is usually sufficiently accurate for distances of less than 200 ft. For acoustically hard sites (i.e., sites with a reflective surface between the source and the receptor, such as a parking lot or body of water), no excess ground attenuation is assumed. For acoustically absorptive or soft sites (i.e., those sites with an absorptive ground surface between the source and the receptor such as soft dirt, grass, or scattered bushes and trees), an excess ground attenuation value of 1.5 dB per doubling of distance is normally assumed. When added to the cylindrical spreading, the excess ground attenuation results in an overall drop-off rate of 4.5 dB per doubling of distance from a line source. (3)

### 2.3.3 ATMOSPHERIC EFFECTS

Receptors located downwind from a source can be exposed to increased noise levels relative to calm conditions, whereas locations upwind can have lowered noise levels. Sound levels can be increased at large distances (e.g., more than 500 feet) due to atmospheric temperature inversion (i.e., increasing temperature with elevation). Other factors such as air temperature, humidity, and turbulence can also have significant effects. (6)

### 2.3.4 SHIELDING

A large object or barrier in the path between a noise source and a receptor can substantially attenuate noise levels at the receptor. The amount of attenuation provided by shielding depends on the size of the object and the frequency content of the noise source. Shielding by trees and other such vegetation typically only has an "out of sight, out of mind" effect. That is, the perception of noise tends to decrease when vegetation blocks the line-of-sight to nearby resident. However, for vegetation to provide a substantial, or even noticeable, noise reduction, the vegetation area must be at least 15 feet in height, 100 feet wide and dense enough to completely obstruct the line-of sight between the source and the receiver. This size of vegetation may provide up to 5 dBA of noise reduction. The FHWA does not consider the planting of vegetation to be a noise abatement measure. (3)

### 2.4 NOISE CONTROL

Noise control is the process of obtaining an acceptable noise environment for an observation point or receptor by controlling the noise source, transmission path, receptor, or all three. This concept is known as the source-path-receptor concept. In general, noise control measures can be applied to these three elements.

### 2.5 NOISE BARRIER ATTENUATION

Effective noise barriers can reduce noise levels by 10 to 15 dBA, cutting the loudness of traffic noise in half. A noise barrier is most effective when placed close to the noise source or receptor. Noise barriers, however, do have limitations. For a noise barrier to work, it must be high enough and long enough to block the path of the noise source. (3)



## 2.6 VIBRATION

Per the Federal Transit Administration (FTA) *Transit Noise Impact and Vibration Assessment* (8), vibration is the periodic oscillation of a medium or object. The rumbling sound caused by the vibration of room surfaces is called structure-borne noise. Sources of ground-borne vibrations include natural phenomena (e.g., earthquakes, volcanic eruptions, sea waves, landslides) or human-made causes (e.g., explosions, machinery, traffic, trains, construction equipment). Vibration sources may be continuous, such as factory machinery, or transient, such as explosions. As is the case with airborne sound, ground-borne vibrations may be described by amplitude and frequency.

There are several different methods that are used to quantify vibration. The peak particle velocity (PPV) is defined as the maximum instantaneous peak of the vibration signal. The PPV is most frequently used to describe vibration impacts to buildings but is not always suitable for evaluating human response (annoyance) because it takes some time for the human body to respond to vibration signals. Instead, the human body responds to average vibration amplitude often described as the root mean square (RMS). The RMS amplitude is defined as the average of the squared amplitude of the signal and is most frequently used to describe the effect of vibration on the human body. Decibel notation (VdB) is commonly used to measure RMS. Decibel notation (VdB) serves to reduce the range of numbers used to describe human response to vibration. Typically, ground-borne vibration generated by man-made activities attenuates rapidly with distance from the source of the vibration. Sensitive receivers for vibration include structures (especially older masonry structures), people (especially residents, the elderly, and sick), and vibration-sensitive equipment.

The background vibration-velocity level in residential areas is generally 50 VdB. Ground-borne vibration is normally perceptible to humans at approximately 65 VdB. For most people, a vibration-velocity level of 75 VdB is the approximate dividing line between barely perceptible and distinctly perceptible levels. Typical outdoor sources of perceptible ground-borne vibration are construction equipment, steel-wheeled trains, and traffic on rough roads. If a roadway is smooth, the ground-borne vibration is rarely perceptible. The range of interest is from approximately 50 VdB, which is the typical background vibration-velocity level, to 100 VdB, which is the general threshold where minor damage can occur in fragile buildings. Exhibit 2-B illustrates common vibration sources and the human and structural response to ground-borne vibration.

**URBAN**
CROSSROADS

*J568 Motor Avenue Noise Impact Analysis*

## EXHIBIT 2-B: TYPICAL LEVELS OF GROUND-BORNE VIBRATION



\* *RMS Vibration Velocity Level in VdB relative to 10⁻⁶ inches/second*

*Source: Federal Transit Administration (FTA) Transit Noise Impact and Vibration Assessment.*

*This page intentionally left blank*

URBAN
CROSSROADS

# 3 REGULATORY SETTING

To limit population exposure to physically and/or psychologically damaging as well as intrusive noise levels, the federal government, the State of California, various county governments, and most municipalities in the state have established standards and ordinances to control noise. In most areas, automobile and truck traffic is the major source of environmental noise. Traffic activity generally produces an average sound level that remains constant with time. Air and rail traffic, and commercial and industrial activities are also major sources of noise in some areas. Federal, state, and local agencies regulate different aspects of environmental noise. Federal and state agencies generally set noise standards for mobile sources such as aircraft and motor vehicles, while regulation of stationary sources is left to local agencies.

## 3.1 STATE OF CALIFORNIA NOISE REQUIREMENTS

The State of California regulates freeway noise, sets standards for sound transmission, provides occupational noise control criteria, identifies noise standards, and provides guidance for local land use compatibility. State law requires that each county and city adopt a General Plan that includes a Noise Element which is to be prepared per guidelines adopted by the Governor's Office of Planning and Research. {9} The purpose of the Noise Element is to *limit the exposure of the community to excessive noise levels*. In addition, the California Environmental Quality Act (CEQA) requires that all known environmental effects of a project be analyzed, including environmental noise impacts.

## 3.2 CITY OF LOS ANGELES GENERAL PLAN NOISE ELEMENT

The City of Los Angeles has adopted a Noise Element of the General Plan to identify goals, objectives, and policies for managing noise issues within the City. (10) The following goal and objectives are identified in the General Plan Noise Element:

| | |
|---|---|
| *Goal* | *A city where noise does not reduce the quality of urban life.* |
| *Objective 1* | *Reduce airport and harbor related noise impacts.* |
| *Objective 2* | *Reduce or eliminate nonairport related intrusive noise, especially relative to noise sensitive uses.* |
| *Objective 3* | *Reduce or eliminate noise impacts associated with proposed development of land and changes in land use.* |

While the Noise Element identifies the policies for managing noise issues within the City, the City of Los Angeles also identifies a specific *CEQA Thresholds Guide* for determining potential noise impacts due to new developments such as the Project. Therefore, the *CEQA Thresholds Guide* is used in this noise study to determine if Project-related noise sources will generate noise levels capable of exceeding the City of Los Angeles standards.



### 3.3 CITY OF LOS ANGELES CEQA THRESHOLDS GUIDE

The City of Los Angeles *CEQA Thresholds Guide* identifies the screening criteria and thresholds for construction, operational, railroad, and airport-related noise impacts. (5) For the purposes of this analysis, construction Project-related noise levels at Palms are analyzed based on the City of Los Angeles *CEQA Thresholds Guide*, while stationary-source noise levels at Palms generated by the operation of the Project are evaluated based on the Municipal Code noise level standards. The following criteria are used to evaluate construction noise levels in the City of Los Angeles:

- *Construction activities lasting more than one day would exceed existing ambient exterior noise levels by 10 dBA or more at a noise sensitive use;*

- *Construction activities lasting more than 10 days in a three month period would exceed existing ambient exterior noise levels by 5 dBA or more at a noise sensitive use; or*

- *Construction activities would exceed the ambient noise level by 5 dBA at a noise sensitive use between the hours of 9:00 p.m. and 7:00 a.m. Monday through Friday, before 8:00 a.m. or after 6:00 p.m. on Saturday, or at anytime on Sunday.*

### 3.4 CITY OF LOS ANGELES MUNICIPAL CODE NOISE STANDARDS

To analyze noise impacts originating from a designated fixed location or private property such as the 3568 Motor Avenue Project, stationary-source (operational) noise such as the expected roof-top air conditioning units, parking garage entry gates, a pad-mounted transformer, and outdoor pool area activity are typically evaluated against standards established under a jurisdiction's Municipal Code or General Plan.

The City of Los Angeles Municipal Code, Chapter XI *Noise Regulation*, has set exterior noise limits to control community noise impacts from non-transportation noise sources (such as air-conditioning units, refrigeration, heating, pumping, and filtering equipment). Section 112.02 indicates that stationary noise sources shall not operate in such a manner as to cause the noise level at any sensitive use to exceed the existing ambient noise level by 5 dBA. (1) The City of Los Angeles Municipal Code, Chapter XI, is provided in Appendix 3.1.

### 3.5 LOS ANGELES UNIFIED SCHOOL DISTRICT NOISE STANDARDS

The Palms is located north of the Project site separated by a 20-foot wide alley, and therefore, noise levels at both outdoor playground and exterior classroom building façades are analyzed in this noise study based on the noise standards identified in the January 23rd, 2017 comment letter prepared by the Los Angeles Unified School District (LAUSD) Office of Environmental Health and Safety. (2)

The LAUSD comment letter cites regulations based on Caltrans and City of Los Angeles regulations including an operational exterior noise level standard of 67 dBA $L_{eq}$ and interior noise level standard of 52 dBA $L_{eq}$. In addition, operational and construction noise level increases are, based on the LAUSD letter, limited to below 3 dBA over existing ambient

URBAN
CROSSROADS

conditions. (2)  As such, this noise study evaluates Project operational and construction noise levels based on both the City of Los Angeles and LAUSD noise standards.

### 3.6   VIBRATION STANDARDS

The City of Los Angeles and LAUSD do not identify specific vibration standards for temporary construction, and therefore, the Caltrans *Transportation and Construction Vibration Guidance Manual* standards are used in this noise study. (11)  Table 19 and 20 of the Caltrans manual identify building damage and human annoyance vibration level standards, respectively, for evaluating construction-generated vibration levels.  Based on the planned equipment for Project construction, the peak particle velocity (PPV) standards for *continuous/frequent intermittent sources* of vibration are used to assess potential Project construction noise levels against both human annoyance and building damage vibration level standards.  Therefore, Project construction vibration levels are evaluated based on Caltrans' *distinctly perceptible* 0.04 in/sec human annoyance standard, and Caltrans' building damage vibration level standard of 0.3 in/sec PPV for *older residential structures*. (11)

*This page intentionally left blank*

URBAN
CROSSROADS

# 4    EXISTING NOISE LEVEL MEASUREMENTS

To assess the existing noise level environment, a 24-hour noise level measurement was taken adjacent to Palms. The location was selected to describe and document the existing noise environment at Palms adjacent to the Project site. Exhibit 4-A provides the noise level measurement location.    To fully describe the existing noise conditions, noise level measurement was collected by Urban Crossroads, Inc. on Wednesday, January 31ˢᵗ, 2018. Appendix 4.1 includes study area photos.

## 4.1    MEASUREMENT PROCEDURE AND CRITERIA

To describe the existing noise environment, the hourly noise levels were measured during typical weekday conditions over a 24-hour period. By collecting individual hourly noise level measurements, it is possible to describe the daytime and nighttime hourly noise levels and calculate the 24-hour CNEL. The long-term noise readings were recorded using Piccolo Type 2 integrating sound level meter and dataloggers. The Piccolo sound level meters were calibrated using a Larson-Davis calibrator, Model CAL 150. All noise meters were programmed in "slow" mode to record noise levels in "A" weighted form. The sound level meters and microphones were equipped with a windscreen during all measurements. All noise level measurement equipment satisfies the American National Standards Institute (ANSI) standard specifications for sound level meters ANSI S1.4-2014/IEC 61672-1:2013. (12)

## 4.2    NOISE MEASUREMENT LOCATIONS

The long-term noise level measurement was positioned as close to Palms as possible to assess the existing ambient hourly noise levels. Both Caltrans and the FTA recognize that it is not reasonable to collect noise level measurements that can fully represent any particular location when estimating impacts for new development projects. This is demonstrated in the Caltrans general site location guidelines which indicate that, *sites must be free of noise contamination by sources other than sources of interest. Avoid sites located near sources such as barking dogs, lawnmowers, pool pumps, and air conditioners unless it is the express intent of the analyst to measure these sources.* (6)    Further, FTA guidance states, *that it is not necessary nor recommended that existing noise exposure be determined by measuring at every noise-sensitive location in the project area. Rather, the recommended approach is to characterize the noise environment for clusters of sites based on measurements or estimates at representative locations in the community.* (8)

Based on recommendations of Caltrans and the FTA, it is not necessary to collect measurements at each individual building, because each receiver measurement represents a group of buildings that share acoustical equivalence. (8) In other words, the area represented by the receiver shares similar shielding, terrain, and geometric relationship to the reference noise source. Receivers represent a location of noise sensitive areas and are used to estimate the future noise level impacts. Collecting reference ambient noise level measurements at the nearby sensitive Palms allows for a comparison of the before and after Project noise levels and

**URBAN** CROSSROADS

Is necessary to assess potential noise impacts due to the Project's contribution to the ambient noise levels.

## 4.3    NOISE MEASUREMENT RESULTS

The noise measurement presented below focuses on the average or equivalent sound levels ($L_{eq}$). The equivalent sound level ($L_{eq}$) represents a steady state sound level containing the same total energy as a time varying signal over a given sample period. Table 4-1 identifies the hourly daytime (7:00 a.m. to 10:00 p.m.) and nighttime (10:00 p.m. to 7:00 a.m.) noise levels at the noise level measurement location. Appendix 4.2 provides a summary of the existing hourly ambient noise levels described below:

- Location L1 represents the noise levels on Motor Avenue adjacent to Palms near the western Project site boundary. The noise level measurements collected show an overall 24-hour exterior noise level of 70.7 dBA CNEL. The hourly noise levels measured at location L1 ranged from 61.4 to 72.0 dBA $L_{eq}$ during the daytime hours and from 56.2 to 68.1 dBA $L_{eq}$ during the nighttime hours. The energy (logarithmic) average daytime noise level was calculated at 67.7 dBA $L_{eq}$ with an average nighttime noise level of 62.8 dBA $L_{eq}$.

Table 4-1 provides the (energy average) noise levels used to describe the daytime and nighttime ambient conditions. These daytime and nighttime energy average noise levels represent the average of all hourly noise levels observed during these time periods expressed as a single number. Appendix 4.2 provides summary worksheet of the noise levels for each hour as well as the minimum, maximum, $L_1$, $L_2$, $L_5$, $L_8$, $L_{25}$, $L_{50}$, $L_{80}$, $L_{95}$, and $L_{99}$ percentile noise levels observed during the daytime and nighttime periods.

The background ambient noise levels in the Project study area are dominated by the transportation-related noise associated with the arterial roadway network. The 24-hour existing noise level measurements shown on Table 4-1 present the existing ambient noise conditions.

#### TABLE 4-1: 24-HOUR AMBIENT NOISE LEVEL MEASUREMENTS

| Location[1] | Distance to Project Boundary (Feet) | Description | Energy Average (Hourly Noise Level) (dBA $L_{eq}$) | | CNEL |
|---|---|---|---|---|---|
| | | | Daytime | Nighttime | |
| L1 | 0' | Located on Motor Avenue adjacent to the Palms Elementary School playground near the western Project site boundary. | 67.7 | 62.8 | 70.7 |

[1] See Exhibit 4-A for the noise level measurement locations.

[2] Energy (logarithmic) average hourly levels. The long-term 24-hour measurement worksheet is included in Appendix 4.2.

"Daytime" = 7:00 a.m. to 10:00 p.m.; "Nighttime" = 10:00 p.m. to 7:00 a.m.



URBAN CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

EXHIBIT 4-A: NOISE MEASUREMENT LOCATION



LEGEND:

△  Noise Measurement Locations

23

**URBAN** CROSSROADS

*3568 Motor Avenue Noise Impact Analysis*

*This page intentionally left blank*

**URBAN**
CROSSROADS

# 5   METHODS AND PROCEDURES

The following section outlines the methods and procedures used to model and analyze the potential Project-related operational and construction noise levels.

## 5.1   OPERATIONAL REFERENCE NOISE LEVELS

To estimate the Project operational noise impacts, reference noise level measurements were collected from similar types of activities to represent the noise levels expected with the development of the proposed Project. This section provides a detailed description of the reference noise level measurements shown on Table 5-1 used to estimate the Project operational noise impacts associated with roof-top air conditioning units, parking garage entry gates, a pad-mounted transformer, and outdoor pool area activity.

**TABLE 5-1: REFERENCE NOISE LEVEL MEASUREMENTS**

| Noise Source | Duration (hh:mm:ss) | Dist. From Source (Feet) | Noise Source Height (Feet) | Hourly Activity (Mins) | Reference Noise Level (dBA $L_{eq}$) | |
|---|---|---|---|---|---|---|
| | | | | | @ Ref. Dist. | @ 50 Feet |
| Roof-top Air Conditioning Unit[1] | 96:00:00 | 5' | 5' | 39 | 77.2 | 57.2 |
| Parking Garage Entry Gate[3] | 00:00:24 | 5' | 10' | 60 | 60.1 | 40.1 |
| Pad-Mounted Transformer[4] | n/a | 6' | 5' | 60 | 56.0 | 37.6 |
| Outdoor Pool Activity[5] | 00:10:00 | 5' | 4' | 60 | 71.0 | 51.0 |

[1] Anticipated duration (minutes within the hour) of noise activity during typical hourly conditions expected at the Project site based on the reference nose level measurement activity.
[2] As measured by Urban Crossroads, Inc. on 7/27/2015 at the Santee Walmart located at 170 Town Center Parkway.
[3] As measured by Urban Crossroads, Inc. on 6/10/2016 at the Audi Mission Viejo dealership.
[4] Source: NEMA TR 1-2013 Transformers, Step Voltage Regulators and Reactors, Table 2 sound level for a 500 kVA transformer.
[5] As measured by Urban Crossroads, Inc. on 7/5/2017 at the Covenant Hill Clubhouse Pool in the unincorporated community of Ladera Ranch in the County of Orange.

### 5.1.1   ROOF-TOP AIR CONDITIONING UNITS

At the time this noise study was prepared, the specific model specifications of the mechanical equipment to be used at the Project site was unknown. Therefore, to present a conservative approach, a reference noise level measurement of a commercial-sized air conditioning unit (roof-top) is used to represent worst-case conditions. To assess the noise levels created by the roof-top air conditioning units at the Project site, reference noise levels measurements were taken at the Santee Walmart on July 27th, 2015. Located at 170 Town Center Parkway in the City of Santee, the noise level measurements describe a single mechanical roof-top air conditioning unit on the roof of an existing Walmart store, with background roof-top unit activity. The reference noise level represents a Lennox SCA120 series 10-ton model packaged air conditioning unit. Using a uniform reference distance of 50 feet, the reference noise level noise level is 57.2 dBA $L_{eq}$. The operating conditions of the reference noise level measurement reflect peak summer cooling requirements with measured temperatures approaching 96

degrees Fahrenheit (°F) with average daytime temperatures of 82°F, which resulted in a peak hourly activity of 39 of the total 60 minutes. The noise attenuation provided by a parapet wall is not reflected in this reference noise level measurement.

### 5.1.2 PARKING GARAGE ENTRY GATE

A garage entry gate (roll-up) reference noise level measurement was taken at the Audi Mission Viejo dealership to represent the multiple parking garage entry gates within the Project's proposed facilities. At 50 feet, the reference noise level is 40.1 dBA $L_{eq}$ at a noise source height of 10 feet. The garage doors at the Project site are anticipated to open and closed as needed. To present a worst-case analysis, noise associated with the entry gates is expected during the typical daytime, and nighttime conditions for the entire hour (60 minutes).

### 5.1.3 PAD-MOUNTED TRANSFORMER

To determine the noise level impacts associated with a pad-mounted transformer within the Project site, the National Electrical Manufacturers Association (NEMA) *Transformers, Step Voltage Regulators and Reactors*, Table 2 sound level for a 500 kVA transformer is used in this analysis. (13) The reference NEMA noise level represents the factory tested noise level of the transformer. At the time of this analysis, the exact model of transformer was unknown, however, the reference noise levels are anticipated to likely overstate the potential noise levels from a residential transformer. Using the uniform reference distance of 50 feet, the reference NEMA transformer noise level is 37.6 dBA $L_{eq}$. Noise associated with the transformer is expected during the typical daytime, and nighttime conditions for the entire hour (60 minutes).

### 5.1.4 OUTDOOR POOL ACTIVITY

To represent the noise levels associated with outdoor pool activities, Urban Crossroads collected a reference noise level measurement on July 5th, 2017 at the Covenant Hill Clubhouse Pool in the unincorporated community of Ladera Ranch in the County of Orange. The measured reference noise level at the uniform 50-foot reference distance is 51.0 dBA $L_{eq}$ for pool activity. The pool activity noise levels include kids playing, running, screaming, splashing, playing with a ball, and parents talking. Noise associated with pool activities is expected to occur for the entire hour (60 minutes).



## 5.2   CONSTRUCTION NOISE LEVELS

Noise generated by the Project construction equipment will include a combination of trucks, power tools, concrete mixers, and portable generators that when combined can reach high levels. The number and mix of construction equipment is expected to occur in the following stages:

- Demolition and Preconstruction
- Shoring
- Excavation, Soil Export, and Grading
- Building Construction
- Paving
- Architectural Coating

This construction noise analysis was prepared using reference noise level measurements taken by Urban Crossroads, Inc. to describe the typical construction activity noise levels for each stage of Project construction. The construction reference noise level measurements represent a list of typical construction activity noise levels. Noise levels generated by heavy construction equipment can range from approximately 68 dBA to in excess of 80 dBA when measured at 50 feet. Hard site conditions are used in the construction noise analysis which result in noise levels that attenuate (or decrease) at a rate of 6 dBA for each doubling of distance from a point source (i.e. construction equipment). For example, a noise level of 80 dBA measured at 50 feet from the noise source to the receiver would be reduced to 74 dBA at 100 feet from the source to the receiver and would be further reduced to 68 dBA at 200 feet from the source to the receiver. The construction stages used in this analysis are consistent with the data used to support the construction emissions in the *3568 Motor Avenue Air Quality Impact Analysis* prepared by Urban Crossroads, Inc. (14)

## 5.3   CONSTRUCTION REFERENCE NOISE LEVELS

To describe the Project construction noise levels, measurements were collected for similar activities at several construction sites. Table 5-2 provides a summary of the construction reference noise level measurements. Since the reference noise levels were collected at varying distances, all construction noise level measurements presented on Table 5-2 have been adjusted to describe a common reference distance of 50 feet.

**URBAN** CROSSROADS

### TABLE 5-2: CONSTRUCTION REFERENCE NOISE LEVELS

| ID | Noise Source | Reference Distance from Source (Feet) | Reference Noise Levels @ Reference Distance (dBA Lw) | Reference Noise Levels @ 50 Feet (dBA Leq) |
|----|-------------|------|------|------|
| 1 | Truck Pass-Bys & Dozer Activity[1] | 30' | 63.6 | 59.2 |
| 2 | Dozer Activity[1] | 30' | 68.6 | 64.2 |
| 3 | Construction Vehicle Maintenance Activities[2] | 30' | 71.9 | 67.5 |
| 4 | Foundation Trenching[2] | 30' | 72.6 | 68.2 |
| 5 | Rough Grading Activities[2] | 30' | 77.9 | 73.5 |
| 6 | Residential Framing[3] | 30' | 66.7 | 62.3 |
| 7 | Concrete Mixer Truck Movements[4] | 50' | 71.2 | 71.2 |
| 8 | Concrete Paver Activities[4] | 30' | 70.0 | 65.6 |
| 9 | Concrete Mixer Pour & Paving Activities[4] | 30' | 70.3 | 65.9 |
| 10 | Concrete Mixer Backup Alarms & Air Brakes[4] | 50' | 71.6 | 71.6 |
| 11 | Concrete Mixer Pour Activities[4] | 50' | 67.7 | 67.7 |
| 12 | Forklift, Jackhammer, & Metal Truck Bed Loading[2] | 50' | 67.9 | 67.9 |
| 13 | Auger Drill Rig[6] | 50' | 77.0 | 77.0 |

[1] As measured by Urban Crossroads, Inc. on 10/14/15 at a business park construction site located at the northwest corner of Barranca Parkway and Alton Parkway in the City of Irvine.
[2] As measured by Urban Crossroads, Inc. on 10/20/15 at a construction site located in Rancho Mission Viejo.
[3] As measured by Urban Crossroads, Inc. on 10/20/15 at a residential construction site located in Rancho Mission Viejo.
[4] Reference noise level measurements were collected from a nighttime concrete pour at an industrial construction site, located at 27334 San Bernardino Avenue in the City of Redlands, between 1:00 a.m. to 2:00 a.m. on 7/1/13.
[5] As measured by Urban Crossroads, Inc. on 9/9/16 during construction of a parking lot at 41 Corporate Park in Irvine.
[6] Source: FHWA Roadway Construction Noise Model.
[7] Reference noise levels are calculated at 50 feet using a drop off rate of 6 dBA per doubling of distance (point source).

### 5.4 CONSTRUCTION VIBRATION ASSESSMENT METHODOLOGY

This analysis focuses on the potential ground-borne vibration associated with construction activities. Construction has the potential to result in varying degrees of temporary ground vibration, depending on the specific construction activities and equipment used. Ground vibration levels associated with various types of construction equipment are summarized on Table 5-3. Based on the representative vibration levels presented for various construction equipment types, it is possible to estimate the human response (annoyance) and building damage using the following vibration assessment methods defined by the FTA and Caltrans. To describe the vibration levels associated with Project construction, the FTA and Caltrans provide the following equation:

$$PPV_{equip} = PPV_{ref} \times (25/D)^{1.5}$$



*3568 Motor Avenue Noise Impact Analysis*

## TABLE 5-3: VIBRATION SOURCE LEVELS FOR CONSTRUCTION EQUIPMENT

| Equipment | PPV (in/sec) at 25 feet |
|---|---|
| Small bulldozer | 0.003 |
| Jackhammer | 0.035 |
| Loaded Trucks | 0.076 |
| Caisson Drilling | 0.089 |

Source: Federal Transit Administration, Transit Noise and Vibration Impact Assessment, May 2006.

URBAN
CROSSROADS

*This page intentionally left blank*

**URBAN**
CROSSROADS

## 6    RECEIVER LOCATIONS

To assess the potential for long-term operational and short-term construction noise impacts, the following two receiver locations as shown on Exhibit 6-A were identified as representative locations for focused analysis. The receiver locations and this analysis assume the playground is relocated to the north of the planned parking lot shown on Exhibit 6-A. Sensitive receivers are generally defined as locations where people reside or where the presence of unwanted sound could otherwise adversely affect the use of the land. Schools, when occupied, are considered to be noise-sensitive land uses, and as such, the closest playground and classroom building within Palms are identified as sensitive receivers in this analysis. Other sensitive areas within Palms that are located at greater distances than those identified in this noise study will experience lower noise levels than those presented in this report due to the additional attenuation from distance and the shielding of intervening structures.

R1:    Located approximately 79 feet northwest of the Project site, R1 represents the closest outdoor playground area within Palms to the Project site. Note that when the school is not in session, this is no longer considered a noise-sensitive receiver location.

R2:    Location R2 represents the closest classroom building within Palms to the Project site at roughly 31 feet north. Note that when the school is not in session, this is no longer considered a noise-sensitive receiver location.

*3568 Motor Avenue Noise Impact Analysis*

**EXHIBIT 6-A: RECEIVER LOCATIONS**



**LEGEND:**

🔵 Receiver Locations  ———▪ Distance from receiver to Project site boundary (in feet)

URBAN
CROSSROADS

# 7    OPERATIONAL IMPACTS

This section analyzes the potential operational noise levels due to the Project's stationary noise sources on Palms. Exhibit 7-A identifies the receiver locations and noise source locations used to assess the Project-related operational noise levels. The on-site Project-related operational noise sources are expected to include: roof-top air conditioning units, parking garage entry gates, a pad-mounted transformer, and outdoor pool area activity.

## 7.1    OPERATIONAL NOISE LEVELS

Based upon the reference noise levels, it is possible to estimate the Project operational stationary-source noise levels at Palms. The operational noise level calculations shown on Table 7-1 account for the distance attenuation provided due to geometric spreading, when sound from a localized stationary source (i.e., a point source) propagates uniformly outward in a spherical pattern. Hard site conditions are used in the operational noise analysis which result in noise levels that attenuate (or decrease) at a rate of 6 dBA for each doubling of distance from a point source. The basic noise attenuation equation shown below is used to calculate the distance attenuation based on a reference noise level (SPL₁):

$$SPL_2 = SPL_1 - 20\log(D_2/D_1)$$

Where $SPL_2$ is the resulting noise level after attenuation, $SPL_1$ is the source noise level, $D_2$ is the distance to the reference sound pressure level (SPL₁), and $D_1$ is the distance to the receiver location. Table 7-1 indicates that the hourly noise levels associated with the roof-top air conditioning units, parking garage entry gates, a pad-mounted transformer, and outdoor pool area activity are expected to range from 38.3 to 54.9 dBA $L_{eq}$ at the sensitive Palms receiver locations. The operational noise levels shown on Table 7-1 account for the barrier attenuation provided by the planned 6-foot high noise barrier. The operational noise level calculation worksheets are included in Appendix 7.1.



**EXHIBIT 7-A: OPERATIONAL NOISE SOURCE AND RECEIVER LOCATIONS**



**LEGEND:**

- ● Receiver Locations
- ◻ Roof-Top Air Conditioning Unit
- ⬤ Parking Garage Entry Gate (1st Floor)
- ⬠ Transformer (1st Floor)

- ◻ Outdoor Pool Activity (2nd Floor)
- —● Distance from receiver to noise source (in feet)
- ▬ Planned 6-Foot High Noise Barrier

**34**

URBAN CROSSROADS

**TABLE 7-1: PROJECT OPERATIONAL NOISE LEVELS**

| Receiver Location[1] | Noise Levels by Individual Source[2] | | | | Combined Operational Noise Levels (dBA Leq)[3] |
|---|---|---|---|---|---|
| | Roof-Top Air Conditioning Unit | Parking Garage Entry Gate | Pad-Mounted Transformer | Outdoor Pool Activity | |
| R1 | 34.8 | 30.5 | 22.6 | 33.9 | 38.3 |
| R2 | 53.4 | 33.1 | 38.9 | 49.0 | 54.9 |

[1] See Exhibit 7-A for the receiver and noise source locations.
[2] Reference noise sources as shown on Table 5-1.
[3] Calculations for each noise source are provided in Appendix 7.1 and include the barrier attenuation provided by the planned 6-foot high noise barrier at the northern property line.

## 7.2   CITY OF LOS ANGELES OPERATIONAL NOISE LEVEL COMPLIANCE

The City of Los Angeles Municipal Code has set exterior noise limits to control community noise impacts from non-transportation noise sources (such as air-conditioning units, refrigeration, heating, pumping, and filtering equipment). Section 112.02 indicates that stationary noise sources shall not operate in such a manner as to cause the noise level at any sensitive use to exceed the existing ambient noise level by 5 dBA. (1) Tables 7-2 and 7-3 show the worst-case Project-only operational noise levels, the closest ambient noise level measurement (see Section 4), and the ambient-adjusted operational noise level limits at each of the nearby sensitive receiver locations. Both the daytime and nighttime ambient noise levels are used to evaluate the potential Project-related operational noise levels, as shown on Tables 7-2 and 7-3, respectively.

Table 7-2 shows the daytime operational noise levels limits, per the City of Los Angeles Municipal Code, will approach 72.7 dBA $L_{eq}$, and the peak Project-only operational noise levels ranging from 38.3 to 54.9 dBA $L_{eq}$ will satisfy the standards at each sensitive receiver location. Table 7-3 shows the nighttime operational noise levels limits, per the City of Los Angeles Municipal Code, will approach 67.8 dBA $L_{eq}$, and the Project-only operational noise levels ranging from 38.3 to 54.9 will satisfy the standards at each sensitive receiver location.

URBAN
CROSSROADS

### TABLE 7-2: DAYTIME PROJECT OPERATIONAL NOISE LEVEL COMPLIANCE (CITY OF LA)

| Receiver Location[1] | Total Project Operational Noise Level[2] | Measurement Location[3] | Reference Ambient Noise Levels[4] | Ambient Plus 5 dBA (LA CEQA Guidelines)[5] | Threshold | Threshold Exceeded?[6] |
|---|---|---|---|---|---|---|
| R1 | 38.3 | L1 | 67.7 | +5 | 72.7 | No |
| R2 | 54.9 | L1 | 67.7 | +5 | 72.7 | No |

[1] See Exhibit 7-A for the sensitive receiver and noise source locations.
[2] Total Project operational noise levels as shown on Table 7-1.
[3] Reference noise level measurement locations as shown on Exhibit 5-1.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Ambient plus 5 dBA per the City of Los Angeles CEQA Thresholds Guidelines and Municipal Code Section 112.02(a).
[6] Do the Project operational noise levels exceed the ambient plus 5 dBA threshold identified by the City of Los Angeles?

### TABLE 7-3: NIGHTTIME PROJECT OPERATIONAL NOISE LEVEL COMPLIANCE (CITY OF LA)

| Receiver Location[1] | Total Project Operational Noise Level[2] | Measurement Location[3] | Reference Ambient Noise Levels[4] | Ambient Plus 5 dBA (LA CEQA Guidelines)[5] | Threshold | Threshold Exceeded?[6] |
|---|---|---|---|---|---|---|
| R1 | 38.3 | L1 | 62.8 | +5 | 67.8 | No |
| R2 | 54.9 | L1 | 62.8 | +5 | 67.8 | No |

[1] See Exhibit 7-A for the sensitive receiver and noise source locations.
[2] Total Project operational noise levels as shown on Table 7-1.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed nighttime ambient noise levels as shown on Table 5-1.
[5] Ambient plus 5 dBA per the City of Los Angeles CEQA Thresholds Guidelines and Municipal Code Section 112.02(a).
[6] Do the Project operational noise levels exceed the ambient plus 5 dBA threshold identified by the City of Los Angeles?

URBAN CROSSROADS

## 7.3    LAUSD OPERATIONAL NOISE LEVEL COMPLIANCE

As previously described in Section 3.5, LAUSD identifies both exterior and interior noise level standards, and a 3 dBA increase over without Project condition threshold for evaluating operational noise levels adjacent to school uses. The following section evaluates the Project's operational noise levels in relation to the LAUSD noise level standards.

### 7.3.1    EXTERIOR AND INTERIOR OPERATIONAL NOISE LEVELS

Table 7-4 shows the Project operational noise levels at receiver locations R1 and R2, which represent the closest outdoor playground area and classroom building at Palms, respectively. As shown on Table 7-4, Project operational noise levels at receiver locations R1 and R2 will range from 38.3 to 54.9 dBA $L_{eq}$, and therefore, will satisfy the LAUSD exterior noise level standard of 67 dBA $L_{eq}$.

The interior noise level is the difference between the predicted exterior noise level at the building façade and the noise reduction of the structure. Typical building construction will provide a minimum Noise Reduction (NR) of approximately 20 to 25 dBA with "windows closed." (3) As such, this analysis assumes a conservative 20 dBA interior noise reduction to assess Project operational noise levels based on the LAUSD interior noise levels standards for interior classroom spaces. Table 7-4 shows the Project operational noise levels will be reduced to interior noise levels approaching 34.9 dBA $L_{eq}$ and will satisfy the LAUSD 52 dBA $L_{eq}$ interior noise level standard at R2, which represents the closest classroom building to the Project site.

#### TABLE 7-4:  PROJECT OPERATIONAL NOISE LEVEL COMPLIANCE (LAUSD)

| Receiver Location[1] | (Use) | Project Operational Noise Levels[2] | | Noise Level Standards[4] | | Threshold? (Exceeded?)[5] | |
|---|---|---|---|---|---|---|---|
| | | Exterior | Interior (NR)[3] | Interior | Exterior | Interior | Exterior | Interior |
| R1 | Outdoor Playground | 38.3 | n/a | n/a | 67 | n/a | No | n/a |
| R2 | Classroom Building | 54.9 | -20 | 34.9 | 67 | 52 | No | No |

[1] See Exhibit 7-A for the sensitive receiver locations and noise source locations.
[2] Total Project operational noise levels as shown on Table 7-1.
[3] A minimum of 20 dBA interior noise reduction is assumed with standard building construction based on FHWA Highway Traffic Noise Analysis and Abatement Policy Guidance, Section 772.11.
[4] Source: Los Angeles Unified School District Office of Environmental Health and Safety noise standards.
[5] Do the Project operational noise levels exceed the LAUSD exterior and interior noise level standards at the adjacent school?
"NR" = Noise Reduction; "n/a" = Exterior receiver location.



### 7.3.2 EXTERIOR OPERATIONAL NOISE LEVEL INCREASES

To describe the Project operational noise level contributions based on the LAUSD 3 dBA increase threshold, the Project operational noise levels were combined with the existing ambient noise levels measurements for the off-site receiver locations potentially impacted by Project operational noise sources. Since the units used to measure noise, decibels (dB), are logarithmic units, the Project-operational and existing ambient noise levels cannot be combined using standard arithmetic equations. (6) Instead, they must be logarithmically added using the following base equation.

$$SPL_{Total} = 10 \log_{10}[10^{SPL1/10} + 10^{SPL2/10} + \ldots 10^{SPLn/10}]$$

Where "SPL1," "SPL2," etc. are equal to the sound pressure levels being combined, or in this case, the Project-operational and existing ambient noise levels. The difference between the combined Project and ambient noise levels describe the Project noise level contributions. Noise levels that would be experienced at Palms receiver locations when Project-source noise is added to the ambient daytime conditions, when the school is open and occupied, are presented on Table 7-5.

As indicated on Table 7-5, the Project will contribute a daytime operational noise level increase of up to 0.2 dBA $L_{eq}$. The Project-related operational noise level contributions of up to 0.2 dBA $L_{eq}$ will satisfy with the LAUSD 3 dBA increase standard. Noise level increases of less than or equal to 1 dBA, such as those due to Project operational noise levels, cannot be perceived except in carefully controlled laboratory experiments. (3)

**TABLE 7-5: OPERATIONAL NOISE LEVEL CONTRIBUTIONS (LAUSD)**

| Receiver Location [1] | Use [2] | Total Project Operational Noise Level [3] (dBA $L_{eq}$) | Measurement Location [3] | Reference Ambient Noise Levels [4] (dBA $L_{eq}$) | Combined Project and Ambient [5] (dBA $L_{eq}$) | Project Contribution [6] (dBA $L_{eq}$) | Threshold Exceeded? [7] |
|---|---|---|---|---|---|---|---|
| R1 | Outdoor Playground | 38.3 | L1 | 67.7 | 67.7 | 0.0 | No |
| R2 | Classroom Building | 54.9 | L1 | 67.7 | 67.9 | 0.2 | No |

[1] See Exhibit 7-A for the sensitive receiver locations.
[2] Unmitigated Project operational noise levels as shown on Table 7-1.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Represents the combined ambient conditions plus the Project activities.
[6] The noise level increase expected with the addition of the proposed Project activities.
[7] A 3 dBA increase over the existing ambient noise level at school uses per LAUSD thresholds.





## 7.4 OPERATIONAL NOISE LEVEL PERCEPTION AT PALMS

The preceding sections show that Project operational noise levels at Palms will range from 38.3 to 54.9 dBA $L_{eq}$ when all Project-related stationary noise sources operate simultaneously. As previously shown on Exhibit 2-A, noise levels ranging from 38.3 to 54.9 dBA $L_{eq}$ represent quiet urban daytime and nighttime noise levels and based on the existing ambient noise level of up to 67.7 dBA $L_{eq}$ Motor Avenue, will be largely overshadowed by existing and future traffic noise sources in the Project study area.

The Project is shown to contribute a daytime operational noise level increase of up to 0.2 dBA $L_{eq}$ which, consistent with any noise level increase of less than 1 dBA, is typically unable to be perceived except in carefully controlled laboratory experiments. (3) While some Project-related noise sources may be audible to receivers within Palms, the findings of this analysis indicate that Project operational noise levels will remain below the LAUSD exterior, interior, and noise level increase standards.



*This page intentionally left blank*

URBAN
CROSSROADS

## 8    CONSTRUCTION IMPACTS

This section analyzes potential noise levels resulting from the short-term construction activities associated with the development of the Project. Exhibit 8-A shows the construction activity boundaries in relation to the nearby sensitive receiver locations.

EXHIBIT 8-A: CONSTRUCTION ACTIVITY AND RECEIVER LOCATIONS



**LEGEND:**

⊕ Receiver Locations

▨ Construction Activity

—● Distance from receiver to primary construction activity (in feet)

⊣ Temporary Noise Barrier

12' Temporary Noise Barrier Height (in feet)

URBAN CROSSROADS

## 8.1  CONSTRUCTION NOISE ANALYSIS

Using the reference construction activity noise levels, previously shown on Table 5-2, calculations of the Project construction noise levels at Palms was completed. Tables 8-1 to 8-6 present the short-term construction noise levels for each stage of construction. Table 8-7 provides a summary of the construction noise levels by stage at Palms. Based on the stages of construction, the noise impacts associated with the proposed Project are expected to create temporarily high noise levels at the nearby Palms receiver locations. To assess the worst-case construction noise levels, this analysis shows the highest noise impacts when the equipment with the highest reference noise level is operating at the closest point from the edge of primary construction activity to each receiver location.

### TABLE 8-1: DEMOLITION ACTIVITY NOISE LEVELS

| Reference Construction Activity | Reference Noise Level @ 50 Feet (dBA L$_{eq}$) |
|---|---|
| Truck Pass-Bys & Dozer Activity | 59.2 |
| Dozer Activity | 64.2 |
| Forklift, Jackhammer, & Metal Truck Bed Activities | 67.9 |
| Highest Reference Noise Level at 50 Feet (dBA L$_{eq}$): | 67.9 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA L$_{eq}$)[3] | Construction Noise Level (dBA L$_{eq}$) |
|---|---|---|---|
| R1 | 82' | -4.3 | 63.6 |
| R2 | 45' | 0.9 | 68.8 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

**URBAN CROSSROADS**

**TABLE 8-2:  SHORING EQUIPMENT NOISE LEVELS**

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA L$_{eq}$) |
|---|---|
| Truck Pass-Bys & Dozer Activity | 59.2 |
| Auger Drill Rig | 77.0 |
| Highest Reference Noise Level at 50 Feet (dBA L$_{eq}$): | 77.0 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA L$_{eq}$)[3] | Construction Noise Level (dBA L$_{eq}$) |
|---|---|---|---|
| R1 | 82' | -4.3 | 72.7 |
| R2 | 45' | 0.9 | 77.9 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

**TABLE 8-3:  EXCAVATION, SOIL EXPORT, AND GRADING EQUIPMENT NOISE LEVELS**

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA L$_{eq}$) |
|---|---|
| Truck Pass-Bys & Dozer Activity | 59.2 |
| Dozer Activity | 64.2 |
| Rough Grading Activities | 73.5 |
| Highest Reference Noise Level at 50 Feet (dBA L$_{eq}$): | 73.5 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA L$_{eq}$)[3] | Construction Noise Level (dBA L$_{eq}$) |
|---|---|---|---|
| R1 | 82' | -4.3 | 69.2 |
| R2 | 45' | 0.9 | 74.4 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

URBAN CROSSROADS

### TABLE 8-4: BUILDING CONSTRUCTION EQUIPMENT NOISE LEVELS

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA Leq) |
|---|---|
| Construction Vehicle Maintenance Activities | 67.5 |
| Foundation Trenching | 68.2 |
| Residential Framing | 62.3 |
| Highest Reference Noise Level at 50 Feet (dBA Leq): | 68.2 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA Leq)[3] | Construction Noise Level (dBA Leq) |
|---|---|---|---|
| R1 | 82' | -4.3 | 63.9 |
| R2 | 45' | 0.9 | 69.1 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

### TABLE 8-5: PAVING EQUIPMENT NOISE LEVELS

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA Leq) |
|---|---|
| Concrete Mixer Truck Movements | 71.2 |
| Concrete Paver Activities | 65.6 |
| Concrete Mixer Pour & Paving Activities | 65.9 |
| Concrete Mixer Backup Alarms & Air Brakes | 71.6 |
| Concrete Mixer Pour Activities | 67.7 |
| Highest Reference Noise Level at 50 Feet (dBA Leq): | 71.6 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA Leq)[3] | Construction Noise Level (dBA Leq) |
|---|---|---|---|
| R1 | 82' | -4.3 | 67.3 |
| R2 | 45' | 0.9 | 72.5 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

URBAN CROSSROADS

**TABLE 8-6: ARCHITECTURAL COATING EQUIPMENT NOISE LEVELS**

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA L[eq]) |
|---|---|
| Residential Framing | 62.3 |
| Highest Reference Noise Level at 50 Feet (dBA L[eq]): | 62.3 |

| Receiver Location | Distance To Construction Activity[2] (Feet) | Distance Attenuation (dBA L[eq])[3] | Construction Noise Level (dBA L[eq]) |
|---|---|---|---|
| R1 | 82' | -4.3 | 58.0 |
| R2 | 45' | 0.9 | 63.2 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

## 8.2 CITY OF LOS ANGELES CONSTRUCTION NOISE LEVEL COMPLIANCE

As shown on Table 8-7, the construction noise levels are expected to range from 72.7 to 77.9 dBA L[eq] at the sensitive receiver locations. For construction activities lasting more than 10 days in a three-month period, such as activities at the Project site, the City of Los Angeles identifies a noise level standard of 5 dBA above the existing exterior ambient noise levels at adjacent Palms receiver locations. To reduce Project construction noise levels, multiple Project Design Features (PDFs) have been incorporated into the Project. As shown on Table 8-8, the Project construction noise levels would exceed the City of Los Angeles 5 dBA above existing ambient noise level standard without the planned PDFs at the nearby sensitive receiver locations (R1 and R2).

**TABLE 8-7: CONSTRUCTION NOISE LEVELS WITHOUT PROJECT DESIGN FEATURES**

| Receiver Location[1] | Construction Hourly Noise Levels (dBA L[eq])[2] | | | | | | Highest Const. Levels[2] | |
|---|---|---|---|---|---|---|---|---|
| | Demolition | Shoring | Excavation & Grading | Building Construction | Paving | Architectural Coating | Shoring | Non-Shoring |
| R1 | 63.6 | 72.7 | 69.2 | 63.9 | 67.3 | 58.0 | 72.7 | 69.2 |
| R2 | 68.8 | 77.9 | 74.4 | 69.1 | 72.5 | 63.2 | 77.9 | 74.4 |

[1] Noise receiver locations are shown on Exhibit 8-A.
[2] Estimated construction noise levels during peak operating conditions.

URBAN CROSSROADS

**TABLE 8-8: CONSTRUCTION NOISE LEVEL COMPLIANCE WITHOUT PDFS**

| Receiver Location [1] | Highest Project Construction Noise Level [2] | Measurement Location [3] | Reference Ambient Noise Levels [4] | Ambient Plus 5 dBA (LA CEQA Guidelines) [5] | Threshold | Threshold Exceeded? [6] |
|---|---|---|---|---|---|---|
| R1 | 72.7 | L1 | 67.7 | +5 | 72.7 | Yes |
| R2 | 77.9 | L1 | 67.7 | +5 | 72.7 | Yes |

[1] See Exhibit 8-A for the sensitive receiver locations.
[2] Project construction noise levels as shown on Table 8-7 without the planned temporary noise barriers.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Ambient plus 5 dBA per the City of Los Angeles CEQA Thresholds Guidelines.
[6] Do the peak Project construction noise levels exceed the ambient plus 5 dBA threshold identified by the City of Los Angeles?

As such, Table 8-9 shows the calculated Project construction noise levels with the temporary noise barrier attenuation provided by the planned 12-foot high temporary noise barrier identified in the PDFs. The noise attenuation provided through temporary noise barriers depends on many factors including cost, wind loading, the location of the receiver, and the ability to place barriers such that the line-of-sight of the receiver is blocked to the noise source, among others. This analysis assumes a temporary noise barrier constructed using frame-mounted materials such as vinyl acoustic curtains or quilted blankets attached to a construction site perimeter fence or structure. The Project construction PDFs are shown to result in reduced construction noise levels approaching 68.9 dBA $L_{eq}$ at the Palms receiver locations and will remain below the City of Los Angeles 5 dBA plus ambient noise level standard for construction activity noise levels.

**TABLE 8-9: CONSTRUCTION NOISE LEVEL COMPLIANCE WITH PDFS**

| Receiver Location [1] | Project Construction Noise Levels With Temporary Noise Barrier [2] | | | Measurement Location [3] | Reference Ambient Noise Levels [4] | Ambient Plus 5 dBA (LA CEQA Guidelines) [5] | Threshold | Threshold Exceeded? [6] |
|---|---|---|---|---|---|---|---|---|
| | Without Barrier | Barrier Atten. | With Barrier | | | | | |
| R1 | 72.7 | -7.9 | 64.8 | L1 | 67.7 | +5 | 72.7 | No |
| R2 | 77.9 | -9.0 | 68.9 | L1 | 57.7 | +5 | 72.7 | No |

[1] See Exhibit 8-A for the sensitive receiver locations.
[2] Project construction noise levels with the planned temporary noise barrier. Appendix 8.1 includes the temporary noise barrier attenuation calculations.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Ambient plus 5 dBA per the City of Los Angeles CEQA Thresholds Guidelines.
[6] Do the peak Project construction noise levels exceed the ambient plus 5 dBA threshold identified by the City of Los Angeles?

URBAN CROSSROADS

## 8.3 LAUSD CONSTRUCTION NOISE LEVEL COMPLIANCE

The planning of Project construction during periods when Palms is not in session is considered a PDF for reducing construction noise levels, since receiver locations R1 and R2 would no longer be considered sensitive receivers if unoccupied during Project construction. Nonetheless, this section analyzes Project construction activities, capable of generating the highest construction noise levels based on the LAUSD 3 dBA ambient noise level increase standard.

### 8.3.1 WITH SCHOOL IN SESSION (SHORING STAGE)

Table 8-10 shows the highest shoring construction noise levels at receiver locations R1 and R2 and the Project's temporary noise level contribution to the existing noise environment due to construction activity, including the barrier attenuation provided by planned 12-foot high temporary noise barrier. Based on the shoring equipment noise levels, receiver location R2, which represents the closest existing classroom building would experience a noise level increase of 3.7 dBA $L_{eq}$, exceeding the LAUSD 3 dBA increase standard. As such, a PDF for Project construction includes restricting the shoring stage of construction to a time period when Palms is not in session, thereby eliminating the temporary noise level increase since R1 and R2 would represent unoccupied school property.

### 8.3.1 WITHOUT SCHOOL IN SESSION (ALL OTHER STAGES)

Table 8-11 shows the highest construction noise levels from all other stages at receiver locations R1 and R2 and the Project's temporary noise level contribution to the existing noise environment due to construction activity, including the barrier attenuation provided by planned 12-foot high temporary noise barrier. Based on the construction activity noise levels, receiver location R1 and R2 would experience Project construction-related noise level increases between 0.9 to 2.0 dBA $L_{eq}$ and remain below the LAUSD 3 dBA increase standard. The construction noise levels shown on Table 8-11 include the temporary noise barrier attenuation provided by the Project PDFs.



*3568 Motor Avenue Noise Impact Analysis*

**TABLE 8-12: CONSTRUCTION NOISE LEVEL INCREASES (SHORING)**

| Receiver Location[1] | Use | Shoring Equipment Noise Level (dBA L_eq)[2] | Measurement Location[3] | Reference Ambient Noise Levels (dBA L_eq)[4] | Combined Shoring and Ambient (dBA L_eq)[5] | Project Contribution (dBA L_eq)[6] | Threshold Exceeded?[7] |
|---|---|---|---|---|---|---|---|
| R1 | Playground | 64.8 | L1 | 67.7 | 69.5 | 1.8 | No |
| R2 | Classroom | 68.9 | L1 | 67.7 | 71.4 | 3.7 | Yes |

[1] See Exhibit 8-A for the sensitive receiver locations.
[2] Project shoring construction equipment noise levels as shown on Table 8-19 with the planned 12-foot high temporary noise barrier.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Represents the combined ambient conditions plus the Project L-1.
[6] The noise level increase expected with the addition of the proposed Project activities.
[7] A 3 dBA increase over the existing ambient noise level at school uses per LAUSD thresholds.

**TABLE 8-13: CONSTRUCTION NOISE LEVEL INCREASES (ALL OTHER STAGES)**

| Receiver Location[1] | Use | Non-Shoring Construction Noise Level (dBA L_eq)[2] | Measurement Location[3] | Reference Ambient Noise Levels (dBA L_eq)[4] | Combined Project and Ambient (dBA L_eq)[5] | Project Contribution (dBA L_eq)[6] | Threshold Exceeded?[7] |
|---|---|---|---|---|---|---|---|
| R1 | Playground | 61.3 | L1 | 67.7 | 68.6 | 0.9 | No |
| R2 | Classroom | 65.4 | L1 | 67.7 | 69.7 | 2.0 | No |

[1] See Exhibit 8-A for the sensitive receiver locations.
[2] Project construction equipment (non-shoring) noise levels with the planned 12-foot high temporary noise barrier.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Represents the combined ambient conditions plus the Project activities.
[6] The noise level increase expected with the addition of the proposed Project activities.
[7] A 3 dBA increase over the existing ambient noise level at school uses per LAUSD thresholds.



### 8.4   CONSTRUCTION NOISE LEVEL PERCEPTION AT PALMS

The preceding sections show that Project construction noise levels at Palms will approach 68.9 dBA $L_{eq}$ during shoring activities, and 65.4 dBA $L_{eq}$ during all other construction stages with the PDFs identified in the Executive Summary during Project construction. Based on the existing ambient noise level of up to 67.7 dBA $L_{eq}$ measured on Motor Avenue adjacent to the Palms playground area, Project construction noise levels will result in ambient noise level increases of up to 3.7 dBA $L_{eq}$ during shoring, and 2.0 dBA $L_{eq}$ during all other construction activities.

Noise level increases of up to 3.7 dBA $L_{eq}$ during shoring would be considered *barely perceptible* above existing ambient noise level conditions, and therefore, Project shoring activities as a PDF shall be restricted to time periods when school is not in session. Increases during all other construction stages of 2.0 dBA $L_{eq}$ are considered less than *barely perceptible* and will likely be largely overshadowed by existing traffic noise levels in the Project study area. (3)  However, while Project construction noise levels are shown to satisfy the standards identified in this study with the planned PDFs, Project construction-related noise sources will still be audible to adjacent sensitive receiver locations within Palms.

### 8.5   CONSTRUCTION VIBRATION LEVELS

Construction activity can result in varying degrees of ground vibration, depending on the equipment and methods used, distance to the affected structures and soil type. It is expected that ground-borne vibration from Project construction activities would cause only intermittent, localized intrusion. The proposed Project's construction activities most likely to cause vibration impacts are:

- Heavy Construction Equipment:  Although all heavy mobile construction equipment has the potential of causing at least some perceptible vibration while operating close to building, the vibration is usually short-term and is not of sufficient magnitude to cause building damage. It is not expected that heavy equipment such as large bulldozers would operate close enough to any residences to cause a vibration impact.

- Trucks:  Trucks hauling building materials to construction sites can be sources of vibration intrusion if the haul routes pass through residential neighborhoods on streets with bumps or potholes. Repairing the bumps and potholes generally eliminates the problem.

Ground-borne vibration levels resulting from construction activities occurring within the Project site were estimated by data published by the Federal Transit Administration (FTA). Construction activities that would have the potential to generate low levels of ground-borne vibration within the Project site include grading.  Using the vibration source level of construction equipment provided on Table 5-3 and the construction vibration assessment methodology published by the FTA and Caltrans, it is possible to estimate the Project vibration levels. Table 8-12 presents the expected Project construction-related vibration levels at the Palms receiver locations.

Based on the reference vibration levels provided by the FTA and Caltrans, a caisson drill represents the peak source of vibration with a reference velocity of 0.089 in/sec PPV at 25 feet.

At distances ranging from 45 to 82 feet from the Project construction activities, construction vibration velocity levels are expected to range from 0.015 to 0.037 in/sec PPV, as shown on Table 8-12. The Project-related vibration levels are, therefore, shown to satisfy the Caltrans annoyance threshold of 0.04 in/sec PPV at R1 and R2, and will satisfy the building damage threshold for older residential structures of 0.3 in/sec PPV at R2, which represents the closest Palms classroom building to the Project site.

TABLE 8-14: CONSTRUCTION EQUIPMENT VIBRATION LEVELS WITHOUT PDFS

| Receiver Location[1] | Distance from Const. Activity[1] (Feet) | Reference & Resulting Exterior Vibration Levels (in/sec PPV)[2] | | | | | Threshold Exceeded?[3] | |
|---|---|---|---|---|---|---|---|---|
| | | Small Bulldozer (0.003) | Jack Hammer (0.035) | Loaded Trucks (0.076) | Caisson Drill (0.089) | Peak Vibration Levels | Annoyance (0.04 in/sec PPV) | Bldg. Damage (0.3 in/sec PPV) |
| R1 | 82' | 0.001 | 0.006 | 0.013 | 0.015 | 0.015 | No | No |
| R2 | 45' | 0.001 | 0.014 | 0.031 | 0.037 | 0.037 | No | No |

[1] Receiver locations are shown on Exhibit 8-A.
[2] Based on the FTA's Vibration Source Levels of Construction Equipment previously shown on Table 6-3 at a reference distance of 25 feet. Calculated using the following equation per FTA guidance: PPVequip = PPVref x (25/D)^1.5
Where "PPVequip" = the vibration level at the receiver; "PPVref" = the reference vibration level at 25 feet; and "D" = the distance to each receiver location.
[3] Does the vibration level exceed the given vibration threshold?

**URBAN**
CROSSROADS

## 9    REFERENCES

1. **City of Los Angeles.** *Municipal Code, Chapter XI - Noise Regulation.*

2. **Los Angeles Unified School District Office of Environmental Health and Safety.** *Comments on the 3568 Motor Avenue Project.* January 23, 2017.

3. **U.S. Department of Transportation, Federal Highway Administration, Office of Environment and Planning, Noise and Air Quality Branch.** *Highway Traffic Noise Analysis and Abatement Policy and Guidance.* June, 1995.

4. **U.S. Department of Transportation Federal Highway Administration.** Acoustical Consideration. *Noise Barrier      Design      Handbook.*      [Online]      [Cited:      November      28,      2016.] https://www.fhwa.dot.gov/environment/noise/noise_barriers/design_construction/design/design0 3.cfm.

5. **City of Los Angeles.** *CEQA Thresholds Guide.* 2006.

6. **California Department of Transportation Environmental Program.** *Technical Noise Supplement - A Technical Supplement to the Traffic Noise Analysis Protocol.* Sacramento, CA : s.n., September 2013.

7. **Environmental Protection Agency Office of Noise Abatement and Control.** *Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety.* March 1974. EPA/ONAC 550/9/74-004.

8. **U.S. Department of Transportation, Federal Transit Administration.** *Transit Noise and Vibration Impact Assessment.* May 2006. FTA-VA-90-1003-06.

9. **Office of Planning and Research.** *State of California General Plan Guidlines 2003.* October 2003.

10. **City of Los Angeles.** *General Plan Noise Element.* February 1999.

11. **California Department** of **Transportation.** *Transportation and Construction Vibration Guidance Manual.* September 2013.

12. **American National Standards Institute (ANSI).** *Specification for Sound Level Meters ANSI S1.4-2014/IEC 61672-1:2013.*

13. **National Electrical Manufacturers Association.** *TR 1-2013 - Transformers, Step Voltage Regulators and Reactors.* 2014.

14. **Urban Crossroads, Inc.** *3568 Motor Avenue Air Quality Impact Analysis.* March 2018.





*This page intentionally left blank*

URBAN
CROSSROADS

# 10  CERTIFICATION

The contents of this noise study report represent an accurate depiction of the noise environment and impacts associated with the proposed 3568 Motor Avenue Project. The information contained In this noise study report Is based on the best available data at the time of preparation. If you have any questions, please contact me directly at (949) 336-5979.

Bill Lawson, P.E., INCE
Principal
URBAN CROSSROADS, INC.
260 E. Baker Street, Suite 200
Costa Mesa, CA 92626
(949) 336-5979
blawson@urbanxroads.com



### EDUCATION

Master of Science in Civil and Environmental Engineering
California Polytechnic State University, San Luis Obispo • December, 1993

Bachelor of Science in City and Regional Planning
California Polytechnic State University, San Luis Obispo • June, 1992

### PROFESSIONAL REGISTRATIONS

PE – Registered Professional Traffic Engineer – TR 2537 • January, 2009
AICP – American Institute of Certified Planners – 013011 • June, 1997–January 1, 2012
PTP – Professional Transportation Planner • May, 2007 – May, 2013
INCE – Institute of Noise Control Engineering • March, 2004

### PROFESSIONAL AFFILIATIONS

ASA – Acoustical Society of America
ITE – Institute of Transportation Engineers

### PROFESSIONAL CERTIFICATIONS

Certified Acoustical Consultant – County of Orange • February, 2011
FHWA-NHI-142051 Highway Traffic Noise Certificate of Training • February, 2013





*This page intentionally left blank*

**URBAN** CROSSROADS

# ORANGE LAW OFFICES, P.C.

Equitable Plaza Tower
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Tel: (213) 736-9900
Fax: (213) 417-8800
Email: orangelawoffices@att.net

22 May 2018

CITY OF LOS ANGELES
CITY COUNCIL – P.L.U.M. COMMITTEE
*via* CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
TEL: (213) 978-1133
FAX: (213) 978-1027
Clerk.CPS@lacity.org

Date: _05/22/2018_

Submitted in _PLUM_ Committee

Council File No: _17-1394_

Item No. _8_

Deputy: Comm. from Appellant
Representative

## VIA HAND DELIVERY

## CEQA APPEAL – FILE No. 17-1394

**RE: Appellants' Second Supplemental Material Submission**
3568 Motor Avenue, Los Angeles, California 90034
Case No. DIR-2016-4880-DB; ENV-2016-4881-CE

Dear Honorable Council Members:

Appellants hereby submit and request that you consider the following objection and
attached supplemental materials:

### I.   Objection to Late Request for Consideration of an Additional CEQA Exemption

On May 14, 2018, just five business days prior to the hearing on this case-file,
the Planning Department submitted a request that this Committee determine that the
Project at issue be classified as a Sustainable Communities Project and thus exempt
from CEQA review. Appellants have had no prior notice of this submission, and it has
not been subject to any procedure by which any interested members of the public would
have reasonable notice of it – or, a reasonable opportunity to be heard prior to
determination. Thus, Appellants hereby object.

### II.   Appellants' Supplemental Materials for Consideration

A.   Exhibit A is a set of three true and accurate pictures detailing the proximity of

EX 10

the Palms Elementary School Kindergarten playground to the Project site. As shown in the pictures, the children's tiny brown playhouse is mere feet from the construction Project.

B. Exhibit B is a true and correct copy of video with audio of some of the jackhammering the Developer engaged in on December 15, 2017, while students and teachers were still in session at Palms Elementary School. Exhibit B is provided on the flash drive included in the envelope given to the Clerk with this filing. For convenience, Exhibit B is also available through the following active hyperlink:

http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_B.mp4

C. Exhibit C is a true and correct copy of video with audio of some of the demolition the Developer engaged in, as well as the particles spread upon the surrounding area, on December 19, 2017, immediately upon the kindergarten playground fence-line of Palms Elementary School. Exhibit C is provided on the flash drive included in the envelope given to the Clerk with this filing. For convenience, Exhibit C is also available through the following active hyperlink: http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_C.mp4

D. Exhibit D is a true and correct copy of a photograph of some of the students whose classrooms are closest to the construction site, and who currently use the kindergarten playground at Palms Elementary School. As indicated by their "Perfect Attendance" certificates, they attend school on a daily basis, and will be exposed to the toxins, particulate matter and carcinogens the Project will emit.

E. Exhibit E is a true and correct copy of email correspondence between Palms Teacher Christal Lord and Los Angeles City Councilman Paul Koretz' office. It occurred when the Developer began construction activities, including but not limited to jackhammering and possibly spraying pesticides when children and teachers were still in school at Palms Elementary on December 15, 2017.

F. Exhibit F is a true and correct copy of May 17, 2018, correspondence from Nick Greif, President of the Palms Neighborhood Council detailing its unanimous vote to oppose the Project.

G. Exhibit G is a true and correct copy of excerpts from the Developer's noise study showing that for ambient noise purposes, noise was measured by the side of Motor Avenue. But, for noise increase compliance purposes, that roadside measurement was improperly applied as a baseline to a classroom located in the interior of the block, far away from the roadside. Thus, giving the false appearance that construction noise increases fall within applicable thresholds.

H. and I. -- Exhibits H and I are true and correct copies of excerpts from the Developer's noise study, and LAUSD's draft Environmental Impact Report for its district-wide School Upgrade Program – respectively. The exhibits show that the Developer's noise levels for similar and/or the same equipment differ by more than 20 decibels, in some cases (see LAUSD dozer at 85 vs. developer dozer at 64.2). Thus, giving the false appearance that construction noise increases fall within applicable thresholds.

J. Exhibit J is a true and correct set of pictures showing the toxic dust and particles discharged by some of the demolition the Developer engaged in, as well as the particles spread upon the surrounding area, on December 19, 2017, immediately upon the kindergarten playground fence-line of Palms Elementary School.

Respectfully submitted,
ORANGE LAW OFFICES, P.C.

Olu K. Orange, Esq.

:: exhibits ::

STATE OF CALIFORNIA                    }        ss.
COUNTY OF LOS ANGELES                  }

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and
not a party to the within action; my business address is: 3435 Wilshire Blvd., Suite 2910, Los
Angeles, CA 90010

On May 22, 2018, I served the following Document(s): **Appellants' Second Supplemental
Material Submission and EXHIBITS (A through J)** upon the interested parties in this action
addressed as follows:

> CITY OF LOS ANGELES
> CITY COUNCIL
> via CITY CLERK
> 200 N. Spring St, Rm 395
> Los Angeles, CA 90012
> TEL (213) 978-1133
> Clerk.CPS@lacity.org

|X| **(Via Hand Delivery)** I caused hand-delivered service of the above-mentioned materials
upon the above-mentioned recipient(s) as addressed by leaving the materials with the person
indicated, or with a person, of the age of majority, apparently responsible for the premises.

☐ **(Via U.S. Mail [Federal or State])** I am readily familiar with the practice for the
collection and processing of correspondence for mailing with the UNITED STATES POSTAL
SERVICE; such envelope will be deposited with the UNITED STATES POSTAL SERVICE on
the above date according to ordinary business practices.

|X| **(Via Email)** By transmitting from my business address a true copy thereof from my
sending computer addressed to each individual at its receiving computer email address set forth
above at the time indicated on the transmission line thereon.

**Executed on May 22, 2018, at Los Angeles, California.**

|X| **(State)** I declare under penalty of perjury under the laws of the State of California that
the above is true and correct.

|X| **(Federal)** I declare that I am employed in the office of a member of the bar of this
Court at whose discretion the service was made.

Olu K. Orange, Esq.

# EXHIBIT A
## PROXIMITY PICTURES





See enclosed flash drive
and/or go to:
http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_B.mp4

# EXHIBIT B
## JACKHAMMERING VIDEO

See enclosed flash drive
and/or go to:
http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_C.mp4

# EXHIBIT C
## DUST CLOUD VIDEO

# EXHIBIT D
## ATTENDANCE CERTIFICATES PICTURE

# EXHIBIT E
## DEMOLITION CORRESPONDENCE

Fw: They Are Spraying Today                    imap://imap.mail.yahoo.com:993/fetch>UID>/INBOX>250995?hca..

# EXHIBIT E, Page 001

**Subject:** Fw: They Are Spraying Today
**From:** CHRISTAL lord <christalleach4@yahoo.com>
**Date:** 2/6/2018 3:19 PM
**To:** Olu Orange <oluorange@att.net>

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Friday, December 15, 2017, 11:57 AM, Joseph Galloway <joseph galloway@lacity.org> wrote:

Christal,

We've been informed by the developer that they are pulling their team from the site at this moment. They were working on fencing and have postponed the work. Please provide us additional updates as you see them.

Sincerely,



**Joseph Galloway**
Senior Field Deputy
Office of Councilmember Paul Koretz, 5th Council District
6380 Wilshire Blvd., Suite 800
Los Angeles, CA 90048
T: 323.866.1828 | F: 323.852.1129 | C: 213.550.6017
E: Joseph.Galloway@lacity.org

Keep up with us on social media:


Download the City of Los Angeles MyLA311 app for smartphones!



MyLA311 links Angelenos with the services and information they need to enjoy their city, beautify their community and stay connected with their local government.

Sign up for the CD 5 e-newsletter here!

**CONFIDENTIALITY NOTICE**

This electronic message transmission is intended only for the party to whom it is addressed as it may contain privileged or confidential information. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachment without reading or saving in any manner.

On Fri, Dec 15, 2017 at 11:53 AM, Joseph Galloway <joseph.galloway@lacity.org> wrote:
Christal,

# EXHIBIT E, Page 001

2/23/2018 12:27 PM

Fw: They Are Spraying Today                                              imap://imap.mail.yahoo.com:993/fetch>UID>/INBOX>250995?hea...

## EXHIBIT E, Page 002

Thank you for notifying us. We are attempting to make contact with their office immediately.

Sincerely,



Joseph Galloway
Senior Field Deputy
Office of Councilmember Paul Koretz, 5th Council District
6380 Wilshire Blvd., Suite 800
Los Angeles, CA 90048
T. 323.866.1828 | F: 323.852.1129 | C: 213.550.6017
E: Joseph.Galloway@lacity.org

Keep up with us on social media:

 

Download the City of Los Angeles MyLA311 app for smartphones!

 

MyLA311 links Angelenos with the services and information they need to enjoy their city,
beautify their community and stay connected with their local government.

Sign up for the CD 5 e-newsletter here!

CONFIDENTIALITY NOTICE
This electronic message transmission is intended only for the party to whom it is addressed as it may
contain privileged or confidential information. If you are not the intended recipient, be aware that any
disclosure, copying, distribution or use of the content of this information is prohibited. If you have
received this communication in error, please notify us immediately by e-mail and delete the original
message and any attachment without reading or saving in any manner.

On Fri, Dec 15, 2017 at 11:52 AM, CHRISTAL lord <christalteach4@yahoo.com> wrote:
Dana from the developers office told me they are spraying from pest today, that is completely illegal we
have to notify parents !!!!!! Please call them to stop !!!
Christal Lord

Inline image

Sent from Yahoo Mail for iPhone

On Friday, December 15, 2017, 11:09 AM, CHRISTAL lord <christalteach4@yahoo.com> wrote:

Hello
The developer promised not to start demolition till December 18. They are currently doing
construction as we speak. We have video and Mr.Orange spoke to the supervisor of
construction today and the developer never told him anything. The promise was to wait till
December 18!!!!! Our kids are still here!! You are suppose to protect us!
Christal Lord

## EXHIBIT E, Page 002

2/23/2018 12:27 PM

Fw: They Are Spraying Today

imap://imap.mail.yahoo.com:993/fetch>UID>/INBOX>250995?hea...

## EXHIBIT E, Page 003

Sent from Yahoo Mail for iPhone

— IMG_7511.JPG —

**EXHIBIT E, Page 003**

2/23/2018 12:27 PM

# EXHIBIT F
## NEIGHBORHOOD COUNCIL OPPOSITION LETTER



**PALMS NEIGHBORHOOD COUNCIL**



May 17th, 2018

### RE: OPPOSITION TO 3568 MOTOR AVE DEVELOPMENT UNTIL LAUSD CONDUCTS AN ENVIRONMENTAL REVIEW OF THE IMPACTS ON THE ABUTTING ELEMENTARYSCHOOL

To Whom It May Concern,

I write to inform you of the Palms Neighborhood Council's position on the 3568 Motor Avenue development, taken by a unanimous vote at our November 15, 2017 board meeting.

The Palms Neighborhood Council **OPPOSES** the development project at 3558-3570 Motor as presented at this time *until* an environmental review of the project can be undertaken by the LA Unified School District (LAUSD) and if necessary, the City of Los Angeles.

Our vote on this project was not taken lightly. Our Council has generally been supportive of constructive development in our community and at this point, this vote is the only time in this 2016-2019 board term that we have outright opposed a development project presented to us.

After many meetings with the developer and our community, we concluded that there would be negative impacts to our community -- particularly Palms Elementary School. A full overview of our discussion on this matter, testimony from the school, LAUSD, parents, and the developer can be found starting on page five of our meeting minutes found here:
https://drive.google.com/open?id=15Rcyskzt-nWUXnv2TMmiJrOiwME9yoJA

Sincerely,

Nick Greif
President, Palms Neighborhood Council

Palms Neighborhood Council - Nick Greif, President / Andrea Cuervo, Vice-President / V. Claire Jadulang, Secretary / Katie Clarkin, Treasurer / Alison Regan, Community Org. Rep. / Jenn Gets Residential Rep. A / Erika Graves, residential Rep B. / Paul Soo, Residential Rep. D / Eryn Block. Residential Rep. F / John Stanley, Business Rep. 1 / Maria Muñoz, Business Rep. 2 / Carly Wallace, Business Rep 3

Follow us on twitter: @PalmsNC or on Facebook.com/PalmsLa
Learn more about the Palms Neighborhood Council and sign up for updates at http://palmsnc.la/

# EXHIBIT G
## CONTRADICTION IN NOISE MEASURE/APPLICATION



# EXHIBIT H
## DEVELOPER EQUIPMENT NOISE LEVELS

*3568 Motor Avenue Noise Impact Analysis*

## 8.1 CONSTRUCTION NOISE ANALYSIS

Using the reference construction activity noise levels, previously shown on Table 5-2, calculations of the Project construction noise levels at Palms was completed. Tables 8-1 to 8-6 present the short-term construction noise levels for each stage of construction. Table 8-7 provides a summary of the construction noise levels by stage at Palms. Based on the stages of construction, the noise impacts associated with the proposed Project are expected to create temporarily high noise levels at the nearby Palms receiver locations. To assess the worst-case construction noise levels, this analysis shows the highest noise impacts when the equipment with the highest reference noise level is operating at the closest point from the edge of primary construction activity to each receiver location.

**TABLE 8-1: DEMOLITION ACTIVITY NOISE LEVELS**

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet[2] (dBA L_eq) |
|---|---|
| Truck Pass-Bys & Dozer Activity | 59.2 |
| Dozer Activity | 64.2 |
| Forklift, Jackhammer, & Metal Truck Bed Activities | 67.9 |
| Highest Reference Noise Level at 50 Feet (dBA L_eq): | 67.9 |

| Receiver Location | Distance To Construction Activity[2] (Feet) | Distance Attenuation[3] (dBA L_eq) | Construction Noise Level (dBA L_eq) |
|---|---|---|---|
| R1 | 82' | -4.3 | 63.6 |
| R2 | 45' | 0.9 | 68.8 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.



### TABLE 8-2: SHORING EQUIPMENT NOISE LEVELS

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA Leq) |
|---|---|
| Truck Pass-Bys & Dozer Activity | 59.2 |
| Auger Drill Rig | 77.0 |
| Highest Reference Noise Level at 50 Feet (dBA Leq): | 77.0 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA Leq)[3] | Construction Noise Level (dBA Leq) |
|---|---|---|---|
| R1 | 82' | -4.3 | 72.7 |
| R2 | 45' | 0.9 | 77.9 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

### TABLE 8-3: EXCAVATION, SOIL EXPORT, AND GRADING EQUIPMENT NOISE LEVELS

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA Leq) |
|---|---|
| Truck Pass-Bys & Dozer Activity | 59.2 |
| Dozer Activity | 64.2 |
| Rough Grading Activities | 73.5 |
| Highest Reference Noise Level at 50 Feet (dBA Leq): | 73.5 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA Leq)[3] | Construction Noise Level (dBA Leq) |
|---|---|---|---|
| R1 | 82' | -4.3 | 69.2 |
| R2 | 45' | 0.9 | 74.4 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

URBAN CROSSROADS

TABLE 8-4: BUILDING CONSTRUCTION EQUIPMENT NOISE LEVELS

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA $L_{eq}$) |
|---|---|
| Construction Vehicle Maintenance Activities | 67.5 |
| Foundation Trenching | 68.2 |
| Residential Framing | 62.3 |
| Highest Reference Noise Level at 50 Feet (dBA $L_{eq}$): | 68.2 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA $L_{eq}$)[3] | Construction Noise Level (dBA $L_{eq}$) |
|---|---|---|---|
| R1 | 82' | -4.3 | 63.9 |
| R2 | 45' | 0.9 | 69.1 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

TABLE 8-5: PAVING EQUIPMENT NOISE LEVELS

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA $L_{eq}$) |
|---|---|
| Concrete Mixer Truck Movements | 71.2 |
| Concrete Paver Activities | 65.6 |
| Concrete Mixer Pour & Paving Activities | 65.9 |
| Concrete Mixer Backup Alarms & Air Brakes | 71.6 |
| Concrete Mixer Pour Activities | 67.7 |
| Highest Reference Noise Level at 50 Feet (dBA $L_{eq}$): | 71.6 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA $L_{eq}$)[3] | Construction Noise Level (dBA $L_{eq}$) |
|---|---|---|---|
| R1 | 82' | -4.3 | 67.3 |
| R2 | 45' | 0.9 | 72.5 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.
[2] Distance from the nearest point of construction activity to the nearest receiver.
[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

URBAN CROSSROADS

**TABLE 8-6: ARCHITECTURAL COATING EQUIPMENT NOISE LEVELS**

| Reference Construction Activity[1] | Reference Noise Level @ 50 Feet (dBA Leq) |
|---|---|
| Residential Framing | 62.3 |
| Highest Reference Noise Level at 50 Feet (dBA Lec): | 62.3 |

| Receiver Location | Distance To Construction Activity (Feet)[2] | Distance Attenuation (dBA Leq)[3] | Construction Noise Level (dBA Leq) |
|---|---|---|---|
| R1 | 82' | -4.3 | 58.0 |
| R2 | 45' | 0.9 | 63.2 |

[1] Reference construction noise level measurements taken by Urban Crossroads, Inc.

[2] Distance from the nearest point of construction activity to the nearest receiver.

[3] Point (stationary) source drop off rate of 6.0 dBA per doubling of distance.

## 8.2 CITY OF LOS ANGELES CONSTRUCTION NOISE LEVEL COMPLIANCE

As shown on Table 8-7, the construction noise levels are expected to range from 72.7 to 77.9 dBA Leq at the sensitive receiver locations. For construction activities lasting more than 10 days in a three-month period, such as activities at the Project site, the City of Los Angeles identifies a noise level standard of 5 dBA above the existing exterior ambient noise levels at adjacent Palms receiver locations. To reduce Project construction noise levels, multiple Project Design Features (PDFs) have been incorporated into the Project.  As shown on Table 8-8, the Project construction noise levels would exceed the City of Los Angeles 5 dBA above existing ambient noise level standard without the planned PDFs at the nearby sensitive receiver locations (R1 and R2).

**TABLE 8-7: CONSTRUCTION NOISE LEVELS WITHOUT PROJECT DESIGN FEATURES**

| Receiver Location[1] | Construction Hourly Noise Levels (dBA Leq), | | | | | | Highest Const. Levels[2] | |
|---|---|---|---|---|---|---|---|---|
| | Demolition | Shoring | Excavation & Grading | Building Construction | Paving | Architectural Coating | Shoring | Non-Shoring |
| R1 | 63.6 | 72.7 | 69.2 | 63.9 | 67.3 | 58.0 | 72.7 | 69.2 |
| R2 | 68.8 | 77.9 | 74.4 | 69.1 | 72.5 | 63.2 | 77.9 | 74.4 |

[1] Noise receiver locations are shown on Exhibit 8-A.

[2] Estimated construction noise levels during peak operating conditions.

URBAN CROSSROADS

**TABLE 8-8: CONSTRUCTION NOISE LEVEL COMPLIANCE WITHOUT PDFS**

| Receiver Location[1] | Highest Project Construction Noise Level[2] | Measurement Location[3] | Reference Ambient Noise Levels[4] | Ambient Plus 5 dBA (LA CEQA Guidelines) | Threshold[5] | Threshold Exceeded?[6] |
|---|---|---|---|---|---|---|
| R1 | 72.7 | L1 | 67.7 | +5 | 72.7 | Yes |
| R2 | 77.9 | L1 | 67.7 | +5 | 72.7 | Yes |

[1] See Exhibit 8-A for the sensitive receiver locations.

[2] Project construction noise levels as shown on Table 8-7 without the planned temporary noise barriers.

[3] Reference noise level measurement locations as shown on Exhibit 5-A.

[4] Observed daytime ambient noise levels as shown on Table 5-1.

[5] Ambient plus 5 dBA per the City of Los Angeles CEQA Thresholds Guidelines.

[6] Do the peak Project construction noise levels exceed the ambient plus 5 dBA threshold identified by the City of Los Angeles?

As such, Table 8-9 shows the calculated Project construction noise levels with the temporary noise barrier attenuation provided by the planned 12-foot high temporary noise barrier identified in the PDFs. The noise attenuation provided through temporary noise barriers depends on many factors including cost, wind loading, the location of the receiver, and the ability to place barriers such that the line-of-sight of the receiver is blocked to the noise source, among others. This analysis assumes a temporary noise barrier constructed using frame-mounted materials such as vinyl acoustic curtains or quilted blankets attached to a construction site perimeter fence or structure. The Project construction PDFs are shown to result in reduced construction noise levels approaching 68.9 dBA $L_{eq}$ at the Palms receiver locations and will remain below the City of Los Angeles 5 dBA plus ambient noise level standard for construction activity noise levels.

**TABLE 8-9: CONSTRUCTION NOISE LEVEL COMPLIANCE WITH PDFS**

| Receiver Location[1] | Project Construction Noise Levels With Temporary Noise Barrier[3] | | | Measurement Location[3] | Reference Ambient Noise Levels[4] | Ambient Plus 5 dBA (LA CEQA Guidelines) | Threshold[5] | Threshold Exceeded?[6] |
|---|---|---|---|---|---|---|---|---|
| | Without Barrier | Barrier Atten. | With Barrier | | | | | |
| R1 | 72.7 | -7.9 | 64.8 | L1 | 67.7 | +5 | 72.7 | No |
| R2 | 77.9 | -9.0 | 68.9 | L1 | 67.7 | +5 | 72.7 | No |

[1] See Exhibit 8-A for the sensitive receiver locations.

[2] Project construction noise levels with the planned temporary noise barrier, Appendix 8.1 includes the temporary noise barrier attenuation calculations.

[3] Reference noise level measurement locations as shown on Exhibit 5-A.

[4] Observed daytime ambient noise levels as shown on Table 5-1.

[5] Ambient plus 5 dBA per the City of Los Angeles CEQA Thresholds Guidelines.

[6] Do the peak Project construction noise levels exceed the ambient plus 5 dBA threshold identified by the City of Los Angeles?

URBAN CROSSROADS

### 8.3 LAUSD CONSTRUCTION NOISE LEVEL COMPLIANCE

The planning of Project construction during periods when Palms is not in session is considered a PDF for reducing construction noise levels, since receiver locations R1 and R2 would no longer be considered sensitive receivers if unoccupied during Project construction. Nonetheless, this section analyzes Project construction activities, capable of generating the highest construction noise levels based on the LAUSD 3 dBA ambient noise level increase standard.

#### 8.3.1 WITH SCHOOL IN SESSION (SHORING STAGE)

Table 8-10 shows the highest shoring construction noise levels at receiver locations R1 and R2 and the Project's temporary noise level contribution to the existing noise environment due to construction activity, including the barrier attenuation provided by planned 12-foot high temporary noise barrier. Based on the shoring equipment noise levels, receiver location R2, which represents the closest existing classroom building would experience a noise level increase of 3.7 dBA $L_{eq}$, exceeding the LAUSD 3 dBA Increase standard. As such, a PDF for Project construction includes restricting the shoring stage of construction to a time period when Palms is not in session, thereby eliminating the temporary noise level increase since R1 and R2 would represent unoccupied school property.

#### 8.3.1 WITHOUT SCHOOL IN SESSION (ALL OTHER STAGES)

Table 8-11 shows the highest construction noise levels from all other stages at receiver locations R1 and R2 and the Project's temporary noise level contribution to the existing noise environment due to construction activity, including the barrier attenuation provided by planned 12-foot high temporary noise barrier. Based on the construction activity noise levels, receiver location R1 and R2 would experience Project construction-related noise level increases between 0.9 to 2.0 dBA $L_{eq}$ and remain below the LAUSD 3 dBA increase standard. The construction noise levels shown on Table 8-11 include the temporary noise barrier attenuation provided by the Project PDFs.





**TABLE 8-12: CONSTRUCTION NOISE LEVEL INCREASES (SHORING)**

| Receiver Location[1] | Use | Shoring Equipment Noise Level (dBA $L_{eq}$)[2] | Measurement Location[3] | Reference Ambient Noise Levels (dBA $L_{eq}$)[4] | Combined Shoring and Ambient (dBA $L_{eq}$)[5] | Project Contribution (dBA $L_{eq}$)[6] | Threshold Exceeded?[7] |
|---|---|---|---|---|---|---|---|
| R1 | Playground | 64.8 | L1 | 67.7 | 69.5 | 1.8 | No |
| R2 | Classroom | 68.9 | L1 | 67.7 | 71.4 | 3.7 | Yes |

[1] See Exhibit 8-A for the sensitive receiver locations.
[2] Project shoring construction equipment noise levels as shown on Table 8-15 with the planned 12-foot high temporary noise barrier.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Represents the combined ambient conditions plus the Project activities
[6] The noise level increase expected with the addition of the proposed Project activities
[7] A 3 dBA increase over the existing ambient noise level at school uses per LAUSD thresholds.

**TABLE 8-13: CONSTRUCTION NOISE LEVEL INCREASES (ALL OTHER STAGES)**

| Receiver Location[1] | Use | Non-Shoring Construction Noise Level (dBA $L_{eq}$)[2] | Measurement Location[3] | Reference Ambient Noise Levels (dBA $L_{eq}$)[4] | Combined Project and Ambient (dBA $L_{eq}$)[5] | Project Contribution (dBA $L_{eq}$)[6] | Threshold Exceeded?[7] |
|---|---|---|---|---|---|---|---|
| R1 | Playground | 61.3 | L1 | 67.7 | 68.6 | 0.9 | No |
| R2 | Classroom | 65.4 | L1 | 67.7 | 69.7 | 2.0 | No |

[1] See Exhibit 8-A for the sensitive receiver locations.
[2] Project construction equipment (non-shoring) noise levels with the planned 12-foot foot high temporary noise barrier.
[3] Reference noise level measurement locations as shown on Exhibit 5-A.
[4] Observed daytime ambient noise levels as shown on Table 5-1.
[5] Represents the combined ambient conditions plus the Project activities.
[6] The noise level increase expected with the addition of the proposed Project activities.
[7] A 3 dBA increase over the existing ambient noise level at school uses per LAUSD thresholds.

# EXHIBIT I
## LAUSD EQUIPMENT NOISE LEVELS

## 5. Environmental Analysis

## 5.12 NOISE

This section of the program EIR evaluates the potential for implementation of the SUP to impact the noise environment in the District. The section discusses plans and policies from several jurisdictional agencies and LAUSD standard conditions, guidelines, specifications, practices, policies, and project design features (LAUSD Standards), along with the existing noise environment throughout the SUP area, and possible environmental impacts that may occur during future phases of the SUP and site-specific projects implemented under the SUP.

### TERMINOLOGY

Noise is most often defined as unwanted sound. Although sound can be easily measured, the perception of noise and the physical response to sound complicate the analysis of its impact on people. People judge the relative magnitude of sound sensation in subjective terms such as "noisiness" or "loudness." The following are brief definitions of terminology used in this chapter:

**Sound.** A disturbance created by a vibrating object, which, when transmitted by pressure waves through a medium such as air, is capable of being detected by a receiving mechanism, such as the human ear or a microphone.

**Noise.** Sound that is loud, unpleasant, unexpected, or otherwise undesirable.

**Decibel (dB).** A unitless measure of sound on a logarithmic scale.

**A-Weighted Decibel (dBA).** An overall frequency-weighted sound level in decibels that approximates the frequency response of the human ear.

**Equivalent Continuous Noise Level ($L_{eq}$).** The mean of the noise level, energy-averaged over the measurement period.

**Day-Night Level ($L_{dn}$).** The energy-average of the A-weighted sound levels occurring during a 24-hour period, with 10 dB added to sound levels from 10:00 PM to 7:00 AM.

**Community Noise Equivalent Level (CNEL).** The energy-average of the A-weighted sound levels occurring during a 24-hour period, with 5 dB added to the levels from 7:00 PM to 10:00 PM and 10 dB added from 10:00 PM to 7:00 AM

#### Characteristics of Sound

Sound is a pressure wave transmitted through the air. It is described in terms of loudness or amplitude (measured in decibels), frequency or pitch (measured in Hertz [Hz] or cycles per second), and duration (measured in seconds or minutes). The standard unit of measurement of the loudness of sound is the decibel (dB). Changes of 1 to 3 dB are detectable under quiet, controlled conditions and changes of less than 1 dBA are usually indiscernible. A 3 dB change in noise levels is considered the minimum change that is detectable

## 5. Environmental Analysis
### NOISE

with human hearing in outside environments. A change of 5 dB is readily discernable to most people in an exterior environment, and a 10 dBA change is perceived as a doubling (or halving) of the sound.

The human ear is not equally sensitive to all frequencies. Sound waves below 16 Hz are not heard at all and are "felt" more as a vibration. Similarly, though people with extremely sensitive hearing can hear sounds as high as 20,000 Hz, most people cannot hear above 15,000 Hz. In all cases, hearing acuity falls off rapidly above about 10,000 Hz and below about 200 Hz.

Noise is defined as unwanted sound and is known to have several adverse effects on people, including hearing loss, speech and sleep interference, physiological responses, and annoyance. Based on these known adverse effects, the federal government, State of California, and many local governments have established criteria to protect public health and safety and to prevent disruption of certain human activities.

### Measurement of Sound

Sound intensity is measured through the A-weighted measure to correct for the relative frequency response of the human ear. That is, an A-weighted noise level deemphasizes low and very high frequencies of sound similar to the human ear's deemphasis of these frequencies.

Unlike units of measure that are computed with arithmetic functions (such as adding or subtracting numbers), decibels are measured and processed on a logarithmic scale. On a logarithmic scale, an increase of 10 dB is 10 times more intense than 1 dB, a 20 dB increase is 100 times more intense, and 30 dB is 1,000 times more intense. A sound as soft as human breathing is about 10 times greater than 0 dB. The decibel system of measuring sound gives a rough connection between the physical intensity of sound and its perceived loudness to the human ear. Ambient sounds generally range from 30 dBA (very quiet) to 100 dBA (very loud). Table 5.12-1 shows the subjective effect of changes in sound pressure levels

**Table 5.12-1    Change in Apparent Loudness**

| ± 3 dB | Threshold of human perceptibility |
|---|---|
| ± 5 dB | Clearly noticeable change in noise level |
| ± 10 dB | Half or twice as loud |
| ± 20 dB | Much quieter or louder |

Source: Bies, David A. and Colin H. Hansen. 2009. Engineering Noise Control: Theory and Practice: 4th ed. New York. Spon Press.

Sound levels decrease as the distance from their source increases. Sound dissipates exponentially with distance from the noise source. This phenomenon is known as "spreading loss." For a single point source, sound levels decrease by approximately 6 dB for each doubling of distance from the source. This drop-off rate is appropriate for noise generated by onsite operations from stationary equipment or activity at a project site. If noise is produced by a line source, such as highway traffic, the sound decreases by 3 dB for each doubling of

## 5. Environmental Analysis
### NOISE

distance in a hard site environment.[1] Line source noise in a relatively flat environment with absorptive vegetation decreases by 4.5 dB for each doubling of distance.

Time variation in noise exposure is typically expressed in terms of a steady-state energy level equal to the energy content of the time varying period (called $L_{eq}$), or alternately, as a statistical description of the sound level that is exceeded over some fraction of a given observation period. For example, the $L_{50}$ noise level represents the noise level that is exceeded 50 percent of the time. Half the time the noise level exceeds this level and half the time the noise level is less than this level. This level also represents the level that is exceeded 30 minutes in an hour. Similarly, the $L_2$, $L_8$ and $L_{25}$ values represent the noise levels that are exceeded 2, 8, and 25 percent of the time or 1, 5, and 15 minutes per hour. These "L" values are typically used to demonstrate compliance for stationary noise sources with a city's noise ordinance, as discussed below. Other values typically noted during a noise survey are the $L_{min}$ and $L_{max}$. These values represent the minimum and maximum root-mean-square noise levels obtained over the measurement period.

Because community receptors are more sensitive to unwanted noise intrusion during the evening and at night, state law and the City and the County of Los Angeles require that, for planning purposes, an artificial dB increment be added to quiet time noise levels in a 24-hour noise descriptor called the Community Noise Equivalent Level (CNEL) or Day-Night Noise Level ($L_{dn}$). The CNEL descriptor requires that an artificial increment of 5 dBA be added to the actual noise level for the hours from 7:00 PM to 10:00 PM and 10 dBA for the hours from 10:00 PM to 7:00 AM. The $L_{dn}$ descriptor uses the same methodology except that there is no artificial increment added to the hours between 7:00 PM and 10:00 PM. Both descriptors give roughly the same 24-hour level, with the CNEL being only slightly more restrictive (i.e., higher).[2]

### Psychological and Physiological Effects of Noise

Physical damage to human hearing begins at prolonged exposure to noise levels higher than 85 dBA. Exposure to high noise levels affects our entire system, with prolonged noise exposure in excess of 75 dBA increasing body tensions and thereby affecting blood pressure, functions of the heart, and the nervous system. In comparison, extended periods of noise exposure above 90 dBA could result in permanent hearing damage.

### Vibration Fundamentals

Vibration is a trembling, quivering, or oscillating motion of the earth. Like noise, vibration is transmitted in waves, but in this case through the earth or solid objects. Unlike noise, vibration is typically of a frequency that is felt rather than heard.

---

[1] Surface type or ground cover is defined as the "hardness" or "softness" of the surrounding area. "Hard site environment" is areas with acoustically hard ground (e.g., pavement or water). Distance attenuation from a line source (i.e., roadway or railway) with a hard site environment is 3 dB per doubling of distance (dB/DD). "Soft site environment" is areas with acoustically soft ground (e.g., lawn or loose dirt or agricultural uses). Ground cover can affect the sound propagation rate by as much as an additional 1.5 dB/DD. (Note that this rate occurs only when both the noise source and the receiver are close to the ground and the terrain between the two is flat and soft.) As a result of this additional attenuation, the line-source sound levels decrease at a rate of 4.5 dB/DD at soft sites.
[2] $L_{dn}$ and CNEL values rarely differ by more than 1 dB. As a matter of practice, $L_{eq}$ and CNEL values are considered equivalent and are treated as such in this assessment.

**Table 5.12-11    Typical Noise Levels**

| Common Outdoor Activities | Noise Level (dBA) | Common Indoor Activities |
|---|---|---|
| | 110 | Rock Band |
| Jet Flyover at 1,000 feet | 105 | |
| Gas Lawn Mower at three feet | 95 | |
| Diesel Truck at 50 feet, at 50 mph | 85 | Food Blender at 3 feet |
| | 80 | Garbage Disposal at 3 feet |
| Noisy Urban Area, Daytime | 75 | |
| | 70 | Vacuum Cleaner at 10 feet |
| Commercial Area | 65 | Normal speech at 3 feet |
| Heavy Traffic at 300 feet | 60 | |
| | 55 | Large Business Office |
| Quiet Urban Daytime | 50 | |
| | 45 | Dishwasher Next Room |
| Quiet Urban Nighttime | 40 | Theater, Large Conference Room (background) |
| Quiet Suburban Nighttime | 35 | |
| | 30 | Library |
| Quiet Rural Nighttime | 25 | Bedroom at Night, Concert Hall (background) |
| | 15 | Broadcast/Recording Studio |
| Lowest Threshold of Human Hearing | 0 | Lowest Threshold of Human Hearing |

Source: California Department of Transportation (Caltrans), 2009, November Technical Noise Supplemental ("TeNS"), Prepared by ICF International.

### North Educational Service Center

Major freeways in the North Educational Service Center (ESC) are Interstates 5, 118, 405, and 210 and State Routes 101, 170, and 134 (see Chapter 3, Figure 3-2, for ESC boundaries). Major roads such as Roscoe Boulevard, Sherman Way, Van Nuys Boulevard, and others generate high levels of traffic noise.

Freight and passenger rail lines are in the North ESC. Metrolink and Amtrak passenger service is provided on lines that link Los Angeles and Ventura County, and travels through the San Fernando Valley.

The major airport that provides domestic commercial service is the Bob Hope Airport in Burbank. In addition, the general aviation airports of Whitman and Van Nuys are in the North ESC.

Stationary noise is generated by all types of land uses. Residential uses generate noise from landscaping, maintenance activities, and air conditioning systems. Commercial and industrial uses generate noise from heating, ventilation, air conditioning (HVAC) systems, loading docks, machinery, parking lots, and other operational sources. Noise generated by residential and commercial uses are generally short and intermittent. Industrial uses typically generate noise on a continual basis due to the nature of their activities.

## 5. Environmental Analysis
### NOISE

**Table 5.12-12    Construction Equipment Vibration Levels**

| Equipment | Approximate RMS Velocity at 25 feet (VdB) | Approximate PPV Velocity at 25 feet (in/sec) |
|---|---|---|
| Impact Pile Driver – upper range | 112 | 1.518 |
| Impact Pile Driver – typical | 104 | 0.644 |
| Vibratory Roller | 94 | 0.210 |
| Large Bulldozer | 87 | 0.089 |
| Caisson Drilling | 87 | 0.089 |
| Jackhammer | 79 | 0.035 |
| Small Bulldozer | 58 | 0.003 |
| Loaded Trucks | 86 | 0.076 |
| FTA Criteria – Human Annoyance (Daytime) | 78 | — |
| FTA Criteria – Architectural Damage | — | 0.300 |

Source: Federal Transit Administration (FTA). 2006, May. *Transit Noise and Vibration Impact Assessment.* United States Department of Transportation. FTA-VA-90-1003-06
Note: RMS velocity calculated from vibration level (VdB) using the reference of 1 microinch/second and a crest factor of 4

As shown in Table 5.12-12, vibration generated by construction equipment has the potential to be substantial. However, groundborne vibration is almost never annoying to people who are outdoors, so it is usually evaluated in terms of indoor environments.[20]

### Vibration Annoyance

Vibration is typically noticed nearby when objects in a building generate noise from rattling windows or picture frames. The effect on buildings near a construction site varies depending on soil type, ground strata, and receptor building construction. The generation of vibration can range from no perceptible effects at the lowest vibration levels, to low rumbling sounds and perceptible vibrations at moderate levels, to slight damage at the highest levels. For human annoyance, the criteria of 0.1 PPV in/sec is the level at which continuous vibration begins to annoy people. Small construction equipment generates vibration levels less than 0.1 PPV in/sec at 25 feet away. However, large equipment such as vibratory roller or pile driver would generate significant vibration at 25 feet. Although vibration dissipates quickly with distance, the maximum construction-related vibration level and close distance of residential units or classrooms, vibration may exceed the 0.1 PPV in/sec threshold for annoyance. District contractors work closely with schools and nearby land uses (see PDF N-5) and try to avoid heavy noise and vibration activities directly adjacent to noise and vibration-sensitive land uses.

### Vibration-Induced Structural Damage

Construction of SUP-related projects would be site specific and would occur intermittently for varying periods of time. Grading and demolition activities typically generate the highest vibration levels. Impact pile driving and rock blasting can generate high levels in excess of 100 PPV at 25 feet away. However, typical construction projects do not require these methods, or if necessary, they can be mitigated with alternate

---

[20] Federal Transit Administration (FTA). 2006, May. *Transit Noise and Vibration Impact Assessment.* United States Department of Transportation. FTA-VA-90-1003-06.

methods, such as nonexplosive rock breaking instead of rock blasting and drilled piles instead of impact pile driving. The threshold at which there is a risk of architectural damage to normal houses with plastered walls and ceilings is 0.2 in/sec. Building damage is not a factor for typical LAUSD projects, unless demolition and construction is planned directly adjacent to a building with fragile wall treatment or an older historic building. LAUSD PDF N-6, PDF N-7, and PDF N-8 would reduce structural vibration impacts during demolition and construction activities by using an acoustical engineer to identify and reduce vibrations, and avoiding vibration-intensive construction equipment or activities, if feasible.

Construction activities would occur at discrete locations in the District's boundaries, and vibration from such activity may impact existing buildings that are close enough. If alternative methods cannot be used, there is no feasible mitigation available that would reduce potential vibration impacts if receptors are in close proximity and equipment generates high vibration levels, such as pile driving. Although incorporation of the LAUSD PDF N-6, PDF N-7 and PDF N-8 into SUP-related projects would reduce vibration levels at nearby uses, demolition and/or construction vibration may still cause annoyance and architectural damage. Thus, demolition/construction-related vibration impacts would be potentially significant and may not be feasibly mitigated to a level of insignificance.

**Impact 5.12-3: Traffic generated by SUP-related projects would not result in substantial permanent increase in ambient noise levels. [Thresholds N-3]**

### All SUP Projects

To determine if a project would cause a substantial permanent traffic noise increase or would exceed local standards related to project related traffic, consideration must be given to the magnitude of the increase and the affected receptors. In general for community noise, a noise level increase of 3 dBA is considered barely perceptible, and an increase of 5 dBA is clearly noticeable. An increase of 3 dBA is often used as a threshold for a substantial increase. A traffic noise impact under CEQA may occur when noise-sensitive receptors along a roadway segment (1) are exposed to ambient noise levels over 60 dBA CNEL, and (2) experience a project-related traffic noise increase over 3 dBA.

Where project-related traffic exceeds 5,000 additional vehicles per day or a twofold increase in traffic, the District will conduct a noise study. According to Institute of Transportation Engineers (ITE) trip generation rates, an increase of student capacity of more than 2,900 students would be required to generate 5,000 daily trips. None of the SUP-related projects would increase traffic on roadways adjacent to existing schools by 5,000 or more, nor would they double exising traffic. Traffic-related noise impacts would be less than significant.

SCHOOL UPGRADE PROGRAM DRAFT EIR
LOS ANGELES UNIFIED SCHOOL DISTRICT

5. Environmental Analysis
**NOISE**

**Impact 5.12-4: Construction activities may result substantial temporary or periodic increase in ambient noise levels in the project vicinity. [Threshold N-4]**

### All SUP Projects

Construction activities associated with the SUP could cause substantial short-term noise from the use of stationary and mobile construction equipment. Table 5.12-13 lists maximum construction equipment noise levels at 50 feet away and the percentage of time each piece of equipment is used.[21]

**Table 5.12-13    Construction Equipment Noise Levels**

| Equipment | Noise Level [dBA] at 50 ft | Typical Duty Cycle |
|---|---|---|
| Auger Drill Rig | 85 | 20% |
| Backhoe | 80 | 40% |
| Blasting | 94 | 1% |
| Chain Saw | 85 | 20% |
| Clam Shovel | 93 | 20% |
| Compactor (ground) | 80 | 20% |
| Compressor (air) | 80 | 40% |
| Concrete Mixer Truck | 85 | 40% |
| Concrete Pump | 82 | 20% |
| Concrete Saw | 90 | 20% |
| Crane (mobile or stationary) | 85 | 20% |
| Dozer | 85 | 40% |
| Dump Truck | 84 | 40% |
| Excavator | 85 | 40% |
| Front End Loader | 80 | 40% |
| Generator (25 KVA or less) | 70 | 50% |
| Generator (more than 25 KVA) | 82 | 50% |
| Grader | 85 | 40% |
| Hydra Break Ram | 90 | 10% |
| In situ Soil Sampling Rig | 84 | 20% |
| Jackhammer | 85 | 20% |
| Mounted Impact Hammer (hoe ram) | 90 | 20% |
| Paver | 85 | 50% |
| Impact Pile Driver | 95 | 20% |
| Pneumatic Tools | 85 | 50% |

---

[21] Duty cycles (see table) are related to the percentage of utilization of each piece of equipment at typical construction phases for development projects such as schools, and are used to calculate average noise levels in a given period.

Case 2:17-cv-09003-JAK-PJW   Document 208-13   Filed 06/24/20   Page 415 of 636   Page ID #:6572

SCHOOL UPGRADE PROGRAM EIR
LOS ANGELES UNIFIED SCHOO

## 5. Environmental Analysis
### NOISE

#### Table 5.12-13    Construction Equipment Noise Levels

| Equipment | Noise Level (dBA) at 50 ft | Typical Duty Cycle |
|---|---|---|
| Pumps | 77 | 50% |
| Rock Drill | 85 | 20% |
| Scraper | 85 | 40% |
| Tractor | 84 | 40% |
| Vacuum Excavator | 85 | 40% |
| Vibratory Concrete Mixer | 80 | 20% |

Source: Thalheimer, E., 2000, Construction Noise Control Program and Mitigation Strategy as the Central Artery/Tunnel Project, Institute of Noise Control Engineering.
Note. KVA = kilovolt amps

The County of Los Angeles has established noise limits for construction activities; however, most jurisdictions exempt noise associated with construction, repair, remodeling, demolition, and grading, as long as these activities occur during the hours established in the jurisdiction's municipal code.

SUP-related project construction would be localized and would occur intermittently for varying periods of time. Potentially affected noise-sensitive land uses include residential, schools, libraries, churches, nursing homes, hospitals, and open space/recreation areas.

All project types throughout the District would have the potential to cause some kind of temporary noise during construction. However, specific school projects have not been identified under the SUP. Information regarding specific projects, construction equipment type, length, and the location of receptors is required to quantify the level of impact associated with construction activity. Even relatively small projects with the operation of a backhoe and a loader in close proximity to a sensitive receptor would generate a combined 83 dBA $L_{eq}$ at 50 feet away, having the potential to exceed the County of Los Angeles 75 dBA $L_{eq}$ daytime standard for a residential use. Projects that require substantial site preparation and excavation would likely require several pieces of earthmoving equipment that, operating simultaneously, could generate much higher noise levels.

Incorporation of PDF AQ-1, N-9, PDF N-10, PDF N-11, PDF N-12, and PDF N-13 would reduce noise impacts during construction by limiting the construction schedule, implementing feasible noise attenuation measures, and providing advance notice to nearby noise receptors. Although compliance with local regulations and incorporation of the LAUSD Standards into each individual project would reduce noise levels at nearby sensitive receptors, construction noise may still result in a substantial increase over the ambient noise or exceed local noise standards for some SUP-related projects. Thus, construction-related noise impacts are considered potentially significant, and potentially may not be feasibly mitigated to a level of insignificance.

Page 5.12-28

PlaceWorks

# EXHIBIT J
## PICTURES OF TOXIC DUST EMISSIONS





1  Olu K. Orange, Esq. (SBN 213653)
   ORANGE LAW OFFICES, P.C.
2  3435 Wilshire Blvd., Suite 2910
   Los Angeles, California 90010
3  Phone: (213) 736-9900
   Fax: 213) 417-8800
4  orangelawoffices@att.net

5  Shawna L. Parks, Esq. (SBN 208301)
   LAW OFFICE OF SHAWNA L. PARKS
6  4470 W. Sunset Blvd., Ste. 107-347
   Los Angeles, CA 90027
7  Phone/Fax: (323) 389-9239
   sparks@parks-law-office.com
8
   Janeen Steel, Esq. SBN (211401)
9  Patricia A. Van Dyke, Esq. SBN (160033)
   LEARNING RIGHTS LAW CENTER
10 205 S. Broadway, Suite 808
   Los Angeles, CA 90012
11 Phone: (213) 489-4030
   patsy@learningrights.org
12

**FILED**
Superior Court of California
County of Los Angeles

AUG 02 2018

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Shaunya Bolden

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

14                        **COUNTY OF LOS ANGELES**

15

16  | S.G., a minor, by and through her guardian | Case No.: BS 174498 |

17  ad litem, Brittany Dorn; A.D.G., and R.L.,
    minors, by and through their guardian ad

18  litem, Derek Spencer; N.B., a minor, by        **EXHIBITS 11-23 TO FIRST AMENDED**
    and through his guardian ad litem, Araceli     **VERIFIED PETITION TO WRIT OF**
19  Boyce; A.G., a minor, by and through his       **MANDAMUS AND COMPLAINT FOR**
    guardian ad litem, Karla Garcia;               **DECLARATORY AND INJUNCTIVE**
20  CHRISTAL LORD; and DYANNA                       **RELIEF**
21  SANABRIA,
                    Petitioners and Plaintiffs,
22
23          vs.

24  CITY OF LOS ANGELES; LOS
    ANGELES CITY COUNCIL; and DOES 1
25  THROUGH 10, inclusive,
26              Respondents and Defendants.

27  HIRO KOBAYASHI, 3568 MOTOR
28  LLC, AND ROES 1 THROUGH 10,
    inclusive,
                    Real Parties In Interest.

- 1-

**File No. 17-1394**

CATEGORICAL EXEMPTION (CE), PLANNING AND LAND USE MANAGEMENT COMMITTEE REPORT relative to a California Environmental Quality Act (CEQA) appeal for the properties located at 3558-3570 South Motor Avenue and 10313 West Tabor Street.

Recommendations for Council action:

1. DETERMINE, based on the whole of the administrative record, the project is exempt from CEQA, pursuant to State CEQA Guidelines Article 19, Sections 15304 and 15332, and City CEQA Guidelines Article III, Section 1, Class 4, Category 1, and there is no substantial evidence demonstrating that an exemption to a categorical exemption pursuant to CEQA Guidelines, Section 15300.0 applies.

2. ADOPT the FINDINGS of the Department of City Planning (DCP), Director's Determination dated September 1, 2017, attached to the Council file, as the Findings of Council.

3. RESOLVE TO DENY THE APPEAL filed by Palms Elementary Family Association, et al. (Representative: Olu K. Orange, Esq., Orange Law Offices, P.C.), and THEREBY SUSTAIN the Director's Determination in approving the CE (No. ENV-2016-4881-CE) for a Density Bonus and Affordable Housing Incentives, as requested by the applicant and subject to Conditions of Approval, for a project totaling 42 dwelling units, reserving 10 percent or four dwelling units of the 38 total base dwelling units permitted on the site, for Very Low Income households occupancy for a period of 55 years, with the Density Bonus including a 32.5 percent increase in the allowable Floor Area Ratio (FAR) allowing a total FAR of 1.98:1 in lieu of the normal maximum of 1.5:1, for the properties located at 3558-3570 South Motor Avenue and 10313 West Tabor Street.

Applicant: Hiro Kobayashi, 3568 Motor LLC

Representative: Dana Sayles, Three6ixty

Case No. DIR-2016-4880-DB

Fiscal Impact Statement: None submitted by the DCP. Neither the City Administrative Officer nor the Chief Legislative Analyst has completed a financial analysis of this report.

Community Impact Statement: None submitted.

Summary:
At a regular meeting held on May 22, 2018, the PLUM Committee considered a DCP report and an appeal for the properties at 3558-3570 South Motor Avenue and 10313 West Tabor Street. Staff from the Department of City Planning provided an overview of the matter. The applicant and appellant representatives commented on the project and the appeals. A representative of the Los Angeles Unified School District provided information related to CEQA. A representative of Council District Five additionally commented on the matter and provided a position regarding the appeal. After an opportunity for public comment, the Committee recommended to deny the



appeal and sustain the decision of the DCP. This matter is now submitted to Council for
consideration.

Respectfully Submitted,


PLANNING AND LAND USE MANAGEMENT COMMITTEE

| MEMBER: | VOTE: |
|---|---|
| HUIZAR | ABSENT |
| HARRIS-DAWSON | YES |
| ENGLANDER | YES |
| BLUMENFIELD | YES |
| PRICE | YES |

SD


**-NOT OFFICIAL UNTIL COUNCIL ACTS-**

## CORRECTED REPORT

**File No. 17-1394**

STATUTORICAL EXEMPTION, CATEGORICAL EXEMPTION (CE), and PLANNING AND LAND USE MANAGEMENT COMMITTEE REPORT relative to a California Environmental Quality Act (CEQA) appeal for the properties located at 3558-3570 South Motor Avenue and 10313 West Tabor Street.

Recommendations for Council action:

1. FIND, based on the whole of the administrative record, the project is Statutorily Exempt from CEQA pursuant to Public Resources Code Section 21155.1 as a Sustainable Communities Project.

2. DETERMINE, based on the whole of the administrative record, the project is exempt from CEQA, pursuant to State CEQA Guidelines Article 19, Sections 15304 and 15332, and City CEQA Guidelines Article III, Section 1, Class 4, Category 1, and there is no substantial evidence demonstrating that an exemption to a CE pursuant to CEQA Guidelines Section 15300.0 applies.

3. ADOPT the FINDINGS of the Department of City Planning (DCP), Director's Determination dated September 1, 2017, attached to the Council file, as the Findings of Council.

4. RESOLVE TO DENY THE APPEAL filed by Palms Elementary Family Association, et al. (Representative: Olu K. Orange, Esq., Orange Law Offices, P.C.), and THEREBY SUSTAIN the Director's Determination in approving the CE (No. ENV-2016-4881-CE) for a Density Bonus and Affordable Housing Incentives, as requested by the applicant and subject to Conditions of Approval, for a project totaling 42 dwelling units, reserving 10 percent or four dwelling units of the 38 total base dwelling units permitted on the site, for Very Low Income households occupancy for a period of 55 years, with the Density Bonus including a 32.5 percent increase in the allowable Floor Area Ratio (FAR) allowing a total FAR of 1.98:1 in lieu of the normal maximum of 1.5:1, for the properties located at 3558-3570 South Motor Avenue and 10313 West Tabor Street.

Applicant: Hiro Kobayashi, 3568 Motor LLC

Representative: Dana Sayles, Three6ixty

Case No. DIR-2016-4880-DB

Fiscal Impact Statement: None submitted by the DCP. Neither the City Administrative Officer nor the Chief Legislative Analyst has completed a financial analysis of this report.

Community Impact Statement: None submitted.

Summary:
At a regular meeting held on May 22, 2018, the PLUM Committee considered a DCP report and an appeal for the properties at 3558-3570 South Motor Avenue and 10313 West Tabor Street.

Staff from the Department of City Planning provided an overview of the matter. The applicant
and appellant representatives commented on the project and the appeals. A representative of
the Los Angeles Unified School District provided information related to CEQA. A representative
of Council District Five additionally commented on the matter and provided a position regarding
the appeal. After an opportunity for public comment, the Committee recommended to deny the
appeal and sustain the decision of the DCP. This matter is now submitted to Council for
consideration.

Respectfully Submitted,

PLANNING AND LAND USE MANAGEMENT COMMITTEE

| MEMBER: | VOTE: |
|---|---|
| HUIZAR | ABSENT |
| HARRIS-DAWSON | YES |
| ENGLANDER | YES |
| BLUMENFIELD | YES |
| PRICE | YES |

SD

**-NOT OFFICIAL UNTIL COUNCIL ACTS-**

HOLLY L. WOLCOTT
CITY CLERK

SHANNON D. HOPPES
EXECUTIVE OFFICER

When making inquiries relative to
this matter, please refer to the
Council File No.: 17-1394

City of Los Angeles
CALIFORNIA



ERIC GARCETTI
MAYOR

OFFICE OF THE
CITY CLERK

Council and Public Services Division
200 N. SPRING STREET, ROOM 395
LOS ANGELES, CA 90012
GENERAL INFORMATION - (213) 978-1133
FAX: (213) 978-1040

PATRICE Y. LATTIMORE
ACTING DIVISION MANAGER

CLERK.LACITY.ORG

## OFFICIAL ACTION OF THE LOS ANGELES CITY COUNCIL

June 6, 2018

**Council File No.:** 17-1394

**Council Meeting Date:** June 05, 2018

**Agenda Item No.:** 34

**Agenda Description:** STATUTORICAL EXEMPTION, CATEGORICAL EXEMPTION, and PLANNING AND LAND USE MANAGEMENT COMMITTEE REPORT relative to a California Environmental Quality Act appeal for the properties located at 3558-3570 South Motor Avenue and 10313 West Tabor Street.

**Council Action:** PLANNING AND LAND USE MANAGEMENT COMMITTEE REPORT - ADOPTED

**Council Vote:**

| | |
|---|---|
| YES | BOB BLUMENFIELD |
| YES | MIKE BONIN |
| ABSENT | JOE BUSCAINO |
| ABSENT | GILBERT A. CEDILLO |
| ABSENT | MITCHELL ENGLANDER |
| YES | MARQUEECE HARRIS-DAWSON |
| YES | JOSE HUIZAR |
| YES | PAUL KORETZ |
| YES | PAUL KREKORIAN |
| YES | NURY MARTINEZ |
| ABSENT | MITCH O'FARRELL |
| YES | CURREN D. PRICE |
| ABSENT | MONICA RODRIGUEZ |
| YES | DAVID RYU |
| YES | HERB WESSON |

HOLLY L. WOLCOTT
CITY CLERK

AN EQUAL EMPLOYMENT OPPORTUNITY - AFFIRMATIVE ACTION EMPLOYER

12

| COUNTY CLERK'S USE | CITY OF LOS ANGELES<br>OFFICE OF THE CITY CLERK<br>200 NORTH SPRING STREET, ROOM 360<br>LOS ANGELES, CALIFORNIA 90012<br>CALIFORNIA ENVIRONMENTAL QUALITY ACT | CITY CLERK'S USE |
|---|---|---|

# NOTICE OF EXEMPTION

(California Environmental Quality Act Section 15062)

Filing of this form is optional. If filed, the form shall be filed with the County Clerk, 12400 E. Imperial Highway, Norwalk, CA 90650, pursuant to Public Resources Code Section 21152 (b). Pursuant to Public Resources Code Section 21167 (d), the filing of this notice starts a 35-day statute of-limitations on court challenges to the approval of the project. Failure to file this notice with the County Clerk results in the statute of limitations being extended to 180 days.

| LEAD CITY AGENCY | | | COUNCIL DISTRICT |
|---|---|---|---|
| City of Los Angeles | | | 5 – Koretz |

| PROJECT TITLE | LOG REFERENCE |
|---|---|
| 3558-3570 South Motor Avenue & 10313 West Tabor.(DIR-2016-4880-DB) | ENV-2016-4881-CE |

| PROJECT LOCATION |
|---|
| 3558 South Motor Avenue & 10313 West Tabor, Los Angeles, CA 90034 |

DESCRIPTION OF NATURE, PURPOSE, AND BENEFICIARIES OF PROJECT:
The proposed Project is for the demolition of an existing one-story, three-unit, 6,768 square-foot commercial building, and the construction, operation, and maintenance of a new six-story, 42-unit, mixed-use development containing 38 market rate units, 4 Very Low Income units, and 1,770 square feet of ground-floor retail. The Project proposes five residential levels over one level of at-grade parking and commercial uses, and one level of subterranean parking, with a total of 54 parking spaces. The building measures 72 feet and 7 inches in height (as measured from average grade to the top of the parapet). Two non-protected trees will be removed. The project also involves a haul route for the export of 8,000 cubic yards of dirt.

| NAME OF PERSON OR AGENCY CARRYING OUT PROJECT, IF OTHER THAN LEAD CITY AGENCY: |
|---|
| 3558 Motor, LLC (Dana Sayles, ThreeSixty) |

| CONTACT PERSON | AREA CODE | TELEPHONE NUMBER | EXT. |
|---|---|---|---|
| Connie Chauv | 213 | 978-0016 | |

EXEMPT STATUS: (Check One)

| | STATE CEQA GUIDELINES | CITY CEQA GUIDELINES |
|---|---|---|
| MINISTERIAL | Sec. 15268 | Art. II, Sec. 2b |
| DECLARED EMERGENCY | Sec. 15269 | Art. II, Sec. 2a (1) |
| EMERGENCY PROJECT | Sec. 15269 (b) & (c) | Art. II, Sec. 2a (2) & (3) |
| X   CATEGORICAL EXEMPTION | Sec. 15300 et seq. | Art. III, Sec. 1 |

Class ____4____  Category ____1____  (City CEQA Guidelines)
Class ____32____  Category ____N/A____  (State CEQA Guidelines)

X   OTHER

STATUTORY EXEMPTION: Public Resources Code Section 21155.1 (Sustainable Communities Project Exemption)

SEE EXPLANATION SUPPORTING USE OF EXEMPTIONS ON PAGE 2

1499438.1

EX 12

JUSTIFICATION FOR PROJECT EXEMPTION:

Class 4 Category 1: Grading on land with a slope of less than ten percent (10%), except where it is to be located in a waterway, in any wetland, in an officially designated(by federal, State, or local governmental action) scenic area or in an officially mapped areas of severe geologic hazard.

Class. 32: In-fill development meeting the conditions described in this section. (a) The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with the applicable zoning ordinances and regulations. (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses. (c) The project site has no value as habitat for endangered, rare or threatened species. (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality. (e) The site can be adequately served by all required utilities and public services.

Public Resources Code Section 21155.1 (Sustainable Communities Project Exemption):
On June 5, 2018, the City Council determined that based on the whole of the administrative record, the Project is exempt from CEQA pursuant to Public Resources Code (PRC) Section 21155.1, found the Project is a Transit Priority Project pursuant to PRC Section 21155, found the Project is a Sustainable Communities Project that meets all of the requirements of subdivisions (a) and (b) and one of the requirements of subdivision (c) of PRC Section 21155.1. The project is statutorily exempt from CEQA pursuant to Public Resources Code Section 21155.1 as a sustainable communities project because: (1) The project is consistent with the general use designation, density, building intensity, and applicable policies in the Southern California Association of Governments' adopted Sustainable Communities Strategy; (2) The project is at least 50 percent residential use based on total building square footage; (3) The project is at least 20 units/acre; (4) The project is located within ½ mile of a major transit stop or high quality transit corridor included in SCAG's Regional Transportation Plan; (5) The project can be adequately served by existing utilities and the project applicant will pay the applicable in-lieu or development fees; (6) The project will not impact wetlands or other wildlife habitat or impact protected species; (7) The project site is not located on a list of facilities and sites compiled pursuant to Section 65962.5 of the Government Code; (8) The project site has been subject to a preliminary endangerment assessment to determine the existence of any release of hazardous substance on the site and to determine the potential for exposure of future occupants to significant health hazards; (9) The project will not have a significant impact on historical resources; (10) The project site is not subject to wildland fire hazards, high fire risk of explosion, risk of a public health exposure, seismic risk, or landslide or flood hazard; (11) The project site is not located on developed open space; (12) The project is 15 percent more efficient than Title 24 standards and designed to use 25 percent less water than the regional average household; (13) The project site is 8 acres or less in total area; (14) The project is 200 residential units or less; (15) The project will not result in any loss in the number of affordable housing units; (16) The project does not include any single level building exceeding 75,000 square feet; (17) The project will incorporate any applicable mitigation measures or performance standards adopted in prior applicable EIRs; (18) The project would not conflict with nearby operating industrial uses; (19) The project site is located within 1/2 mile of a rail station included in the RTP or within 1/4 mile of a High Quality Transit Corridor included in the RTP; and (20) The project meets the requirement that at least five percent of the housing will be available to very-low-income households and legal commitments are in place to ensure the continued availability of the affordable units for a 55-year period.

Additional information is available at Los Angeles City Council File No. 17-1394 at
https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?fa=ccfi.viewrecord&cfnumber=17-1394.

IF FILED BY APPLICANT, ATTACH CERTIFIED DOCUMENT ISSUED BY THE CITY PLANNING DEPARTMENT STATING THAT THE DEPARTMENT HAS FOUND THE PROJECT TO BE EXEMPT.

| SIGNATURE | TITLE | DATE |
|---|---|---|
|  | CITY PLANNING ASSOCIATE | 06/14/18 |

| FEE: | RECEIPT NO. | REC'D. BY | DATE |
|---|---|---|---|
| $ 2,280 | 0101673266 | Eric Claros | 12/21/2018 |

DISTRIBUTION: (1) County Clerk, (2) City Clerk, (3) Agency Record
Rev. 11-1-03 Rev. 1-31-06 Word

IF FILED BY THE APPLICANT:

□ HIROTAKA KOBAYASHI
NAME (PRINTED)

SIGNATURE

□ 6/14/2018
DATE

I hereby verify and attest this to be a true and correct
copy of the official record on file in the office of this
Department at City Planning of the City of Los Angeles

designated as ENV-2016-4881-CE / DIR-2016-4890-DB

ERNIE CHANY
Department Representative

1499438.1



**Odic Environmental**

Tel 888-ODICENV 888-634-2368
Fax 213-380-0505

Environmental Consulting & Real Estate Due Diligence
3255 Wilshire Blvd. Suite 1510
Los Angeles, CA 90010

## RELIANCE LETTER

July 16, 2015

To:     Wells Fargo Bank ("Lender")

        and

        U.S. Small Business Administration ("SBA")

Re:     Borrower Name: Arthur Munoz
        Project Address ("Property"): 3568 Motor Avenue, Los Angeles, CA 90034
        Environmental Investigation Report Number(s): 6359167ESAI

Dear Lender and SBA:

Hyung Kim ("Environmental Professional") meets the definition of an Environmental Professional
as defined by 40 C.F.R. § 312.10(b) and has performed the following "Environmental
Investigation(s)" (check all that apply):

        ___. A Transaction Screen of the Property dated _____, 20___, conducted in
        accordance with ASTM International's most recent standard (currently ASTM E1528-14);

        _X_ A Phase I (or an Updated Phase I) Environmental Site Assessment of the Property
        dated July 16, 2015, conducted in accordance with ASTM International's most recent
        standard (currently ASTM E1527-13). In addition, the Environmental Professional has
        addressed the performance of the "additional inquiries" set forth at 40 C.F.R. § 312.22;

        ___ A Phase II Environmental Site Assessment of the Property dated _____, 20___,
        conducted in accordance with generally-accepted industry standards of practice and
        consisting of a scope of work that would be considered reasonable and sufficient to
        identify the presence, nature and extent of a Release as it impacts the Property.

Reliance by SBA and Lender. Environmental Professional (and Environmental Professional's
firm, where applicable) understand(s) that the Property may serve as collateral for an SBA
guaranteed loan, a condition for which is an Environmental Investigation of the Property by an
Environmental Professional. Environmental Professional (and Environmental Professional's firm,
where applicable) authorize(s) Lender and SBA to use and rely upon the Environmental
Investigation. Further, Environmental Professional (and Environmental Professional's firm, where
applicable) authorize(s) Lender and SBA to release a copy of the Environmental Investigation to
the borrower for information purposes only. This letter is not an update or modification to the
Environmental Investigation. Environmental Professional (and Environmental Professional's firm,
where applicable) makes no representation or warranty, express or implied, that the condition of
the Property on the date of this letter is the same or similar to the condition of the Property
described in the Environmental Investigation.

Insurance Coverage. Environmental Professional (and/or Environmental Professional's firm,
where applicable) certifies that he or she or the firm is covered by errors and omissions liability
insurance with a minimum coverage of $1,000,000 per claim (or occurrence) and that evidence of
this insurance is attached. As to the Lender and SBA, Environmental Professional (and

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001091**



**Odic Environmental**

Environmental Consulting & Real Estate Due Diligence

Tel 888-ODICENV 888-634-2368
Fax 213-380-0505

3255 Wilshire Blvd. Suite 1510
Los Angeles, CA 90010

Environmental Professional's firm, where applicable) specifically waive(s) any dollar amount
limitations on liability up to $1,000,000.

Waiver of Right to Indemnification. Environmental Professional and Environmental Professional's
firm waive any right to indemnification from the Lender and SBA.

Impartiality. Environmental Professional certifies that (1) to the best of his or her knowledge,
Environmental Professional is independent of and not a representative, nor an employee or
affiliate of seller, borrower, operating company, or any person in which seller has an ownership
interest; and (2) the Environmental Professional has not been unduly influenced by any person
with regard to the preparation of the Environmental Investigation or the contents thereof.

Acknowledgment. The undersigned acknowledge(s) and agree(s) that intentionally falsifying or
concealing any material fact with regard to the subject matter of this letter or the Environmental
Investigations may, in addition to other penalties, result in prosecution under applicable laws
including 18 U.S.C. § 1001.

_____
Environmental Professional
Printed Name: Hyung Kim

**(Note: The Environmental Professional must always sign this letter above. If the
Environmental Professional is employed or retained by an Environmental Firm, then an
authorized representative of the firm must also sign below).**

_____
Signature of representative of firm who is authorized to sign this letter
Printed Name & Title: Eric Miller, President
Name of Environmental Firm: Odic Environmental
Enclosure: Evidence of Insurance

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001092

*Phase I Environmental Site Assessment Report*
*Project No. 6359187-ESA1*
*- 39 -*

## 8.0 RECOMMENDATIONS AND OPINIONS

ODIC performed a Phase I Environmental Site Assessment of the Property in conformance with the scope and limitations of ASTM Standard Practice E1527-13.

The Property consists of a 14,977-square-foot rectangular-shaped parcel improved with a single-story commercial building subdivided into three units totaling 6,768 square feet. Currently, the Property is occupied by a grocery store (Palms Super Market), coin laundry (Palms Laundry Mat), and a party supplies store (Party Supplies).

Based on a review of historical city directories, the Property was formerly occupied by Safeway Stores Incorporated in 1942, Palms Super Market from 1954 to at least 2000, and Palms Laundry and Cleaners from 1958 to at least 1985. However, ODIC was unable to ascertain documented evidence that onsite dry-cleaning operation was practiced by the Palms Laundry.

According to the SCAQMD EMI database, several businesses are listed, as shown below, under the business name of Palms Cleaners, but none of these facilities are located at the Property.

| 79040 | PALMS CLEANERS 18515 BURBANK BLVD , TARZANA, CA 91356 |
|---|---|
| 100064 | PALMS CLEANERS, BYUNG HEE LEE |
| 140406 | PALMS CLEANERS, CHARLES RYU DBA 156 BONITA AVE , SAN DIMAS, CA |
| 141497 | PALMS CLEANERS, KWANG H. LEE DBA 25910 IRIS AVE , MORENO VALLEY |

Mr. Arthur Munoz, business and Property owner, was interviewed during site reconnaissance. Mr. Munoz indicated that he has been associated with the Property since approximately 2006 when he purchased the market at the Property. He subsequently acquired the laundry mat in 2010 and the party supply business in 2014. To his best knowledge, no underground storage tanks or significant amounts of hazardous materials have ever been used on the site.

Mr. Munoz stated that longtime customers and residents in the area remember the Property as a market and laundry, and no drycleaners actually occupied the Property. He believes that a drop-off drycleaning service may have been offered by the laundry.

To the best of his knowledge, and according to business customers and residents, the site has always been used as a market and laundry, and no drycleaners used to be located within the premises.

ODIC reviewed all available records at the City of Los Angeles building department and Fire Department Hazmat Unit as well as UST Division; however, no records were found indicating any historical drycleaner business at the Property.

Reviewed historical building permits did not have any business permits or records as an actual PCE-using dry-cleaning plant facility, or plumbing/electric permits (boiler, distillation, condenser, etc.) which would be typically associated for a commercial drycleaners. Any drycleaners using PCE solvent is typically listed and identified as RCRA hazardous waste (HAZNET database) generator (PCE is federal F-coded hazardous waste) and SCAQMD FINDS (all drycleaners are required to be permitted by SCAQMD particularly after 1980). Since the Property address is not listed in any of these databases, it is highly likely that the Palms Laundry and Cleaners was a drop-off agency at least since 1980.

Since drycleaners using PCE-based solvent generate waste PCE as hazardous wastes, they are listed as RCRA waste generators, and should also be identified under the SCAQMD database. Again, the Property is not listed in any environmental database provided by EDR as Haznet, RCRA Generator, or SCAQMD FINDS EMI. It should be however noted that Palms Laundry and Cleaners occupied the Property since at least 1958. Since this is during a period of little or no regulatory oversight, permitting or



*Phase I Environmental Site Assessment Report*
*Project No. 6359167-ESAI*
*- 40 -*

compliance, there is still an unresolved concern about possible dry-cleaning operation conducted by Palms Laundry and Cleaners. This is identified as a potential environmental concern and significant data gap which affects our ability to determine RECs in connection with the Property.

ODIC is still in the process of conducting additional inquiry to obtain more information about the historical listing of Palms Laundry and Cleaners, by interviewing longtime residents in the vicinity of the Property. As stated in Section 5.2 of this Report, a response from public agencies such as County of Los Angeles Fire Department and Sanitation District is pending as of this date, which is identified as a data gap.

In the event that additional information is later found or identified to confirm actual PCE-solvent use related to the former Palms Laundry and Cleaners, such information should be reviewed for re-evaluation of the environmental risk for the Property. If Client/User of this Report desires an additional level of comfort in ascertaining the absence or presence of contamination with PCE and chlorinated organic solvent in the subsurface beneath the Property, subsurface investigation can be conducted in the areas of concern.

It should be noted that, effective on October 1, 2010, US SBA started requiring mandatory Phase II Environmental Site Assessment for onsite dry cleaners that may have been operated for more than five years.

Source: https://www.sba.gov/sites/default/files/sops/serv_sops_50105c_loan_0.pdf

Even though it is highly likely and reasonable that the former listing of Palms Laundry and Cleaners may have been a drop-off agency cleaners at least since early 1980s when the AQMD required permitting of drycleaners, Palms Laundry and Cleaners is known to have occupied the Property since at least 1958 which is before the period of regulatory compliance and permitting required by Clean Air Act in 1970, or 1991 when the Air Resources Board identified Perchoroethylene (Perc) as a toxic air contaminant (TAC) under California's Toxic Air Contaminant Identification and Control Program (Health and Safety Code section 39650 et. seq.) or SCAQMD Rule 1421 Control of Perchloroethylene Emissions from Dry Cleaning System.

Due to the data gap identified in this Phase I ESA, as to the former listing of Palms Laundry and Cleaners which is identified to have occupied the Property since 1958, Phase II Environmental Site Assessment is considered a prudent lending practice to comply with SBA SOP 50-10 which became effective since 2010.





*SUPERSEDED*

By document dated: 8/10/17

Authorized by: CC/MUV

**APPLICATIONS:**

# DEPARTMENT OF CITY PLANNING APPLICATION

*THIS BOX FOR CITY PLANNING STAFF USE ONLY*

## DIR-2016-4880-DB

| | |
|---|---|
| **Case Number** | |
| **Env. Case Number** | ENV-2016-4881-EAF |
| **Application Type** | DB |
| **Case Filed With (Print Name)** | Eric Claros |
| | Date Filed 12/23/16 |

**Application includes letter requesting:**

☐ Waived hearing  ☐ Concurrent hearing Related Case Number  ☐ Hearing not be scheduled on a specific date (e.g. vacation hold)

*Provide all information requested. Missing, incomplete or inconsistent information will cause delays.
All terms in this document are applicable to the singular as well as the plural forms of such terms.*

1. **PROJECT LOCATION**

   Street Address¹ 3558-3570 S. Motor Ave _____ Unit/Space Number _____

   Legal Description² (Lot, Block, Tract) Lot 13 & 14, Block S, The Palms Tract MR 21 43/45

   Assessor Parcel Number 4314-014-002 _____ Total Lot Area 14,997 sq. ft.

2. **PROJECT DESCRIPTION**

   Present Use Commercial _____

   Proposed Use Mixed Use: Commercial & Residential _____

   Project Name (if applicable) 3568 S. Motor Ave _____

   Describe in detail the characteristics, scope and/or operation of the proposed project The new construction,

   operation and maintenance of a mixed-use building with 49 units, 55 parking stalls and 3,920 sq. ft of open space;

   35% density bonus, 11% set aside as affordable (5 units) with two incentives for increased FAR reduced open space.

   Additional information attached  ■ YES  ☐ NO

   Complete and check all that apply:

   **Existing Site Conditions**

   ☐ Site is undeveloped or unimproved (i.e. vacant)    ☐ Site is located within 500 feet of a freeway or railroad

   ■ Site has existing buildings (provide copies of building permits)    ■ Site is located within 500 feet of a sensitive use (e.g. school, park)

   ☐ Site is/was developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning, gas station, auto repair, industrial)    ☐ Site has special designation (e.g. National Historic Register, Survey LA)

¹ Street Addresses must include all addresses on the subject/application site (as identified in ZIMAS—http://zimas.lacity.org)
² Legal Description must include all contiguously owned properties (even if they are not a part of the proposed project site)

CP-7771.1 [revised 03/31/2016]

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001087

EX 14

PROPERTY OWNER

9. **PROPERTY OWNER AFFIDAVIT.** Before the application can be accepted, the owner of each property involved must provide a notarized signature to verify the application is being filed with their knowledge. Staff will confirm ownership based on the records of the City Engineer or County Assessor. In the case of partnerships, corporations, LLCs or trusts the agent for service of process or an officer of the ownership entity so authorized may sign as stipulated below.

- **Ownership Disclosure.** If the property is owned by a partnership, corporation, LLC or trust, a disclosure identifying the agent for service or process or an officer of the ownership entity must be submitted. The disclosure must list the names and addresses of the principal owners (25% interest or greater). The signatory must appear in this list of names. A letter of authorization, as described below, may be submitted provided the signatory of the letter is included in the Ownership Disclosure. Include a copy of the current partnership agreement, corporate articles, or trust document as applicable.

- **Letter of Authorization (LOA).** A LOA from a property owner granting someone else permission to sign the application form may be provided if the property is owned by a partnership, corporation, LLC or trust or in rare circumstances when an individual property owner is unable to sign the application form. To be considered for acceptance, the LOA must indicate the name of the person being authorized the file, their relationship to the owner or project, the site address, a general description of the type of application being filed and must also include the language in Items A-D below. In the case of partnerships, corporations, LLCs or trusts the LOA must be signed and notarized by the authorized signatory as shown on the Ownership Disclosure or in the case of private ownership by the property owner. Proof of Ownership for the signatory of the LOA must be submitted with said letter.

- **Grant Deed.** Provide a Copy of the Grant Deed if the ownership of the property does not match City Records and/or if the application is for a Coastal Development Permit. The Deed must correspond exactly with the ownership listed on the application.

- **Multiple Owners.** If the property is owned by more than one individual (e.g. John and Jane Doe or Mary Smith and Mark Jones) notarized signatures are required of all owners.

A. I hereby certify that I am the owner of record of the herein previously described property located in the City of Los Angeles which is involved in this application or have been empowered to sign as the owner on behalf of a partnership, corporation, LLC or trust as evidenced by the documents attached hereto.

B. I hereby consent to the filing of this application on my property for processing by the Department of City Planning.

C. I understand if the application is approved, as a part of the process the City will apply conditions of approval which may be my responsibility to satisfy including, but not limited to, recording the decision and all conditions in the County Deed Records for the property.

D. By my signature below, I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct.

*Property Owner's signatures must be signed/notarized in the presence of a Notary Public.*
*The City requires an original signature from the property owner with the "wet" notary stamp.*
*A Notary Acknowledgement is available for your convenience on following page.*

Signature _____          Date ___12/6/2016___

Print Name ___HIROTAKA  KOBAYASHI___

Signature _____          Date _____

Print Name _____

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001088

**Space Below For Notary's Use.**

**California All-Purpose Acknowledgement**

**Civil Code ' 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of   _Los Angeles_

On _December_ _6, 2016_  before me,  _Mary Sato, Notary Public_

(Insert Name of Notary Public and Title)

personally appeared   _Hirotaka Kabayashi_                                            , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf on which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_[signature]_
Signature

(Seal)

MARY SATO
COMM. #2041394
Notary Public - California
Los Angeles County
My Comm. Expires Sep. 30, 2017

CP-7771.1 [revised 03/31/2016]

| APPLICANT |
|---|

**10. APPLICANT DECLARATION.** A separate signature from the applicant, whether they are the property owner or not, attesting to the following, is required before the application can be accepted.

A. I hereby certify that the information provided in this application, including plans and other attachments, is accurate and correct to the best of my knowledge. Furthermore, should the stated information be found false or insufficient to fulfill the requirements of the Department of City Planning, I agree to revise the information as appropriate.

B. I hereby certify that I have fully informed the City of the nature of the project for purposes of the California Environmental Quality Act (CEQA) and have not submitted this application with the intention of segmenting a larger project in violation of CEQA. I understand that should the City determine that the project is part of a larger project for purposes of CEQA, the City may revoke any approvals and/or stay any subsequent entitlements or permits (including certificates of occupancy) until a full and complete CEQA analysis is reviewed and appropriate CEQA clearance is adopted or certified.

C. I understand that the environmental review associated with this application is preliminary, and that after further evaluation, additional reports, studies, applications and/or fees may be required. Additionally, I understand that this application will not be considered complete until the required environmental review is concluded.

D. I understand and agree that any report, study, map or other information submitted to the City in furtherance of this application will be treated by the City as public records which may be reviewed by any person and if requested, that a copy will be provided by the City to any person upon the payment of its direct costs of duplication.

E. I understand that the burden of proof to substantiate the request is the responsibility of the applicant. Additionally, I understand that planning staff are not permitted to assist the applicant or opponents of the project in preparing arguments for or against a request.

F. I understand that there is no guarantee, expressed or implied, that any permit or application will be granted. I understand that each matter must be carefully evaluated and that the resulting recommendation or decision may be contrary to a position taken or implied in any preliminary discussions.

G. I understand that if this application is denied, there is no refund of fees paid.

H. I understand and agree to defend, indemnify, and hold harmless, the City, its officers, agents, employees, and volunteers (collectively "City"), from any and all legal actions, claims, or proceedings (including administrative or alternative dispute resolution (collectively "actions"), arising out of any City process or approval prompted by this Action, either in whole or in part. Such actions include but are not limited to: actions to attack, set aside, void, or otherwise modify, an entitlement approval, environmental review, or subsequent permit decision; actions for personal or property damage; actions based on an allegation of an unlawful pattern and practice; inverse condemnation actions; and civil rights or an action based on the protected status of the petitioner or claimant under state or federal law (e.g. ADA or Unruh Act). I understand and agree to reimburse the City for any and all costs incurred in defense of such actions. This includes, but it not limited to, the payment of all court costs and attorneys' fees, all judgments or awards, damages, and settlement costs. The indemnity language in this paragraph is intended to be interpreted to the broadest extent permitted by law and shall be in addition to any other indemnification language agreed to by the applicant.

I. By my signature below, I declare under penalty of perjury, under the laws of the State of California, that all statements contained in this application and any accompanying documents are true and correct, with full knowledge that all statements made in this application are subject to investigation and that any false or dishonest answer to any question may be grounds for denial or subsequent revocation of license or permit.

*The City requires an original signature from the applicant. The applicant's signature below does not need to be notarized.*

Signature: _____    Date: __12/6/2016__

Print Name: ___Hizotaica  Kobayashi___

CP-7771.1 (revised 03/31/2016)    Page 7 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001090



RE͟CEIVE͟D
CITY OF LOS ANGELES
AUG 1 0 2017
CITY PLANNING
PROJECT PLANNING

**APPLICATIONS:**

## DEPARTMENT OF CITY PLANNING APPLICATION

| THIS BOX FOR CITY PLANNING STAFF USE ONLY | |
|---|---|

Case Number

Env. Case Number

Application Type

Case Filed With (Print Name) _____  Date Filed _____

Application includes letter requesting:

☐ Waived hearing    ☐ Concurrent hearing    ☐ Hearing not be scheduled on a specific date (e.g. vacation hold)
Related Case Number

*Provide all information requested. Missing, incomplete or inconsistent information will cause delays.*
*All terms in this document are applicable to the singular as well as the plural forms of such terms.*

### 1. PROJECT LOCATION

Street Address[1] 3558-3570 S. Motor Ave / 10313 W. Tabor St   Unit/Space Number _____

Legal Description[2] (Lot, Block, Tract) Lot 13 & 14, Block S, The Palms Tract MR 21 43/45

Assessor Parcel Number 4314-014-002   Total Lot Area 14,997 sq. ft.

### 2. PROJECT DESCRIPTION

Present Use Commercial

Proposed Use Mixed Use: Commercial & Residential

Project Name (if applicable) 3568 S. Motor Ave

Describe in detail the characteristics, scope and/or operation of the proposed project The new construction,
operation and maintenance of a mixed-use building with 42 units, 54 parking stalls and 1,777 SF of commercial space

10% density bonus, 10% affordable set aside (4 units) with one incentive for increased FAR

Additional information attached   ■ YES   ☐ NO

Complete and check all that apply:

**Existing Site Conditions**

☐ Site is undeveloped or unimproved (i.e. vacant)

■ Site has existing buildings (provide copies of building permits)

☐ Site is/was developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning, gas station, auto repair, industrial)

☐ Site is located within 500 feet of a freeway or railroad

■ Site is located within 500 feet of a sensitive use (e.g. school, park)

☐ Site has special designation (e.g. National Historic Register, Survey LA)

[1] Street Addresses must include all addresses on the subject/application site (as identified in ZIMAS—http://zimas.lacity.org)
[2] Legal Description must include all contiguously owned properties (even if they are not a part of the proposed project site)

CP-7771.1 (revised 03/31/2016)   Page 1 of 8
PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001086



**SUPERSEDED**

By document dated: 8/10/17

Authorized by: CCH/MW



**APPLICATIONS:**

## DEPARTMENT OF CITY PLANNING APPLICATION

### THIS BOX FOR CITY PLANNING STAFF USE ONLY

# DIR-2016-4880-DB

| | |
|---|---|
| **Case Number** | |
| **Env. Case Number** | ENV-2016-4881-EAF |
| **Application Type** | DB |
| **Case Filed With (Print Name)** | Eric Claros          Date Filed 12/23/16 |

Application includes letter requesting:

☐ Waived hearing      ☐ Concurrent hearing      ☑ Hearing not be scheduled on a specific date (e.g. vacation hold)
Related Case Number

*Provide all information requested. Missing, incomplete or inconsistent information will cause delays.*
*All forms in this document are applicable to the singular as well as the plural forms of such terms.*

1. **PROJECT LOCATION**

   Street Address[1]  3558-3570 S. Motor Ave                              Unit/Space Number _____

   Legal Description[2] (Lot, Block, Tract)  Lot 13 & 14, Block S, The Palms Tract MR 21 43/45

   Assessor Parcel Number  4314-014-002                    Total Lot Area  14,997 sq. ft.

2. **PROJECT DESCRIPTION**

   Present Use  Commercial

   Proposed Use  Mixed Use: Commercial & Residential

   Project Name (if applicable)  3568 S. Motor Ave

   Describe in detail the characteristics, scope and/or operation of the proposed project  The new construction,
   operation and maintenance of a mixed-use building with 49 units, 55 parking stalls and 3,920 sq. ft of open space;
   35% density bonus, 11% set aside as affordable (5-units) with two incentives for increased FAR reduced open space.

   Additional information attached      ■ YES      ☐ NO

   Complete and check all that apply:

   **Existing Site Conditions**

   ☐ Site is undeveloped or unimproved (i.e. vacant)

   ☑ Site has existing buildings (provide copies of building permits)

   ☐ Site is/was developed with use that could release hazardous materials on soil and/or groundwater (e.g. dry cleaning, gas station, auto repair, industrial)

   ☐ Site is located within 500 feet of a freeway or railroad

   ☑ Site is located within 500 feet of a sensitive use (e.g. school, park)

   ☐ Site has special designation (e.g. National Historic Register, Survey LA)

   [1] Street Addresses must include all addresses on the subject/application site (as identified in ZIMAS—http://zimas.lacity.org)
   [2] Legal Description must include all contiguously owned properties (even if they are not a part of the proposed project site)

   CP-7771.1 [revised 03/31/2016]                                                                Page 1 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001087

 

**PROPERTY OWNER**

9. **PROPERTY OWNER AFFIDAVIT.** Before the application can be accepted, the owner of each property involved must provide a notarized signature to verify the application is being filed with their knowledge. Staff will confirm ownership based on the records of the City Engineer or County Assessor. In the case of partnerships, corporations, LLCs or trusts the agent for service of process or an officer of the ownership entity so authorized may sign as stipulated below.

- **Ownership Disclosure.** If the property is owned by a partnership, corporation, LLC or trust, a disclosure identifying the agent for service or process or an officer of the ownership entity must be submitted. The disclosure must list the names and addresses of the principal owners (25% interest or greater). The signatory must appear in this list of names. A letter of authorization, as described below, may be submitted provided the signatory of the letter is included in the Ownership Disclosure. Include a copy of the current partnership agreement, corporate articles, or trust document as applicable.

- **Letter of Authorization (LOA).** A LOA from a property owner granting someone else permission to sign the application form may be provided if the property is owned by a partnership, corporation, LLC or trust or in rare circumstances when an individual property owner is unable to sign the application form. To be considered for acceptance, the LOA must indicate the name of the person being authorized the file, their relationship to the owner or project, the site address, a general description of the type of application being filed and must also include the language in items A-D below. In the case of partnerships, corporations, LLCs or trusts the LOA must be signed and notarized by the authorized signatory as shown on the Ownership Disclosure or in the case of private ownership by the property owner. Proof of Ownership for the signatory of the LOA must be submitted with said letter.

- **Grant Deed.** Provide a Copy of the Grant Deed if the ownership of the property does not match City Records and/or if the application is for a Coastal Development Permit. The Deed must correspond exactly with the ownership listed on the application.

- **Multiple Owners.** If the property is owned by more than one individual (e.g. John and Jane Doe or Mary Smith and Mark Jones) notarized signatures are required of all owners.

A. I hereby certify that I am the owner of record of the herein previously described property located in the City of Los Angeles which is involved in this application or have been empowered to sign as the owner on behalf of a partnership, corporation, LLC or trust as evidenced by the documents attached hereto.

B. I hereby consent to the filing of this application on my property for processing by the Department of City Planning.

C. I understand if the application is approved, as a part of the process the City will apply conditions of approval which may be my responsibility to satisfy including, but not limited to, recording the decision and all conditions in the County Deed Records for the property.

D. By my signature below, I declare under penalty of perjury under the laws of the State of California that the foregoing statements are true and correct.

*Property Owner's signatures must be signed/notarized in the presence of a Notary Public. The City requires an original signature from the property owner with the "wet" notary stamp. A Notary Acknowledgement is available for your convenience on following page.*

Signature _____   Date  12/6/2016

Print Name  HIROTAKA KOBAYASHI

Signature _____   Date _____

Print Name _____

CP-7771.1 (revised 03/31/2016)                    Page 8 of 8

**PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001088**

Space Below For Notary's Use

**California All-Purpose Acknowledgement**                                     **Civil Code '1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _LOS ANGELES_

On _DECEMBER 6, 2016_ before me, _MARY SATO NOTARY PUBLIC_
                                        (Insert Name of Notary Public and Title)

personally appeared _HIROTAKA KOBAYASHI_ , who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf on which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct

WITNESS my hand and official seal.

_____
Signature                                        (Seal)

MARY SATO
COMM. #2041394
Notary Public - California
Los Angeles County
My Comm. Expires Sep. 30, 2017

CP-7771.1  [revised 03/31/2016]                                        Page 6 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001089

 

**APPLICANT**

10. **APPLICANT DECLARATION.** A separate signature from the applicant, whether they are the property owner or not, attesting to the following, is required before the application can be accepted.

A. I hereby certify that the information provided in this application, including plans and other attachments, is accurate and correct to the best of my knowledge. Furthermore, should the stated information be found false or insufficient to fulfill the requirements of the Department of City Planning, I agree to revise the information as appropriate.

B. I hereby certify that I have fully informed the City of the nature of the project for purposes of the California Environmental Quality Act (CEQA) and have not submitted this application with the intention of segmenting a larger project in violation of CEQA. I understand that should the City determine that the project is part of a larger project for purposes of CEQA, the City may revoke any approvals and/or stay any subsequent entitlements or permits (including certificates of occupancy) until a full and complete CEQA analysis is reviewed and appropriate CEQA clearance is adopted or certified.

C. I understand that the environmental review associated with this application is preliminary, and that after further evaluation, additional reports, studies, applications and/or fees may be required. Additionally, I understand that this application will not be considered complete until the required environmental review is concluded.

D. I understand and agree that any report, study, map or other information submitted to the City in furtherance of this application will be treated by the City as public records which may be reviewed by any person and if requested, that a copy will be provided by the City to any person upon the payment of its direct costs of duplication.

E. I understand that the burden of proof to substantiate the request is the responsibility of the applicant. Additionally, I understand that planning staff are not permitted to assist the applicant or opponents of the project in preparing arguments for or against a request.

F. I understand that there is no guarantee, expressed or implied, that any permit or application will be granted. I understand that each matter must be carefully evaluated and that the resulting recommendation or decision may be contrary to a position taken or implied in any preliminary discussions.

G. I understand that if this application is denied, there is no refund of fees paid.

H. I understand and agree to defend, indemnify, and hold harmless, the City, its officers, agents, employees, and volunteers (collectively "City"), from any and all legal actions, claims, or proceedings (including administrative or alternative dispute resolution (collectively "actions"), arising out of any City process or approval prompted by this Action, either in whole or in part. Such actions include but are not limited to: actions to attack, set aside, void, or otherwise modify, an entitlement approval, environmental review, or subsequent permit decision; actions for personal or property damage; actions based on an allegation of an unlawful pattern and practice; inverse condemnation actions; and civil rights or an action based on the protected status of the petitioner or claimant under state or federal law (e.g. ADA or Unruh Act). I understand and agree to reimburse the City for any and all costs incurred in defense of such actions. This includes, but it not limited to, the payment of all court costs and attorneys' fees, all judgments or awards, damages, and settlement costs. The indemnity language in this paragraph is intended to be interpreted to the broadest extent permitted by law and shall be in addition to any other indemnification language agreed to by the applicant.

I. By my signature below, I declare under penalty of perjury, under the laws of the State of California, that all statements contained in this application and any accompanying documents are true and correct, with full knowledge that all statements made in this application are subject to investigation and that any false or dishonest answer to any question may be grounds for denial or subsequent revocation of license or permit.

*The City requires an original signature from the applicant. The applicant's signature below does not need to be notarized.*

Signature: _____     Date: _12/6/2016_

Print Name: _FEDOZHO   KOMARSKI_

CP-7771.1 [revised 03/31/2016]                                                                          Page 7 of 8

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001090

Fw: They Are Spraying Today

imap://imap.mail.yahoo.com:993/fetch>UID>/INBOX>250905?hea...

# EXHIBIT E, Page 001

**Subject:** Fw: They Are Spraying Today
**From:** CHRISTAL lord <christalteach4@yahoo.com>
**Date:** 2/6/2018 3:19 PM
**To:** Olu Orange <oluorange@att.net>

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Friday, December 15, 2017, 11:57 AM, Joseph Galloway <joseph.galloway@lacity.org> wrote:

Christal,

We've been informed by the developer that they are pulling their team from the site at this moment. They were working on fencing and have postponed the work. Please provide us additional updates as you see them.

Sincerely,



**Joseph Galloway**
Senior Field Deputy
Office of Councilmember Paul Koretz, 5th Council District
6380 Wilshire Blvd., Suite 800
Los Angeles, CA 90048
T: 323.866.1828 | F: 323.852.1129 | C: 213.550.5012
E: Joseph.Galloway@lacity.org

Keep up with us on social media:



Download the City of Los Angeles MyLA311 app for smartphones!

 

MyLA311 links Angelenos with the services and information they need to enjoy their city, beautify their community and stay connected with their local government.

Sign up for the CD 5 e-newsletter here!

CONFIDENTIALITY NOTICE

This electronic message transmission is intended only for the party to whom it is addressed as it may contain privileged or confidential information. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the content of this information is prohibited. If you have received this communication in error, please notify us immediately by e-mail and delete the original message and any attachment without reading or saving in any manner.

On Fri, Dec 15, 2017 at 11:53 AM, Joseph Galloway <joseph.galloway@lacity.org> wrote:
Christal,

# EXHIBIT E, Page 001

2/23/2018 12:27 PM

EX 15

Fw: They Are Spraying Today                                          imap://imap.mail.yahoo.com:993/fetch>UID>/INBOX>250995?hea...

## EXHIBIT E, Page 002

Thank you for notifying us. We are attempting to make contact with their office immediately.

Sincerely,



Joseph Galloway
Senior Field Deputy
Office of Councilmember Paul Koretz, 5th Council District
6380 Wilshire Blvd., Suite 800
Los Angeles, CA 90048
T: 323.866.1828 | F: 323.852.1179 | C: 213.550.6017
E: Joseph.Galloway@lacity.org

Keep up with us on social media:



Download the City of Los Angeles MyLA311 app for smartphones!

 

MyLA311 links Angelenos with the services and information they need to enjoy their city,
beautify their community and stay connected with their local government.

Sign up for the CD 5 e-newsletter here!

CONFIDENTIALITY NOTICE

This electronic message transmission is intended only for the party to whom it is addressed as it may
contain privileged or confidential information. If you are not the intended recipient, be aware that any
disclosure, copying, distribution or use of the content of this information is prohibited. If you have
received this communication in error, please notify us immediately by e-mail and delete the original
message and any attachment without reading or saving in any manner.

On Fri, Dec 15, 2017 at 11:52 AM, CHRISTAL lord <christalteach4@yahoo.com> wrote:
Dana from the developers office told me they are spraying from pest today, that is completely illegal we
have to notify parents !!!!!! Please call them to stop !!!
Christal Lord

Inline image

Sent from Yahoo Mail for iPhone

On Friday, December 15, 2017, 11:09 AM, CHRISTAL lord <christalteach4@yahoo.com> wrote:

Hello
The developer promised not to start demolition till December 18. They are currently doing
construction as we speak. We have video and Mr.Orange spoke to the supervisor of
construction today and the developer never told him anything. The promise was to wait till
December 18!!!!! Our kids are still here!! You are suppose to protect us!
Christal Lord

## EXHIBIT E, Page 002

Fw: They Are Spraying Today                          imap://imap.mail.yahoo.com:993/fetch>(IID>/INBOX>250995?hca...

## EXHIBIT E, Page 003

Sent from Yahoo Mail for IPhone

— IMG_7511.JPG ———————————————————————————————————————

## EXHIBIT E, Page 003

2/23/2018 12:27 PM

See enclosed flash drive
and/or go to:
http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_B.mp4

# EXHIBIT B
## JACKHAMMERING VIDEO

See enclosed flash drive
and/or go to:
http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_C.mp4

# EXHIBIT C
## DUST CLOUD VIDEO



Ex 16



# EXHIBIT H

This video exhibit was previously filed with the Court on February 23, 2018
as a cd-rom exhibit. (Docket No. 33-2, Exhibit B; Docket No. 36 (manually
filed).

It is also available at the following website:

http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_B.mp4.

# EXHIBIT I

This video exhibit was previously filed with the Court on February 23, 2018
as a cd-rom exhibit. (Docket No. 33-2, Exhibit C; Docket No. 36 (manually
filed).

It is also available at the following website:
http://www.orangelawoffices.com/casemedia/palms/EXHIBIT_C.mp4.

# Los Angeles Unified School District

**Office of Environmental Health and Safety**

VIVIAN EKCHIAN
*Interim Superintendent of Schools*

DIANE PAPPAS
*CEO District Operations & District Innovation*

ROBERT LAUGHTON
*Director, Environmental Health and Safety*

CARLOS A. TORRES
*Deputy Director, Environmental Health and Safety*

January 23, 2017

Hiro Kobayashi,
RBM of California
*SENT ELECTRONICALLY TO: <h.kobayashi@rbmofca.com>*

SUBJECT:    3568 Motor Avenue Project

Thank you for giving the Los Angeles Unified School District (LAUSD) the opportunity to comment on the proposed mixed use development (proposed project) located at 3568 Motor Avenue. Presented below are comments submitted on behalf of the LAUSD regarding the proposed project. Due to the fact that Palms Elementary School (ES) is located adjacent to the northern boundary of the project site, LAUSD is concerned about the potential negative impacts of the project to our students, staff, and parents located at and traveling to and from Palms Elementary School.

Based on the extent/location of the proposed project, it is our opinion that significant environmental impacts on LAUSD's Palms ES (aesthetics, air quality, noise, traffic, and pedestrian safety) will occur. Since the project will have a significant impact on a LAUSD school, recommended measures designed to help reduce or eliminate such impacts are included in this response.

## Aesthetics

The proposed project's placement of a building on the southern boundary of the school that is significantly higher than the existing building at this location will result in significantly more shadows on the school's recreational field, particularly the kindergarten play yard, than occur presently. The increase in shadow has the potential to result in a significant impact to the school.

The District understands that the proponent has opted not to conduct a shadow analysis siting Public Resources Code Section 21099, which provides that "aesthetic and parking impacts of a residential, mixed-use residential, or employment center project on an infill site within a transit priority area shall not be considered significant impacts on the environment." The Categorical Exemption also states that the proposed project does not exceed the City's screening criteria for potential shade and shadow impacts because it does not include structures in excess of 60 feet in height above the ground elevation. However, due to the proposed project site being on the southern boundary of the school's recreational area, a shadow-sensitive use, the District believes that a shadow analysis is warranted.

Furthermore, the City of Los Angeles CEQA Thresholds Guide states that, "A project impact would normally be considered significant if shadow-sensitive uses would be shaded by project-related structures for more than three hours between the hours of 9:00 AM and 3:00 PM Pacific Standard Time (between October and April), or for more than four hours between the hours of 9:00 AM and 5:00 PM Pacific Daylight Time (between April and October)." However, the Categorical Exemption does not analyze shadow impacts to determine if the proposed project exceeds this threshold at the play area north of the proposed project site.

333 South Beaudry Avenue, 21st Floor, Los Angeles, CA 90017 • Telephone (213) 241-3199 • Fax (213) 241-6816

*Our Mission: To ensure a safe and healthy environment for students to learn, teachers to teach, and employees to work.*
*Our Vision: To eliminate all environmental, health, and safety risks at schools.*

$\mathcal{E}X$ 18

LAUSD Comments on 3568 Motor Project

The developer should work with this District to explore options for minimizing or offsetting this impact, including but not limited to reconfiguring the southern portion of the Palms ES campus.

### Air Quality

Construction activities for the proposed project would potentially result in short term effects on ambient air quality in the area resulting from equipment emissions and fugitive dust. Palms ES houses young children, who are considered sensitive receptors. The District greatly appreciates that the developer has agreed to conduct demolition during winter break and excavation during summer break. Completing these activities when school is not in session will go a long way towards minimizing air quality impacts on the students and staff at Palms ES.

To ensure that effective mitigation is applied to reduce construction air pollutant impacts on Palms ES, the following measures should also be included as part of the proposed project for construction that may occur while school is in session:

- Ensure that construction equipment is properly tuned and maintained in accordance with manufacturer's specifications
- Water/mist soil as it is being excavated and loaded onto the transportation trucks.
- Water/mist and/or apply surfactants to soil placed in transportation trucks prior to exiting the site.
- Minimize soil drop height into transportation trucks or stockpiles during dumping.
- Cover the bottom of the excavated area with polyethylene sheeting when work is not being performed.
- Place stockpiled soil on polyethylene sheeting and cover with similar material.
- Place stockpiled soil in areas shielded from prevailing winds.
- Sweep streets at the end of the day if visible soil material is carried onto adjacent public paved roads (recommend water sweepers).
- Install wheel washers where vehicles enter and exit unpaved roads onto paved roads, or wash off trucks and any equipment leaving the site each trip.
- Suspend all excavating and grading operations when wind speeds (as instantaneous gusts) exceed 25 miles per hour (mph).
- Excavation and transportation of soil known to contain hazardous substances should be limited to periods when Palms Elementary School is not in session.

If the proposed mitigation measures do not reduce air quality impacts to Palms Elementary School, the project applicant shall develop new and appropriate measures to effectively mitigate construction related air emissions. Provisions shall be made to allow the school and or designated representative(s) to notify the project applicant when such measures are warranted.

### Noise Impacts (General)

Noise created by construction and operation activities may impact Palms ES, which is adjacent to the northern project boundary. CEQA requires that such impacts be quantified and eliminated or reduced to a level of insignificance.

*Our Mission: To ensure a safe and healthy environment for students to learn, teachers to teach, and employees to work.*
*Our Vision: To eliminate all environmental, health, and safety risks at schools.*

LAUSD Comments on 3568 Motor Project

Once again, the District would like to express appreciation to the developer for conducting demolition during winter break and excavation during summer break. Completing these activities when school is not in session will go a long way towards minimizing noise impacts on the students and staff at Palms ES.

However, the Categorical Exemption does not discuss Palms ES as a noise sensitive receptor. LAUSD requests that the construction and operation noise impacts at Palms Elementary School, which is sensitive receptor, be analyzed in relation to LAUSD's Noise Standards. LAUSD established maximum allowable noise levels to protect students and staff from noise impacts generated in terms of $L_{eq}$. These standards were established based on regulations set forth by the California Department of Transportation and the City of Los Angeles LAUSD's exterior noise standard is 67 dBA $L_{eq}$ and the interior noise standard is 52 dBA $L_{eq}$. A noise level increase of 3 dBA or more over ambient noise levels is considered significant for existing schools and would require mitigation to achieve levels within 2 dBA of pre-Project ambient level.

Noise levels are anticipated to exceed the levels permitted in LAUSD's Noise Standards and increase the ambient noise levels by more than 3 dBA; therefore, LAUSD requests that the following measures be put in place to reduce construction related noise levels to below the level of significance:

- The developer shall include features such as sound walls and other design features in order to attenuate exterior noise levels on a school campus to less than 70 dBA L10 or 67 dBA Leq.
- An acoustical analysis to identify feasible measures to reduce traffic noise increases to 3 dBA CNEL or less at the noise-sensitive land use shall be prepared. The developer shall implement recommended measures to reduce noise.
- Construction contractor shall consult and coordinate with the school principal or site administrator, and other nearby noise sensitive land uses prior to construction to schedule high noise or vibration producing activities to minimize disruption. Coordination between the school, nearby land uses and the construction contractor shall continue on an as-needed basis throughout the construction phase of the project to reduce school and other noise sensitive land use disruptions.
- For projects where pile driving activities are required within 150 feet of a structure, a detailed vibration assessment shall be provided by an acoustical engineer to analyze potential impacts related to vibration to nearby structures and to determine feasible mitigation measures to eliminate potential risk of architectural damage.

If the control measures do not satisfactorily reduce noise impacts to Palms ES, the project applicant shall develop additional measures to effectively reduce construction related noise. Specific noise reduction measures include, but are not limited to, the following:

Source Controls
- Time Constraints – prohibiting work during sensitive nighttime hours
- Scheduling – performing noisy work during less sensitive time periods (on operating campus: delay the loudest noise generation until class instruction at the nearest classrooms has ended)
- Equipment Restrictions – restricting the type of equipment used
- Noise Restrictions – specifying stringent noise limits
- Substitute Methods – using quieter methods and/or equipment
- Exhaust Mufflers – ensuring equipment have quality mufflers installed
- Lubrication & Maintenance – well maintained equipment is quieter
- Reduced Power Operation – use only necessary size and power
- Limit Equipment On-Site – only have necessary equipment on-site
- Noise Compliance Monitoring – technician on site to ensure compliance
- Quieter Backup Alarms – manually-adjustable or ambient sensitive types

333 South Beaudry Avenue, 21st Floor, Los Angeles, CA 90017 • Telephone (213) 241-3199 • Fax (213) 241-6816

*Our Mission: To ensure a safe and healthy environment for students to learn, teachers to teach and employees to work.*
*Our Vision: To eliminate all environmental, health, and safety risks at schools.*

LAUSD Comments on 3568 Motor Project

Path Controls

- Noise Barriers – semi-permanent or portable wooden or concrete barriers
- Noise Curtains – flexible intervening curtain systems hung from supports
- Enclosures – encasing localized and stationary noise sources
- Increased Distance – perform noisy activities farther away from receptors, including operation of portable equipment, storage and maintenance of equipment

Receptor Controls

- Window Treatments – reinforcing the building's noise reduction ability
- Community Participation – open dialog to involve affected residents
- Noise Complaint Process – ability to log and respond to noise complaints. Advance notice of the start of construction shall be delivered to all noise sensitive receptors adjacent to the project area. The notice shall state specifically where and when construction activities will occur, and provide contact information for filing noise complaints with the contractor and the District. In the event of noise complaints the LAUSD shall monitor noise from the construction activity to ensure that construction noise does not exceed limits specified in the noise ordinance.
- Temporary Relocation – in extreme otherwise unmitigatable cases. Temporarily move residents or students to facilities away from the construction activity.

Provisions shall be made to allow the school and or designated representative(s) to notify the project applicant when such measures are warranted.

### Noise Impacts (DHH students)

Palms ES hosts a Deaf and Hard of Hearing Program (DHH). Students in the DHH program require the use of sound amplification devices. As a result, these students are substantially more sensitive to noise impacts.

The developer should work with the District to explore options for minimizing or offsetting this impact, including but not limited to relocating DHH classrooms within campus away from noise sources, coordinating construction activity schedules to avoid potential adverse impacts to the DHH program, and soundproofing four (4) DHH-designated classrooms and an additional 4 general classrooms for when the DHH students are participating in classes with the wider school population.

### Traffic/Transportation

LAUSD's Transportation Branch **must be contacted** at (213) 580-2950 regarding the potential effect upon existing school bus routes. The project applicant or designee will have to notify the LAUSD Transportation Branch of the expected start and ending dates for various portions of the proposed project that may affect traffic within nearby school areas. To ensure that effective mitigations are employed to reduce construction and operation related transportation effects at Palms ES, we ask that the following language be included in the traffic control measures:

- School buses must have unrestricted access to Palms Elementary School.
- During the construction phase, truck traffic and construction vehicles may not cause traffic delays for our transported students.
- During and after construction, changed traffic patterns, lane adjustment, traffic light patterns, and altered bus stops may not affect school buses' on-time performance and passenger safety.
- Construction trucks and other vehicles are required to stop when encountering school buses using red-flashing-lights must-stop-indicators per the California Vehicle Code.

333 South Beaudry Avenue, 21ˢᵗ Floor, Los Angeles, CA 90017 • Telephone (213) 241-3199 • Fax (213) 241-6816

*Our Mission: To ensure a safe and healthy environment for students to learn, teachers to teach, and employees to work.
Our Vision: To eliminate all environmental, health, and safety risks at schools.*

LAUSD Comments on 3568 Motor Project

- Contractors must install and maintain appropriate traffic controls (signs and signals) to ensure vehicular safety.
- Contractors must maintain ongoing communication with LAUSD school administrators, providing sufficient notice to forewarn children and parents when existing vehicle routes to school may be impacted.
- Parents dropping off their children must have access to the passenger loading areas.

### Pedestrian Safety

Construction activities that include sidewalk closures, street closures, the presence of heavy equipment, and increased truck trips to haul materials on and off the project site can lead to safety hazards for people walking in the vicinity of the construction site. To ensure that effective measures are employed to reduce construction and operation-related pedestrian safety effects on the District site, LAUSD asks that the following language be included in the pedestrian safety control measures:

- Developer should work with the City to close the alley between the project site and the school campus to avoid creating an attractive nuisance.
- Contractors must maintain ongoing communication with Palms Elementary School administrators, providing sufficient notice to forewarn children and parents when existing pedestrian routes to school may be impacted.
- Contractors must maintain safe and convenient pedestrian routes to Palms Elementary School. The District's School Pedestrian Route Maps are available at: http://www.lausd-oehs.org/saferoutestoschools.asp.
- Contractors must install and maintain appropriate traffic controls (signs and signals) to ensure pedestrian and vehicular safety.
- Haul routes are not to pass by *any* school, except when school is *not* in session.
- Delivery vehicles should avoid drop off and pick up times
- No staging or parking of construction-related vehicles, including worker-transport vehicles, will occur on or adjacent to a school property.
- Funding for crossing guards or flaggers, at the contractor's expense, may be required when safety of children may be compromised by construction-related activities at impacted school crossings.
- Barriers and/or fencing must be installed to secure construction equipment and to minimize trespassing, vandalism, short-cut attractions, and attractive nuisances.
- Contractors are required to provide security patrols (at their expense) to minimize trespassing, vandalism, and short-cut attractions.

The District's charge is to protect the health and safety of students and staff, and the integrity of the learning environment. The comments presented above identify potential environmental impacts related to the proposed project that must be either analyzed further or addressed to ensure the welfare of the students attending Palms ES, their teachers and the staff, as well as to assuage the concerns of the parents of these students. Therefore, further analysis must be completed to identify the full extent of the proposed project's impacts and the measures set forth in these comments should be adopted as conditions of project approval to offset unmitigated impacts on the students and staff at Palms ES.

333 South Beaudry Avenue, 21st Floor, Los Angeles, CA 90017 • Telephone (213) 241-3199 • Fax (213) 241-6816

*Our Mission: To ensure a safe and healthy environment for students to learn, teachers to teach, and employees to work.
Our Vision: To eliminate all environmental, health, and safety risks to schools.*

LAUSD Comments on 3568 Motor Project

Thank you for your attention to this matter. If you need additional information please contact me at (213) 241-4707.

Regards,

*[signature]*

Gwenn Godek, CEQA Advisor | CP
LAUSD, Office of Environmental Health & Safety

cc:     William Lamb, Principal, Palms Elementary School
        Joan Pelico, Chief of Staff, Councilmember Paul Koretz
        Alison Regan, Palms Neighborhood Council
        Dana Sayles, three6ixty

333 South Beaudry Avenue, 21ˢᵗ Floor, Los Angeles, CA 90017 • Telephone (213) 241-3199 • Fax (213) 241-8816

*Our Mission: To ensure a safe and healthy environment for students to learn, teachers to teach, and employees to work.*
*Our Vision: To eliminate all environmental, health, and safety risks at schools.*

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



# PropertyHealth, Inc.
## AARDVARK Property Hazard Analysis

Indoor Air Quality, Thermography, Water Intrusion
Assessments, Moisture Mapping,
Asbestos, Lead-Paint, Microbial, Clandestine Labs,
Biological Contaminants. Consulting, Testing, Expert
Witness, Assessments, Oversight & Post Remediation
Clearance Certification

3300 S. Sepulveda Blvd. Suite J23 Los Angeles, CA 90034
21922 Corrina Place, Chatsworth, CA 91311

Phone 310-901-3102
Fax 310-881-6955
Propertyhealth@gmail.com

August 12, 2016

Project No. 6388

**CLIENT:**

*RBM of California Inc.*
*800 S. Figueroa Street #960*
*Los Angeles, CA 90017*
*Attn.: Mr. Koji Matsumoto*

Re:   Comprehensive pre-demolition asbestos and lead identification survey report

# 3568 Motor Avenue, Los Angeles, CA 90034

Free standing approx. 5,800 square foot wood framed single story high ceiling
commercial building on concrete slab including:

- 10313 Tabor Street 650 square foot dance studio
- 3570 Motor Ave 850 sq.ft. Laundromat
- 3568 Motor Ave 3,445 sq.ft. Grocery Store + 800 square feet added attached
  newer storage structure

## SURVEY FINDINGS AND RESPONSE ACTION REQUIREMENTS

The asbestos and lead surface coating survey performed at this site by PropertyHealth,
Inc. / AARDVARK (PHI) has confirmed the following (please see the attached
drawings and photo file for further details):

### Asbestos:

- Non-friable Asbestos black mastic is present on the concrete slab under wood
  flooring throughout dance studio (625 sq.ft.) as well as under ceramic floor tiles
  in the bathroom (25 sq.ft.). the material is intact and enclosed by the floor
  finishes. No immediate response action is required. Full removal of this
  material is required prior to building demolition. Sample # 31 contains 2%
  Chrysotile type asbestos

EX 19

- Non-friable Asbestos black and gray roof patch, penetration and seam mastics are present throughout the roof at various spots. Approx. 25 spots or 30 square feet various scattered at base of pipes, vents, equipment, arounds drains etc. plus a stretch of 73 linear feet x 6 inched = 36.5 square feet on the roof on a wall separating two structures = total 66.5 square feet. The material is intact with no occupant exposure risk if maintained in good condition. No immediate response action is required. Full removal of this material is required prior to building demolition. Sample #29 contains 5% Chrysotile asbestos

- Three non-friable known/presumed vertical asbestos containing Transite exhaust flue pipes 4" OD to 12" OD above old boiler, water heater, etc. up through wall/ceiling cavities to the roof. Approx. 35 linear feet total. The material is intact with no occupant exposure risk if maintained in good condition. No immediate response action is required. Full removal of this material is required prior to building demolition.

- All other suspect asbestos containing material were tested/analyzed and confirmed not to contain asbestos including all 4 to 6 layers of roofing cap sheet, tar, felts, on field areas and parapets, all exterior stucco walls, all interior wall and ceiling finishes plasters, plaster finish coats (on wood strip lather and gypsum button-board lathe), drywall, drywall joint compounds, all vinyl floor tiles and black mastics on the concrete slab throughout the grocery store, all ceramic floor and wall tile grouts, backings, underlayments in all three stores, all acoustical ceiling panels, and all minor mastics. No other suspect asbestos containing material were observed at this site

Any form of disturbance, handling, removal and disposal of the asbestos must only be performed under controlled conditions by a licensed and Cal/OSHA Registered asbestos abatement contractor.

## Lead:

- The following Lead Based Paint (LBP) coated surfaces and components were confirmed:

  ➢ Exterior grocery store wood door and window components – poor condition – approx. 65 linear feet along the west store front plus 3 linear feet on a window at the north side east end

  ➢ Exterior laundromat original store front wood posts/columns and wood soffit overhangs and trims as well as 2 upper wall windows on the south side (all covered with stucco) – all intact

  ➢ Interior laundromat ceiling level wide wood crown moldings extending above the acoustical ceiling tiles – intact

> ➢ Interior grocery stores all wood columns/posts – poor condition – 8 posts with 4 square feet of damage each only at lower base – 32 square feet

> ➢ Interior grocery store west side perimeter wood window components – poor condition – approx. 80 linear feet

> ➢ Interior grocery store all wood ceiling and crown molding trims - intact

> ➢ Interior grocery store northeast corner restrooms and food prep area original wood doors, door frames, and window components – poor condition – 4 doors/frames + 1 window frame = approx. 10 square feet damaged paint surfaces

- The following surface coatings were tested and confirmed not to be coated with LBP, dangerous levels of lead for children (DLL) or contain lead glazing: all ceramic floor and wall tiles in all three stores, all plaster and drywall walls/ceilings, acoustical ceiling panels, the original upper wall metal square window frames, sashes, mullions, as well as the painted glass, all exterior stucco walls, all yellow parking bollards and metal gates, the white and blue ground parking stripes, green exterior wood shed, green exterior concrete block walls, exterior beige yellow and green metal corrugated panels on exterior upper walls covering the metal windows, (please see all XRF test shot readings depicted in the attached photo file – the first numbers on the left of the screen in front of PbK and PbL rows are relevant).No other suspect lead surface coating was observed.

A response action is required now to stabilize, remove loose/damaged paint, and prime, seal, repaint all LBP in poor condition to reduce/eliminate hazards for children and adults entering the premises or walking alongside the building on public walkways.

The intact LBP components can remain and be demolished along with the rest of the building structure so long as the LBP is intact (additional stabilization may be required prior to demolition).

PHI perform the legally required representative lead waste characterization testing and analysis of all LBP coated wood components at this site and confirmed through Total Threshold Limit Concentration (TTLC) analysis than none leached more than 50 part per million (PPM) of lead and thus considered regular non-hazardous construction debris for disposal purposes.

## INTRODUCTION:

As requested, the property located at the above site was surveyed by PHI on July 13, 2016, for asbestos-containing materials (ACM), presumed ACM (PACM), and/or asbestos containing construction materials (ACCM) as well as lead surface coatings (paint, shellac, varnish, stain,

lacquer, glazing, etc.), water damage and mold. The survey was performed as a prerequisite for pre-occupancy, planned renovation, remodeling, or demolition activities at this site. Findings of the survey, conclusions, recommendations, and immediate response action requirements (if any) are summarized below.

This survey was conducted by the following PHI personnel: Mr. Frank Najafi, Cal/DOSH Certified Asbestos Consultant (CAC), No. 93-1185, Cal/DPH Certified Lead in Construction Inspector/Assessor, Monitor/Supervisor/Project Designer, No. 089, and ACAC Certified Mold Inspector and Indoor Environmentalist.

- The survey was comprehensive without any limitation (all accessible areas)

## ASBESTOS:

### Asbestos Definitions:

- **ACCM** – materials containing detectable quantities of asbestos, legally defined in California, as materials containing percentages of asbestos greater than one-tenth of one percent (>0.1%) by weight[1].

- **ACM**[2]. **and PACM**[3]– materials containing percentages of asbestos greater than one percent (>1%) by area

- *Friable*[4]: material that can be easily pulverized and crushed to powder by simple hand pressure; otherwise, *Non-friable*[5].

The survey included visual observation for ACM, PACM, & ACCM, sampling of accessible suspect asbestos containing building materials, and laboratory analysis. The survey was performed in compliance with requirements of the Asbestos Hazard Emergency Response Act (AHERA) 40 CFR 763, Cal/OSHA Asbestos Construction Standard Title 8 CCR 1529, The South Coast Air Quality Management District (SCAQMD) Rule 1403, as well as the National Emissions Standards For Hazardous Air Pollutants (NESHAPS) 40 CFR 61 Subpart M.

---

[1] California Code of Regulations, Title 8, Section 1529.

[2] EPA 40 CFR 763; NESHAPS 40 CFR 61

[3] PACM: Presumed Asbestos Containing Material; materials which are known asbestos containing products such as Transite cement exhaust flue pipes, shingles, paneling, or siding; or material which have a high probability of containing asbestos such as roof patch/penetration mastics; also includes material that a property owner presumed to contain asbestos without sampling/analysis. Also includes suspect asbestos containing material that were not tested.

[4] Friable: materials which can be crumbled, pulverized or reduced to powder by hand pressure when dry.

[5] Nonfriable: materials which if used as intended, cannot be broken, crumbled, pulverized or reduced to powder by hand pressure when dry; but can be made friable by mechanical means such as sanding, sandblasting, cutting, Scraping, improper handling and disposal, or leaching of matrix binders amongst other means.

Single or multi-layered physical bulk samples of suspect asbestos containing material within the specific scope of work areas were collected. The samples were placed in individual sealed containers and labeled with a unique identification number. The sample numbers, descriptions and locations were logged onto the field sampling data sheet / chain-of-custody form. All samples were then collectively delivered to

AQ Environmental Laboratories at 1508 E. 33rd Street, Signal Hill, CA 90755, for analysis by Polarized Light Microscopy (PLM) in accordance with EPA Method 600/R-93/116. AQ NVLAP Accreditation Code: 500044-0

The Laboratory is accredited by the National Institute of Standards and Technology's National Voluntary Laboratory Accreditation Program (NIST/NVLAP), participating in the American Industrial Hygiene Association (AIHA) Proficiency in Analytical Testing (PAT) Program and the AIHA/National Institute for Occupational Safety and Health (NIOSH) PAT Program.

## LEAD SURFACE COATINGS:

This survey was performed in order to determine the presence, if any, of Lead Surface Coatings on surfaces/components that might be disturbed by planned renovation activities, long term property maintenance, child safety, or future demolition. For this survey, lead testing was performed by X-Ray Fluorescent (XRF) technology. After verified calibration tests, representative readings were collected from all suspect surface coatings (paint, varnish, stain, shellac, lacquer, glazing, and porcelain or metal components) within the scope of work areas at this site.

### Lead Definitions:

• **Lead Based Paint (LBP):**

Paint or other surface coatings that contain an amount of lead equal to, or in excess of one milligram per square centimeter (1.0 mg/cm2) or more than half of one percent (0.5%) by weight (%wt.), 5,000 parts per million (ppm) or 5,000 milligrams per kilogram (mg/kg) regulated by The California Department of Public Health **(CDPH)** Title 17, California Code of Regulations, Division 1, Chapter 8: Accreditation, Certification and Work Practices for Lead-Based Paint and Lead Hazards, which implements California's Health & Safety Code 105250.

• **Los Angeles County Dangerous Level of Lead-Bearing Substance (DLL):**

Any paint, varnish, lacquer, putty, plaster, or similar coating or structural material which contains lead or its compounds in excess of 0.7 mg/cm2 or 600 ppm, or 0.06 %wt. in Los Angeles County on any premises inhabited or

frequented by children under the age of 7 years regulated by the Los Angeles County Department of Health Services, LA County Code Title 11, Health & Safety, Chapter 11.28, section 11.28.010.

## Lead Waste Characterization Sampling & Analysis Requirements

Per regulatory requirements, lead waste characterization of all lead containing surfaces/components that will be removed due to planned renovation activities is required for all project sites. The tests can be performed by the contractor or property owner. Bulk samples of the generated waste ideally after removal should be collected and submitted to a properly accredited independent lab for analysis. Up to three tests are required for each type of waste stream, i.e. drywall, plaster, wood, metal, brick, ceramic, etc. (if present and applicable to this project site) follows:

- TTLC - Total Threshold Limit Concentration

    This analysis determines the total concentration of each target analyte in a sample. Samples are analyzed using published EPA methods. When any target analyte exceeds the TTLC limits, the waste is classified as hazardous and its waste code is determined by the compound(s) that failed TTLC. The results of this analysis can be used to determine if analysis for STLC level is necessary by comparing 10 times the STLC limit to the TTLC results. A factor of ten is necessary to compensate for a 1:10 dilution factor that is present in one analysis but not the other. If the TTLC results do not exceed 10 times the STLC limit then normally no further analysis is required. TTLC analysis is performed in accordance with EPA Method SW-846, 6010B/5030

- STLC - Soluble Threshold Limit Concentration

    This analysis determines the amount of each analyte that is soluble in the "Waste Extraction Test", (W.E.T.) leachate. This W.E.T. leachate procedure is used for solid samples or for samples containing > 0.5% solids. The sample is tumbled in 10 times its weight of a 0.2M sodium citrate buffer for 48 hours. This leachate is then analyzed to determine the soluble concentrations. The STLC hazardous waste definition for lead waste in California is 5.0 mg/l per CCR Title 22, Chapter 11, Article 3. STLC Extraction "WET" analysis is performed in accordance with EPA Method SW-846, 6010B. TTLC and STLC are used when determining the hazardous waste characterization under California State regulations as outlined in Title 26 of the California Code of Regulations (CCR).

- TCLP – Toxicity Characteristic Leaching Procedure

The TCLP or Toxicity Characteristic Leaching (not Leachate) Procedure is designed to determine the mobility of both organic and inorganic analytes present in liquid, solid, and multiphasic wastes. This is usually used to determine if a waste may meet the definition of EP Toxicity, that is, carrying a hazardous waste code under RCRA (40 CFR Part 261) of D004 through D052. As it is the generator's responsibility to make this determination, but generators often contract outside labs to perform the TCLP test, these questions and answers may be helpful to generators. For this reason and sometimes in cleanup actions, businesses are often asked to perform an analysis on their waste using the TCLP. The Code of Federal Regulations (CFR) 40 CFR §261.24, outlines the 40 contaminants the TCLP analysis tests for. If a "Solid Waste" fails the test for one or more of these compounds, the waste is considered to be a characteristic hazardous waste – unless there is an exemption that applies. Bear in mind, too, that a characteristic waste may still also be a "listed" hazardous waste.

### How to interpret TTLC, STLC, and TCLP analysis results:

- If TTLC is less than 50 ppm, the waste is non-hazardous and STLC/TCLP is not required;
- If TTLC is between 50 & 100 ppm, then only STLC is required;
- If TTLC is greater than 100 ppm, then both STLC and TCLP are required.
- If STLC is greater than 5 mg/l the waste is California restricted hazardous waste.
- If STLC is less than 5/mg/l but TTLC is greater than 1,000 ppm, then the waste is Federal Resource Conservation Recovery Act (RCRA) Toxic Waste.
- If TCLP is greater than 5 mg/l the waste is RCRA Toxic Waste.
- If waste is to be disposed outside of California and contains >5mg/l of leachable lead, then STLC is not required (but still requires transportation as Hazardous Waste)

## DISCLAIMER & LIMITATIONS:

PHI performed this survey in accordance with generally accepted standards of care practiced by other members of our profession in Los Angeles County, California at the time the work was completed. The survey was limited to the areas requested by the Client. Our conclusions are limited to the conditions and findings reported for the time the survey was completed. No warranty, expressed or implied, is made. PHI will assume no responsibility or liability whatsoever for any claim, loss of property value, damage, or injury which results from pre-existing hazardous materials being encountered or present on this project site, or from the discovery of such hazardous materials.

PHI is committed to providing quality consulting services. However, asbestos and lead survey work is not an exact science. The possibility of field and general conditions, beyond PHI' control, that affect our work or that present a concern for the safety of our employees, our consultants, building occupants and the public at the site, and insurance constraints, requires that we qualify the services we provide with the following limitations:

The findings of this survey, opinions rendered, recommendations and conclusions provided in this survey report are only valid for a period of up to one year from the date of this report. Reasonable effort is made by PHI' personnel to locate and sample all suspect materials. However, for any facility the existence of unique or concealed asbestos-containing materials and debris and lead containing material and debris is a possibility. In addition, sampling and laboratory analysis constraints typically hinder the investigation. PHI does not warrant, guarantee or profess to have the ability to locate or identify all asbestos-containing materials in a facility.

Confined spaces, and areas determined by PHI' personnel as unsafe to access, are excluded from the scope of work. PHI does not employ professional cost estimators. Statements of probable construction cost or cost estimates prepared by PHI represent PHI' professional opinion of probable costs based upon current industry information. Actual costs may fluctuate due to several variables including, but not limited to, the time the work is performed, phasing, labor availability, quantity of work performed, product availability, specification requirements, and unforeseeable changes in the economy and asbestos regulations.

PHI is not, and has no responsibility as, a generator, operator, treater, storer, transporter or disposer of hazardous materials or waste found or identified as a result of PHI' work. PHI does not guarantee or warrant that the facility or workplace is safe, nor does PHI' involvement in this property relieve the Client, building owner/operator or tenant of any continuing responsibility for providing a safe facility or workplace.

This report was based on those conditions observed on the day(s) the field evaluation was accomplished. In the event that changes in the nature of the property have occurred, or additional relevant information about the property is subsequently discovered, the findings and recommendations contained in this report may not be valid unless these changes and additional relevant information are reviewed and the conclusion of this report is modified and verified in writing.

In as such that no destructive investigation has been performed during the survey, the report may not reveal concealed asbestos-containing materials. Subsequently, additional investigation including construction documents review and/or destructive investigation is recommended as a precaution to prevent accidental exposure when construction or demolition is planned for this facility (especially areas between hardwood flooring and substrates, under ceramic or porcelain tiles, multi-layered sheet vinyl flooring and substrates, within wall or ceiling cavities, etc.).

*Comprehensive Pre-Demolition Asbestos & Lead Survey Report for: 3568 Motor Avenue, Los Angeles, CA 90034*
*Performed on July 13, 2016*
*Report Date: August 12, 2016*

Please contact the undersigned should there be any questions.

Thank you for the opportunity to be of service.

## ATTACHMENTS:

- Asbestos sampling data sheet and lab analysis report
- Lead waste characterization sample data sheet and lab analysis report
- Project Drawings
- Project Photo File depicting all lead XRF test shot readings

PropertyHealth, Inc. (commercial projects)
AARDVARK Property Hazard Analysis, Co. (residential projects)

Indoor Air Quality & Contaminant Testing in Homes & The Work Place: Allergens, Odors, Asbestos, Lead Surface Coatings, Mold, Bacteria, Illicit Drug Residue, Water Intrusion Assessment, Fire Residue, and more; report preparation, abatement options, solutions, expert testimony, regulatory compliance audits

3300 S. Sepulveda Blvd Suite J23, Los Angeles, CA 90034
21922 Cortina Place, Chatsworth, CA 91311
P) 310-901-3120
F) 310-881-6965
frank@propertyhealthinc.com

An EPA Certfied Lead RRP Firm
An IICRC Certified Firm



Frank Najafi, Principal
ACAC Board Certified Indoor Environmentalist, No. 02185
ACAC Board Certified Environmental Thermography Consultant, No. 1201033
IAQA Certified Microbial Investigator, No. 161613
California DOSH Certified Asbestos Consultant, No. 93-1185
California DPH Certified Lead-Paint Consultant, No. 089
EPA Certified Lead Renovator, No. R-I-18351-10-15894
IICRC Certified in Water Damage Restoration & Applied Microbial Remediation
IICRC Certified in Fire & Smoke Restoration; Odor Control
IICRC Certified in Substrate/Subfloor Inspections
IICRC Certified Mold Removal Specialist





ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



**Be it known that**
**FRANK F. NAJAFI**
is certified in these areas:

WATER DAMAGE RESTORATION
APPLIED MICROBIAL REMEDIATION
ODOR CONTROL
FIRE & SMOKE RESTORATION
INTRO TO SUBSTRATE/SUBFLOOR INSPEC.



Renewed Thru 2016



**Be it known that**
**FRANK NAJAFI**
is certified in these areas:

Mold Removal Specialist

Renewed Thru 2016



NAT-113762-1



**thecleantrust**
**CERTIFIED**



**INSTITUTE of INSPECTION CLEANING and RESTORATION CERTIFICATION**
**CERTIFIED FIRM**



**ENVIRONMENTAL LABORATORIES**

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax: 562-206-2773

| | | |
|---|---|---|
| PropertyHealth, Inc./Aardvark Bldg Haz Analysis | **Project Number** | |
| 3300 S. Sepulveda Blvd. #J23 | **Project Name** | 3568 Motor Ave |
| Los Angeles CA 90034 | **Location** | LA, CA 90034 |
| Attn.: Frank Najafi | **PO Number** | |
| **Report Number** 1625009 | **WO Number** | |

| | | | | |
|---|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 |

**Method of Analysis**   40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-001 | 10313 Tabor- Interior Walls/Ceiling | | | | | |
| 071316-AB-01 | Drywall Joint Compound, White, Homogeneous | LAYER 1 100% | Calcium Carbonate Binder/Filler | 85% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-002 | 10313 Tabor- Interior Walls/Ceiling | | | | | |
| 071316-AB-02 | Drywall Joint Compound, White, Homogeneous | LAYER 1 100% | Gypsum Calcium Carbonate Binder/Filler | 50% 35% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-003 | 10313 Tabor- Interior Walls/Ceiling | | | | | |
| 071316-AB-03 | Drywall Joint Compound, White/Brown, Homogeneous Note: Sample appears to be drywall | LAYER 1 100% | Cellulose Fiber Fibrous Glass Gypsum | 25% <1 75% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-004 | 10313 Tabor- Bathroom | | | | | |
| 071316-AB-04 | Ceramic Floor Tile Grout & Underlayment, Gray. Homogeneous | LAYER 1 100% | Calcium Carbonate Quartz Other Non-Fibrous Material | 25% 45% 30% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-005 | 10313 Tabor- Wall | | | | | |
| 071316-AB-05 | Mirror Mastic, Black, Homogeneous | LAYER 1 100% | Cellulose Fiber Bituminous Matrix/Filler | 5% 95% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-006 | 10313 Tabor- Floor Concrete Slab under Wood Flooring | | | | | |
| 071316-AB-31 | Mastic, Black, Homogeneous | LAYER 1 100% | Cellulose Fiber Bituminous Matrix/Filler | 8% 90% | Chrysotile | 2% |
| | **Asbestos Present: Yes** | | Total % Non-Asbestos: | | 98.0% **Total %Asbestos:** | **2.0%** |

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



**ENVIRONMENTAL LABORATORIES**

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax: 562-206-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis
3300 S. Sepulveda Blvd. #J23
Los Angeles CA 90034
Attn.: Frank Najafi

**Report Number** 1625009

| | | | |
|---|---|---|---|
| **Project Number** | | | |
| **Project Name** | 3568 Motor Ave | | |
| **Location** | LA, CA 90034 | | |
| **PO Number** | | | |
| **WO Number** | | | |

| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
|---|---|---|---|
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 |

**Method of Analysis** 40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-007 | 3570 Motor- Floor | | | | | |
| 071316-AB-06 | Ceramic Floor Tile Grout & Underlayment, Gray, Homogeneous | LAYER 1 100% | Calcium Carbonate Quartz Other Non-Fibrous Material | 25% 40% 35% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-008 | 3570 Motor- Select Walls | | | | | |
| 071316-AB-07 | Joint Compound, White, Homogeneous Note: No Drywall Present | LAYER 1 100% | Calcium Carbonate Binder/Filler | 80% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-009 | 3570 Motor- Select Walls | | | | | |
| 071316-AB-08 | Joint Compound, White, Homogeneous Note: No Drywall Present | LAYER 1 100% | Calcium Carbonate Binder/Filler | 80% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-010 | 3570 Motor- Select Walls | | | | | |
| 071316-AB-09A | Drywall, White/Brown, Non-homogeneous | LAYER 1 100% | Cellulose Fiber Fibrous Glass Gypsum Mica | 40% <1 60% <1 | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-011 | 3570 Motor- Select Walls | | | | | |
| 071316-AB-09B | JC, White, Homogeneous | LAYER 1 100% | Calcium Carbonate Binder/Filler | 85% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |



ENVIRONMENTAL
LABORATORIES

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax 562-206-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis
3300 S. Sepulveda Blvd. #J23
Los Angeles CA 90034
Attn.: Frank Najafi

**Report Number** 1625009

| | |
|---|---|
| **Project Number** | |
| **Project Name** | 3568 Motor Ave |
| **Location** | LA, CA 90034 |
| **PO Number** | |
| **WO Number** | |

| | | | |
|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 36 |

**Method of Analysis**   40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-012 | 3570 Motor- Main Walls & Upper Ceiling on Wood Strip Lathe | | | | | |
| 071316-AB-10 | Plaster & Finish Coat, Green/White/Beige,  Non-homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 10% 35% 40% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-013 | 3570 Motor- Main Walls & Upper Ceiling on Wood Strip Lathe | | | | | |
| 071316-AB-11 | Plaster & Finish Coat, Green/White/Beige,  Non-homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 10% 35% 40% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-014 | 3570 Motor- Main Walls & Upper Ceiling on Wood Strip Lathe | | | | | |
| 071316-AB-12 | Plaster & Finish Coat, Green/White/Beige,  Non-homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 15% 35% 40% 10% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-015 | 3570 Motor- Main Walls & Upper Ceiling on Wood Strip Lathe | | | | | |
| 071316-AB-13 | Plaster & Finish Coat, Green/White, Non-homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 25% 30% 25% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf

**PAGE:  3  of   9**



**ENVIRONMENTAL LABORATORIES**

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax: 562-206-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis

3300 S. Sepulveda Blvd. #J23

Los Angeles CA 90034

Attn:. Frank Najafi

**Report Number** 1625009

| | | | |
|---|---|---|---|
| **Project Number** | | | |
| **Project Name** | 3568 Motor Ave | | |
| **Location** | LA, CA 90034 | | |
| **PO Number** | | | |
| **WO Number** | | | |

| | | | |
|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 |

**Method of Analysis**   40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-016 | 3570 Motor- Main Walls & Upper Ceiling on Wood Strip Lathe | | | | | |
| 071316-AB-14 | Plaster & Finish Coat, Green/White/Beige, Non-homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 10% 35% 40% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-017 | 3570 Motor- Interior Ceiling | | | | | |
| 071316-AB-15 | 2x4 Acoustic Ceiling Panels, White/Beige, Non-homogeneous | LAYER 1 100% | Cellulose Fiber Mineral Wool Perlite Binder/Filler | 35% 25% 30% 10% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-018 | 3570 Motor- Exterior Walls | | | | | |
| 071316-AB-16 | Stucco, Beige, Non-homogeneous | LAYER 1 100% | Jute Fiber Gypsum Quartz Other Non-Fibrous Material | <1% 40% 40% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-019 | 3570 Motor- Interior Walls | | | | | |
| 071316-AB-32A | Vinyl Covebase, Gray, Homogeneous | LAYER 1 100% | Vinyl Binder/ Filler | 100% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-020 | 3570 Motor- Interior Walls | | | | | |
| 071316-AB-32B | Adhesive, Yellow, Homogeneous | LAYER 1 100% | Adhesive Binders/Filler | 100% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf

**AQ** ENVIRONMENTAL
LABORATORIES

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-205-2770
Fax: 562-205-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis

3300 S. Sepulveda Blvd. #J23

Los Angeles CA 90034

Attn.: Frank Najafi

**Report Number** 1625009

| | |
|---|---|
| **Project Number** | |
| **Project Name** | 3568 Motor Ave |
| **Location** | LA, CA 90034 |
| **PO Number** | |
| **WO Number** | |

| | | | |
|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 |

**Method of Analysis**   40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-021 | 3568 Motor- Exterior Walls | | | | | |
| 071316-AB-17 | Stucco, Beige,  Non-homogeneous | LAYER 1 100% | Jute Fiber Gypsum Quartz Binder/Filler | <1% 40% 40% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-022 | 3568 Motor- Exterior Walls | | | | | |
| 071316-AB-18 | Stucco, Beige,  Non-homogeneous | LAYER 1 100% | Jute Fiber Gypsum Quartz Binder/Filler | <1% 40% 40% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-023 | 3568 Motor- Interior Floors | | | | | |
| 071316-AB-19 | 12"x12" VFT/Mastic, White,  Non-homogeneous Note:  No separable Mastic present. | LAYER 1 100% | Calcium Carbonate Vinyl Binder/ Filler | 60% 40% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-024 | 3568 Motor- Interior Floors | | | | | |
| 071316-AB-20A | 12"x12" VFT. White,  Homogeneous | LAYER 1 100% | Calcium Carbonate Vinyl Binder/ Filler | 60% 40% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-025 | 3568 Motor- Interior Floors | | | | | |
| 071316-AB-20B | Mastic, Black,  Homogeneous | LAYER 1 100% | Cellulose Fiber Adhesive Binders/Filler | 5% 95% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-026 | 3568 Motor- Interior Floors | | | | | |
| 071316-AB-21A | 12"x12" VFT, White,  Homogeneous | LAYER 1 100% | Calcium Carbonate Vinyl Binder/ Filler | 65% 35% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



**ENVIRONMENTAL LABORATORIES**

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax: 562-206-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis
3300 S. Sepulveda Blvd. #J23
Los Angeles CA 90034
Attn.: Frank Najafi

**Report Number** 1625009

| | | | |
|---|---|---|---|
| **Project Number** | | | |
| **Project Name** | 3568 Motor Ave | | |
| **Location** | LA, CA 90034 | | |
| **PO Number** | . | | |
| **WO Number** | | | |

| | | | |
|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 |

**Method of Analysis**   40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-027 071316-AB-21B | 3568 Motor- Interior Floors Mastic, Black, Homogeneous | LAYER 1 100% | Adhesive Binders/Filler | 100% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-028 071316-AB-22 | 3568 Motor- Interior Walls/Ceiling Plaster/FC, Green/White/Beige, Non- homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 10% 35% 40% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-029 071316-AB-23 | 3568 Motor- Interior Walls/Ceiling Plaster/FC, Green/White/Beige, Non- homogeneous | LAYER 1 100% | Calcium Carbonate Gypsum Quartz Other Non-Fibrous Material | 10% 35% 40% 15% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos. | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-030 071316-AB-24A | 3568 Motor- Interior Walls/Ceiling Plaster/FC, Beige, Non- homogeneous | LAYER 1 100% | Gypsum Quartz Other Non-Fibrous Material | 40% 40% 20% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-031 071316-AB-24B | 3568 Motor- Interior Walls/Ceiling Button Board, White/Brown, Non- homogeneous | LAYER 1 100% | Cellulose Fiber Gypsum | 20% 80% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |

ASBESTOS/LEAD 3568 Motor Ave LA 9K034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf


ENVIRONMENTAL
LABORATORIES

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel. 562-206-2770
Fax: 562-206-2773

| | |
|---|---|
| PropertyHealth, Inc./Aardvark Bldg Haz Analysis | **Project Number** |
| 3300 S. Sepulveda Blvd. #J23 | **Project Name** 3568 Motor Ave |
| Los Angeles CA 90034 | **Location** LA, CA 90034 |
| Attn.: Frank Najafi | **PO Number** |
| **Report Number** 1625009 | **WO Number** |
| **Date Received** 07/13/2016 | **Date Sampled** 07/13/2016 |
| **Date Analyzed** 07/18/2016 | **Sampled By** |
| **Date Reported** 07/18/2016 | **Total Samples** 38 |

**Method of Analysis** 40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-032 | 3568 Motor- Roof | | | | | |
| 071316-AB-25 | LAYER 1 All Layer Core Composite - Capsheet, White/Black, Non-homogeneous | LAYER 1 40% | Synthetic Fiber Fibrous Glass Bituminous Matrix/Filler | 20% 5% 60% | None Detected | |
| | LAYER 2 Felt, Black, Homogeneous | LAYER 2 10% | Fibrous Glass Bituminous Matrix/Filler | 15% 85% | None Detected | |
| | LAYER 3 Layered Felt/Tar, Black, Non-homogeneous | LAYER 3 30% | Fibrous Glass Bituminous Matrix/Filler | 25% 75% | None Detected | |
| | LAYER 4 Felt, Black, Homogeneous | LAYER 4 20% | Cellulose Fiber Bituminous Matrix/Filler | 65% 35% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% Total %Asbestos: | **No Asbestos Detected** |
| 1625009-033 | 3568 Motor- Roof | | | | | |
| 071316-AB-26 | LAYER 1 All Layer Core Composite - Capsheet (2 Layers), White/Black, Non-homogeneous | LAYER 1 50% | Synthetic Fiber Fibrous Glass Bituminous Matrix/Filler Other Non-Fibrous Material | 20% 5% 60% 15% | None Detected | |
| | LAYER 2 Felt, Black, Homogeneous | LAYER 2 10% | Fibrous Glass Bituminous Matrix/Filler | 15% 85% | None Detected | |
| | LAYER 3 Layered Felt/Tar, Black, Non-homogeneous | LAYER 3 15% | Fibrous Glass Bituminous Matrix/Filler | 25% 75% | None Detected | |
| | LAYER 4 Composition Roofing, White/Black, Homogeneous | LAYER 4 10% | Fibrous Glass Bituminous Matrix/Filler Other Non-Fibrous Material | 15% 65% 20% | None Detected | |
| | LAYER 5 Felt, Black, Homogeneous | LAYER 5 15% | Cellulose Fiber Bituminous Matrix/Filler | 65% 35% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% Total %Asbestos: | **No Asbestos Detected** |



**ENVIRONMENTAL LABORATORIES**

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax: 562-206-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis
3300 S. Sepulveda Blvd. #J23
Los Angeles CA 90034
Attn.. Frank Najafi
**Report Number** 1625009

| | |
|---|---|
| **Project Number** | |
| **Project Name** | 3568 Motor Ave |
| **Location** | LA, CA 90034 |
| **PO Number** | |
| **WO Number** | |

| | | | |
|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 |

**Method of Analysis** 40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|
| 1625009-034 | 3568 Motor- Roof | | | | | |
| 071316-AB-27 | LAYER 1 All Layer Core Composite - Capsheet, White/Black, Non-homogeneous | LAYER 1 40% | Synthetic Fiber Fibrous Class Bituminous Matrix/Filler | 20% 5% 60% | None Detected | |
| | LAYER 2 Felt, Black, Homogeneous | LAYER 2 15% | Fibrous Glass Bituminous Matrix/Filler | 15% 85% | None Detected | |
| | LAYER 3 Layered Felt/Tar, Black, Non-homogeneous | LAYER 3 25% | Fibrous Glass Bituminous Matrix/Filler | 25% 75% | None Detected | |
| | LAYER 4 Felt, Black, Homogeneous | LAYER 4 20% | Cellulose Fiber Bituminous Matrix/Filler | 65% 35% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-035 | 3568 Motor- Wall Seam | | | | | |
| 071316-AB-28 | Mastics, Black, Homogeneous | LAYER 1 100% | Cellulose Fiber Bituminous Matrix/Filler | 5% 95% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-036 | 3568 Motor- Around Drains | | | | | |
| 071316-AB-29 | Mastics, Black, Homogeneous | LAYER 1 100% | Bituminous Matrix/Filler | 95% | Chrysotile | 5% |
| | **Asbestos Present: Yes** | | Total % Non-Asbestos: | | 95.0% **Total %Asbestos:** | **5.0%** |
| 1625009-037 | 3568 Motor- AC Equipment | | | | | |
| 071316-AB-30 | Mastics, Black, Homogeneous | LAYER 1 100% | Cellulose Fiber Bituminous Matrix/Filler | 10% 90% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |
| 1625009-038 | 3568 Motor- Roof | | | | | |
| 071316-AB-33 | Penetration Mastic, Black, Homogeneous | LAYER 1 100% | Bituminous Material | 100% | None Detected | |
| | **Asbestos Present: No** | | Total % Non-Asbestos: | | 100.0% **Total %Asbestos:** | **No Asbestos Detected** |



ENVIRONMENTAL LABORATORIES

1508 East 33rd Street
Signal Hill, CA 90755
Toll: 888-207-2022
Tel: 562-206-2770
Fax: 562-206-2773

PropertyHealth, Inc./Aardvark Bldg Haz Analysis
3300 S. Sepulveda Blvd. #J23
Los Angeles CA 90034
Attn.: Frank Najafi

**Report Number** 1625009

| | | | |
|---|---|---|---|
| **Project Number** | | | |
| **Project Name** | 3568 Motor Ave | | |
| **Location** | LA, CA 90034 | | |
| **PO Number** | | | |
| **WO Number** | | | |

| | | | | |
|---|---|---|---|---|
| **Date Received** | 07/13/2016 | **Date Sampled** | 07/13/2016 | |
| **Date Analyzed** | 07/18/2016 | **Sampled By** | | |
| **Date Reported** | 07/18/2016 | **Total Samples** | 38 | |

**Method of Analysis** 40 CFR Part 763 Appendix E to Subpart E, EPA Method 600/M4-82-020; updated method 600 R-93/116
Determination of Asbestos in Bulk Building Materials.

## Test Report

| Laboratory ID Sample No. | Sample Location Description | Layer No. Layer % | Non-Asbestos Components | (%) | Asbestos Type | (%) |
|---|---|---|---|---|---|---|

Method Detection Limit: Less than one percent (<1%). Asbestos content has been determined using calibrated visual estimation (CVES). Samples tested were received in acceptable condition unless otherwise stated. Test report relates only to items tested. Due to PLM limitations, results on samples with None Detected or samples with low asbestos concentrations may not be reliable and further analysis such as TEM is recommended to confirm PLM results. This report shall not be reproduced except in full without the written approval of this laboratory. This report may not be used by the customer to claim product certification, endorsement, or approval by NIST/NVLAP or any agency of the government. Samples shall be disposed according to local, state and federal laws, 30 days after results are reported.

**Analyst -** Fred Chappelear

**Approved Signatory** Cristine E. Tabatt

Lab Code 500044-0

1625009                    Page 1 of 9

## CHAIN OF CUSTODY

| Deliver to: | Lab Name: | A Q | | |
|---|---|---|---|---|
| Bill to: | PropertyHealth, Inc. dba Aardvark Building Hazard Analysis | | | |
| Contact: | Frank Najafi | ❑ Email Results to: | propertyhealth@gmail.com | |
| Address: | 21922 Cortina Place | ❑ Email Results to: | | |
| City & State: | Chatsworth, CA | Zip | 91311 | ❑ Email Results to: |
| Phone: | 310-901-3102 | *DO NOT MAIL OR FAX THE RESULTS!* | | |

PropertyHealth /
Aardvark Project #:

Project Name / Address: 3568 Motor Ave
LA, CA 90034

### TURNAROUND TIME

| ❑ Same Day | ❑ 3-4 hours | ❑ 6-8 hours | ❑ 24 Hours | ❑ 48 Hours | ☒ 72 Hours | ❑ 5 Days | ❑ 1 week | ❑ 2 week |
|---|---|---|---|---|---|---|---|---|

### SAMPLE MATRIX

| ❑ Air | ☒ Bulk | ❑ Soil | ❑ Wipe | ❑ Micro-Vac | ❑ Water | ❑ Swab | ❑ Chips | ❑ Tape-Lift |
|---|---|---|---|---|---|---|---|---|

## ASBESTOS ANALYSIS

**PCM - Air**
- ❑ NIOSH 7400 (A)
- ❑ OSHA w/TWA

**TEM Air**
- ❑ AHERA 40 CFR, Part 763 Subpart E
- ❑ NIOSH 7402 Issue 2
- ❑ EPA Level II

**PLM – Bulk or Dust**
- ☑ EPA 600/R-93/116 bulk
- ❑ EPA 600/R-93/116 dust wipe Qualitative
- ❑ EPA Point Count (1,000 Points)
- ❑ EPA Point Count (1,000 Points) Gravimetric Reduction

**SOILS**
- ❑ EPA 600/R-93/116 bulk

**TEM BULK or Dust or Wipe**
- ❑ Bulk Chatfield SOP-1988-02
- ❑ Microvac Dust ASTM D 5755 (structure/cm2)
- ❑ Microvac Dust ASTM D 5756 (mass/cm2)
- ❑ TEM Wipe

## LEAD ANALYSIS

**Flame Atomic Absorption**
- ❑ Wipe, SW846-7420
- ❑ Drinking Water EPA 200.9
- ❑ Soil, SW846-7420
- ❑ Air, NIOSH 7082
- ❑ Chips, SW846-7420

**Waste Characterization**
- ❑ T/LC LEAD
- ❑ TCLP LEAD
- ❑ STLC LEAD

**Graphite Furnace Atomic Absorption**
- ❑ Air, NIOSH 7105
- ❑ Wastewater, SW846-7421
- ❑ Soil, SW846-7421
- ❑ Drinking Water, EPA 239.2

## OTHER ANALYSIS

- ❑ Indoor Fire Smoke Soot Bi-Products and Particulates Level IV including all elemental analysis and carbon black with pH by PLM, RLM, TEM, EDX, Electron Microscopy by ASTM D3649, ASTM D6602 & pH – Modified ASTM D4972
- ❑ Illicit Drugs: Methamphetamine residue by LC/MS
- ❑ PCB's

## MICROBIAL ANALYSIS

**Air Samples**
- ❑ Mold spore trap – total spore – Zefon Air-O-Cell
- ❑ Mold & Fungi by Agar Plate count & id
- ❑ Bacterial Count and Gram Stain
- ❑ Bacterial Count and Identification

**Wipe and Bulk Samples**
- ❑ Mold & Fungi – Direct Examination
- ❑ Mold & Fungi – (Culture follow up to direct examination if necessary)
- ❑ Mold & Fungi – Culture (Count only)
- ❑ Bacterial Count & Identification (3 most prominent types)

- ❑ Sewage Contamination in Buildings (Modified Total Coliform, Fecal Coliform, E.Coli, and Fecal Streptococcus)
- ❑ Coliform/Bacteria/E-Coli Presence/Absence

| Sample # (S) | | 01 | to | 33 | TOTAL # of SAMPLE containers | 33 |
|---|---|---|---|---|---|---|
| Relinquished: | | | | Date: | Time: | |
| Received: | | | | Date: 7/13/16 | Time: 1605 | |

Date: 7/13/16

1625009

Page 2 of 4.

| PropertyHealth, Inc. / Aardvark Project #: | Project Name / Address: | 3568 Motor Ave LA 90034 |
| --- | --- | --- |

| SAMPLE NUMBER | SAMPLE & MATERIAL LOCATIONS, DESCRIPTION, CONDITION | QUANTITY |
| --- | --- | --- |
| | 10313 Tabor | |
| 071316-AB-01 | Interior walls/ceiling | Drywall | Joint compound |
| 02 | " | " | " |
| 03 | " | " | " |
| 04 | Bathroom | ceramic floor tile grout & underlayment | |
| 05 | wall | mirror mastic | |
| 31 | floor | black mastic on concrete slab under wood floor | |
| | 3570 Motor | |
| 06 | floor | ceramic floor tile grout & underlayment | |
| 07 | Select walls | Drywall & JC | |
| 08 | | | |
| 09 | | | |
| 10 | Main walls & upper ceiling | Plaster & finish coat on wood slip lathe | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |

| | | Date: | Time: |
| --- | --- | --- | --- |
| Relinquished: | | 7/13/16 | |
| Received: | | 7/13/16 | 1605 |
| Relinquished: | | | |
| Received: | | | |
| Relinquished: | | | |
| Received: | | | |

1625009                    Page 3 of 4

PropertyHealth, Inc. /
Aardvark Project #:

Project Name / Address:  3568  Moter Ave
                         LA  90034

| SAMPLE NUMBER | | SAMPLE & MATERIAL LOCATIONS, DESCRIPTION, CONDITION | QUANTITY |
|---|---|---|---|
| | | 3570 Moter Anc | |
| 071316-AB -15 ✓ | | Interior Ceiling | 2x4 Acoustic Ceiling panels |
| | 16 ✓ | Exterior walls | stucco |
| | 32 | interior walls | vinyl cove base & adhesive |
| | | 3568 Moter Ave | |
| | 17 ✓ | Exterior walls, | stucco |
| | 18 ✓ | " | " |
| | 19 ✓ | Interior floors | 12x12" white VFT/Black mastic |
| | 20 ✓ | | |
| | 21 ✓ | | |
| | 22 ✓ | Interior walls/ceiling | plaster/FC |
| | 23 ✓ | | |
| | 24 ✓ | | |
| | 25 ✓ | Roof | all layer core composite |
| | 26 ✓ | | |
| | 27 ✓ | | |
| ✓ | 28 | | mastics on wall seam |
| ✓ | 29 | | mastics around drains |
| ✓ | 30 | | mastics on AC equipment |

| | | Date: | Time: |
|---|---|---|---|
| **Relinquished:** | | 7/13/16 | |
| **Received:** | | 7/13/16 | 1605 |
| **Relinquished:** | | | |
| **Received:** | | | |
| **Relinquished:** | | | |
| **Received:** | | | |

1625009          Page 4 of 4

PropertyHealth, Inc. /          Project Name / Address:
Aardvark Project #:                  3568   Mester Ave LA 90039-

| SAMPLE NUMBER | | SAMPLE & MATERIAL LOCATIONS, DESCRIPTION, CONDITION | QUANTITY |
|---|---|---|---|
| 071316-AB- | 33 | Roof | g/ry penetration mentics |

Relinquished:          Date: 7/13/16      Time:
Received:              Date: 7/13/16      Time: 1605
Relinquished:          Date:             Time:
Received:              Date:             Time:
Relinquished:          Date:             Time:
Received:              Date:             Time:

**Certificate of Analysis**
**Lead - TTLC**
**EPA Method 3050B/7000A**

tel · 714-899-8900
free · 888-743-0998
fax · 714-899-7098
www.patriotlab.com
1041 S. Placentia Avenue, Fullerton, CA 92831

**PATRIOT**
**Environmental Laboratory Services, Inc.**

Property Health, Inc.
Attn: Frank Najafi
21922 Cortina Place,
Chatsworth, CA 91311

Report Number: 618905
Project Number:
Project Name:
Project Location: 3568 Motor Ave.
Los Angeles, CA 90034

| | | | |
|---|---|---|---|
| Date Collected: | 7/15/2016 | Collected By: | |
| Date Received: | 7/18/2016 | Claim Number: | |
| Date Analyzed: | 7/19/2016 | PO Number: | |
| Date Reported: | 7/19/2016 | Number of Samples: | 3 |

| Lab/Client ID | Location | Material Description | Result (mg/kg) |
|---|---|---|---|
| 618905-001<br>071316-LWC-01 | Painted Wood | Type 1 | <15 |
| 618905-002<br>071316-LWC-01 | Painted Wood | Type 2 | 12 |
| 618905-003<br>071316-LWC-01 | Painted Wood | Type 3 | 17 |

Alyzza Cabrera - Analyst

Ian Reyes - Approved By

Reporting Limit: 20ug; Detection Limit: 6.3ug. Condition of samples as received is fair unless otherwise noted. The results reported pertain only to the items tested. Test data are accurate to two significant figures. Data have not been corrected with instrument or process blanks. Unless otherwise noted, the reported test results have passed necessary quality control requirements. This report was issued by a DOHS ELAP (Lab No.2540) accredited laboratory and may not be reproduced without the expressed written consent of Patriot Environmental Laboratory Services, Inc. This report must not be used to claim product certification, approval or endorsement by DOHS ELAP or any government agency.

618905          CHAIN OF CUSTODY          7/19 @0800



| Deliver to: | Lab Name: | Patriot | | |
|---|---|---|---|---|
| Bill to: | PropertyHealth, Inc. dba Aardvark Building Hazard Analysis | | | |
| Contact: | Frank Najafi | | ☐ Email Results to: | propertyhealth@gmail.com |
| Address: | 21922 Cor鸟na Place | | ☐ Email Results to: | |
| City & State: | Chatsworth, CA | Zip | 91311 | ☐ Email Results to: |
| Phone: | 310-901-3102 | | DO NOT MAIL OR FAX THE RESULTS! | |

PropertyHealth /
Aardvark Project #: _____

Project Name / Address: 3568 Motor Ave
Los Angeles, CA 9003:

**TURNAROUND TIME**

| ☐ Same Day | ☐ 3-4 hours | ☐ 6-8 hours | ☒ 24 Hours | ☐ 48 Hours | ☐ 72 Hours | ☐ 5 Days | ☐ 1 week | ☐ 2 week |
|---|---|---|---|---|---|---|---|---|

**SAMPLE MATRIX**

| ☐ Air | ☒ Bulk | ☐ Soil | ☐ Wipe | ☐ Micro-Vac | ☐ Water | ☐ Swab | ☐ Chips | ☐ Tape-Lift |
|---|---|---|---|---|---|---|---|---|

## ASBESTOS ANALYSIS

**PCM - Air**
☐ NIOSH 7400 (A)
☐ OSHA w/TWA

**TEM AIR**
☐ AHERA 40 CFR, Part 763 Subpart E
☐ NIOSH 7402 Issue 2
☐ EPA Level II

**PLM – Bulk or Dust**
☐ EPA 600/R-93/116 bulk
☐ EPA 600/R-93/116 dust wipe Qualitative
☐ EPA Point Count (1,000 Points)
☐ EPA Point Count (1,000 Points) Gravimetric Reduction

**SOILS**
☐ EPA 600/R-93/116 bulk

**TEM BULK or Dust or Wipe**
☐ Bulk Chatfield SOP-1988-02
☐ Microvac Dust ASTM D 5755 (structure/cm2)
☐ Microvac Dust ASTM D 5756 (mass/cm2)
☐ TEM Wipe

## LEAD ANALYSIS

**Flame Atomic Absorption**
☐ Wipe, SW846-7420
☐ Drinking Water EPA 200.9
☐ Soil, SW846-7420
☐ Air, NIOSH 7082
☐ Chips, SW846-7420

**Waste Characterization**
☒ TLC LEAD
☐ TCLP LEAD
☐ STLC LEAD

**Graphite Furnace Atomic Absorption**
☐ Air, NIOSH 7105
☐ Wastewater, SW846-7421
☐ Soil, SW846-7421
☐ Drinking Water, EPA 239.2

## OTHER ANALYSIS

☐ Indoor Fire Smoke Suot Bi-Products and Particulates Level IV including all elemental analysis and carbon black with pH by PLM, RLM, TEM, EDX, Electron Microscopy by ASTM D3849, ASTM D8602 & pH - Modified ASTM D4972
☐ Illicit Drugs: Methamphetamine residue by LC/MS
☐ PCB's

## MICROBIAL ANALYSIS

**Air Samples**
☐ Mold spore trap – total spore – Zefon Air-O-Cell
☐ Mold & Fungi by Agar Plate count & id
☐ Bacterial Count and Gram Stain
☐ Bacterial Count and Identification

**Wipe and Bulk Samples**
☐ Mold & Fungi – Direct Examination
☐ Mold & Fungi – (Culture follow up to direct examination if necessary)
☐ Mold & Fungi - Culture (Count only)
☐ Bacterial Count & Gram Stain
☐ Bacterial Count & Identification (3 most prominent types)

☐ Sewage Contamination in Buildings (Modified Total Coliform, Fecal Coliform, E.Coli, and Fecal Streptococcus)
☐ Coliform/Bacteria/E-Coli Presence/Absence

07131b - LWC - 01          Painted wood type #1
              - 02                 ✓          type #2
              - 03                 ✓          type #3

| Sample # (S) | | 01 | to | - 3 | TOTAL # of SAMPLE containers | 3 |
|---|---|---|---|---|---|---|
| Relinquished: | | | | Date: 7/15/16 | Time: | |
| Received: | SMN | | | Date: 7-18-1.16 | Time: 0800 | |

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property-Health, Inc. pdf

## Google Maps    3568 Motor Ave



Imagery ©2016 Google, Map data ©2016 Google    20 ft.

Location of confirmed asbestos containing material

7/13/16   N ↑

3568 Motor Ave Los Angeles  CA V-037



ROOF

asbestos roof mastic applied to wall separation seam on roof 73 linear feet and 6" wide = 36.5 square feet plus 25 other asbestos roof patch/penetration mastics spots scattered at base of pipes, equipment, vents, around drains, etc.

⊗ =   Asbestos
      Transite Exhaust flue pipes

All dimensions are interior wall to wall

NOT TO SCALE - PROPERTYHEALTH, INC. / AARDVARK

Location of confirmed asbestos containing material

7/13/16 N ↑

3568 Motor Ave. Los Angeles CA. 134

8 03"

57'-4"     8'-3"

53'02

FOOD
PREP
Freezer

Market      3568 Motor

41"05

5'7 Bath E

10313 Tabor
Dance
Studio

31'-03"

19 02

3570 Motor
Laundromat

44'-6"          19'-1"

650 square feet of asbestos black mastic on concrete slab under wood and ceramic flooring

All dimensions are interior wall to wall

NOT TO SCALE - PROPERTYHEALTH, INC. / AARDVARK

Location of confirmed lead-based paint (LBP) in poor condition requiring stabilization

7/13/16    N

3568 Motor Ave [...] 91384

LBP poor condition 1 sq.ft.
exterior wood window

LBP poor condition on interior/exterior wood door and window frame '03

57'-4"        8'-2'

FOOD
PREP

Freezer

52.02"

Market    3568 Motor

41'05"

5'-7  Cash E.

10313 Tabor

31-03"

19  02    3570 Motor

Laundromat

Dance
Studio

LBP in poor
condition
at base of
select
interior
columns/
posts total 6

44'-6"        19'-1"

LBP in poor condition at base of a wood
doors, 4 door frames, and a window

All dimensions are interior wall to wall

NOT TO SCALE - PROPERTYHEALTH, INC. / AARDVARK

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568- exterior east non LBP wood electrical equipment room (1).JPG



3568- exterior east non LBP wood electrical equipment room (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc..pdf



3568- exterior non asbestos or LBP stucco wall finishes (1).JPG



3568- exterior non asbestos or LBP stucco wall finishes (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568- exterior non asbetsos or LBP stucco wall finishes (3).JPG

3568- exterior non asbetsos or LBP stucco wall finishes (4).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Prosperty Health Inc...pdf



3568- exterior non asbestos or LBP stucco wall finishes (5).JPG



3568- exterior non asbestos or LBP stucco wall finishes (6).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc..pdf



356R- exterior non asbestos or LBP stucco wall finishes (2).JPG



3568- exterior non asbestos or LBP stucco wall finishes and both color coats (1).JPG



3568- exterior non asbestos or LBP stucco wall finishes and both color coats (2) JPG

3568- exterior non asbestos or LBP stucco wall finishes and both color coats (3) JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568 - exterior non-asbestos or LBP stucco wall finishes and both color coats (4).JPG



3568 - exterior non-asbestos or lead stucco walls and soffits (4).JPG

ASBESTOS LEAD 3568 Miner Ave t A 90x24 July 12 - August 12, 2016 Properwrte 4b, Inc. pdf



3568- exterior non asbestos or lead stucco walls and soffits (5).JPG



3568- exterior non asbestos or lead stucco walls and soffits (6).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12. 2016 PropertyHealth, Inc. pdf



3568- exterior non asbestos or lead stucco walls and soffits (?).JPG



3568- exterior non-LEP yellow metal parking poles, gate, blue parking stripes (1).JPG

ASBESTOS LEAD 7568 Motor Ave LA 90034 July 13 August 12, 2016 Property/Health, Inc..pdf



3568- exterior non-LBP yellow metal parking poles, gate, blue parking stripes (2).JPG



3568- exterior non-LBP yellow metal parking poles, gate, blue parking stripes (3).JPG



3568- exterior non-LBP yellow metal parking poles, gate, blue parking stripes (4).JPG



3563- exterior non-LBP yellow metal parking poles, gate, blue parking stripes (5).JPG

ASBESTOS LEAD 3568 Hoder Ave LA 9R0G1 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568- exterior north LBP coated wood window components under stucco - poor condition (1).JPG



3568- exterior north LBP coated wood window components under stucco - poor condition (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568 - exterior north LBP coated wood window components under stucco - poor condition (3).JPG



3568 - exterior north LBP coated wood window components under stucco - poor condition (4).JPG



3568 - exterior north LBP coated wood window components under stucco - poor condition (5).JPG



3569 - exterior north side non-injection of LBP stucco walls (1).JPG



3568- exterior north side non asbestos or LBP stucco walls (2).JPG



3568- exterior north side non asbestos or LBP stucco walls (3).JPG



3568- exterior north side non asbestos or LBP stucco walls (4).JPG

3568- exterior north side non asbestos or LBP stucco walls (5).JPG

ASBESTOS LEAD 3568 Moor Ave .A 90034 July 13 - August 12, 2016 Property Health, Inc. pdf



3568- exterior parking non-LBP yellow bollards and white parking stripes (1).JPG



3568- exterior parking non-LBP yellow bollards and white parking stripes (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth. Inc. pdf



3568- exterior parking non-LBP yellow bollards and white parking stripes (3).JPG



3568- exterior south LBP wood window components (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568- exterior south LBP wood window components (2).JPG



3568- exterior south side LBP coated original wood window components.JPG



3568- exterior south side non LBP wood and metal doors and frames (4).JPG



3568- exterior south side non LBP wood and metal doors and frames (5).JPG



3568- exterior south side non LBP wood and metal doors and frames (6).JPG



3568- exterior south side non LBP wood and metal doors and frames (7).JPG

ASBESTOS LF AO 3568 Motor Ave I A 90034 July 13   August 12, 2016 ProperlyHealth, Inc..pdf



3568- exterior west LBP coated original wood trims and door and window components poor condition (1).JPG



3568- exterior west LBP coated original wood trims and door and window components poor condition (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90024 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568- exterior west LBP coated original wood trims and door and window components poor condition (3).JPG



3568- exterior west LBP coated original wood trims and door and window components poor condition (4) JPG

ASBESTOS LEAD 3568 Motor Ave LA 9l0064 July 13 - August 12, 2016 PropertyHealth Inc..pdf



3568- exterior west LBP coated original wood trims and door and window components poor condition (5).JPG



3568- exterior west LBP coated original wood trims and door and window components poor condition (6).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property+Health, Inc .pdf



3568 - exterior west LBP coated original wood trims and door and window components poor condition (7).JPG



3568 - exterior west LBP coated original wood trims and door and window components poor condition (8).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568- exterior west LBP coated original wood trims and door and window components poor condition (9).JPG



3568- exterior west LBP coated original wood trims and door and window components poor condition (10).JPG

ASBESTOS LEAD 356R Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



356R- exterior west LBP coated original wood trims and door and window components poor condition (11).JPG



356R- exterior west LBP coated original wood trims and door and window components poor condition (12).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property/Health, Inc..pdf



3568- exterior west LBP coated original wood trims and door and window components poor condition (13).JPG



3568- exterior west LBP coated original wood trims and door and window components poor condition (14).JPG

ASBESTOS/LEAD 3568 Motor Ave LA 90034 July 12 - August 12, 2016 Property Health Inc..pdf



3568- exterior west LBP coated original wood trims and door and window components poor condition (15).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (1).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (2).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (3).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (4).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (5).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (6).JPG



3568- exterior west side LBP in poor condition wood trims, window and door components (7).JPG

ASBESTOS LEAD 3568 Motor Ave, LA 90034 July 13 - August 12, 2016 PropertyHealth Inc .pdf

ASBESTOS-LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealm. Inc,.pdf



3568- exterior west side LBP window frame in poor condition.JPG



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc..pdf



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (2).JPG



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (3).JPG



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (4).JPG



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (5).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (6).JPG



3568- grocery store interior rear all non-lead glazed ceramic wall and floor tiles (7).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (8).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (9).JPG

ASBESTOS LEAD 3565 Motor Ave. LA 90034 July 13. August 12. 2016 PropertyHealth Inc..pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (10).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (11).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc..pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition  (12).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition  (13).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12 2016 Property health, Inc .pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (14).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (15).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc .pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall, wood trims, window components - poor condition (1).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall, wood trims, window components - poor condition (2).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (3).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (4).JPG

ASBESTOS LEAD 3568 Mador Ave LA 90034 July 13 - August 12, 2016 Property-Health, inc .pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (5).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (6).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (7).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (8).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (9).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (10).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc..pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (11).JPG



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (12).JPG

ASBESTOS LEAD 3568 Major Ave LA 90052- July 13 - August 12, 2016 Property-Health, Inc..pdf



3568- grocery store LBP coated concrete and wood posts, columns, crownmoldings, upper wall wood trims, window components - poor condition (13).JPG



3568- interior grocery store all non-LBP plaster walls (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Pomerty-Health, Inc .pdf



3568- interior grocery store all non-LBP plaster walls (2).JPG



3568- interior grocery store all non-LBP plaster walls (3).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property-Health. Inc. pdf



3568- interior grocery store non asbestos or LBP plaster ceiling.JPG



3568- interior grocery store non asbestos vinyl floor tiles and black mastic on concrete slab (1).JPG



3568- interior grocery store non asbestos vinyl floor tiles and black mastic on concrete slab (2).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (1).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (2) JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (3) JPG

ASBESTOS LEAD 3568 Motor Ave 3568 LA 90034 July 13 - August 12, 2018 PropertyHealth, Inc. pdf



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (4).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (5).JPG



3568- interior grocery store rear all _BP coated wood door windows frames, trims, beams, etc (6).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (7).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property-Health, Inc .pdf



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (8).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (9).JPG

ASBESTOS LEAD 3566 Motor Ave LA 90034 July 13 - August 12, 2016 Property-Health. Inc. pdf



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (10).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (12).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13   August 12, 2016 Property-Health, Inc. pdf



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (12).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (13).JPG

ASBESTOS LEAD 3568 Motor Ave # LA 00234 July 13 - August 12, 2016 Property Health, Inc. pdf



7/13/2016 11:41:27

3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (14).JPG



3568- interior grocery store rear all LBP coated wood door windows frames, trims, beams, etc (15).JPG



3568- interior grocery store rear storeage no suspect asbestos or lead (1).JPG



3568- interior grocery store rear storeage no suspect asbestos or lead (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..psf



3568- interior grocery store rear storeage no suspect asbestos or lead (3).JPG



3568- interior grocery store refrigerator no Transite panels and non-lead glazed ceramic floor tiles (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealm, Inc..pdf



3568- interior grocery store refrigerator no Transite panels and non-lead glazed ceramic floor tiles (2).JPG



3568- interior grocery store refrigerator no Transite panels and non-lead glazed ceramic floor tiles (3).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Health, Inc..pdf



3568- interior grocery store refrigerator no Transite panels and non-lead glazed ceramic floor tiles (4).JPG



3568- interior grocery store refrigerator no Transite panels and non-lead glazed ceramic floor tiles (5).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property/Health, Inc..pdf



3568- interior grocery store refrigerator no Transite panels and non-lead glazed ceramic floor tiles (6).JPG



3568- interior rear grocery store LBP coated wood trims under stucco (.).JPG

ASBESTOS LEAD 3568 Mnonr Ave LA 90034 July 13 - August 12, 2016 Property Hoolth, Inc. pdf



3568- interior rear grocery store LBP coated wood trims under stucco (2).JPG



3568- interior rear grocery store LBP coated wood trims under stucco (3).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property/Health, inc..pdf



3568- interior rear grocery store LBP coated wood trims under stucco (4).JPG



3568- interior rear grocery store LBP coated wood trims under stucco (5).JPG

ASBESTOS LEAD 3568 Minor Ave LA 90034 July 13 - August 12, 2016 Property/Health, Inc. pdf



3568- interior rear grocery store non-LBP green, paint on concrete slab (1).JPG



3568- interior rear grocery store non-LBP green paint on concrete slab (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568- interior rear grocery store non-LBP green paint on concrete slab (3)_JPG



3568- interior rear grocery store non-LBP green paint on concrete slab (4).JPG



3568- interior rear grocery story LBP coated wood door frames in poor condition (1).JPG



3568- interior rear grocery story LBP coated wood door frames in poor condition (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth Inc.pdf



3568- laundry ceiling plenum ron asbestos or LBP original plaster walls and ceilings (1).JPG



3568- laundry ceiling plenum non asbestos or LBP original plaster walls and ceilings (2).JPG

ASBESTOS LEAD 3568 Motor Ave. LA 90034 July 13 - August 12, 2016 Property Health, Inc. and?



3568- laundry ceiling plenum non asbestos or LBP origina  plaster walls and ceilings (3).JPG



3568- laundry ceiling plenum non asbestos or LBP original plaster walls and ceilings (4).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568- laundry main entry original LBP coated wood columns and soffit deck blue and green under stucco and drywall (1).JPG

3568- laundry main entry original LBP coated wood columns and soffit deck blue and green under stucco and drywall (2).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12 2016 Property/Health, Inc. pdf



3568- laundry main entry original LBP coated wood columns and soffit deck blue and green under stucco and drywall (3).JPG



3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July '13, August 12, 2015 PropertyHealthIssue...pdf





3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (2).JPG



3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (3).JPG

ASBESTOS LEAD 3568 Motor Ave. LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (4).JPG



3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (5).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July '3 - August 12. 2016 PropertyHealth. Inc..pdf



3568- laundry plenum LBP original wood crown molcings and trims at ceiling level (6).JPG



3568- laundry plerum L3P original wood crown moldings and trims at ceiling level (7).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13   August 12, 2016 Property Health, Inc..pdf





7/13/2016 11:18:55

3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (8).JPG



7/13/2016 11:18:46

3568- laundry plenum LBP original wood crown moldings and trims at ceiling level (9).JPG



356R-dance studio non asbestos walls and ceilings.JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth Inc.pdf



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (2).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (3).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 15 - August 12, 2015 Property Health, Inc..pdf



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames. etc (4).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames. etc (5).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12 2016 PrimelyHealth, Inc..pdf



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames. etc (6).JPG



7/13/2016 11:28:50

3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames. etc (7).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (8).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (9).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc. pdf



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (10).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (11).JPG



3565-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (12).JPG



3565-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (13).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames. etc (14).JPG



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames. etc (15).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property Heaton, Inc..pdf



3568-dance studio non LBP surface coatings: floors, walls, ceilings, doors, frames, etc (16).JPG



3568-dance studio non LBP surface coatings: floors, walls, ceilings, doors, frames, etc (17).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property-teaim, inc..pdf



3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (18).JPG





3568-dance studio non LBP surface coatings floors, walls, ceilings, doors, frames, etc (19).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf





3568-dance studio asbestos black mastic on concrete slab under wood flooring (4).JPG



3568-dance studio asbestos black mastic on concrete slab under wood flooring (5).JPG



3568-dance studio asbestos black mastic on concrete slab under wood flooring (6).JPG



7/13/2016 11:39:57

3568-dance studio asbestos black mastic on concrete slab under wood flooring (7).JPG

ASBESTOS LFAD.3568 Motor Ave LA 5llil34 Jniy 13 - August 12, 2016 Property Health, Inc. pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (1).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (2).JPG

ASBESTOS LEAO 3558 Motor Ave LA 90034 July 13 - August 12, 2016 Property/Health, Inc..pdf



7/13/2016 12:06:06
3568-laundry non asbestos or LBP interior walls ceilings floors (3).JPG



7/13/2016 12:06:22
3568-laundry non asbestos or LBP interior walls ceilings floors (4).JPG

ASBESTOS LEAG 3568 Motor Ave LA 9C034 July 13 - August 12, 2016 PropertyHealth, Inc..pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (5).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (6).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13  August 12  2016 Property/Health, Inc. pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (7).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (8).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (9).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (10).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12 2016 Proponylchealth, Inc..pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (11).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (12).JPG



ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2015:Property:Health, In...pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (13).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (14).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth Inc..pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (15).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (16).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth. Inc..pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (17).JPG



3568-laundry non asbestos or LBP interior walls ceilings floors (18).JPG

ASBESTOS LEAD 3568 Moica Ave LA 90024 July 13 - August 12, 2016 PropertyHealth Inc..pdf



3568-laundry non asbestos or LBP interior walls ceilings floors (19).JPG



3568-laundry non asbestos original plaster walls and ceilings (1).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12. 2016 PropertyHealth. Inc. pdf



3568-laundry non asbestos original plaster walls and ceilings (2).JPG



3568-laundry non asbestos original plaster walls and ceilings (3).JPG

ASBESTOS LEAD 3568 Motor Ave LA 60034 July 13   August 12, 2015 Property Health, Inc. pdf



3568-laundry non asbestos original plaster walls and ceilings (4).JPG



3568-laundry non asbestos original plaster walls and ceilings (5).JPG



3568-laundry non asbestos original plaster walls and ceilings (6).JPG



3568-non asbestos multilayer roof core composite field area and parapets (1).JPG



3568-non asbestos multilayer roof core composite field area and parapets (2).JPG



3568-non asbestos multilayer roof core composite field area and parapets (3).JPG

ASBESTOS LEAD 3568 Vidor Ave LA 90034 July 13 - August 12 2016 Promary Health, Inc..pdf



7/13/2016 11:10:55

3568-non asbestos multilayer roof core composite field area and parapets (4).JPG



3568-non asbestos multilayer roof core composite field area and parapets (5).JPG



3568-non asbestos multilayer roof core composite field area and parapets (6).JPG



3568-non asbestos multilayer roof core composite field area and parapets (7).JPG

ASBESTOS LEAD 3568 Maine Ave. LA 90304 July 13 - August 12  2016  Property Health Inc..pdf



3568-non asbestos multilayer roof core composite field area and parapets (8).JPG



3568-non asbestos multilayer roof core composite field area and parapets (9).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 Property-Health inc. pdf



3568-non asbestos multilayer roof core composite field area and parapets (10).JPG



7/13/2018  15:57

3568-original gray asbestos roof penetration and seam mastics (1).JPG



3568-original gray asbestos roof penetration and seam mastics (2).JPG



3568-original gray asbestos roof penetration and seam mastics (3).JPG





3568-original gray asbestos roof penetration and seam mastics (4).JPG



3568-original gray asbestos roof penetration and seam mastics (5).JPG



3568-original gray asbestos roof penetration and seam mastics (6).JPG



3568-original gray asbestos roof penetration and seam mastics (7).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12, 2016 PropertyHealth, Inc .pdf



3568-original gray asbestos roof penetration and seam mastics (8).JPG



3568-original gray asbestos roof penetration and seam mastics (9).JPG



3568-original gray asbestos roof penetration and seam mastics (10).JPG



3568-original gray asbestos roof penetration and seam mastics (11).JPG



3568-original gray asbestos roof penetration and seam mastics (12).JPG



3568-original gray asbestos roof penetration and seam mastics (13).JPG



3568-original gray asbestos roof penetration and seam mastics (14).JPG



3568-original gray asbestos roof penetration and seam mastics (15).JPG

ASBESTOS LEAD 3568 Motor Ave LA 90034 July 13 - August 12 2016 PropertyHealth Inc. pdf



3568-three asbestos vertical Transite cement exhaust flue pipes (1).JPG



3568-three asbestos vertical Transite cement exhaust flue pipes (2).JPG



3568-three asbestos vertical Transite cement exhaust flue pipes (3).JPG



7/13/2016 11:00:29

3568-three asbestos vertical Transite cement exhaust flue pipes (4).JPG



3568-three asbestos vertical Transite cement exhaust flue pipes (5).JPG

| From: | Grazioli, Albert |
|---|---|
| **Sent time:** | 12/05/2017 12:48:34 PM |
| To: | Alison Regan <alison.regan@palmsnc.la>; Dana Sayles <dana@three6ixty.net> |
| Cc: | Hiro Kobayashi <h.kobayashi@rbmofca.com>; Koji Matsumoto <k.matsumoto@rbmofca.com>; GODEK, GWENN; Aviv Kleinman <aviv.kleinman@lacity.org> |
| **Subject:** | RE: PLUM Meeting on Dec. 13 |

Alison,

What the District is doing now is reviewing all of the documentation provided and developing a response as if this would have
been a more formal CEQA process (which we know was not required by the City but it will capture all of the normal things we
would have responded to had one been done, dust, noise, flagmen, pedestrian safety, etc.). We may or may not have any
issues regarding demo, pesticides, the studies that were done (or not) to date  Let us see what has been done and we will
respond very timely.

In terms of "hammering out an agreement" we don't know what you mean. The purpose of the community meeting was to
present the project to the community and get their feedback. We here in Beaudry have some ideas of improvements we may
want the developer to provide as part of the minimum requirements for the project (such as a block wall along the alley to
replace our chain link fence) and some ideas of priorities for other improvements at the school should the developer be so
inclined to work with us. Also, operationally, during construction there are things we will need to discuss given the sensitive
receptors on the school site (children in general and our DHH program in particular, not to mention the staff) that will need
further study to determine the needs.  But coming to any type of an "agreement" and the use of that phrase, particularly in
ight of the heightened concerns of the community, is probably premature.

Let's get all the information and get RBM some comments and we will see where we go from there. We do appreciate, though,
both RBM and your openness and commitment to the health and safety of our school.

Regards,

Al

Al Grazioli

Asset Development Director

LAUSD

333 South Beaudry Avenue 23rd Floor

Los Angeles, CA 90017

W: (213) 241-6457

C: (626) 688-7718

**From:** Alison Regan [mailto:alison.regan@palmsnc.la]

EX 20

Sent: Tuesday, December 05, 2017 12:18 PM
To: Dana Sayles <dana@three6ixty.net>
Cc: Grazioli, Albert <albert.grazioli@lausd.net>; Hiro Kobayashi <h.kobayashi@rbmofca.com>; Koji Matsumoto
<k.matsumoto@rbmofca.com>; GODEK, GWENN <gwenn.godek@lausd.net>; Aviv Kleinman <aviv.kleinman@lacity.org>
Subject: Re: PLUM Meeting on Dec. 13

All,

Once the district and developer have hammered out an agreement on the items mentioned last Thursday, if you could get that to
me, I'd like to put that onto a fact sheet to distribute before the meeting. I find that if the stakeholders have some information going
in that might dispel any previous misunderstandings, that's helpful in alleviating some potential tension.

And Hiro, if you could lay out your proposed timeline for the project and get that to me, that would also be helpful.

Thanks,

Alison

On Mon, Dec 4, 2017 at 9:05 PM, Dana Sayles <dana@three6ixty.net> wrote:

All... I'm getting to emails very late today, so sorry for that... yes I can help on the alley
· permit below and anything else needed ☺

three6ixty ✆
Dana A. Sayles, AICP
4309 Overland Avenue
Culver City, California 90230
T (310) 204.3500 F 204.3505
M (310) 259.8288
dana@three6ixty.net

From: "Grazioli, Albert" <albert.grazioli@lausd.net>
Date: Monday, December 4, 2017 at 11:54 AM
To: Hiro Kobayashi <h.kobayashi@rbmofca.com>
Cc: Koji Matsumoto <k.matsumoto@rbmofca.com>, "GODEK, GWENN" <gwenn.godek@lausd.net>, Alison Regan
<alison.regan@palmsnc.la>, "Dana A. Sayles, AICP" <dana@three6ixty.net>, Aviv Kleinman
<aviv.kleinman@lacity.org>

Subject: RE: PLUM Meeting on Dec. 13

From:

To:.     Hiro Kobayashi <h.kobayashi@rbmofca.com>; GODEK, GWENN; Elisa Paster <epaster@glaserweil.com>; Dana Sayles
<dana@three6ixty.net>

Subject:     RE: Palms Elementary - Estimate

Attachments:    Palms ES_Parking Lot Cost Estimate_2-7-18.pdf

Hiro,

For reference, use the attached plan (not a working drawing but a good representation) of a proposed reconfiguration of the area adjacent to your project. This plan effectively takes the area inside the chain link fence and out to the alley(s) as new. So take up the old asphalt, demo the chain link fence and put down a new base for the parking area, new concrete for the trash enclosure and a new 8' block wall with new gates, both pedestrian (chain link), trash and alley vehicular gates. We gave this plan to our estimator and he gave me back the attached estimate which has the construction costs, including a design contingency of over $352,000. Now add to that about 40% more for overhead, plans, inspection, permits, etc and you get a project that is about $500,000.

Al Grazioli
Asset Development Director

LAUSD
333 South Beaudry Avenue 23rd Floor
Los Angeles, CA 90017
W: (213) 241-6457
C: (626) 688-7718

From: Hiro Kobayashi [mailto:h kobayashi@rbmofca.com]
Sent: Monday, March 05, 2018 1:12 PM
To: Grazioli, Albert <albert.grazioli@lausd.net>; GODEK, GWENN <gwenn.godek@lausd.net>; Elisa Paster
<epaster@glaserweil.com>; Dana Sayles <dana@three6ixty.net>
Subject: Palms Elementary - Estimate

Al,

I wanted to follow up on our phone call, and let you know that we are working on the letter back to LAUSD with our commitments. We are waiting for the noise and health report to come in before we send out the letter.

In the mean time, if you are able to send over the estimate of the construction improvements regarding the wall, parking lot and kindergarten yard, it would helpful in getting the necessary approvals.

Thank you

- Hiro

--
Hiro Kobayashi
RBM of California, Inc.
2999 Overland Avenue #203
Los Angeles, CA 90064
TEL: 213-488-9039 // 310-280-1041
FAX: 310-280-1043
www.RBMofCA.com

Ex 21

| From: | |
|---|---|
| To: | Dana Sayles <dana@three6ixty.net> |
| Cc: | GODEK, GWENN; Olivia Joncich <olivia@three6ixty.net> |
| Subject: | RE: DHH acoustical standards? |

One idea for us to discuss (see attached plan). The building will cast a shadow over the entire K play ground. And currently, the only thing to separate the playground from the project (on the side where cars are entering and exiting the parking garage, is a chain link fence. The school also needs more parking. So a possible solution is for your group to pay to remove two classrooms in existing bungalows in the K play yard, pave over the area under the bungalow, restripe for K play activities, install a new chain link fence to separate a row of parking (which will now be in the shade, keeping cars cool), construct a new 8' block wall on the school's south property line [protects the school from cars that might come up ramp and crash into the fence] and new trash enclosure and gate. The parking area and trash pick-up will be accessed from the alley on the east of your project. This could all be designed quickly, and built over the summer.

This is in addition to whatever mitigation measures you will need to look into for the DHH program.

Talk to you this afternoon.

AL

Al Grazioli
Asset Development Director

LAUSD
333 South Beaudry Avenue 23rd Floor
Los Angeles, CA 90017
W: (213) 241-6457
C: (626) 688-7718

From: Dana Sayles [mailto:dana@three6ixty.net]
Sent: Wednesday, January 17, 2018 5:35 PM
To: Grazioli, Albert <albert.grazioli@lausd.net>
Cc: GODEK, GWENN <gwenn.godek@lausd.net>; Olivia Joncich <olivia@three6ixty.net>
Subject: Re: DHH acoustical standards?

Hi Al & Gwenn,

I hope you're well... we were circling back on this to see if you have those standards for us? Also we never got the letter list of items from LAUSD re: construction, etc. WE have a meeting with the opponents next week and those two items are critical to our discussion.

Please advise on status,

Dana

three6ixty🟢
Dana A. Sayles, AICP
4309 Overland Avenue
Culver City, California 90230
T (310) 204.3500 F 204.3505
M (310) 259.8288
dana@three6ixty.net

From: "Grazioli, Albert" <albert.grazioli@lausd.net>
Date: Friday, January 5, 2018 at 10:39 AM

**To:** "Dana A. Sayles, AICP" <dana@three6ixty.net>
**Cc:** "GODEK, GWENN" <gwenn.godek@lausd.net>, Olivia Joncich <olivia@three6ixty.net>
**Subject:** RE: DHH acoustical standards?

The woman who is my point of contact is out until Monday. So I should get more information then.

AL

Al Grazioli            .
Asset Development Director

LAUSD
333 South Beaudry Avenue  23rd Floor
Los Angeles, CA 90017
W: (213) 241-6457
C: (626) 688-7718

**From:** Dana Sayles [mailto:dana@three6ixty.net]
**Sent:** Friday, December 22, 2017 12:04 PM
**To:** Grazioli, Albert <albert.grazioli@lausd.net>
**Cc:** GODEK, GWENN <gwenn.godek@lausd.net>; Olivia Joncich <olivia@three6ixty.net>
**Subject:** DHH acoustical standards?

Al,

Happy Holidays.  Can you please send over your acoustical/noise standards for the DHH program? We want to provide that info to our noise consultant.

Thanks so much,

Dana

### three6ixty ❀
Dana A. Sayles, AICP
4309 Overland Avenue
Culver City, California 90230
T (310) 204.3500 F 204.3505
M (310) 259.8288
dana@three6ixty.net




### Los Angeles Unified School District
Facilities Services Division - Program/Project Controls
Estimating Unit

| BUDGET ESTIMATE | |
|---|---|
| PROJECT NAME | PROJECT NUMBER |
| **PALMS ES** | **PIC #xxxxxxx** |
| ARCHITECT | PM/DM/DAR |
| **TBD** | **ALBERT GRAZIOLI** |
| DESIGN PHASE | CHIEF ESTIMATOR |
| **BUDGET** | **LUTHER LUU** |
| PROJECT DESCRIPTION | DATE |
| **PARKING/PLAYGROUND IMPROVEMENTS** | **07-Feb-18** |

| DIVISION SUMMARY | | SITE | |
|---|---|---|---|
| 32 EXTERIOR IMPROVEMENTS | | $ | 245,518 |
| **SUBTOTAL** | | **$** | **245,518** |
| General Conditions, Overhead and Profit * | 25.00% | $ | 61,379 |
| Design Contingencies | 15.00% | $ | 46,035 |
| Escalation | | excluded | |
| **TOTAL CONSTRUCTION** | | **$** | **352,932** |

**Note:**

1 The above estimate should be updated if the documents were revised or further developed.

2 * The project was assumed to be bid out in a single contract with a general contractor. This percentage could be varied significantly if a general contractor is not required in the bid documents

3 The above estimate was based on competitive open bidding with the receipt of a minimum of 5 genuine bids. Deviation of bid amount from the above estimate for more or less than 5 bids is anticipated.

**Exclusions**

1 Escalation in labor and material beyond the date of the estimate

2 Design fees

3 Project and construction management

4 Permits and fees

5 Testing and inspection .

6 Movable furniture and equipment

7 Change orders

8 Restriction of work schedule and hours

9 Phased construction

10 Environmental related expenses



Palms ES_Parking Lot Cost Estimate_2-7-18.pdf

## Los Angeles Unified School District
### Facilities Services Division - Program/Project Controls
### Estimating Unit

| BUDGET ESTIMATE | | |
|---|---|---|

| PROJECT NAME | PROJECT NUMBER: |
|---|---|
| **FRANKLIN ES** | TBD |
| ARCHITECT | PM/DM/OAR |
| TBD | **ALBERT GRAZIOLI** |
| DESIGN PHASE | CHIEF ESTIMATOR |
| **BUDGET** | Luther Luu |
| PROJECT DESCRIPTION | DATE: |
| PARKING/PLAYGROUND IMPROVEMENTS | 7-Feb-18 |

| ITEM | QTY | UNIT | UNIT COST | SUBTOTAL | DIVISION TOTAL |
|---|---|---|---|---|---|
| **Scope definition and assumptions:** | | | | | |
| **A. Scope of Work** | | | | | |
| Add masonry block wall to south of property line | | | | | |
| Add trash enclosure and gate | | | | | |
| Add 15 parking stall along south perimeter | | | | | |
| Add chain link fence and gate to parking | | | | | |
| Remove existing portable building | | | | | |
| Patch or new asphalt paving to removed portable area | | | | | |
| Restripe play area at Kindergarten play area | | | | | |
| | | | | | |
| **B. Information received** | | | | | |
| 1 sketches and email dated 2/5/18 | | | | | |
| | | | | | |
| **C. Assumptions:** | | | | | |
| Work area will be fenced off for safety | | | | | |
| Normal working hours | | | | | |
| School will still be in operation | | | | | |
| | | | | | |
| **D. Areas:** | | | per stall | | |
| Parking area = 131'3"x43' | 6,099 | SF | 406.58 | sf | |
| Paving to trash area 35'x30' | 1,050 | SF | | | |
| Kindergarten play area (approx.) | 12,500 | SF | | | |
| | | | | | |
| **PARKING AREA DETAILS** | | | | | |
| | | | | | |
| **Demolition and removal** | | | | | $ 11,351 |
| Existing portable building | 1 | ea | | By Relocatable | |
| Sawcut asphalt paving | 209 | lf | $ 3.00 | $ 628 | |
| Remove existing asphalt paving | 7,149 | sf | $ 1.00 | $ 7,149 | |
| Miscellaneous demolition | 7,149 | sf | $ 0.50 | $ 3,574 | |
| | | | | | |
| **Grading** | | | | | $ 23,101 |
| Rough grading | 7,149 | sf | $ 1.00 | $ 7,149 | |
| Fine grading | 7,149 | sf | $ 0.75 | $ 5,362 | |
| Over excavate and recompact soil 2' deep | 530 | cy | $ 15.00 | $ 7,943 | |
| Import engineering fill and compact due to shrinkage | 132 | cy | $ 20.00 | $ 2,648 | |
| | | | | | |
| **Paving and Parking** | | | | | $ 115,268 |
| Asphalt paving and base under removed bungalow | | | | By Relocatable | |

**Los Angeles Unified School District**
Facilities Services Division - Program/Project Controls
Estimating Unit

## BUDGET ESTIMATE

| PROJECT NAME | | PROJECT NUMBER: | |
|---|---|---|---|
| **FRANKLIN ES** | | **TBD** | |
| ARCHITECT | | PM/DM/OAR | |
| **TBD** | | **ALBERT GRAZIOLI** | |
| DESIGN PHASE | | CHIEF ESTIMATOR | |
| **BUDGET** | | **Luther Luu** | |
| PROJECT DESCRIPTION | | DATE: | |
| **PARKING/PLAYGROUND IMPROVEMENTS** | | **7-Feb-18** | |

| ITEM | QTY | UNIT | UNIT COST | SUBTOTAL | DIVISION TOTAL |
|---|---|---|---|---|---|
| Asphalt paving and base, 4"+6" | 6,099 | sf | $ 6.00 | $ 36,593 | |
| Concrete paving and base to trash area | 1,050 | sf | $ 15.00 | $ 15,750 | |
| Concrete curb to trash enclosure | 50 | lf | $ 35.00 | $ 1,750 | |
| Concrete entry driveway from alley | 1 | ea | $ 3,000.00 | $ 3,000 | |
| Striping for regular parking stall | 15 | ea | $ 30.00 | $ 450 | |
| Precast concrete wheel stop | 15 | ea | $ 65.00 | $ 975 | |
| Fence mounted signage | 3 | ea | $ 100.00 | $ 300 | |
| Miscellaneous signage and directional striping | 1 | ls | $ 500.00 | $ 500 | |
| Lighting to parking area | | | | NIC | |
| Hose bib and valve to trash area | 1 | ea | $ 450.00 | $ 450 | |
| Water service and connection | 1 | ls | $ 2,000.00 | $ 2,000 | |
| Floor drain (Fox drain) and vent to trash area | 1 | ea | $ 5,000.00 | $ 5,000 | |
| Sewer line and connection | 1 | ls | $ 2,000.00 | $ 2,000 | |
| Trash bin | | | | NIC | |
| Patch, repair and seal existing play area | 12,500 | sf | $ 1.50 | $ 18,750 | |
| Premium for color asphalt paving (allow 20%) | 2,500 | sf | $ 4.50 | $ 11,250 | |
| Restripe play area marking | 12,500 | sf | $ 1.00 | $ 12,500 | |
| Protection to existing playmat and play equipment/STRUCTURE | 1 | ls | $ 2,000.00 | $ 2,000 | |
| Patch and repair to any damaged existing work | 1 | ls | $ 2,000.00 | $ 2,000 | |
| | | | | | |
| **Wall and Fencing** | | | | | **$ 95,799** |
| Chain link fencing 8' high | 179 | lf | $ 50.00 | $ 8,963 | |
| Connect new chain link fence to existing | 1 | ea | $ 200.00 | $ 200 | |
| New vehicular swing gate 20' wide | 1 | ea | $ 8,000.00 | $ 8,000 | |
| Pedestrian accessible gate 3'6" wide | 1 | ea | $ 4,000.00 | $ 4,000 | |
| Trash enclosure swing gate 30' wide | 1 | ea | $ 8,000.00 | $ 8,000 | |
| Reinforced concrete wall footing for masonry wall | 199 | lf | $ 75.00 | $ 14,944 | |
| Masonry wall 8' high | 1,343 | sf | $ 28.00 | $ 37,611 | |
| Masonry wall 6' high | 350 | sf | $ 26.00 | $ 9,100 | |
| Masonry wall cap | 199 | lf | $ 25.00 | $ 4,981 | |
| Paint to wall | 3,387 | sf | $ - | not required | |
| | | | | | **$ 245,518** |

 Technical Consultation, Data Analysis and
Litigation Support for the Environment

2656 29th Street, Suite 201
Santa Monica, CA 90405

Paul E. Rosenfeld, Ph.D.
(310) 795-2335
prosenfeld@swape.com

December 5, 2017

Olu K. Orange
Orange Law Offices, P.C.
3435 Wilshire Boulevard, Suite 2910
Los Angeles, CA 90010

Subject:      Comments on the 3568 Motor Avenue Project

Dear Mr. Orange,

We have reviewed the September 2017 Director's Determination Density Bonus & Affordable Housing
Incentives ("Determination") and associated attachments for the proposed 3568 Motor Avenue Project
("Project") located in the City of Los Angeles ("City"). The proposed Project includes the demolition of an
existing one-story three-unit commercial building, and the construction of a six-story mixed-use
commercial and residential building providing 42 apartment units, including a minimum of 4 units for
Very Low-Income Households, and 1,770 square feet of ground-floor retail. The project proposes a total
of 54 vehicular parking spaces and a total of 44 long-term and 7 short-term bicycle parking spaces. The
project consists of 20 vehicular parking spaces at the ground floor and 34 residential parking spaces in
one subterranean parking level. The total project size is limited to 29,807 square feet, and the building
will measure approximately 72 feet and 7 inches in height. The proposed project requests a haul
route to export 6,000 cubic yards of soil. Two non-protected trees are being removed.

According to the Determination report, the proposed Project qualifies for a Class 32 Categorical
Exemption, as the Project 1) is consistent with the City's General Plan and zoning; 2) occurs within City
limits on a project site of no more than five acres substantially surrounded by urban uses; 3) has no
value as habitat for endangered, rare, or threatened species; 4) will not result in any significant effects
relating to traffic, noise, air quality, or water quality; and 5) the site can be adequately served by all
required utilities and public services. Therefore, no further environmental review is required.

However, review of the Determination report and associated documents demonstrates that the
Project's potential health risk impact posed to nearby sensitive receptors has not been adequately
evaluated. Specifically, the Determination report fails to evaluate, whatsoever, the diesel particulate
matter (DPM) emissions that would be emitted during construction and operation of the proposed
Project, and therefore, there is no way to verify that a significant unmitigated air quality impact will not

1

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001001

EX 22

occur once construction commences. The California Air Pollution Control Officer's Association (CAPCOA) categorizes receptors as sensitive receptors or work receptors. According to CAPCOA,

> "Sensitive receptors refer to those segments of the population most susceptible to poor air quality (i.e., children, the elderly, and those with pre-existing serious health problems affected by air quality). Land uses where sensitive individuals are most likely to spend time include schools and schoolyards, parks and playgrounds, daycare centers, nursing homes, hospitals, and residential communities (these sensitive land uses may also be referred to as sensitive receptors). Worker receptors refer to employees and locations where people work."[1]

Thus, it is critical that the proposed Project's health related impact is evaluated, as there are numerous residences and the Palms Elementary School located directly across from the Project site. Due to the lack of evidence supporting the conclusion that the Project will not result in a significant health related impact, we find the Determination's conclusion that the Project would not result in significant impacts to be unsubstantiated, as the health impacts associated with construction and operation of the proposed Project have not been adequately addressed. A health risk assessment (HRA) should have been prepared to adequately assess the potential impacts that the Project could have on the health impacts to sensitive receptors. As such, a proper analysis of the Project's health related impacts must be conducted before the Project can claim a Class 32 Categorical Exemption under the California Environmental Quality Act (CEQA).

## Air Quality

### Diesel Particulate Matter Health Risk Emissions Inadequately Evaluated

In order to determine if the proposed Project would qualify for a Class 32 Categorical Exemption under CEQA, the Project Applicant must demonstrate that the Project would not result in significant adverse impacts. The Determination report concludes that the Project would not result in significant adverse impacts related to air quality because "the proposed Project will not cause the SCAQMD's recommended threshold levels to be exceeded" (pp. 14). Specifically, the Determination report states,

> "The project, a 29,782-square foot mixed-use building will replace an approximately 6,768-square foot existing commercial building. The project will not result in significant impacts related to air quality because it falls below interim air threshold established by DCP staff. Interim thresholds were developed by DCP staff based on CalEEMod model runs relying on reasonable assumptions, consulting with AQMD staff, and surveying published air quality studies for which criteria air pollutants did not exceed the established SCAQMD construction and operational thresholds. Possible project-related air quality concerns will derive from the mobile source emissions generated from the proposed residential uses for the project site. Operational emissions for project-related traffic will be less than significant. In addition to mobile sources from vehicles, general development causes smaller amounts of "area source" air pollution to be

[1] "Health Risk Assessments for Proposed Land Use Projects." CAPCOA, July 2009, *available at:* http://www.capcoa.org/wp-content/uploads/downloads/2010/05/CAPCOA_HRA_LU_Guidelines_8-6-09.pdf

2

generated from on-site energy consumption (natural gas combustion) and from off-site electrical generation. These sources represent a small percentage of the total pollutants. The inclusion of such emissions adds negligibly to the total significant project-related emissions burden generated by the proposed project. The proposed project will not cause the SCAQMD's recommended threshold levels to be exceeded. Operational emission impacts will be at a less-than-significant level" (pp. 14).

In 2012, pursuant to Senate Bill 226 (SB 226), the Office of Planning and Research (OPR) developed and adopted additions to CEQA Guidelines that set forth a streamlined CEQA review process for infill projects.[2] CEQA Guidelines Section 15332, referred to as Class 32 Exemption, allows infill developments within urbanized areas to be exempt from CEQA review if a proposed development meets specific criteria.[3] However, one of the mandatory criterion listed in Section 15332 of the CEQA Guidelines state that projects can be characterized as infill developments only if "approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality".[4] As a result of the Determination report's assertion that the Project would not result in significant impacts, it concludes that the proposed Project is "categorically exempt from environmental review" (pp. 14). The Determination report states,

"The proposed incentives will not have a specific adverse impact. A 'specific adverse Impact' is defined as 'a significant, quantifiable, direct and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete' (LAMC Section 12.22.A.25(b)). The proposed Project and potential impacts were analyzed in accordance with the California Environmental Quality Act (CEQA) Guidelines and the City's L.A. CEQA Thresholds Guide. These two documents establish guidelines and thresholds of significant impact, and provide the data for determining whether or not the impacts of a proposed Project reach or exceed those thresholds. Analysis of the proposed Project determined that it is Categorically Exempt from environmental review pursuant to State CEQA Guidelines Article 19, Sections 15304 (Class 4) and 15332 (Class 32), and City CEQA Guidelines Article III, Section 1, Class 4 Category 1. The Class 32 Exemption is intended to promote infill development within urbanized areas" (pp. 10).

This reasoning and subsequent conclusion, however, are incorrect, as the Determination report fails to evaluate, whatsoever, the potential health-related impacts that construction and operation of the proposed Project would pose to nearby sensitive receptors. Simply because the proposed Project is an infill project does not mean that the Project's potential health related impact would inherently be less than significant. Thus, it is evident that although the proposed Project is an infill development project, it should not be exempt from a CEQA review until the Project's health-related impacts are properly

---

[2] "CEQA Streamlining for Infill Projects (SB 226)." The Governor's Office of Planning and Research, *available at:* https://www.opr.ca.gov/s_sb226.php

[3] "State CEQA Guideline Section 15183.3: Streamlining for Infill Projects." OPR, February 2013, *available at:* https://www.opr.ca.gov/docs/Section_15183.3_feb2013.pdf

[4] "CEQA Guidelines Section 15332." California Natural resources Agency, *available at:* http://resources.ca.gov/ceqa/guidelines/art19.html

3

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001003

assessed. As such, we find the conclusions made within the Determination to be unsubstantiated and should not be relied upon to determine Project significance.

According to the South Coast Air Quality Management District (SCAQMD), the lead air pollution control agency for the proposed Project, a health risk assessment should be performed for any project that is expected to generate mobile emissions from diesel powered equipment and trucks. According to SCAQMD's Mobile Source Toxics Analysis page on AQMD's website (emphasis added),

> "In August 2002, the SCAQMD's Mobile Source Committee approved the 'Health Risk Assessment Guidance for Analyzing Cancer Risks from Mobile Source Diesel Emissions.' This document provided guidance for analyzing cancer risks from diesel particulate matter from mobile sources at facilities such as truck stops and warehouse distribution centers. Subsequently, SCAQMD staff revised the aforementioned document to expand the analysis to provide technical guidance for analyzing cancer risks from potential diesel particulate emissions impacts from truck idling and movement (such as, but not limited to, truck stops, warehouse and distribution centers, or transit centers), ship hoteling at ports, and train idling. This revised guidance document titled, 'Health Risk Assessment Guidance for Analyzing Cancer Risks from Mobile Source Diesel Idling Emissions for CEQA Air Quality Analysis' was presented to and approved by the SCAQMD's Mobile Source Committee at its March 28, 2003 committee meeting. It is suggested that projects with diesel powered mobile sources use the following guidance document to quantify potential cancer risks from the diesel particulate emission".[5]

As you can see in the excerpt above, the SCAQMD explicitly states that in the event that the proposed Project generates or attracts vehicular trips, a mobile source health risk assessment must be prepared. As noted in the Determination report, Project construction is expected to "temporarily create emissions of dusts, fumes, equipment exhaust, and other air contaminants", therefore, it is reasonable to assume that a significant amount of DPM, a known human carcinogen, will be emitted from the exhaust stacks of construction equipment the Project proposes to use (p. 13). Once operational, the Project's commercial land use will result in frequent truck deliveries, or approximately 153 daily truck trips according to the Project's Transportation Impact Study, while the Project's residential land uses are expected to generate approximately 326 daily vehicle trips (Transportation Study, pp. 41). Thus, it is reasonable to assume that large amounts of diesel exhaust will be generated over the duration of Project operation. As such, a proper HRA should have been conducted prior to approval of the Project, as long-term exposure to DPM and other toxic air contaminants (TACs) may result in a significant health risk impact and therefore, should be properly assessed.

Furthermore, it is critical that a proper HRA be prepared for the proposed Project, as health risk analyses conducted for similar CEQA projects within the City of Los Angeles have demonstrated significant impacts. For example, SWAPE conducted a screening-level HRA for The View project (SCH No.

---

[5] "Mobile Source Toxics Analysis." SCAQMD, *available at*: http://www.aqmd.gov/home/regulations/ceqa/air-quality-analysis-handbook/mobile-source-toxics-analysis

4

2017041016)[6] to determine whether or not the project would result in significant health risk impacts.
The View project proposed to construct a multi-family residence lot and 88 attached residential
condominium dwelling units on 1.84 acres of land. SWAPE's screening level HRA demonstrated that the
excess cancer risk posed to adults, children, and infants located approximately 1 meter away from the
Project site (similar to the proposed Project) would be approximately 43, 290, and 250 in one million,
respectively.[7] Furthermore, the analysis demonstrated that the excess cancer risk over the course of a
residential lifetime (30 years) was approximately 580 in one million.[8] The infant, child, adult, and lifetime
cancer risks all exceeded the SCAQMD's threshold of 10 in one million. Thus, our analysis demonstrated
that that when the project's health-related impacts were properly assessed, we found that emissions
released during construction and operation of The View project would pose a significant health risk to
nearby sensitive receptors. Seeing as The View project is similar to the proposed Project, it is reasonable
to assume that the 3558 Motor Avenue Project could also result in similar, significant health-related
impacts. As such, a proper HRA should have been conducted prior to Project approval, as exposure to
DPM and other TACs may result in a significant health risk impact and therefore, should be properly
assessed.[9]

A quantitative analysis of the Project's health-related impacts should have been prepared and the
results of this analysis should have been compared to applicable thresholds. The SCAQMD provides a
specific numerical threshold of 10 in one million for determining a project's health risk impact.[10]
Therefore, the Project Applicant should have conducted an assessment that compares the Project's
combined construction and operational health risk to this threshold in order to determine the Project's
health risk impact. By failing to prepare an HRA, the Determination fails to provide a comprehensive
analysis of the sensitive receptor impacts that may occur as a result of exposure to substantial air
pollutants.

Due to the reasons listed above, we find that there is substantial evidence indicating that the proposed
Project could result in a potentially significant impact to the surrounding environment, something that
the Determination and associated documents failed to evaluate or even address. Without the findings of
a quantified HRA, the Project lacks a comprehensive analysis of the sensitive receptor impacts that may
occur as a result of exposure to the Project's potentially substantial air pollutant emissions. As such, a
proper analysis must be conducted in order to determine the impact that the proposed Project will have

[6] The View Initial Study/Mitigated Negative Declaration (SCH No. 2017041016), *available at*:
http://uha1979.org/assets/RPC_staff_recommendations_re_the_View_07.21.2017.pdf
[7] See SWAPE October 23, 2017 Comments for The View Project, p. 10
[8] *ibid.*
[9] We acknowledge that The View project has a larger building square footage and lot acreage compared to the
proposed Project. However, as discussed, the excess cancer risk posed by The View project far exceeds applicable
thresholds. Additionally, the proposed Project includes 1,770 square feet of commercial land use, which will result
in frequent truck and delivery vehicle trips during operation. Therefore, it is possible that the cancer risk for the
proposed Project, although smaller than The View project, could still result in a significant health-related impact.
[10] http://www.aqmd.gov/docs/default-source/ceqa/handbook/scaqmd-air-quality-significance-
thresholds.pdf?sfvrsn=2

5

on the health of school children attending the Palms Elementary School and on residents living near the
Project site.

Finally, due to the ongoing nature of this matter, we reserve the right to modify our work, opinion, and
any information presented in this document, and any revisions in the future, as reasonably accessible
information becomes available that materially-affects the findings and conclusions stated herein.

Sincerely,

Paul E. Rosenfeld, Ph.D.

Hadley Nolan

6

PALMS ELEMENTARY / OBJECTORS EXHIBITS: 001006

23

```
**********************
*** FAX TX REPORT ***
**********************

        TRANSMISSION OK

JOB NO.                 1186
DEPT. ID                1
DESTINATION ADDRESS     912139781027
SUBADDRESS
DESTINATION ID
ST. TIME                07/18 14:03
TX/RX TIME              00' 28
PGS.                    2
RESULT                  OK
```



July 18, 2018

CITY OF LOS ANGELES
CITY COUNCIL
*via* CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
FAX: (213) 978-1027

HIRO KOBAYASHI
3568 MOTOR LLC
800 S. Figueroa Street, #960
Los Angeles, CA 90017
FAX: (310) 280-1043

<u>VIA FAX & US MAIL</u>

RE:  Notice of Intent to Sue
     3568 Motor Avenue, Los Angeles, California 90034
     LA City File No. DIR-2016-4880-DB; ENV-2016-4881-CE

Please take notice, under Public Resources Code Section 21167.5, that S.G., A.D.G.,
R.L., N.B., A.G., Christal Lord and Dyanna Sanabria intend to file a petition, *inter
alia,* under the provisions of the California Environmental Quality Act against
respondents City of Los Angeles, Los Angeles City Council, Hiro Kobayashi and
3568 MOTOR LLC in connection with the above-referenced matter.

DATED: July 18, 2018            LEARNING RIGHTS LAW CENTER

Ex 23



July 18, 2018

CITY OF LOS ANGELES
CITY COUNCIL
*via* CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
FAX: (213) 978-1027

HIRO KOBAYASHI
3568 MOTOR LLC
800 S. Figueroa Street, #960
Los Angeles, CA 90017
FAX: (310) 280-1043

VIA FAX & US MAIL

RE:   Notice of Intent to Sue
      3568 Motor Avenue, Los Angeles, California 90034
      LA City File No. DIR-2016-4880-DB; ENV-2016-4881-CE

Please take notice, under Public Resources Code Section 21167.5, that S.G., A.D.G., R.L., N.B., A.G., Christal Lord and Dyanna Sanabria intend to file a petition, *inter alia*, under the provisions of the California Environmental Quality Act against respondents City of Los Angeles, Los Angeles City Council, Hiro Kobayashi and 3568 MOTOR LLC in connection with the above-referenced matter.

DATED: July 18, 2018

LEARNING RIGHTS LAW CENTER

By: Patricia A. Van Dyke

205 S. Broadway Avenue, Suite 808, Los Angeles, CA 90012
Phone: 213-489-4030     Fax: 213-489-4033

# PROOF OF SERVICE

**STATE OF CALIFORNIA**     }   **SS.**
**COUNTY OF LOS ANGELES**     }

    I am employed in the County of Los Angeles, State of California. I am over the age
of 18 and not a party to the within action; my business address is: 205 S. Broadway, Suite
808, Los Angeles, California 90012.

On July 18, 2018, I served the following Documents: **PLAINTIFFS S.G., A.D.G., R.L.,
N.B., A.G., LORD AND SANABRIA'S NOTICE OF INTENT TO SUE** upon the
interested parties in this action in addressed as follows:

| CITY OF LOS ANGELES<br>CITY CLERK<br>200 North Spring Street,<br>Room 395, City Hall<br>Los Angeles, CA 90012<br>TEL: (213) 978-1133 / FAX: (213) 978-1027 | HIRO KOBAYASHI<br>3568 MOTOR LLC<br>800 S. FIGUEROA ST #960<br>LOS ANGELES, CA 90017<br>TEL: (213) 488-9039 / FAX: (310) 280-1043 |
|---|---|

| X | **(Via Facsimile)** I transmitted via facsimile to the persons above, at the listed
facsimile numbers, the documents listed above by entering those facsimile numbers into a
facsimile machine on my business premises and pressing send.

|   | **(By Electronic Mail )** I transmitted the above-described materials in PDF format via
an e-mail message having a subject header including the case name and number in the instant
case and an attachment containing the above described materials.

| X | **(Via U.S. Mail )** I am readily familiar with the practice for mailing with the
UNITED STATES POSTAL SERVICE; such envelope was deposited postage prepaid
with the UNITED STATES POSTAL SERVICE on the above date according to ordinary
business practices.

**Executed on July 18, 2018, at Los Angeles, California.**

| X | **(State)** I declare under penalty of perjury under the laws of the State of California
that the above is true and correct.

| X | **(Federal)** I declare that I am employed in the office of a member of the bar of this
Court at whose discretion the service was made.

                                        Aracely Ortez White.



CHANGING LIVES THROUGH EDUCATION ADVOCACY

BOARD OF DIRECTORS

LILY CORZO
Chair
Capitol Research

DR. JILL BICKETT
Secretary
Loyola Marymount University

XA WHITE
Juror
Caston Advocate

ALICIA MIÑANA de LOVELACE
Founding Chair
Law Offices of Alicia Miñana

MATT CAVE
Morrison & Foerster

WENDY HARPER
Ernst & Young LLP

GARY ROBERTS
Dentons US LLP

JASON RUDOLPH
Attorney

ERIC SAGERMAN
Winston & Strawn LLP

TINA STECK
Attorney

JOSEPH TELTSER
Carmel Group LLC

MARJBETH TOWERS
Major League Soccer

MARYSOL SANCHEZ VELAMOOR
Attorney

STAFF

INÉS KUPERSCHMIT
Co-Executive Director & Co-Founder

JANEEN STEEL
Co-Executive Director & Co-Founder

PATRICIA REYES
Finance and Office Manager

KYRA CLIPPER
Advocacy for Children with
Autism Program Director

SAMANTHA COCHRAN
Education Rights Clinic Director

ALFO ESTRADA
Community Engagement & Policy Director

CAROL JUNG
Los Angeles Medical-Legal
Collaborative for Education Director

PATSY VAN DYKE
Impact Litigation Attorney

ERIN BURRIS
Staff Attorney

NANCY SHEA
Staff Attorney

QIONGYUE HU
Harvard Law Fellow

VIVIAN WONG
Skadden Law Fellow

MARISOL CHIANELLO
Pro Bono Manager

ARACELY ORTEZ WHITE
Paralegal

AZRA VARISCIC
Development Manager

AARON BICART
Development Associate

LETICIA MEJIA
Education Rights Clinic Advocate

CARMEN REYNAGA
TIGER Coordinator

SERGEI HASENECZ
Legal File Clerk

GABRIELA GARCIA
Administrative Assistant

MELISSA VASQUEZ
Reception.st and
Administrative Assistant

JOSH MORALES
...

July 18, 2018

Via Fax Only to: (310) 843-2655

Elisa L. Paster, Esq
Glaser Weil
Epaster@GlaserWeilcom

Re:     S.G. et. al. v. City of Los Angeles, et. al.

Dear Ms. Paster:

I am providing you with a courtesy copy of our Notice of Intent to Sue regarding the above matter. Our office had attempted to notify Hiro Kobayashi, 358 Motor LLC via fax. To (310) 280-1043. However, it appears that the fax transmission was unsuccessful. I have provided you with our proof of unsuccessful fax transmission.

Sincerely,

Aracely Ortez White

Paralegal to Patricia A. Van Dyke, Esq.

705 S. Broadway, Suite 808 • Los Angeles, CA 90012 • Phone (213) 489-4030 • Fax: (213) 489-4033
www.learningrights.org



July 18, 2018

CITY OF LOS ANGELES
CITY COUNCIL
*via* CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
FAX: (213) 978-1027

HIRO KOBAYASHI
3568 MOTOR LLC
800 S. Figueroa Street, #960
Los Angeles, CA 90017
FAX: (310) 280-1043

VIA FAX & US MAIL

RE:   Notice of Intent to Sue
      3568 Motor Avenue, Los Angeles, California 90034
      LA City File No. DIR-2016-4880-DB; ENV-2016-4881-CE

Please take notice, under Public Resources Code Section 21167.5, that S.G., A.D.G.,
R.L., N.B., A.G., Christal Lord and Dyanna Sanabria intend to file a petition, *inter
alia,* under the provisions of the California Environmental Quality Act against
respondents City of Los Angeles, Los Angeles City Council, Hiro Kobayashi and
3568 MOTOR LLC in connection with the above-referenced matter.

DATED: July 18, 2018                    LEARNING RIGHTS LAW CENTER

                                        By: Patricia Van Dyke

                                        Patricia A. Van Dyke

205 S. Broadway Avenue, Suite 808, Los Angeles, CA 90012
Phone: 213-489-4030     Fax: 213-489-4033

# PROOF OF SERVICE

**STATE OF CALIFORNIA**     }   **ss.**
**COUNTY OF LOS ANGELES**     }

    I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 205 S. Broadway, Suite 808, Los Angeles, California 90012.

On July 18, 2018, I served the following Documents: **PLAINTIFFS S.G., A.D.G., R.L., N.B., A.G., LORD AND SANABRIA'S NOTICE OF INTENT TO SUE** upon the interested parties in this action in addressed as follows:

| | |
|---|---|
| CITY OF LOS ANGELES<br>CITY CLERK<br>200 North Spring Street,<br>Room 395, City Hall<br>Los Angeles, CA 90012<br>TEL: (213) 978-1133 / FAX: (213) 978-1027 | HIRO KOBAYASHI<br>3568 MOTOR LLC<br>800 S. FIGUEROA ST #960<br>LOS ANGELES, CA 90017<br>TEL: (213) 488-9039 / FAX: (310) 280-1043 |

[X]    **(Via Facsimile)** I transmitted via facsimile to the persons above, at the listed facsimile numbers, the documents listed above by entering those facsimile numbers into a facsimile machine on my business premises and pressing send.

[ ]    **(By Electronic Mail )** I transmitted the above-described materials in PDF format via an e-mail message having a subject header including the case name and number in the instant case and an attachment containing the above described materials.

[X]    **(Via U.S. Mail )** I am readily familiar with the practice for mailing with the UNITED STATES POSTAL SERVICE; such envelope was deposited postage prepaid with the UNITED STATES POSTAL SERVICE on the above date according to ordinary business practices.

**Executed on July 18, 2018, at Los Angeles, California.**

[X]    **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[X]    **(Federal)** I declare that I am employed in the office of a member of the bar of this Court at whose discretion the service was made.

Aracely Orez White

```
****************************
*** FAX ERROR TX REPORT ***
****************************

TX FUNCTION WAS NOT COMPLETED

JOB NO.                  1189
DEPT. ID                 1
DESTINATION ADDRESS      913102801043
SUBADDRESS
DESTINATION ID
ST. TIME                 07/18 14:16
TX/RX TIME               00'00
PGS.                     0
RESULT                   NG
                         0        #018  BUSY/NO SIGNAL
```



July 18, 2018

CITY OF LOS ANGELES
CITY COUNCIL
via CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
FAX: (213) 978-1027

HIRO KOBAYASHI
3568 MOTOR LLC
800 S. Figueroa Street, #960
Los Angeles, CA 90017
FAX: (310) 280-1043

VIA FAX & US MAIL

RE:   Notice of Intent to Sue
      3568 Motor Avenue, Los Angeles, California 90034
      LA City File No. DIR-2016-4880-DB; ENV-2016-4881-CE

Please take notice, under Public Resources Code Section 21167.5, that S.G., A.D.G.,
R.L., N.B., A.G., Christal Lord and Dyanna Sanabria intend to file a petition, *inter
alia*, under the provisions of the California Environmental Quality Act against
respondents City of Los Angeles, Los Angeles City Council, Hiro Kobayashi and
3568 MOTOR LLC in connection with the above-referenced matter.

DATED: July 18, 2018                       LEARNING RIGHTS LAW CENTER

```
U//18/2018 WED 14:10    FAX 213 489 4033    #:6792    Learning Rights    @001

                    ****************************
                    *** FAX ERROR TX REPORT ***
                    ****************************

                    TX FUNCTION WAS NOT COMPLETED


        JOB NO.                      1187
        DEPT. ID                     1
        DESTINATION ADDRESS          913102801043
        SUBADDRESS
        DESTINATION ID
        ST. TIME                     07/18 14:09
        TX/RX TIME                   00'00
        PGS.                         0
        RESULT                       NG
                                     0        #018   BUSY/NO SIGNAL
```



July 18, 2018

CITY OF LOS ANGELES
CITY COUNCIL
*via* CITY CLERK
200 North Spring Street,
Room 395, City Hall
Los Angeles, CA 90012
FAX: (213) 978-1027

HIRO KOBAYASHI
3568 MOTOR LLC
800 S. Figueroa Street, #960
Los Angeles, CA 90017
FAX: (310) 280-1043

VIA FAX & US MAIL

RE:    Notice of Intent to Sue
       3568 Motor Avenue, Los Angeles, California 90034
       LA City File No. DIR-2016-4880-DB; ENV-2016-4881-CE

Please take notice, under Public Resources Code Section 21167.5, that S.G., A.D.G.,
R.L., N.B., A.G., Christal Lord and Dyanna Sanabria intend to file a petition, *inter
alia*, under the provisions of the California Environmental Quality Act against
respondents City of Los Angeles, Los Angeles City Council, Hiro Kobayashi and
3568 MOTOR LLC in connection with the above-referenced matter.

DATED: July 18, 2018                        LEARNING RIGHTS LAW CENTER

```
*********************
*** FAX TX REPORT ***
*********************

            TRANSMISSION OK

JOB NO.                 1193
DEPT. ID                1
DESTINATION ADDRESS     913108432655
SUBADDRESS
DESTINATION ID
ST. TIME                07/18 14:49
TX/RX TIME              02'38
PGS.                    5
RESULT                  OK
```

**BOARD OF DIRECTORS**

LILY CORZO
Chair
Capitol Research

DR. JILL BICKETT
Secretary
Loyola Marymount University

ERIKA WHITE
Treasurer
Education Advocate

ALICIA MIÑANA de LOVELACE
Founding Chair
Law Offices of Alicia Miñana

MATT CAVE
Morrison & Foerster

WENDY HARPER
Ernst & Young LLP

GARY ROBERTS
Deutsche US LLP

JASON RUDOLPH
Attorney

ERIC SAGERMAN
Winston & Strawn LLP

TINA STECK
Attorney

JOSEPH YELTSER
Consort Group LLC

MARIBETH TOWERS
Major League Soccer

MARYSOL SANCHEZ VILLAMOOR
Attorney

**STAFF**

INES KUPERSCHMIT
Co-Executive Director & Co-Founder

JANEEN STIKL
Co-Executive Director & Co-Founder

PATRICIA REYES
Finance and Office Manager

KYRA CLIPPER
Advocacy for Children with
Autism Program Director

SAMANTHA COGHLAN
Education Rights Clinic Director

RODOLFO ESTRADA
Community Engagement & Policy Director

CAROL JUNG
Los Angeles Medical-Legal
Collaborative for Education Director

PATSY VAN DYKE
Impact Litigation Attorney

ERIN BURNS
Staff Attorney

NANCY SHEA
Staff Attorney

QIONGYUE HU
Harvard Law Fellow

VIVIAN WONG
Sheehan Law Fellow

MARISOL CHARRELLO
Pro Bono Manager

ARACELY ORTEZ WHITE
Paralegal

AZRA VARISCIC
Development Manager



*CHANGING LIVES THROUGH EDUCATION ADVOCACY*

July 18, 2018

Via Fax Only to: (310) 843-2655

Elisa L. Paster, Esq
Glaser Weil
Epaster@GlaserWeilcom

Re:   *S.G. et. al. v. City of Los Angeles, et. al.*

Dear Ms. Paster:

I am providing you with a courtesy copy of our Notice of Intent to Sue regarding the above matter. Our office had attempted to notify Hiro Kobayashi, 358 Motor LLC via fax. To (310) 280-1043. However, it appears that the fax transmission was unsuccessful. I have provided you with our proof of unsuccessful fax transmission.

Sincerely,

Aracely Ortez White

Paralegal to Patricia A. Van Dyke, Esq.